**No. 2023-1005 and 2023-1007**

**IN THE**

# United States Court of Appeals for the Federal Circuit

**SOFTVIEW LLC**,
*Appellant,*

*v.*

**APPLE INC. and MOTOROLA MOBILITY LLC**,
*Appellees*

**KATHERINE K. VIDAL, Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office,**
*Intervenor*

APPEAL FROM
THE UNITED STATES PATENT AND TRADEMARK OFFICE,
PATENT TRIAL AND APPEAL BOARD
IN REEXAMINATION CONTROL NOS. 95/000,634 AND 95/002,132

## BRIEF OF APPELLANT SOFTVIEW LLC (CORRECTED)

R. ALAN BURNETT

**LAW OFFICE OF R. ALAN BURNETT**

4108 131st Ave SE
Bellevue WA 98006
(425) 417-4729

*Attorneys for Appellant*
SOFTVIEW LLC

June 1, 2023

Representative Claim 1:

87. A mobile hand-held device, comprising:

a processor,

a wireless communications interface, to facilitate wireless communication with a network that supports access to the Internet;

a display; and

non-volatile memory, operatively coupled to the processor, in which a plurality of instructions are stored that when executed by the processor enable the mobile hand-held device to perform operations including,

rendering a browser interface on the display via which a user is enabled to request access to a Web page comprising HTML-based Web content defining an original page layout, functionality, and design of content on the Web page;

in response to a user request of the Web page,

retrieving the Web page via the wireless communications interface;

rendering the Web page such that a width of the Web page is rendered to fit across the display; and

re-rendering the display in response to associated user inputs to enable the Web page to be browsed at various zoom levels and panned views while preserving the original page layout, functionality, and design of the Web a e content at each zoom level and panned view.

# CERTIFICATE OF INTEREST



## UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2023-1005 and 2023-1007

**Short Case Caption** SoftView LLC v. Apple Inc.

**Filing Party/Entity** SoftView LLC

**Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box**. Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 06/01/2023

Signature: /s/ R. Alan Burnett

Name: R. Alan Burnett

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| SoftView LLC | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ........ i

TABLE OF AUTHORITIES ........ viii

STATEMENT OF RELATED CASES ........ xiv

JURISDICTIONAL STATEMENT ........ 1

INTRODUCTION ........ 2

STATEMENT OF THE ISSUES ........ 3

STATEMENT OF THE CASE ........ 4

I. PROCEDURAL BACKGROUND ........ 4

SUMMARY OF THE ARGUMENT ........ 5

ARGUMENT ........ 6

I. STANDARD OF REVIEW ........ 6

II. APPLICATION OF C.F.R § 42.73(d)(3)(i) ........ 6

A. C.F.R § 42.73(d)(3)(i) Estoppel is Not Applicable to Any Claim on Appeal ........ 6

1. 37 C.F.R. § 42.73(d)(3)(i) Does Not Apply to Issued Claims ........ 10

2. Applying § 42.73(d)(3)(i) to Issued Claims Would Be Contrary to Law ........ 13

a) 35 U.S.C. §§ 301(a)(1) and 311 (pre-AIA) ........ 14

b) 35 U.S.C. § 304 ........ 14

c) 35 U.S.C. § 316 ........ 15

**Page**


3. "Patentably Indistinct" Means "Substantially" or "Essentially the Same" .................. 15

B. § 42.73(d)(3) Estoppel Must Apply Traditional Principles of Collateral Estoppel/Issue Preclusion ................ 18

C. Elements of Collateral Estoppel Are Not Met ....................... 19

1. The Issues Are Not Identical ...................................... 20

2. The Issues were Not Actually Litigated in the First Action .......................................................... 22

3. Only Possible Resolution of Issue Essential to the Judgment was Claim Construction .................... 23

4. Patent Owner Did Not Have a Full and Fair Opportunity to Litigate Issues in The First Action ......................................................................... 24

a) Burden Shifted to Patent Owner to Prove Patentability; *Prima Facie* Case of Obviousness Never Established .................... 24

b) Additional Reasons .......................................... 26

5. Issue Preclusion Exceptions ....................................... 27

6. Burden is on the Party Asserting Issue Preclusion to Prove All Elements ................................ 29

7. *Res Judicata* Cannot Apply to the '353 FWD.......................................................................... 29

D. All Claims on Appeal are Patentably Distinct Over All Claims Cancelled in the '353 IPR ................................... 30

1. The SoftView Patents and the "preserving/preservation" limitation ........................... 31

2. The PTAB's Claim Construction in IPR2013-00007 and IPR2013-00256 .......................... 38

**Page**


a) The '353 FWD Claims Construction Was the Basis for Cancellation of Claims 1 and 36. ........ 40

3. The '353 FWD Claim Construction was the Primary Issue Appealed to the Federal Circuit ........ 41

a) Claim Construction of the "Preserving" limitation in the '353 IPR FWD Must be Applied ........ 42

4. The Claims for which Estoppel are Asserted Must be Construed Under *Phillips* ........ 43

5. Claim Construction For Appealed Claimed ........ 44

a) This Court Should Consider the District Court Claim Construction ........ 45

b) Independent Claims 87, 185, 285, and 318 ........ 46

c) Independent Claims 1, 36, 70, 149, 209, and 216 ........ 48

d) Claim Construction Under the Appeal Decision is Inapposite to the Claim Construction in the '353 FWD ........ 50

6. Difference in IPR and *Phillips* Claim Construction ........ 53

E. Board's Claim Rejections under New Ground ........ 61

1. Claims 87, 185, 285, and 318 ........ 61

2. Rejection of Dependent Claims ........ 62

a) Additional Synergy Analysis Not Supported By Any Court Precedent ........ 62

**Page**

b) Effect of Patent Expiration ................................ 65

c) Real-time Rendering/Zooming.......................... 65

d) Billions of Web Pages ...................................... 66

e) Cascaded Style Sheets ...................................... 69

f) Tap to Zoom on Column and Paragraph........................................................ 70

g) XML Code........................................................ 79

F. Violation of the Administrative Procedure Act (APA) ..................................................................... 79

CONCLUSION ........................................................................................ 81

ADDENDUM ........................................................................................... 83

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Apple Inc. v. Andrea Elecs. Corp.*,
949 F.3d 697 (Fed. Cir. 2020) ....................27

*Application of Craig,*
411 F.2d 1333, 162 U.S.P.Q. (BNA) 157 (C.C.P.A. 1969) ....................30

*Application of Herr*,
377 F.2d 610, 153 U.S.P.Q. (BNA) 548 (C.C.P.A. 1967) ....................30

*Applied Concepts, Inc. v. Olympia Indus., Inc.*,
15 F.Appx. 793 (Fed. Cir. 2001) ....................63

*Arista Networks, Inc. v. Cisco Sys., Inc.*,
908 F.3d 792 (Fed. Cir. 2018) ....................46

*Arthrex, Inc. v. Smith & Nephew, Inc.*,
880 F.3d 1345 (Fed. Cir. 2018) .................... 9, 11

*B&B Hardware, Inc. v. Hargis Indus., Inc.,*
575 U.S. 138 (2015)....................19

*Blonder-Tongue v. University Foundation,*
402 U.S. 313, 91 S. Ct. 1434 (1971) ....................24

*Bourns, Inc. v. U.S.*,
537 F.2d 486, 493 (Ct. Cl. 1976).................... passim

*Comark Communications, Inc. v. Harris Corp.*,
156 F.3d 1182 (Fed. Cir. 1998) ....................63

*Cooper Techs. Co. v. Dudas*,
536 F.3d 1330, 1335 (Fed. Cir. 2008 ....................7

*Dole Food Co. v. Patrickson*,
538 U.S. 468 (2003)....................15

*Fantasy Sports Props., Inc. v. Sportsline.com, Inc.*,
287 F.3d 1108 (Fed. Cir. 2002) ....................67

*Finjan, Inc. v. Secure Computing Corp.*,
626 F.3d 1197 (Fed. Cir. 2010) ....................................................................67

*Google v. Hammond Development International, Inc.,*
No. 21-2218 (Fed. Cir. Dec. 8, 2022)...........................................................22

*Graham v. John Deere Co.*,
383 U.S. 1, 17, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966) ..................................63

*In re Affinity Labs of Tex., LLC*,
856 F.3d 902 (Fed. Cir. 2017) ......................................................................70

*In re Anderson*,
662 F. App'x 958 (Fed. Cir. 2016)................................................................65

*In re CSB-Sys. Int'l, Inc.*,
832 F.3d 1335 (Fed. Cir. 2016) ....................................................................21

*In re Freeman*,
30 F.3d 1459 (Fed. Cir. 1994) ................................................................ 20, 27

*In re Magnum Oil Tools Int'l, Ltd.*,
829 F.3d 1364 (Fed. Cir. 2016) ............................................... 23, 24, 25, 26

*In re Rambus, Inc.,*
753 F.3d 1253 (Fed.Cir.2014) ......................................................................20

*In re Vivint, Inc.*,
2020-1992 (Fed. Cir. Sep. 29, 2021) ............................................................78

*Intel Corp. v. Qualcomm Inc.*,
21 F.4th 784 (Fed. Cir. 2021) ................................................................ 43, 46

*Intelligent Bio-Systems, Inc. v. Illumina Cambridge Ltd.*,
821 F.3d 1359 (Fed. Cir. 2016) ....................................................................27

*Jackson Jordan, Inc. v. Plasser Am. Corp.,*
747 F.2d 1567 (Fed.Cir.1984) ......................................................................42

*JEM Broadcasting Co. v. Federal Communications Commission*,
22 F.3d 320 (D.C. Cir. 1994)....................................................................8, 9

*Lamoille Valley R.R. Co. v. Interstate Commerce Comm'n*,
711 F.2d 295 (D.C. Cir. 1983)....................................................................9

*Markman v. Westview Instruments, Inc.*,
517 U.S. 370 (1996)..............................................................................44

*Ohio Willow Wood Co. v. Alps S., LLC*,
735 F.3d 1333 (Fed. Cir. 2013) ................................................... 6, 22, 29, 52

*Personalized Media Communications, LLC v. Apple Inc.*,
952 F.3d 1336 (Fed. Cir. 2020) ..................................................................44

*Pharmacia Upjohn Co. v. Mylan Pharm*,
170 F.3d 1373 (Fed. Cir. 1999) ..................................................................24

*Phil-Insul Corp. v. AirLite Plastics Co.*,
854 F.3d 1344 (Fed. Cir. 2017) ..................................................................42

*Phillips v. AWH Corp*.,
415 F.3d 1303, (Fed. Cir. 2005) (en banc) ........................................... passim

*PPC Broadband, Inc. v. Corning Optical Communications RF, LLC*,
815 F.3d 734 (Fed. Cir. 2016) ............................................................. 20, 46

*Purdue Pharma L.P. v. Iancu*,
2018-1710 (Fed. Cir. Apr. 17, 2019)..........................................................22

*Regents of Univ. Minnesota v. LSI Corp*.,
926 F.3d 1327 (Fed. Cir. 2019) ............................................................. 18, 26

*RF Delaware, Inc. v. Pacific Keystone Technologies, Inc.*,
326 F.3d 1255 (Fed. Cir. 2003) ..................................................................29

*Ritter v. Mount St. Mary's Coll.,*
814 F.2d 986 (4th Cir. 1987) .....................................................................24

*Sanofi–Synthelabo v. Apotex, Inc.,*
550 F.3d 1075 (Fed.Cir. 2008) ...................................................................22

*SAS Institute, Inc. v. ComplementSoft, LLC.*,
825 F.3d 1341 (Fed. Cir. 2016) ..................................................................27

*Silicon Graphics, Inc. v. ATI Technologies, Inc.*,
607 F.3d 784 (Fed. Cir. 2010) .......................................................................66

*Simpleair, Inc. v. Google LLC*,
884 F.3d 1160 (Fed. Cir. 2018) .....................................................................18

*Softview LLC v. Kyocera Corp.*,
592 F. App’x 947 (Fed. Cir. 2015) ..................................................................4

*Softview LLC v. Kyocera Corp.*,
592 F. App’x 949 (Fed. Cir. 2015) ........................................................... 4, 30

*Soverain Software LLC v. Victoria’s Secret Direct Brand Management, LLC*, 778 F.3d 1311 (Fed. Cir. 2015) ............................................................17

*SRI International v. Matsushita Electric Corp.*,
775 F.2d 1107 (Fed. Cir. 1985) .....................................................................61

*Sunovion Pharmaceuticals, Inc. v. Teva Pharmaceuticals USA, Inc.*,
731 F.3d 1271 (Fed. Cir. 2013) .....................................................................44

*SynQor, Inc. v. Vicor Corp.*,
988 F.3d 1341 (Fed. Cir. 2021) ........................................................ 6, 18, 29

*Tafas v. Doll*,
559 F.3d 1345, 1352 (Fed. Cir. 2009) (*Tafas III*) ................................. 7, 8, 9

*Tafas v. Dudas,*
541 F. Supp. 2d 805 (E.D. Va. 2008) (*Tafas II*) ..............................................7

*Tecsec, Inc. v. Int'l Bus. Machs. Corp.,*
731 F.3d 1336 (Fed. Cir. 2013) ............................................................ 24, 42

*Teva Pharms. USA Inc. v. Sandoz, Inc.*,
574 U.S. 318 (2015) .......................................................................................44

*Westwood Chemical, Inc. v. U.S.*,
525 F.2d 1367 (Ct. Cl. 1975) ................................................................. 21, 62

*Yeda Research v. Mylan Pharm. Inc.*,
906 F.3d 1031, 1040 (Fed. Cir. 2018) ............................................................6

**Statutes**

28 U.S.C. § 1295(a)(4)(A) ....................1

35 U.S.C. § 141 ....................1

35 U.S.C. § 2(b) .................... 7, 8, 15

35 U.S.C. § 301 .................... 13, 14

35 U.S.C. § 303 ....................14

35 U.S.C. § 304 .................... 13, 14

35 U.S.C. § 311 (pre-AIA).................... 13, 14

35 U.S.C. § 315 ....................15

35 U.S.C. § 316 .................... passim

35 U.S.C. § 325 ....................15

5 U.S.C. § 706 .................... 6, 78

**Rules**

37 C.F.R. § 42.401 ....................17

37 C.F.R § 42.73(d)(3)(i).................... passim

37 C.F.R. § 42.73(b) ....................9

37 C.F.R. § 42.73(d)(3).................... passim

**Treatises**

18 C. Wright & A. Miller, FEDERAL PRACTICE & PROCEDURE
§ 4422 ....................28

Restatement (Second) of Judgments § 27, cmt. e. ....................23

Restatement (Second) of Judgments § 28 (1980) ....................28

Restatement (Second) of Judgments § 29 (1980) ....................29

**<u>Agency Decisions</u>**

*Apple Inc. v. Contentguard Holdings, Inc.*, IPR2015-00458..................................12

*General Electric Co. v. United Technologies Corp.*, IPR2017-00428...................12

Reexamination Control No. 90/014,266, Decision on Appeal in No. 2020-004978.........................................................................................12

**<u>Federal Register</u>**

83 Fed. Reg. 51340 (Oct. 11, 2018).........................................................27

Notice of Final Rulemaking, 77 Fed. Reg. 48,612 (Aug. 14, 2012) .......................11

Rules of Practice for Trials Before the Patent Trial and Appeal Board and Judicial Review of Patent Trial and Appeal Board Decisions (Proposed), 77 Fed. Reg. 6,878 (Feb. 9, 2012)............................16

Rules of Practice for Trials Before the Patent Trial and Appeal Board and Judicial Review of Patent Trial and Appeal Board Decisions, 77 Fed. Reg. 48,649 (Aug. 14, 2012) .................................. 10, 16

All emphasis in **bold** and ***bold italics*** added unless otherwise noted.

## STATEMENT OF RELATED CASES

No other appeal in or from the same proceeding was previously before this or any other appellate court.

This is consolidated appeal combining Appeal Nos. 2023-1005 and 2023-1007.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. § 141 as an appeal from a final decision of the Patent Trial and Appeal Board (the "Board") of the United States Patent Office (the "PTO") in an *Inter Partes* Reexamination (the Rehearing Decision ("Reh'g Dec")).

# INTRODUCTION

This case presents issues of first impression before this Court. In conjunction with reversing the Examiner on all § 103 rejections and confirmation of claims in the Appeal Decision, the Board issued a new ground of rejection for all claims on appeal under an overly broad interpretation of 37 C.F.R § 42.73(d)(3)(i) that has no statutory support and belies the promulgation history and *dictum* from this Court regarding the rule. Rather than determining whether the elements of collateral estoppel and *res judicata* are present, the Board insists such is not required and applies its own interpretation of the rule. This includes reconstruing claims cancelled in the '353 IPR to have a dramatically narrower scope than that used to cancel the claims, and then using the new claim construction for the cancelled claims as the baseline for determining whether the appealed claims are patentably distinct over the cancelled claims. The Board further asserts that "not patentably distinct" refers to patentably indistinct in an obviousness sense and then evaluates the patentability of the claims relative to the cancelled claims operating as prior art using the "domino" approach this Court expressly held is improper in *Bourns, Inc. v. U.S.*, 537 F.2d 486, 493 (Ct. Cl. 1976).

This Court should correct these errors committed by the Board by reversing the Board's decisions.

## STATEMENT OF THE ISSUES

1. Whether 37 C.F.R. §§ 42.73(d)(3) and 42.73(d)(3)(i), as interpreted by the Board, have statutory authority under 35 U.S.C. § 2(b) and 35 U.S.C. § 316(a)(4)?

2. Whether § 42.73(d)(3)(i) precludes confirmation of issued claims on the merits for an issued patent in an *Inter Partes* Reexamination proceeding established before promulgation of the rule?

3. Whether § 42.73(d)(3)(i) requires application of common law collateral estoppel and *res judicata*?

4. Whether "not patentably distinct" means "[the] same or substantially the same," or whether it means patentably indistinct in the obviousness sense?

5. Whether the claim construction used to cancel claims in an IPR Final Written Decision must be used when evaluating whether claims are not patentably distinct from the cancelled claims?

6. Whether certain claims on appeal are patentably distinct over the cancelled claims in the IPR FWD?

## STATEMENT OF THE CASE

### I. PROCEDURAL BACKGROUND

On May 20, 2011, Third Party Petitioner Apple Inc. filed a Request for *Inter Partes* Reexamination of SoftView's '353 Patent (7,461,351) (95/000,634), which was granted on August 8, 2011. On August 31, 2012, Motorola Mobility LLC filed a Request for *Inter Partes* Reexamination of the '353 Patent (90/002,132), which was granted on November 26, 2012. The '353 Patent has undergone a parallel proceeding in *Ex Parte* Reexamination 90,009,994 (Apple Inc.).

On October 2, 2012, Petitions for *Inter Partes Review* of the '353 and '926 (7,831,926) Patents were filed by Kyocera. Decisions to Institute were entered on March 29, 2013 (IPR2013-00007) (IPR2013-00004), which were subsequently joined by Motorola Mobility LLC (IPR2013-00256) (IPR2013-00257).

In Final Written Decisions (March 27, 2014), the Board found all challenged claims in the '353 and '926 patents unpatentable under 35 U.S.C. § 103 and cancelled. The Federal Circuit issued Rule 36 Judgments affirming unpatentability of the challenged claims in *Softview LLC v. Kyocera Corp.*, 592 F. App'x 947 (Fed. Cir. 2015) and *Softview LLC v. Kyocera Corp.*, 592 F. App'x 949 (Fed. Cir. 2015).

## SUMMARY OF THE ARGUMENT

This Court should reverse the Board's decision that the appealed claims are invalid under 37 C.F.R § 42.73(d)(3)(i):

- First, the Board erred by applying a new ground of rejection under § 42.73(d)(3)(i) to issued claims in a *Inter Partes* Reexamination (IPX). § 42.73(d)(3)(i) is non-statutory, and even if found to be statutory cannot apply to issued claims in an IPX, since those claims have already been obtained.
- Second, the Board erred by not applying common law collateral estoppel or *res judicata*, asserting the promulgation history and case law addressing § 42.73(d)(3)(i) does not require this.
- Third, the Board erred by applying an obviousness sense not patentably distinct analysis using a new and substantially narrower claim construction rather than the construction under which the claims were cancelled in the '353 IPR.
- Even if the new construction was valid, the Board erred by cancelling dependent claims that are patentably distinct over the cancelled claims.

Thus, the Board's decision should be reversed outright.

# ARGUMENT

## I. STANDARD OF REVIEW

Appellant SoftView's challenge of the Board's conclusions on C.F.R. § 42.73(d)(3)(i) is a question of law that is reviewed *de novo*. *SynQor, Inc. v. Vicor Corp.*, 988 F.3d 1341 (Fed. Cir. 2021). Collateral estoppel is a legal determination subject to *de novo* review. *Ohio Willow Wood Co. v. Alps S., LLC*, 735 F.3d 1333, 1341 (Fed. Cir. 2013). The Board's decision is reviewed under the standards set forth in 5 U.S.C. § 706 of the Administrative Procedure Act. *Yeda Research v. Mylan Pharm. Inc.*, 906 F.3d 1031, 1040 (Fed. Cir. 2018).

## II. APPLICATION OF C.F.R § 42.73(d)(3)(i)

### A. C.F.R § 42.73(d)(3)(i) Estoppel is Not Applicable to Any Claim on Appeal

In its Appeal Decision (Appx0070-0074), the Board raised a new ground of rejection under the estoppel provision of C.F.R. § 42.73(d)(3)(i), which recites:

> § 42.73 Judgment.
>
> (d) Estoppel.
>
> > (3) Patent applicant or owner. A patent applicant or owner is precluded from taking action inconsistent with the adverse judgment, including obtaining in any patent:
> >
> > > (i) A claim that is not patentably distinct from a finally refused or cancelled claim; or …

The Board states (Appx0079),

> We conclude that Patent Owner is estopped from arguing that limitations of the relevant cancelled claims render the challenged

> claims patentable over those cancelled claims because of the issuance in IPR2013-00007 on the Certificate cancelling those claims.

The Board asserts §§ 42.73(d)(3) and 42.73(d)(3)(i) are authorized under 35 U.S.C. § 316(a)(4) and 35 U.S.C. § 2(b) (Appx0014):

> Section 2(b)(2)(A) provides the Office with broad authority to "establish regulations, not inconsistent with law, which–(A) shall govern the conduct of proceedings in the Office."

This Court has held § 2(b)(2) does not vest the USPTO with any general substantive rulemaking authority. As stated in *Tafas v. Doll*, 559 F.3d 1345, 1352 (Fed. Cir. 2009) (*Tafas III*)[1] citing *Tafas v. Dudas,* 541 F. Supp. 2d 805 (E.D. Va. 2008) (*Tafas II*),

> We agree with the district court that § 2(b)(2) "does not vest the USPTO with any general substantive rulemaking power." *Tafas II*, 541 F.Supp.2d at 811. "… [B]ecause Congress has not vested the Commissioner with any general substantive rulemaking power, the Final Determination at issue in this case cannot possibly have the force and effect of law." (citations and quotation marks omitted); *Cooper Techs. Co. v. Dudas*, 536 F.3d 1330, 1335 (Fed. Cir. 2008) ("To comply with section 2(b)(2)(A), a Patent Office rule must be 'procedural' — *i.e.*, it must 'govern the conduct of proceedings in the Office.'").

---

[1] Vacated 328 Fed.Appx. 658 (Fed. Cir. 2009); *en banc* review mooted after USPTO rescinded proposed Final Rules; *Tafas II* was reinstated under *Tafas v. Kappos*, 586 F.3d 1369 (Fed. Cir. 2009)

*Tafas II*, 559 F.3d, 1352

This Court has further held the question of whether § 2(b)(2) vests the USPTO with substantive rulemaking authority is not subject to *Chevron* deference. *Id.* at 1354.

Under § 316(a)(4), "The Director shall prescribe regulations – establishing and governing inter partes review under this chapter and the relationship of such review to other proceedings under this title."

A central issue to this appeal is whether §§ 42.73(d)(3) and 42.73(d)(3)(i), as interpreted by the Board, are substantive rules in violation of § 2(b)(2) or merely procedural rules. Appellant asserts the rules are clearly substantive, as, under the Board's interpretation issued claims that are found patentable on the merits in an *inter partes* reexamination may be estopped from being confirmed.

In *Tafas III*, this court found the proposed USPTO rules for continuations and reexaminations to be procedural, based, in part, on the D.C. Circuit's approach in *JEM Broadcasting Co. v. Federal Communications Commission*, 22 F.3d 320 (D.C. Cir. 1994):

> We are most persuaded in this case by the D.C. Circuit's approach in *JEM.* [T]he court noted that a "***critical feature of the procedural exception [in section 553 of the APA] is that it covers agency actions that do not themselves alter the rights or interests of parties***" … The court recognized that the rules could result in the loss of substantive

> rights, ***but found that they were nonetheless procedural because they did not "foreclose effective opportunity to make one's case on the merits."*** *Id.* at 327-28 (quoting *Lamoille Valley R.R. Co. v. Interstate Commerce Comm'n*, 711 F.2d 295, 328 (D.C. Cir. 1983)).
>
> … The Final Rules may "alter the manner in which the parties present . . . their viewpoints" to the USPTO, ***but they do not, on their face, "foreclose effective opportunity" to present patent applications for examination.*** *JEM*, 22 F.3d at 326, 328.
>
> *Tafas III*, 559 F.3d at 1355-56

Under the Board's application of § 42.73(d)(3)(i), Appellant is foreclosed from arguing for patentability of issued claims on the merits. Significantly, in the Appeal Decision the Board reversed the Examiner's rejection of the claims on appeal under 35 U.S.C. § 103 ***on the merits***. Appx0132. Yet, that determination is deemed irrelevant. Also, invalidating issued claims under § 42.73(d)(3)(i) would be an ***agency actions that alters the rights or interests of parties.***

In *Arthrex, Inc. v. Smith & Nephew, Inc.*, 880 F.3d 1345, 1347 (Fed. Cir. 2018), the panel majority, in an opinion authored by Judge Timothy Dyk, expressly left open whether the PTO had authority to adopt a regulation providing for estoppel on the cancellation of a patent or claim [§§ 42.73(b) and 42.73(d)(3)] because the patent owner "has specifically disclaimed any argument that the regulations are not authorized by the statute." Judge Kathleen O'Malley stated that she had "doubts about whether the Director had the authority under 35 U.S.C. §

316 (or any other statutory provision) to issue [§§ 42.73(b) and 42.73(d)(3)] or whether, if so, the regulation was properly promulgated." *Id*. at 1351.

If this Court determines § 42.73(d)(3)(i) is a procedural rule, it should next consider whether the rule, as applied by the Board, is consistent with the Patent Act. Appellant asserts it is inconsistent with multiple statutes under the Patent Act.

**1. 37 C.F.R. § 42.73(d)(3)(i) Does Not Apply to Issued Claims**

On its plain meaning, the asserted estoppel under § 42.73(d)(3)(i) does not apply to at least any previously issued claims because Appellant is not "obtaining" any of those claims, as they were already obtained.

The promulgation history and case law clearly indicate that § 42.73(d)(3)(i) applies to *new* claims obtained through reissue and in continuations. The commentary accompanying the final rule for § 42.73(d)(3)(i)[2] provides (Appx3030):

> A number of comments questioned whether there is statutory basis for the patent owner estoppel provisions set forth in proposed § 42.73(d)(3). … Section 42.73(d)(3)(i), as adopted in this final rule, ***merely provides estoppel against claims that are patentably indistinct from those claims that were lost***, and claim amendments that were presented and denied, during a trial. ***In other words, the patent owner may subsequently present in a continuing or reissue application claims that are patentably distinct from such claims***. As such,

[2] 77 Fed. Reg. 48612 (Aug. 14, 2012).

> § 42.73(d)(3) set forth in this final rule is consistent with the AIA, other statutory provisions, ***the common law related to estoppel***, and the common law related to the recapture rule.[3] …

In *Arthrex*, this Court has accepted the straightforward reading of § 42.73(d)(3)(i), saying that the regulation would only affect prosecution of continuation patent applications. 880 F.3d at 1347. Moreover, Judge Pauline Newman, dissenting in *Arthrex*, wrote:

> [The patent owner] observes that some PTAB decisions have held that such an adverse judgment "creates an estoppel that would limit [the patent owner's] rights as ***to future patent claims in continuing applications***." … This consequence makes it imperative that the PTAB's rules conform to the legislative intent, and are implemented in accordance with their text, so that the concerned public will know the consequences of its choices. *Id*. at 1353.

Other Boards have held that post-grant proceedings confirming previously issued claims is not "obtaining" claims that could be subject to such estoppel:

> We determine § 42.73(d)(3)(i) does not apply here, because Patent Owner is not "obtaining" claims 10-14 in this proceeding, as set forth in the rule. Instead, Patent Owner is merely defending against a charge of unpatentability of claims 10-14 over prior art. Claims 10-14 have already been obtained by Patent Owner during the original prosecution of the '920 patent.

[3] 77 Fed. Reg. at 48649.1 (Appx3030)

*General Electric Co. v. United Technologies Corp.*, IPR2017-00428, Final Written Decision, Paper No. 38 at 8 (Board June 22, 2018); see also *Apple Inc. v. Contentguard Holdings, Inc.*, IPR2015-00458, Paper 9 at 7-8 (Board July 15, 2015) (holding § 42.73(d)(3) estoppel "does not preclude Patent Owner from defending the patentability of the challenged claims").

The Board identifies a Decision on Appeal in No. 2020-004978 (Reexamination Control No. 90/014,266) in support of another Board rejecting a patent owner's argument that estoppel under § 42.73(d)(3)(i) does not apply because it was not "obtaining" claims under reexamination (Appx0012). However, that decision did not address § 42.73(d)(3)(i) head on, explaining that a narrow focus on sub-section (i) ignores the broader prohibition in § 42.73(d)(3) that precludes a patent owner "from taking action inconsistent with the adverse judgment" in the prior IPR. *Id.* at 9.

The Board further argues (Appx0011),

> Patent Owner's assertion that the Board is applying estoppel to prevent "a patent owner from *arguing* in favor of the PTO confirming earlier issued claims" grossly overstates the rule. PO Req. Reh'g 1. Nothing in the estoppel rule would have prohibited Patent Owner from presenting claims that are patentably distinct from those cancelled in the IPR.

The estoppel rule, as interpreted by the Board, prohibits patent owners from arguing in favor of the PTO confirming earlier issued claims on the merits. In addition to being found patentable over the cited art on the merits, numerous claims on appeal were found patentably distinct over the cancelled claims by the Examiner in the '353 Right of Appeal Notices (Appx2027-0030, Appx3937-3940) and during *ex-parte* reexamination 90/009,994 (Appx4499). The Board, *ipse dixit*, now asserts the Examiner was wrong.

Confirmation by the PTO of issued claims of a (now) expired patent in a reexamination brought by an adverse third party is not "prosecution" of an "application" filed by an applicant. It certainly is not "A patent applicant or owner … taking action … including ***obtaining*** in any patent: (i) A claim" under 37 C.F.R. § 42.73(d)(3)(i)." Accordingly, the regulation cannot bar the PTO confirming issued claims in a patent subject to reexamination.

### 2. Applying § 42.73(d)(3)(i) to Issued Claims Would Be Contrary to Law

Applying § 42.73(d)(3)(i) to the confirmation of issued claims would contravene the patent statues, including at least (a) 35 U.S.C. §§ 301(a)(1) and 311 (pre-AIA) ); (b) 35 U.S.C. § 304; and (c) 35 U.S.C. § 316. Additionally, such application would violate well-established legal principles of *res judicata* preclusion.

**a) 35 U.S.C. §§ 301(a)(1) and 311 (pre-AIA)**

Proper grounds for *inter partes* reexamination of issued claims are limited by statute to "prior art consisting of patents and printed publications." 35 U.S.C. §§ 301(a)(1) and 311 (pre-AIA). This does not include estoppel. However, the Appeal Decision asserts estoppel under § 42.73(d)(3)(i) as a (new) ground of rejection that is not authorized by any statute.

**b) 35 U.S.C. § 304**

35 U.S.C. § 304 guarantees Patent Owners the right to make statements on the record about the alleged substantial new question of patentability raised by patents and publications discovered by [the Director] or cited under the provisions of section 301 in a reexamination ordered under subsection 303(a).

Rather than address § 304, the Board states, "The estoppel provision of § 42.73(d) simply operates to prohibit patentably indistinct claims and in no way limits a patent owner's opportunity to explain why its claims are patentably distinct." Appx0015. Thus, for claims for which § 42.73(d) would be applied, any statements filed by patent owners under § 304 addressing substantial new questions of patentability based on prior art patents and publications (section 301) would be rendered moot, nullifying the purpose of § 304.

The Board's new rejection is contrary to this statute and must be withdrawn.

#### c) 35 U.S.C. § 316

§§ 42.73(d)(3) and 42.73(d)(3)(i) exceed the PTO's rulemaking authority and are contrary to statute, fundamentally unfair, and void as *ultra vires*. The power of the PTO to prescribe regulations related to IPRs is limited by 35 U.S.C. § 316 in view of § 2(b)(2). Nothing in that section (nor any other) authorizes the Director to promulgate §§ 42.73(d)(3) and 42.73(d)(3)(i) as applied by the Board.

The provisions of the AIA indicate no such estoppel is authorized. 35 U.S.C. §§ 315(e) and 325(e) of the AIA set forth estoppel provisions that apply against an unsuccessful ***petitioner*** in an *inter partes* review proceeding. The omission of patent owners from the estoppel provisions of §§ 315(e) and 325(e) – which exclusively limit estoppel to petitioners – suggests that the drafters of the AIA did not intend to apply estoppel to patent owners. The "absence of this language" in the statute "instructs [the Court] that Congress did not intend" for it to be used there. *Dole Food Co. v. Patrickson*, 538 U.S. 468, 476 (2003).

### 3. "Patentably Indistinct" Means "Substantially" or "Essentially the Same"

The Board asserts "patentably distinct" is used in § 42.73(d)(3)(i) in the obviousness sense … which "means that the claim at issue is more than simply an obvious variation over a prior patent claim." Appx0015-0016. This is not supported by the promulgation history, nor anywhere in 37 CFR Part 42 – TRIAL PRACTICE BEFORE THE PATENT TRIAL AND APPEAL BOARD.

The proposed rule for § 42.73(d)(3)(i) published in the Federal Register on February 9, 2012[4] recited (Appx2997),

> (3) …
>
> (i) A claim to ***substantially the same invention*** as the finally refused or cancelled claim;

In the final version of § 42.73(d)(3)(i)[5] the language was changed to:

> (i) A claim that is ***not patentably distinct*** from a finally refused or cancelled claim;

The change in language appears to be based on comments suggesting "alternative language for the rule." *See Comment* 213, Appx2993.

While § 42.73 itself did not define the meaning of not "patentably distinct," the meaning of "patentably indistinct" was defined in the definitions under Subpart E – Derivation:

> **§ 42.401 Definitions**.
>
> …
>
> ***Same or substantially the same means patentably indistinct***.

An accompanying comment and response states[6]:

---

[4] 77 Fed. Reg. 6913 (Feb. 9, 2012)

[5] 77 Fed. Reg. at 48649.2) (Appx2993)

[6] 77 Fed. Reg. at 48649.2 (Appx3030)

> *Comment 214:* One comment requested clarification on whether proposed § 42.73(d)(3) applies to derivation proceedings.
>
> *Response:* Paragraph (d)(3) of § 42.73 applies to derivation proceedings, *inter partes* review, post-grant review, and covered business method review.

The Board asserts the § 42.401 definition does not apply to inter partes review, arguing,

> … The more logical reading of this promulgation history is that, rather than adopting a new standard for determining when estoppel applies, the PTO simply adopted the same standard as used in other contexts (such as interferences and double patenting) – *i.e.,* that a subsequent claim is precluded if it is not patentably distinct in the obviousness sense. Appx0018.

The Board fails to identify any support for its position in the promulgation history or § 42.

This Court has also held collateral estoppel (issue preclusion) applies to "substantially the same invention." *Soverain Software LLC v. Victoria's Secret Direct Brand Management, LLC*, 778 F.3d 1311 (Fed. Cir. 2015). This Court has also held patentably indistinct means essentially the same under common law *res judicata* (*i.e.*, claim preclusion) "… we conclude that claims which are patentably indistinct are essentially the same." *Simpleair, Inc. v. Google LLC*, 884 F.3d 1160, 1167 (Fed. Cir. 2018).

### B. § 42.73(d)(3) Estoppel Must Apply Traditional Principles of Collateral Estoppel/Issue Preclusion

The Board asserts there is no requirement "that § 42.73(d)(3) must be applied through the lens of common law preclusion doctrines, and Patent Owner has cited no authority for importing common law collateral estoppel or res judicata into § 42.73(d)(3)." Appx0019-0020.

Both the promulgation history and this Court indicate estoppel under § 42.73(d)(3) must apply the principles of common law collateral estoppel and issue preclusion. The PTO stated § 42.73(d)(3) should be interpreted "consistent with… ***the common law related to estoppel***." *See supra*, Appx2993.

In *Regents of Univ. Minnesota v. LSI Corp*., 926 F.3d 1327 (Fed. Cir. 2019), this Court weighed in with the same conclusion:

> To the extent the estoppel provisions in 37 C.F.R. § 42.73(d)(3), prevent a patent owner from ***obtaining a patent*** on claims that are patentably indistinct from cancelled claims in an IPR proceeding, that result is no different than what is mandated under traditional principles of ***res judicata and collateral estoppel***.
>
> Additional views of Dyk, Wallach, and Hughes, Circuit Judges, footnote 5. *Id.* at 1346.

In *SynQor*, this Court held [common law] collateral estoppel could apply to an *inter partes* reexamination if the elements of collateral estoppel are met in the specific circumstances:

> If Congress did not foreclose the application of issue preclusion, we then "turn to whether there is a categorical reason why [inter partes reexamination] decisions can never meet the ordinary elements of

> issue preclusion, *e.g.*, those elements set out in § 27 of the Restatement (Second) of Judgments." *B & B Hardware* , 575 U.S. at 153, 135 S.Ct. 1293. Absent any such categorical reasons, we turn to whether the elements of collateral estoppel are met in the specific factual circumstances here. *Id*. at 1347.

The Board refused to apply the elements of collateral estoppel in this case. As the Board acknowledged during oral hearing (Appx2747-2748), the requirements for issue preclusion are not met:

> JUDGE MACDONALD: Mr. Abidin, this is Judge MacDonald. I think you're mixing separate issues here, 42.73(d) is really to cancel claims per estoppel, not issue preclusion. Issue preclusion has its own rules and they're quite, you know, they are quite sturdy rules as to when you can have an issue preclusion. We didn't find any analysis in the record from the examiner to attempt to meet the requirement for issue preclusion, so I don't really think you need to make any arguments about issue preclusion here. It's not present. …

### C. Elements of Collateral Estoppel Are Not Met

Issue preclusion, also referred to as collateral estoppel is only appropriate if the following conditions are met:

(1) the issue is identical to one decided in the first action;

(2) the issue was actually litigated in the first action;

(3) resolution of the issue was essential to a final judgment in the first action; and

(4) the party against whom estoppel is invoked had a full and fair opportunity to litigate the issue in the first action.

*In re Freeman*, 30 F.3d 1459, 1465 (Fed. Cir. 1994).

### 1. The Issues Are Not Identical

The issues decided in the first action are not identical to the issues of patentability in this proceeding. First, the standard for interpretation of claims is different. Under the IPR proceeding the Broadest Reasonable Interpretation (BRI) standard was used. Under this proceeding, the correct construction under the *Phillips* standard must be applied, as the ’353 patent expired during reexamination.

In *PPC Broadband, Inc. v. Corning Optical Communications RF, LLC*, 815 F.3d 734 (Fed. Cir. 2016) this Court stated,

> District courts, by contrast, do not assign terms their broadest reasonable interpretation. ***Instead, district courts seek out the correct construction—the construction that most accurately delineates the scope of the claimed invention***—under the framework laid out in *Phillips v. AWH Corp.,*415 F.3d 1303 (Fed.Cir.2005) (en banc). The same is true of reexaminations before the PTO when claims have expired, and therefore may not be amended. *In re Rambus, Inc.,* 753 F.3d 1253, 1256 (Fed.Cir.2014). *PPC Broadband* at 740.
>
> … [C]laim construction in IPRs is not governed by *Phillips.* Under *Cuozzo,* claims are given their broadest reasonable interpretation consistent with the specification, ***not necessarily the correct construction under the framework laid out in* Phillips**. *Cuozzo,* 793 F.3d at 1279. *PPC Broadband* at 742.

As with *PPC Broadband*, “in this case, the claim construction standard is outcome determinative.” *Id.* at 741.

First, the BRI interpretation of the claims cancelled in the ’353 FWD are substantially different that (1) how those claims would have been correctly construed under *Phillips*; (2) how those claims were construed under *Phillips* in the District Court Claim Construction order; and (3) how the scopes of the cancelled claims under BRI compare with the claims on appeal under *Phillips*.

Second, the prior art used in the ’353 IPR and the prior art raised in this *inter partes* reexamination are different. Notably, none of the claims cancelled in the ’353 FWD were cancelled over the art of record in this *inter partes* reexamination.

Third, when the identity-of-issues question in the collateral estoppel analysis involves a question of obviousness, the claim as a whole to which estoppel is sought to be applied must be evaluated. *Westwood Chemical, Inc. v. U.S.*, 525 F.2d 1367, 1375 (Ct. Cl. 1975); *Bourns,* 537 F.2d at 493. “[I]t is clear that the differences revealed by such comparisons [between adjudicated claims and unadjudicated claims] must be evaluated, not in terms of obviousness under a domino approach, but, rather, in terms of the *Graham* issues.” *Id.* It is improper to focus the inquiry on a particular element, or to otherwise apply a “domino approach” in which only those elements found to be lacking are analyzed. *Id.*; *Ohio Willow Wood*, 735 F.3d at 1343-44 “[t]he determination of obviousness is made with respect to the subject matter as a whole, not separate pieces of the claim,” *Sanofi–Synthelabo v. Apotex, Inc.,* 550 F.3d 1075, 1085 (Fed. Cir. 2008).

*Google v. Hammond Development International, Inc.,* No. 21-2218 (Fed. Cir. Dec. 8, 2022) is instructive. The opinion found, “Whether the differences between the [unadjudicated and adjudicated] patent claims materially alter the

question of patentability (*Ohio Willow Wood*, 735 F.3d at 1342) is a legal conclusion based on underlying facts." Slip op. at 7.

During oral argument[7] Judge Moore raised the issue whether collateral estoppel was a question of law or a mixed question of law and factual considerations,[8] followed by Judge Chen questioning Google's representative regarding whether collateral estoppel was in play when the determination involved consideration of *Graham* factor analysis (5:58-6:22):

Judge Chen: If you have to do a Graham factor analysis then … you cannot apply collateral estoppel because you no longer have identity-of-issues?

Google Representative: I would agree with that …

Indeed, this is the correct interpretation of the law under *Westwood, Ohio Willow Wood,* and *Bourns*.

**2. The Issues were Not Actually Litigated in the First Action**

For cancelled dependent claims, 58, 59, 66, 138, and 139, the issues were not actually litigated. As observed in *Purdue Pharma L.P. v. Iancu*, 2018-1710 (Fed. Cir. Apr. 17, 2019):

> The Restatement (Second) of Judgments (1982) has guided this Court's application of the principles of collateral estoppel. … Regarding the determination of whether an issue is actually litigated, comment e of section 27 of the Restatement states,
>
> "[a] judgment is not conclusive in a subsequent action as to issues which might have been but were not litigated and determined in the prior action." See *Voter Verified*, 887 F.3d at 1383. The Restatement

[7] https://oralarguments.cafc.uscourts.gov/default.aspx?fl=21-2218_10042022.mp3

[8] 3:33-6:15

> further explains that ***[a]n issue is not actually litigated if the defendant might have interposed it as an affirmative defense but failed to do so*** . . . if it is raised by a material allegation of a party's pleading but is admitted (explicitly or by virtue of a failure to deny) in a responsive pleading . . . if it is a stipulation between the parties. . . . ***In the case of a judgment entered by confession, consent, or default, none of the issues is actually litigated***.

In the '353 FWD claim 66 was cancelled without the Board presenting *any* evidence ***at trial***. Rather, since Appellant did not address claims 66 in its Patent Owner response, the Board issued, in effect, a default judgment. This was clear legal error, as subsequently held by this Court in *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364 (Fed. Cir. 2016) (*see infra*). Appellant also did not address claims 58, 59, 66, 138, and 139 in its PO response and none of these claims were appealed to the Federal Circuit.

#### 3. Only Possible Resolution of Issue Essential to the Judgment was Claim Construction

As discussed *infra*, the only issue that (possibly) was actually litigated and essential to the judgment in the '353 IPR was claim construction. Since all claims in the '353 IPR were cancelled over two combinations of prior art references, no determinations regarding prior art were essential to the judgment. *Tecsec, Inc. v. Int'l Bus. Machs. Corp.,* 731 F.3d 1336 (Fed. Cir. 2013); *Ritter v. Mount St. Mary's Coll.,* 814 F.2d 986, 993 (4th Cir. 1987) ("where the court in the prior suit has determined two issues, either of which could independently support the result, ***then neither determination is considered essential to the judgment***.") If this Court determines claim construction was not actually litigated and essential to the judgment then there cannot be identity-of-issues, which would defeat collateral estoppel outright.

#### 4. Patent Owner Did Not Have a Full and Fair Opportunity to Litigate Issues in The First Action

A patentee "must be permitted to demonstrate, if he can, that he did not have 'a fair opportunity procedurally, substantively and evidentially to pursue his claim the first time' ". *Blonder-Tongue v. University Foundation,* 402 U.S. 313, 91 S. Ct. 1434 (1971). In *Pharmacia Upjohn Co. v. Mylan Pharm*, 170 F.3d 1373 (Fed. Cir. 1999) this Court stated, "[A] judgment of invalidity will have no collateral estoppel effect if the patentee can show that it did not have a full and fair opportunity to litigate."

SoftView did not have a full and fair opportunity to litigate issues in the '353 IPR proceeding for the following reasons.

##### a) Burden Shifted to Patent Owner to Prove Patentability; *Prima Facie* Case of Obviousness Never Established

In the '353 IPR, the burden was shifted to SoftView to prove patentability. In *Magnum* it came to light the PTAB's practice (prior to *Magnum*) was upon institution of an IPR the burden of persuasion was shifted to the patent owner to prove non-obviousness. The PTO argued this practice was proper; this Court found otherwise, holding, "the petitioner continues to bear the burden of proving unpatentability after institution, and ***must do so by a preponderance of the evidence at trial***." 829 F.3d at 1364. As stated in *Magnum*,

> … [B]ecause of the "significant difference" between the standards of proof at institution and trial during an IPR, *see TriVascular,* 812 F.3d at 1068, it is inappropriate to shift the burden to the patentee after institution to prove that the patent is patentable. ***Instead, the petitioner continues to bear the burden of proving unpatentability after institution, and must do so by a preponderance of the evidence***

> ***at trial***. *See* 35 U.S.C. § 316(e). ***And, the Board has an obligation to assess the question anew after trial based on the totality of the record.*** *Id.* 1376-1377.

The Petitioner and Board presented no evidence ***at trial*** concerning the patentability of dependent claim 66. The ’353 FWD states (Appx0366-0367),

> Patent Owner’s response to the challenge to claim 66 is based solely on its arguments concerning Zaurus and Pad++. Upon consideration of claim 66, we determine by a preponderance of the evidence, that claim 66 would have been obvious to one of ordinary skill n [sic] the art over the combination of Zaurus, Pad++ and SVG.

Also, from footnote 8 (Appx0357), “Patent owner does not present separate arguments concerning claim 66, for which trial was instituted based on the combination of Zaurus, Pad++, and SVG.”

Based on PO not separately addressing claim 66, the PTAB cancelled it without ever establishing a *prima facie* case of obviousness. That was clear legal error under *Magnum*. When this was identified in the ’634 oral hearing (Appx2694-2695), APJ MacDonald stated,

> Let me stop you there because you're trying to relitigate. And I saw when I went through the record for the IPR, I was very surprised that there was no arguments presented for Claim 66, and it was allowed to fall with Claim 36. ***The effect of that is that that was given up during the IPR … The cascaded style sheet, that wasn't dealt with in the IPR, and therefore, that issue's not going to be relitigated here***.

Under 37 CFR § 42.120 and as observed by this Court there is no requirement for a patent owner to respond to each claim challenged in an IPR. *See Magnum* footnote 1,

> We note, however, that while the institution of an IPR does not by itself translate to a conclusion of unpatentability … ***the patent owner is not required to use its opportunity under the regulations to file a patent owner response***, …

Similarly, footnote 6 in *Regents of Univ. Minnesota* states,

> C.F.R. § 42.120 ("A patent owner ***may file*** a response to the petition . . . ."). It is the petitioner that "shall have the burden of proving a proposition of unpatentability by a preponderance of the evidence." 35 U.S.C. § 316(e).

By not providing responses to claims 58, 59, 66, 138, and 139, these claims were not disclaimed nor were they "given up during the IPR." Appellant's (lack of) action does not qualify as a request for adverse judgment under § 42.73(b).

**b) Additional Reasons**

SoftView was denied entry of a Sur-reply to refute false assertions made by Dr. Grimes in a 94-page Reply Declaration, and SoftView's motion to exclude Grimes' Reply Declaration, which violated 37 C.F.R. § 42.23(b) by introducing new prior art references and arguments not addressing PO's Reply, was improperly denied. See *Intelligent Bio-Systems, Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359 (Fed. Cir. 2016) and *Apple Inc. v. Andrea Elecs. Corp.*, 949 F.3d 697 (Fed. Cir. 2020).

While these issues were raised on appeal, the Rule 36 Judgments were issued prior to the precedential opinion in *Intelligent Bio-Systems* (representing a change in law), and the *Apple Inc. v. Andrea Elecs. Corp.* opinion.

The PTO recognized the unfairness of the original rules governing IPR proceedings and changed several rules to address these inequities, including:

- Sur-replies following Principal Briefs now permitted by right
- Claim Construction standard changed from BRI to *Phillips*[9]
- Testimonial Evidence now permitted in the Patent Owner Preliminary Response

Additionally, the claim construction issued for the first time in the '353 and '926 FWDs was not asserted in petitions nor argued by either party (including in the parties' briefs). Under the APA, Appellant should have been provided an opportunity to address the new claim construction as applied to the cancelled claims. *SAS Institute, Inc. v. ComplementSoft, LLC.*, 825 F.3d 1341 (Fed. Cir. 2016). Nor did the PTAB (re)construe any cancelled dependent claim in consideration of its new claim construction.

**5. Issue Preclusion Exceptions**

"The doctrine of issue preclusion is premised on principles of fairness." *Freeman,* 30 F.3d at 1465. Thus, Courts have recognized exceptions to issue preclusion, including:

> §28 Exceptions to the General Rule of Issue Preclusion
>
> Although an issue is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, ***relitigation of the issue in a subsequent action between the parties is not precluded in the following circumstances***:
>
> …

[9] 83 Fed. Reg. at 51342.2

> (3) A new determination of the issue is warranted by differences in the quality or extensiveness of the procedures followed in the two courts …; or
>
> (4) The party against whom preclusion is sought had a significantly heavier burden of persuasion with respect to the issue in the initial action than in the subsequent action; the burden has shifted to his adversary; or the adversary has a significantly heavier burden than he had in the first action; or
>
> (5) There is a clear and convincing need for a new determination of the issue (a) because of the potential adverse impact of the determination on the public interest …
>
> Restatement (Second) of Judgments § 28 (1980).
>
> "Issue preclusion … may be defeated by shifts in the burden of persuasion or by changes in the degree of persuasion required." WRIGHT & MILLER § 4422; *see* Restatement § 28, cmt. f.
>
> Also, issue preclusion may be inappropriate in subsequent litigation with others when:
>
> (2) The forum in the second action affords the party against whom preclusion is asserted procedural opportunities in the presentation and determination of the issues that were not available in the first action and could likely result in the issue being differently determined.
>
> Restatement (Second) of Judgments § 29 (1980).

It is inarguable the Board in the '353 IPR committed legal error by never establishing a *prima facie* case of obviousness for at least claim 66 and by shifting the burden to Appellant to prove patentability of all cancelled claims.

*Inter partes* reexamination allows procedural opportunities that were not available in the IPRs. These include the opportunity to submit multiple rounds of responses with expert declarations, and the opportunity to address false assertions in opposing expert declarations. Indeed, the ability to challenge expert declarations was at the core of the holding in *SynQor.* 988 F.3d 1352. In the '353 IPR, Appellant was denied the opportunity to address false assertions in Dr. Grimes' 94-page Declaration that were addressed in this proceeding.

#### 6. Burden is on the Party Asserting Issue Preclusion to Prove All Elements

"The party seeking to invoke collateral estoppel bears the burden to prove all necessary elements." *RF Delaware, Inc. v. Pacific Keystone Technologies, Inc.*, 326 F.3d 1255 (Fed. Cir. 2003). "[I]t is the identity of the *issues* that were litigated that determines whether collateral estoppel should apply." *Ohio Willow Wood* 735 F.3d 1342. It is the Board's burden to show the identity-of-*issues* are met, not the burden of Appellant to show they are not met. The Board has failed to meet its burden.

#### 7. *Res Judicata* Cannot Apply to the '353 FWD

As argued in Appellant's Request for Rehearing (Req. Reh'g) (Appx2839), the traditional principles of *res judicata* case law preclude application of estoppel under § 42.73(d)(3) as applied to the new ground of rejection in the Appeal Decision. The Board reversed the Examiner on all § 103 rejections on the merits, and thus the claims are patentable under the patent statutes. For reasons similar to those found in *Application of Craig,* 411 F.2d 1333, 162 U.S.P.Q. (BNA) 157 (C.C.P.A. 1969) and *Application of Herr*, 377 F.2d 610, 153 U.S.P.Q. (BNA) 548 (C.C.P.A. 1967), it would be against public policy to deny confirmation of claims found patentable over the art, where, "Society stands to lose when a patent is refused on an invention patentable under the statute." *Id.*

### D. All Claims on Appeal are Patentably Distinct Over All Claims Cancelled in the ’353 IPR

Even under the Board’s broad interpretation of § 42.73(d)(3)(i), estoppel cannot apply because all claims on appeal, when correctly construed, are patentably distinct over all the claims cancelled in the ’353 IPR under the claim construction applied in that proceeding.

While there is strong disagreement between what was actually litigated and determined based on the Federal Circuit’s Rule 36 Judgment in *Softview LLC v. Kyocera Corp.,* 592 F. App'x 947, there can be no question that the claim construction for cancelled claims 1 and 36 was actually litigated and confirmed by the Judgment. The claim construction was the central issue that was appealed by SoftView and was the basis for invalidating claims 1 and 36. As argued by SoftView in its Appellant Briefs (Appx2877, Appx2976), the claim construction was errant and had a correct claim construction been applied the claims were clearly patentable over both combinations of art used to invalidate the cancelled claims including claims 1 and 36. Under the doctrine of issue preclusion all parties, as well as the Board, are estopped from asserting a different claim construction for the purpose of estoppel under §§ 42.73(d)(3) and 42.73(d)(3)(i).

### 1. The SoftView Patents and the "preserving/preservation" limitation

The SoftView '353 and '926 Patents disclose novel solutions for browsing Web content on mobile devices, enabling Web page content to be displayed, zoomed, and panned while preserving the original page layout, functionality, and design of the Web content as defined by the page's HTML-based Web content. "[P]reserving the original page layout, functionality, and design of the content on the Web page as *defined by the HTML-based Web content*" literally means just that – the original page layout, functionality, and design of Web page content is required to be rendered as defined by the HTML-based Web content, meaning in compliance/accordance with applicable HTML and CSS standards. Preservation applies to all the original page layout, functionality, and design of the Web page content. This is consistent with the plain meaning, the patent specification and drawings, and the prosecution history.

The Figures from the patents below illustrate an implementation of the preferred embodiment as applied to an example Web page. The Web page's HTML-based content (HTML, and (if present) CSS[10], XML, and JavaScript) is processed using an HTML- and CSS-compliant rendering engine (*e.g.*, Mozilla "Gecko") to perform the functions in blocks 150, 152, and 154 of FIG. 5. '353

---

[10] Mozilla used a default CSS style sheet having styles that could be overridden by CSS in/with the Web page

Patent, 17:31-41. Gecko's rendering process is described by Wolf with reference to the following diagrams (Appx2207).



> 19. The ’926 and ’353 patents use Gecko to generate everything up to the Frame Tree, including Reflow. Thus, Gecko is used to generate the layout information for the HTML objects including bounding boxes in accordance with the CSS box model defined in HTML 4.01.

The HTML objects and page layout information are used to generate a scalable resolution-independent representation of the Web page (also referred to as a “vector representation”) that can be used to display, zoom, and pan views of the Web page by scaling and translation operations. 15:43-18:32. This aspect of the invention is captured by the “preserving” elements in the claims on appeal.




FIG. 4A




FIG. 4B




FIG. 4C




FIG. 5

FIGs. 4D and 4G show scaling of two HTML objects, FIG. 4E shows a scaled page, and FIG. 4F shows scaled bounding boxes for the scaled page.




FIG. 4D




FIG. 4G




FIG. 4E




FIG. 4F

The following page rendering example as applied to the www.nytimes.com Web page was provided in the Supplemental Amendment filed on May 20, 2008, beginning on page 77 (Appx2462) in a section entitled "Discussion of new claim terminology, "preserves the original page layout, functionality, and design of the Web page content."" The upper desktop browser rendering employed the Firefox 2.0 browser and the Sony CLIÉ rendering employed the SoftView™ browser implementing the teachings of the ’353 patent running on a Palm 3.5 emulator.


INTERNET
REQ URL
)EM
(W)LAN
AP
MOBILE SERVICE PROVIDER NETWORK
BS
WIRELESS/MOBILE DEVICE
The New York Times
SONY
menu
CLIÉ
POWER

The section also included the penultimate criteria for meeting the preserving limitation,

1. …[U]nder aspects of embodiments of the invention … the overall layout, functionality and appearance (design) of the scaled Web pages defined by the HTML code for the Web page are preserved.

### 2. The PTAB's Claim Construction in IPR2013-00007 and IPR2013-00256

The '353 FWD states (original emphasis),

> In consideration of the language of the claims of the '353 Patent, the language of the claim of the '926 Patent, as discussed in our Final Written Decision in IPR2013-00004, and the parties' contentions that the preserving limitation be construed to have the same meaning in the '353 and '926 Patents, we apply the same construction in both patents. Thus, as previously noted, *we construe the preserving limitation to mean, maintains the features of the web page's capabilities and appearances in a manner consistent with the translated portion of HTML code defining those capabilities and appearances.* Appx0358.

The '353 FWD addressed the limitations of claim 1 and claim 36 and was based on a more-detailed claim construction in the '926 FWD of claim 30 (Appx0391-0396), which literally recites (only) the translated [at least a] portion of HTML-based content is required to be preserved:

> **translating** **at least a portion of the HTML-based content** from its original format to produce translated content including scalable vector-based content that supports a scalable resolution-independent representation of the HTML-based content **that preserves an original page layout, functionality and design of the at least a portion of the HTML-based content** when scaled and rendered;

The Board attempts to divert attention from the ’353 FWD claim construction, incorporating a quote from the ’926 FWD that is demonstrably false:

> … ('926 FWD discussing that in the "Decision to Institute, we construed the claim terms as the Petitioner represented they were construed by the district court in co-pending litigation, *SoftView LLC v. Apple Inc.,* Case No. 10-389-LPS (D. DE). Dec. to Institute (Paper 12) …) Appx0022-0023

The ’926 Decision to Institute (Appx4455) used Patent Owner’s claim construction *proffered* in the litigation and was entered five months *before* issuance of the district court claim construction (on September 4, 2013) (Appx3036, Appx3064). Most importantly, the “preserve(s) / preserved / preserving / preservation” limitation was not addressed in the ’926 Decision to Institute and was construed in the ’353 FWD inapposite to the plain meaning construed by the district court. Appx3068-3069.

#### a) The ’353 FWD Claims Construction Was the Basis for Cancellation of Claims 1 and 36.

The following statements made by the Board in the ’353 FWD further buttress the claim construction determined in the ’353 FWD and provides substantial evidence that this claim construction was used to invalidate claims 1 and 36:

> … Construing the claim broadly, a portion of the HTML-based content could be scaled and rendered ***that would preserve only some features of the original layout, function, and design, as viewed on a conventional desktop***. While preserving the original layout, functionality, and design ***of the translated portion of the HTML-based content***, the web page rendered on the claimed device may, or may not, appear as it would on a conventional desktop, ***depending upon what portion of the HTML-based content is translated***. Appx0355.

> … Thus, Zaurus discloses a system that maintains the primary features of a page’s appearance in a manner consistent with the portion of HTML code that the Zaurus browser uses. ***To the extent that the browser in Zaurus provides a limited implementation of HTML, Zaurus preserves the layout and design of the web page defined by the translated portion of the HTML-based Web content (claim 1) and that portion of the HTML content which is processed in the retrieved Web page (claim 36)***. Appx0360.

> As discussed above, claim 1 requires preserving the original layout, function, and design of the translated portion of the HTML-based Web content. … Claim 36 does not recite processing all of the HTML-based Web content, ***or <u>any particular HTLM-based Web content</u> that preserves the original layout, functionality, and design***, into scalable content. Claim 36 next recites re-rendering the display while preserving the original page layout, functionality, and design of the Web page. Thus, the original layout, functionality and design of the Web page content is preserved to the extent it was displayed on the mobile device, *i.e.*, to the extent that the mobile device processed the HTML. Although neither Zaurus nor Bederson implements each and every feature of HTML, ***as discussed above, both Zaurus and Bederson disclose preserving the layout, functionality and design of <u>the part of the web page that is translated (claim 1) or processed (claim 36)</u>***. Appx0365

### 3. The ’353 FWD Claim Construction was the Primary Issue Appealed to the Federal Circuit

In Appellant SoftView’s Opening Appeal Brief (Appx2878) and Reply Brief (Appx2977) for the Federal Circuit appeal, the ’353 FWD claim construction of the “preserving” limitation was the first issue raised. Under STATEMENT OF THE ISSUES (Appx2883):

> 1. Whether the Board erred in construing the "preserving" limitation to cover devices that significantly change the original page layout, functionality, and design of a webpage?

As argued in the INTRODUCTION section (Appx2881):

For example, the Board formulated an unreasonable claim construction for the "preserving" limitation that directly contradicts the intrinsic record—a construction that rewrites the claim language, ignores clear statements in the specification, disregards disclaimers in prosecution, and contradicts the positions taken by *both sides* in the District Court Case. The Board then relied upon its unreasonable construction to find the "preserving" limitation in prior art that explicitly teaches *changing* the original webpage content—the opposite of "preserving."

#### a) Claim Construction of the "Preserving" limitation in the '353 IPR FWD Must be Applied

The '353 FWD's interpretation of the "preserving" limitation is binding for the purpose of applying estoppel under § 42.73(d)(3)(i). The Board disagrees, stating "while the Federal Circuit opinion confirms the unpatentability of the claim in the '353 FWD, it says nothing about the application of estoppel in the current proceeding." Appx0025. Use of a different construction would violate the identity-of-issues requirement.

For collateral estoppel to apply to a court's claim construction, the construction "had to be the reason for the loss," *Tecsec,* F.3d at 1344 citing *Jackson Jordan, Inc. v. Plasser Am. Corp.,*747 F.2d 1567, 1577 (Fed.Cir.1984). In addressing *Tecsec* in *Phil-Insul Corp. v. AirLite Plastics Co.*, 854 F.3d 1344 (Fed. Cir. 2017), this Court clarified that "[h]ad claim construction been the only issue in the IBM appeal, and had that claim construction been essential to sustaining the

judgment of noninfringement, the preclusive effect of our Rule 36 judgment would have been undeniable." *Id* at 1356.

Claim construction is the cornerstone of any invalidity determination. All claims, including claims 1 and 36, were cancelled over two separate combinations of references. Significantly, the same claim construction was applied to both combinations of references. Therefore, since the Rule 36 Judgment confirmed cancellation of the claims that were appealed (including claims 1 and 36), the claim construction determined in the ’353 FWD was ‘necessary’ or ‘essential’ to the final appellate judgment and that claim construction is binding for collateral estoppel.

#### 4. The Claims for which Estoppel are Asserted Must be Construed Under *Phillips*

As the ’353 patent expired during this reexamination, the *Phillips* standard must be applied in construing the claims for which estoppel is asserted.

> Claim terms are generally accorded their ordinary meaning—that is, their meaning to a skilled artisan at the time of the invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc). This approach “provides an objective baseline” for our inquiry. *Id.* at 1313. … “Importantly,” skilled artisans are “deemed to read the claim term . . . in the context of the entire patent.” *Id.* at 1313.
>
> *Intel Corp. v. Qualcomm Inc.*, 21 F.4th 784, 791 (Fed. Cir. 2021)

> "The prosecution history, in particular, 'may be critical in interpreting disputed claim terms,'" and "even where 'prosecution history statements do not rise to the level of unmistakable disavowal, they do inform the claim construction.'" *Personalized Media Communications, LLC v. Apple Inc.*, 952 F.3d 1336, 1340 (Fed. Cir. 2020) (quoting *Sunovion Pharmaceuticals, Inc. v. Teva Pharmaceuticals USA, Inc.*, 731 F.3d 1271, 1276 (Fed. Cir. 2013)).

### 5. Claim Construction For Appealed Claimed

Claim construction is a question of law, and receives *de novo* review on appeal. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 390–91 (1996); *Teva Pharms. USA Inc. v. Sandoz, Inc.*, 574 U.S. 318, 325 (2015).

Appellant has consistently argued throughout prosecution of this reexamination that the original and amended independent claims require "preservation of the original page layout, functionality, and design in accordance with HTML and (if applicable) CSS standards for the HTML-based content for the Web page (all of it)." Appx2146.

The preservation/preserving limitation requires two aspects. First (1), the Web page needs to be rendered in accordance with the HTML-based Web content, which is what defines the original page layout, functionality, and design of content on a Web page. Second (2), that original page layout, functionality, and design of the content aspect (1) needs to be preserved at the different zoom levels. Appx4055.

As argued throughout this reexamination, including the ’634 oral hearing of December 8, 2021 (Appx2731), there are no embodiments under which a portion of the HTML-based Web content defining the original page layout, functionality, and design is skipped or ignored such that the original page layout, functionality, and design of the Web page content is not preserved.

#### a) This Court Should Consider the District Court Claim Construction

As argued in Req. Reh’g (Appx2860), the Board should have considered the Claim Construction Memorandum Opinion (Appx3036) and the Claim Construction Order (Appx3064) issued by Judge Leonard Stark in the District Court litigation. While Judge Stark’s *Phillips* construction is non-binding on the Court, it is informative. Notably the construction for “preserve(s) / preserved / preserving / preservation” and “fit across” was plain and ordinary meaning and does not need to be construed. Appx3068-3069.

### b) Independent Claims 87, 185, 285, and 318

Claim 87 recites in part,

87. A mobile hand-held device, comprising:

… instructions … that when executed by the processor enable the mobile hand-held device to perform operations including,

rendering a browser interface on the display via which a user is enabled to request access to **a Web page** **comprising HTML-based Web content defining** **an original page layout, functionality, and design of content on the Web page**;

in response to a user request of the Web page,

retrieving **the Web page** via the wireless communications interface;

rendering **the Web page** such that a width of the Web page is rendered to fit across the display; and

re-rendering the display in response to associated user inputs to enable **the Web page** to be browsed at various zoom levels and panned views **while preserving** **the original page layout, functionality, and design of the Web a e** [sic] **content** at each zoom level and panned view.

In view of the ’353 specification, the prosecution history, and plain meaning, the original page layout, functionality, and design of the Web page content (as defined by its HTML-based Web content) must be preserved at each zoom level and panned view under both BRI and *Phillips*.

Even when seeking the "broadest reasonable construction in light of the specification," …we still give words "their plain meaning" unless

"inconsistent with the specification and prosecution history." *Arista Networks, Inc. v. Cisco Sys., Inc.*, 908 F.3d 792, 796–98 (Fed. Cir. 2018) ... "Above all, the broadest reasonable interpretation must be *reasonable* in light of the claims and specification." *PPC Broadband,* 815 F.3d 755.

*Intel Corp.*, 21 F.4th at 791

**c) Independent Claims 1, 36, 70, 149, 209, and 216**

By way of example, claim 70 recites, in part,

70. A mobile hand-held device, comprising:

…

storage means, in which a plurality of instructions are stored,

wherein, upon execution of the instructions by the processing means, the mobile device is enabled to perform operations, including,

rendering a browser interface via which a user is enabled to request access to **a Web page comprising HTML-based Web content defining an original page layout, functionality, and design *of content on the Web page***;

retrieving ***the Web page*** via the wireless communications means, and processing at least a portion of the HTML-based Web content to produce scalable content; and

employing at least one of the scalable content or data derived therefrom to,

render the Web page on the display; and

re-render the display in response to associated user inputs made via the display to enable the Web page to be browsed at various zoom levels and panned views **while preserving the original page layout, functionality, and design *of the Web page content* at each zoom level and panned view**.

As was well-known by a POSITA at the time of the invention, an HTML document (*e.g.*, a Web page) includes a (1) HTML (and optionally CSS,

JavaScript, and/or XML)[11] content in the BODY defining the page layout, functionality, and design of the Web page that is interpreted by a rendering engine; and may include (2) other HTML content in the HEAD Element that does not define any of the page layout, functionality, and design of the Web page.[12]

This was described and illustrated in Req. Reh'g, including the following diagram (Appx2844):




Under the ordinary meaning of the the "preserving" limitation in claim 70 and correct use of antecedent basis, the original page layout, functionality, and design of the Web page content must be preserved at each zoom level and panned view.

The processing "at least a portion of the HTML-based Web content" to produce scalable content language was drafted to address how an HTML- and

---

[11] CSS, XML and/or JavaScript may also be included in separate document(s) referenced in the HTML parent document.

[12] A Head Metatag may be used to define a viewport used for page layout (Appx2844).

CSS-compliant rendering engine (*e.g.*, Mozilla) processes HTML-based content and to preclude an infringer from asserting, "we do not process [(2)] to produce scalable content, therefore we do not infringe." Appx2843. But there can be no question under *Phillips* that the original page layout, functionality, and design of the Web page content is preserved – all of it. The result is similar for each of claims 1, 36, 70, 149, 209, and 216 when correctly construed under *Phillips*.

#### d) Claim Construction Under the Appeal Decision is Inapposite to the Claim Construction in the '353 FWD

Contrary to the clear case law and the equitable considerations on which common law estoppel is based, the Board provides a new claim construction for claim 1 and applies this construction to claims 1 and 36 as the baseline for claim scope comparison rather than the claim construction determined in the '353 FWD. But claims 1 and 36 were not and could not have been cancelled as obvious under this new claim construction. This is clear legal error.

The Board states, (Appx0082):

> Essentially, cancelled claim 1 required HTML-based Web content that includes A=(layout), B=(functionality), C=(design), and X=(additional content), and only the ABC portion of the content was required to be translated and preserved when scaling.[13]

[13] The Board did not separately construe the scope of Claim 36.

The Board does not indicate what claim construction standard it used; however, the new construction of claim 1 generally correlates with the correct interpretation under *Phillips* discussed above (*i.e.*, all the original page layout, functionality, and design for the Web page must be preserved). Notably, the "preserving" limitation in this construction is inapposite to the claim construction in the '353 FWD. A side-by-side comparison of these claim constructions is shown in the following table.

| '353 IPR FWD | Board '634 Appeal Decision |
|---|---|
| *we construe the preserving limitation to mean, maintains the features of the web page's capabilities and appearances in a manner consistent <u>with the translated portion</u> of HTML code defining those capabilities and appearances.* | Essentially, cancelled claim 1 required HTML-based Web content that includes A=(layout), B=(functionality), C=(design), and X=(additional content), and only the ABC portion of the content was required to be translated and preserved when scaling. |

Under the '353 FWD, only the portion of ABC that was translated (or processed for claim 36) needed to have its "capabilities and appearances" maintained[14]. This interpretation places no limit on what portion of ABC (the HTML-based content defining the (original) page layout, functionality, and design

---

[14] "maintained" and "preserved" are well-known synonyms.

of content on the Web page) is translated. Specifically, repeated in part from above (Appx0365, underlining added),

> … claim 1 requires preserving the original layout, function, and design of the translated portion of the HTML-based Web content. …Claim 36 does not recite processing all of the HTML-based Web content, or any particular HTLM-based Web content that preserves the original layout, functionality, and design, into scalable content. … both Zaurus and Bederson disclose preserving the layout, functionality and design of the part of the web page that is translated (claim 1) or processed (claim 36).

The Board is comparing claims on appeal that require preserving all the page layout, functionality, and design of the Web page content relative to their own new interpretation of claims 1 and 36. But the estoppel must be based on the interpretation of claims 1 and 36 used to cancel those claims in the ’353 IPR. The ’353 FWD did not find the combinations of references rendered claims 1 and 36 obvious under the Board’s new interpretation of claims 1 and 36. The ’353 FWD repeatedly indicates that preserving what the Appeal Decision refers to as “A=(layout), B=(functionality), C=(design)” was not required. Had the PTAB in the ’353 FWD determined that the combinations of references rendered preserving “ABC” obvious there would have been no need to apply the claim construction of claim 30 in the ’926 IPR to claims 1 and 36. And any argument that they could have would be pure speculation because this is not what they did and was not the claim construction affirmed under Rule 36.

Under the *Phillips* standard, as well as the new construction in the Appeal Decision, all of A=(layout), B=(functionality), C=(design) defined by the HTML-based Web content is required to be preserved. This claim scope falls outside the coverage of the IPR art (both combinations of references). Conversely, under the BRI claim construction used in the '353 FWD (which Appellant maintains was errant), this dramatically broader scope of the claims falls within the coverage of the IPR art.




### 6. Difference in IPR and *Phillips* Claim Construction

In Reh'g Dec the Board states,

> Patent Owner is required to show some difference in the claim scope under the BRI versus *Phillips* standards and then identify how that difference materially alters the patentability determination. Appx0028.

As discussed *supra*, it is the burden of the party asserting estoppel to prove all elements. This includes providing evidence that "the differences between the unadjudicated patent claims and adjudicated patent claims do not materially alter the question of invalidity." *Ohio Willow Wood* 735 F.3d at 1342 citing *Bourns,* 537 F.2d at 493. The Board has failed to meet it burden.

A comparison of the BRI claim construction used to cancel claims in the ’353 IPR and the correct claim construction under *Phillips* and BRI of selected independent claims is shown in the following table and diagram.

| | |
|---|---|
| ’353 IPR FWD | 87, 185, 285, 318 (BRI and *Phillips*)<br><br>1, 36, 70, 149, 209, 216 (*Phillips*) |
| *we construe the preserving limitation to mean, maintains the features of the web page's capabilities and appearances in a manner consistent <u>with the translated portion</u> of HTML code defining those capabilities and appearances.* | the original page layout, functionality, and design of the Web page content as defined by the page’s HTML-based content is preserved …<br>when scaled and rendered (1);<br>at each zoom level and panned view (36, 70, 87, 149, 185, 285);<br>under both the first and second scale factors (209); or<br>at any selectable zoom level (318) |




As with the previous diagram in section II.D.5.c, the scope of claims 87, 185, 285, and 318 do not fall within the BRI scope in the ’353 IPR. The previous section II.D.5.c diagram also applies to claims 1, 36, 70, 149, 209, and 216. Additionally, applying BRI, the Examiner correctly determined that original (issued) claims 87, 185, and 285, were patentably distinct in the ’635 reexamination proceeding (Appx2027-2030).

Under the ’353 FWD claim construction and the statement, “both Zaurus and Bederson disclose preserving the layout, functionality and design of the part of the web page that is translated (claim 1) or processed (claim 36),” the rendering of the Web pages shown in the Pad++ references (presumably) met these claim limitations.




**Figure 1: Snapshot of Pad++ Web Browser.**




**Figure 2: Another view of same web pages.**

Appx0589




**Figure 5.** Many different HTML documents loaded in Pad++. Their layout implicitly shows the history of the user's interaction. The two views show the same tree focused on different nodes

Appx0646

None of these Web page views preserves the HTML-based Web content defining the original page layout, functionality, and design of content on the Web page, and there was no evidence of record in this proceeding nor the IPR

proceedings that would support an assertion they do. The following provides an example of the difference between the errant manner the Pad++ browser rendered the yahoo.com home page (1995) and how the page is rendered when it is properly interpreted using an HTML-complaint rendering engine (*i.e.*, as defined by the HTML-based Web content).







Appx2161

With respect to the Zaurus, there is a rendering in the '353 IPR proceeding showing a portion of a Zaurus Plaza page from a translated manual (Appx1926).




ZAURUS PLAZA (Zaurus home page) screen

PX1004_642 (Appx1924) shows the following.

<u>Contents of ZAURUS PLAZA (Zaurus home page)</u>

ZAURUS PLAZA (the Zaurus home page) is a page which provides information and services catering to Zaurus users. This ZAURUS PLAZA is in "WildBird," an information service for mobile information terminals and mobile personal computers.
The following is the ZAURUS PLAZA address (URL).
http://www.wildbird.or.jp/zaurus/




*The screen design and contents of ZAURUS PLAZA are modified as needed.

ZAURUS PLAZA (Zaurus home page) Screen

As stated, "The screen design and contents of ZAURUS PLAZA are modified as needed." There is no evidence this page is rendered in accordance with HTML standards, nor any evidence all the page layout, functionality, and

design of the Web page content is preserved under the reduced display or the magnified display, much less both.

In the following pairs of Web page renderings, the screen captures on the left were produced by Pad++ and the screen captures on the right were produced by Netscape 6 using the Mozilla rendering engine. The Mozilla renderings meet the preservation/preserving limitations under *Phillips* and under BRI for claims 87, 185, 285, and 318, and meet the preservation/preserving limitation under *Phillips* for all other independent claims on appeal. Under the ’353 FWD claim construction, the Pad++ renderings, which shows the portion of the HTML-based Web content that is translated (claim 1) or processed (claim 36) by Pad++, the preservation/preserving limitation presumably would be met. The dramatic difference in claim scope as applied to actual Web pages at the time of the invention cannot be overstated.



www.yahoo.com (April 18, 1997)



www.yahoo.com (April 4, 2001)



www.msn.com (April 3, 2001)



www. nytimes.com (Nov. 9, 2000)



www.aol.com (April 1, 2001)



www.about.com (April 1, 2001)

Appx2853

In summary, it is inarguable that the claims on appeal using the correct claim construction under *Phillips* (and under BRI for claims 87, 185, 285, and 318) are patentably distinct from the claims cancelled in the ’353 IPR using the Board’s claim construction.

**E. Board’s Claim Rejections under New Ground**

**1. Claims 87, 185, 285, and 318**

In rejecting claim 87 as not being patentably distinct from claims 1 and 36 the Board asserts (Appx0113-0114),

> …
>
> Except for the limitations discussed infra, claim 87 is a combination of the cancelled sub-combination claims 1 and 36. Our review does not find any additional synergy from the combination of cancelled claims 1 and 36. Rather, in the combination the limitations merely perform as they did in each sub-combination. Therefore, we conclude that based on the combined limitations, appealed claim 87 is not patentably distinct from the cancelled sub-combination claims.

First, claim 87 is not a combination of any other claims. Claim 87 was drafted to remove any question to what is required to be preserved, and each of claims 1 and 36 include limitations not present in claim 87. “It is settled law that when a patent claim does not contain a certain limitation and another claim does, that limitation cannot be read into the former claim in determining either validity

or infringement." *SRI International v. Matsushita Electric Corp.*, 775 F.2d 1107, 1122 (Fed. Cir. 1985) (other citations omitted).

Second, the claim scope that must be applied for consideration of collateral estoppel is the claim scope of claims 1 and 36 determined in the '353 FWD, not the new claim scope the Board has applied in the Appeal Decision. Under the '353 FWD claim scope claim 87 is clearly patentably distinct over claims 1 and 36, as demonstrated above and as found by the Examiner. Moreover, claims 87 and 1 or 87 and 36 are not remotely close to being "essentially the same" or "substantially the same" when the correct estoppel claim scopes are considered. For similar reasons, each of independent claims 185, 285, and 318 are patentably distinct over all claims cancelled in the '353 FWD.

**2. Rejection of Dependent Claims**

**a) Additional Synergy Analysis Not Supported By Any Court Precedent**

The Board states,

> Patent Owner argues that the Board addresses the dependent claims in isolation as a "delta" of the independent claims. PO Req. Reh'g 39. Patent Owner is mistaken.
>
> The Board repeatedly states, when addressing dependent claims, that it "does not find any additional synergy" from the combination of cancelled claims, thereby clearly considering the subject matter as a whole. Appx0029

The Board does not identify, nor can Appellant find any court precedent for its “additional synergy” approach when determining whether the dependent claims on appeal are patentably distinct from the claims cancelled in the ’353 IPR. The Board also erroneously asserts, “The focus of the analysis is on any differences between the adjudicated and non-adjudicated claims –not on prior art or record evidence, which would provide an easy end-run around preclusion rules designed to avoid repetitious litigation.” Appx0023.

“[T]he inquiry should be whether the nonlitigated claims present new issues ***as to the art pertinent to the nonlitigated claims; as to the scope and content of that art; as to the differences between the prior art and the nonlitigated claims; and as to the level of ordinary skill in that art***.” *Westwood Chemical*, 525 F.2d at 1375. "[B]y focusing on the issues of fact and law necessary to a resolution of the obviousness issue, *Graham* [citation omitted], a determination can be made whether the unadjudicated claims present any new issues, which, ***to afford due process, would require a trial on the merits***, . . .") *Bourns,* 537 F.2d at 492 .

The Board’s approach is akin to the domino approach rejected by this Court in *Bourns*: “A domino approach in which each successively narrower claim is compared with the one before it, not with the prior art, is inappropriate since it improperly gives prior-art effect to the subject matter of an invalid claim. 537 F.2d at 492-93.

Where obviousness is the basis for the prior invalidity holding, an inquiry into the identity of the validity issue is more properly phrased in terms of the factual inquiries mandated by *Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), as a prerequisite to such a validity determination.

To determine whether a claim is patentably indistinct from another claim, all the claim elements must be considered, and the claims must be construed as a whole. Moreover, for estoppel purposes in this proceeding, all claim elements of the allegedly estopped claims must be construed under the correct (*Phillips*) standard. For many of the claims on appeal, the claims are patentably distinct relative to the cancelled claims *even when considering the Board's new claim construction*, which, as argued above cannot be applied.

The canons of claim construction include the presumption that "each claim in a patent is presumptively different in scope" and also "the presumption that [a parent] claim [] should not be" "interpret[ed] [in a manner that] would render [a dependent] claim completely superfluous and redundant of [the parent] claim". *Applied Concepts, Inc. v. Olympia Indus., Inc.*, 15 F.Appx. 793, 798–99 (Fed. Cir. 2001) ("each claim in a patent is presumptively different in scope") (citing *Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) ("the presumption that [a parent] claim should not be [construed in a manner that renders

a dependent claim 'superfluous and redundant of' the parent claim] in order to preserve the distinction between [the] claims")).

**b) Effect of Patent Expiration**

Appellant agrees that the amended claims must revert back to their original (issued) form. However, Appellant vigorously disagrees that it did not propose claim constructions under *Phillips* in Req. Reh'g. For example, *see* Appx2858: "Under the *Phillips* standard, as well as the new construction in the Appeal Decision, all of A=(layout), B=(functionality), C=(design) defined by the HTML-based Web content is required to be preserved." Also *see* Appx2862.

**c) Real-time Rendering/Zooming**

"The Board specifically rejects a construction that has specific time frames" (Appx0030) – a construction that can be found in the '353 patent (fraction of a second) and in the prosecution history ("For the purpose of a defined time period, "in real time" as used herein means the operation is performed in a few seconds or less.") (Appx2461).

The Board falsely asserts the '353 patent shows real-time zooming is achieved using vectors (alone) while ignoring how the '353 patent utilizes vectors in a specific way and in combination with other teachings to achieve real-time zooming. Appx0030. The '353 patent states,

> … Because the client-side viewer ***manipulates vectors***, ***there is no loss in quality as the display is zoomed***. The graphics rendering engine within the client is so efficient that file manipulation ***happens in a fraction of a second***. 5:10-13

Also, the Board falsely asserts, "Patent Owner argues there are additional known ways to implement real time rendering besides the vectors relied upon by the Board." Appx0030. Appellant actually argued,

> Second, the use of vectors ***was not the sole reason*** actual implementations on PDAs including the Sony Clie and Pocket PC devices were able to achieve real-time rendering and zooming. Real-time rendering was also based on the disclosed solution under which the bounding boxes linked to the page's DOM (Document Object Model) objects were "vectorized," the use of a display list of vectors, and the use of a lightweight and fast vector-based rendering engine/library (SVF). Appx2863.

#### d) Billions of Web Pages

The Board argues that "enables a user" limitation is merely a "for use" claim limitation that does not add a structural limitation to the claimed system or method. *See In re Anderson*, 662 F. App'x 958, 963 (Fed. Cir. 2016). Appx0033. The claims do not recite anything that could be construed as a "for use" limitation, but rather recite additional functionality that inherently requires additional structure (instructions).

For example, claim 111 recites,

111. The mobile hand-held device of claim 87, wherein the device enables a user to browse, zoom, and pan billions of Web pages in a manner that preserves the original layout, functionality, and design of the HTML-based Web page content of each Web page.

Claim 87 is directed to a mobile hand-held device (an apparatus) and includes the structural limitation, "non-volatile memory, operatively coupled to the processor, ***in which a plurality of instructions are stored that when executed by the processor enable the mobile hand-held device to perform operations including***,".

The structure is the mobile hand-held device, its processor and instructions that execute thereon. To enable additional functionality (preserving billions of claims), additional structural means (instructions) are required.

Appellant has never argued the user must visit billions of Web pages, but rather the claimed apparatus must be capable of enabling a user to browse billions of pages while preserving the original page layout, functionality, and design of those pages.

This situation is addressed in *Silicon Graphics, Inc. v. ATI Technologies, Inc.*, 607 F.3d 784 (Fed. Cir. 2010):

> … this court has held that an apparatus claim directed to a computer that is claimed in functional terms is nonetheless infringed so long as the product is designed "in such a way as to ***enable a user*** of that [product]

> to utilize the function . . . without having to modify [the product]." *Fantasy Sports Props., Inc. v. Sportsline.com, Inc.*, 287 F.3d 1108, 1118 (Fed. Cir. 2002). Where, as here, a product includes the structural means for performing a claimed function, it can still infringe "separate and apart" from the operating system that is needed to use the product. *Id.* at 794, emphasis added.

Also *see Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197 (Fed. Cir. 2010): Infringement [in *Fantasy Sports*] occurred because the code "was written in such a way as to enable a user of that software to utilize the function . . . without having to modify that code." *Id*. at 1204.

The Board makes the conclusory assertion (Appx0033), "the claim is still invalid because ***the number of webpages*** would have been obvious to a person of skill in the art (POSITA)," without any supporting evidence, nor addressing the preserving limitation in view of the claim as a whole.

The intended scope of the preserving "billions of Web pages" limitation was discussed in the prosecution history (Appx2478-2480) and is a literal limitation as argued by Appellant throughout this reexamination. "As stated in paragraph [0093] of the present application, ". . . users are enabled to view the entire content of billions of existing Web pages using hand-held devices in a simple and reasonable way."" Appx2479. Also, as stated by Wolf, "In order to meet the preserving "billions of pages" limitation, the browser rendering engine would have

needed to support each of HTML 3.2, HTML 4.0/4.01 and CSS, including CSS 1 and part of CSS 2." Appx2219 ¶62.

**e) Cascaded Style Sheets**

The Petitioner and Board presented no evidence ***at trial*** concerning the patentability of claim 66, and claim 66 was not "given up," as the Board asserts. This was clear legal error. Nor was claim 66 reconstrued in view of the PTAB's new claim construction of claim 36 under which the preservation limitation required *the features of the web page's capabilities and appearances in a manner consistent with the [processed] portion of HTML code defining those capabilities and appearances* be preserved. Under this construction a page's CSS code could be entirely skipped and the preservation limitation would be met for claim 66. Under claims 106, 182, 204, 282, 304, and 322 all the web page's layout and design defined by the CSS code must be preserved under both BRI and *Phillips*.

The difference is overwhelming, as shown below. Under the IPR claim construction, the preservation limitation would be (apparently) met under the Pad++ rendering at left. The Netscape 6 rendering at right show correct interpretation of the page's CSS code.







Appx2853 (Enlarged)

## f) Tap to Zoom on Column and Paragraph

To invalidate the tap to zoom on column claim the Board again uses its domino approach, stating "there is no reasonable dispute the user input of claim 48 can be "tapping,"" (Appx0032). However, the Board failed to construe the claims in their entirety.

#### (i) *Phillips* claim construction for claim 50

48. The mobile hand-held device of claim 36, wherein execution of the instructions performs further operations comprising enabling a user to zoom on a column of the Web content via a corresponding user input [(50) comprising tapping on a column], wherein in response thereto, the display is re-rendered such that content corresponding to the selected column is rendered to fit across the display.

Claims must be construed as a whole, in context. The zoom must be "in response to" tapping on the column (or paragraph) and may not include subsequent zoom operations using additional inputs to obtain the fit across the display limitation, which was not construed in the IPR. *In re Affinity Labs of Tex., LLC*, 856 F.3d 902, 907 (Fed. Cir. 2017).

The prosecution history (Appx2455-2456) references the following images to illustrate "the Web page is rendered to fit across the display." The images are also referenced for column zooms (Appx2457), image zooms (Appx2458-2459), and paragraph zooms (Appx2459-2460). The prosecution history was also used by Judge Stark to construe the "fit across the display" limitation in the Claim Construction Memorandum Opinion. Appx3053-3054.


File Edit View History Bookmarks Tools Help
http://www.nytimes.com/
BA PayPal Finance Currency Selfpromote Kitco Good Arbidol 1&1 Hocky SoftSource ING G-News eBay
HOME PAGE MY TIMES TODAY'S PAPER VIDEO MOST POPULAR TIMES TOPICS
Get Home Delivery Log In Register Now
The Kite Runner
IN SELECT THEATERS DECEMBER 14
The New York Times
Monday, November 12, 2007 Last Update: 7:32 PM ET
BE ONE OF THE FIRST TO SEE AN ADVANCED SCREENING OF THE MOVIE
JOIN THE KITE RUNNER CLUB!
NYT Archive Since Search
Get Home Delivery | Personalize Your Weather
JOBS
REAL ESTATE
AUTOS
ALL CLASSIFIEDS
WORLD
U.S.
Politics
Washington
Education
N.Y./REGION
BUSINESS
TECHNOLOGY
SPORTS
SCIENCE
HEALTH
OPINION
ARTS
Books
Movies
Music
Television
Theater
STYLE
Dining & Wine
Fashion & Style
Home & Garden
Weddings/ Celebrations
TRAVEL
Blogs
Cartoons / Humor
Classifieds
Corrections
Crossword/ Games
First Look
Learning Network
Multimedia
Findings Could Ease Concerns About Troubled Schoolchildr
By BENEDICT CAREY 56 minutes ago
Two new studies could change the way scientists, teachers and parents understand and manage children who are disruptive or emotionally withdrawn.
Pakistan to Detain Bhutto in Bid to Stop Protest March
By JANE PERLEZ and DAVID ROHDE 4:07 PM ET
The opposition leader Benazir Bhutto faces a seven-day detention order if she presses ahead with a planned opposition march.
Times Topics: Bhutto | Pakistan
In Old Quarter, Sectarian Ties
Peter Scoones/Getty Images
Explaining the Instinct to Swarm
By CARL ZIMMER 5:12 PM ET
Researchers are discovering simple rules that allow thousands of animals to form a collective brain.
Graphics: Swarm Intelligence | Modeling Ant Behavior
At Least Half a Dozen Killed at Gaza Rally
By TAGHREED EL-KHODARY and ISABEL KERSHNER 2:43 PM ET
Armed clashes between rival Palestinian factions broke out on the third anniversary of the death of Yasir Arafat.
Back Story With Isabel Kershner (mp3)
Justices May Hear Second Amendment Case
By LINDA GREENHOUSE 3:04 PM ET
The Supreme Court will be asked to interpret the right to "keep and bear arms" if it weighs in on Washington's strict gun-control law.
MORE NEWS
Dow Ends the Day Below
ARTS »
Opera's Newest Gimmick
A 90-minute "Tosca" is the latest effort to revive opera in Italy.
Magnanimity Becomes One of Rap's Moguls
Jay-Z's show at the Hammerstein Ballroom felt scrappy and spectacular.
OPINION »
Cohen: Watch Al Jazeera
The Board: Iraq Films
Opinionator: Buddhists
Editorial: Our Veterans
Trade Smarter
Fidelity
MARKETS
DOW 12,987.55 -55.19 -0.42%
NAS 2,584.13 -43.81 -1.67%
S&P 1,439.18 -14.52 -1.00%
My Portfolio »
Stock Quotes: Go
Tools: Alerts | Stocks | Sectors
Answers for life
Get answers to the toughest questions at siemens.com/answers
SIEMENS
REAL ESTATE AUTOS JOBS ALL CLASSIFIEDS
Town at One With
FIND PROPERTIES
Enter Location
Search
Done


SONY
menu
The New York Times
CLIÉ
POWER


Pocket PC
SoftView
4:09
The New York Times
View Tools

Further support for the "fit across the display" limitation are shown in FIGs. 7A (left) and 7B (right). Appx2251.




Zooming on a column or paragraph requires a bounding box for the column or paragraph. Appx2221-2223, Appx2248-2252. Appx2250 shows the bounding box for the right-hand column of www.yahoo.com on 3-10-2001 (approximate date when FIGs. 7A and 7B were captured) using Firefox's Element Inspector:




Howard (Section X, Appx2325-2337) provides an example of a bounding box for a paragraph and describes in depth how Pad++ processed paragraphs. It is

unrefuted that Pad++ did not create nor use a bounding box for paragraphs or columns (¶¶128-142).




Zaurus did not support CSS, nor create nor use (CSS) bounding boxes.

The FWD states (Appx0368),

Zaurus describes magnifying or reducing the entire display in response to the user activation of the magnify key. … The portion of

the screen that a user zooms in on or selects to view, however, is determined by the user activating the horizontal scrolling keys and the vertical scrolling bar with the touch screen. ... Thus, applying the broadest reasonable construction, Zaurus discloses executing instructions that perform operations that enable a user to zoom on a column (claim 48) or image (claim 51) via a corresponding user input, such that the display is re-rendered with the column or image fitting across the display.




Appx1926

The foregoing requires multiple user inputs, none of which involve tapping on any content on the Web page, and the fitting across the display is not met.

Pad++ could not interpret columns and disclosed clicking inputs for selecting hyperlinks and changing the focus page.




Figure 5. Many different HTML documents loaded in Pad++. Their layout implicitly shows the history of the user's interaction. The two views show the same tree focused on different nodes

Appx2187

Section V.B.4. Paragraph Operations states,

> "Regarding paragraph operations, Patent Owner fails to provide any arguments or explanation regarding the materiality of any alleged differences between the subject matter of claims 18-21 and cancelled claims 11-14. … [T]he Board provides a well-reasoned explanation for the paragraph operations of claims 18-21 being patentably indistinct from canceled claims 11-14 which are directed to a column. Appx0032.

One problem – Claims 11-14 were not cancelled in the '353 IPR. Additionally, the Board's domino approach comparing individual limitations as opposed to the claims as a whole is improper under *Bourns*).

The Board asserts,

> A paragraph is a distinct portion of written or printed material dealing with a particular idea, and a column is a vertical arrangement on a page of horizontal lines of type. Both are well-known arrangements of printed material, and the claimed computer/display operations performed on one would be recognized by an artisan as equally applicable to the other. Appx0101.

HTML paragraphs and HTML elements used for laying out content in columns (tables, divs, spans, frames) are structural elements – none of which are interpreted by Pad++ nor for which bounding boxes are generated by Zaurus. Without a bounding box, there would be no means to determine (1) what paragraph has been selected to zoom on and (2) the changes in scale and offset to fit the

content of the paragraph across the display. Wolf, Appx2248-2252 ("A similar scheme is used to support tap-to-zoom on images and paragraphs").

#### g) XML Code

The Board uses the "domino" and its "additional synergy" approach to reject claim 105 (Appx0115). This rejection 1) does not address claim as a whole; 2) is based on art not considered in the '353 IPR; and 3) does not address the *Graham* factors.

### F. Violation of the Administrative Procedure Act (APA)

Claims 5, 23-37, 60, 61, 122, 137, 140, 141, 147, 156, 174-177, 238-242, 248, 259, and 274-277 recite identical language to like-numbered claims that were determined to be patentable as indicated in the *Ex Parte* Reexamination Certificate 11231st for 7,461,353 (Reexamination Request No. 90/009,994) (Appx0267). The prior art references considered in this *Inter Partes* Reexamination and 90/009,994 are the same and 3PR Apple Inc. is the same. In the Appeal Decision, after finding these claims patentable under § 103 they are cancelled as estopped under § 42.73(d)(3)(i), a new ground of rejection not raised by a 3PR. Moreover, the Board found claims determined by the Examiner to be patentably distinct (over the cancelled claims) in this proceeding and the '994 proceeding (Appx4507-4512) to not be patentably distinct based on a new claim construction not asserted by any party. This Agency action is an abuse of discretion and arbitrary and capricious, in

violation of the APA under 5 U.S.C. § 706(2)(A) . *See In re Vivint, Inc.*, 2020-1992 (Fed. Cir. Sep. 29, 2021) ("Under the APA, we must set aside an agency action that is either an abuse of discretion or arbitrary and capricious.")

## CONCLUSION

The Court should reverse in full the Board's Decision as applied to the new ground of rejection under § 42.73(d)(3)(i). Any remand should be limited to instructing the Board to issue a reexamination certificate confirming all claims on appeal.

Dated: June 1, 2023

Respectfully submitted,

By: /s/ R. Alan Burnett

LAW OFFICE OF R. ALAN BURNETT, PS

*ATTORNEYS FOR APPELLANT*
*SOFTVIEW LLC*

# ADDENDUM

# CONTENTS OF ADDENDUM


| | Page |
|---|---|
| DECISION ON REQUEST FOR REHEARING<br>Appeal 2021-005530 | Appx0001 |
| DECISION ON APPEAL<br>Appeal 2021-005530 | Appx0047 |
| DECISION ON REQUEST FOR REHEARING<br>Appeal 2022-000153 | Appx0146 |
| DECISION ON APPEAL<br>Appeal 2022-000153 | Appx0184 |
| U.S. 7,461,353 B2 Dec. 2, 2008 | Appx0218 |
| INTER PARTES REVIEW CERTIFICATE (110TH)<br>U.S. 7,461,353 K1 Jan. 12, 2016 | Appx0267 |
| EX PARTE REEXAMINATION CERTIFICATE (11231ST)<br>U.S. 7,461,353 C1 Dec. 29, 2017. | Appx0269 |

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

APPLE INC.
Requester and Cross-Appellant,

v.

SOFTVIEW LLC
Patent Owner and Appellant.

---

Appeal 2021-005530
Reexamination Control 95/000,634
Patent 7,461,353 B2
Technology Center 3900

---

Before ALLEN R. MacDONALD, ERIC B. CHEN, and BRIAN J. McNAMARA, *Administrative Patent Judges*.

MacDONALD, *Administrative Patent Judge*.

DECISION ON REQUEST FOR REHEARING

Patent Owner SoftView LLC ("Patent Owner") filed a Request for Rehearing ("PO Req. Reh'g")[1], requesting that we reconsider our Decision

---

[1] The request for rehearing must address any new ground of rejection and state with particularity the points believed to have been misapprehended or overlooked in entering the new ground of rejection. 37 C.F.R. § 41.77(b)(2).

("Dec." or "Decision") of April 6, 2022, wherein we reversed the Examiner's rejections of all claims appealed by the Patent Owner, and entered a new ground of rejection against all pending claims. We have reconsidered our Decision in light of Patent Owner's comments in the Request, and are not persuaded that we misapprehended or overlooked arguments presented by Patent Owner.

Patent Owner's request is denied.

## I. INTRODUCTION

Appeal 2021-005530 (Reexamination Control No. 95/000,634) is directed to a reexamination of the same patent as related Appeal 2022-000153 (Reexamination Control No. 95/002,132). PO Appeal Br. 1. This appeal and its related appeal are directed to the same issues. The appeals were decided concurrently and those Decisions are referenced respectively herein as the '634 Decision (or "'634 Dec.") and the '132 Decision (or "'132 Dec."). The '132 Decision incorporated by reference to the related '634 Decision. '132 Dec. 1.

The Board found the subject matter of the claims at issue is patentably indistinct from the challenged claims already found unpatentable in the prior IPR2013-00007 ("the '353 IPR") of U.S. Patent No. 7,461,353 B2 ("the '353 Patent"). The Board found the Patent Owner had a full and fair opportunity to contest patentability in the prior '353 IPR and appeal of the '353 IPR decision to the Federal Circuit. In the '353 IPR, after considering all of Patent Owner's arguments the Board found the claims challenged in the '353 IPR to be unpatentable ('353 IPR FWD 36 (IPR2013-00007, Paper No. 51, at 36)), and the Federal

Circuit affirmed that determination (*Softview LLC v. Kyocera Corp.*, No. 14-1600 (Fed. Cir. Feb. 9, 2015)). The claims that were cancelled in the ’353 IPR are now subject to a final adjudication of invalidity, and the patentably indistinct claims at issue in this ’634 proceeding are likewise deemed invalid. ’634 Dec. 86. The Board precluded Patent Owner from taking action inconsistent with the Board’s earlier decision in the ’353 IPR and its affirmance by the Federal Circuit.

## II. CLAIMS SUBJECT TO THIS APPEAL

Third Party Requester Apple Inc. (hereinafter “Requester”) argues that the ’634 Decision on Appeal mistakenly “address[es] claims ***that were rejected*** by the Examiner ***and were not appealed*** by Patent Owner in its November 5, 2020 Notice of Appeal or its January 4, 2021 Appeal Brief.” Third Party Requester Comments (“Third Pty. Req. Cmts.”) 2 (emphasis added). The Requester requests that the Board correct the status of the claims in its decision on Patent Owner’s Rehearing Request.

The Requester asserts

> Patent Owner stated . . . “[t]he appealed claims are: 3, 5, 11, 13, 14, 16-18, 20, 21, 24, 25, 30-32, 35, 37, 38, 41, 50, 53, 55, 60, 69, 70, 75, 78, 79, 81-83, 87, 88, 90-95, 97, 98, 101, 105, 107-109, 111, 122, 128, 129, 131-134, 144, 145, 150, 151, 154, 161, 162, 164-169, 171, 174, 175, 185-187, 189-194, 196, 199, 203, 206, 207, 209, 215, 216, 226, 227, 229-235, 239, 240, 245, 246, 251, 253, 264, 265, 267-270, 274, 275, 285-288, 290-294, 296, 303, 305-307, 310, and 318-321.” Patent Owner’s January 4, 2021 Appeal Brief at cover page. Requester in turn only appealed allowed claims 106, 182, 204, 282, 304 and 322 in its appeal brief. Requester Appeal Brief filed January 15, 2021 at cover page.

Third Pty. Req. Cmts. 2–3.

The Requester also asserts:

> The ['634] Decision on Appeal [mistakenly addresses] the Examiner's rejection of claims 2-28, 30-32, 34, 35, 37, 38, 41, 44-46, 50, 53-55, 60, 61, 69-83, 85-111, 122-126, 128-135, 137, 140, 141, 144, 145, 147, 150-152, 154, 156-159, 161-177, 182, 184-209, 215, 216, 226-236, 238-242, 245-248, 251, 253, 254, 257, 259, 264-271, 274-277, 282, 285-310, and 318-322 [all pending claims] —a broader set of claims than those appealed by Patent Owner or Requester. ['634] Decision at 2, 13-15.

Third Pty. Req. Cmts. 3.

37 C.F.R. § 41.61(c) requires "[t]he notice of appeal or cross appeal in the proceeding must ***identify*** the appealed claim(s)," and 37 C.F.R. § 41.67(c)(1)(iii) requires the appellant's brief "must also ***identify*** the rejected claims whose rejection is being appealed." Emphasis added. Although the Requester's above quotation from the Notice of Appeal and Patent Owner's Appeal Brief is factually correct, we disagree with the ultimate conclusion reached by the Requester. The form of the identification is not set forth in the rules, and it is not uncommon to have conflicting identification of the appealed claims.

Patent Owner's Notice of Appeal contained the appealed claim quotation above, but is also deemed to have identified a *broader set* of appealed claims as appealed (i.e., all rejected claims) by stating "Applicant hereby appeals to the Patent Trial and Appeal Board from the last decision of the examiner." Notice of Appeal (emphasis omitted). Such a Notice of Appeal conflict is typically resolved by the subsequent Appeal Brief's identification of the rejected claims whose rejection is being appealed. However, that is not the situation before us.

Although Patent Owner's Appeal Brief repeats the appealed claim quotation above at its cover page, it also identifies by claim number the above broader set of appealed claims (i.e., all rejected claims) among the issues to be reviewed on appeal. PO Appeal Br. 8. Further, throughout the Appeal Brief Patent Owner also identifies and argues rejected claims that are not identified on the Appeal Brief cover page. *See* PO Appeal Br. 12 (claims 23, 26–28, 34, 137, 140, 141, 147, 156, 176, 177, 238, 241, 242, 259, 276, 277), 13 (claims 2, 4, 6–11, 12, 15, 19, 22, 23, 26–28), 45 (claim 257), 46 (claim 257), 51 (claim 247), and 65 (claims 23, 26, 27, 276, 277).

Given the Patent Owner's Notice of Appeal and Appeal Brief each at least once identifies (in some form) that the Patent Owner's appealed claims are all the rejected claims, we are not persuaded by the Requester that the Board erred by addressing all pending claims in its '634 Decision.

## III. PATENT EXPIRATION EFFECT

Requester argues that the Board's '634 Decision overlooked that claims 320–322 are impacted by the expiration of the '353 Patent. Requester submits that claims 320–322 should not be considered as issued claims. Third Pty Req. Cmts. 4–5.

The Board issued its '634 Decision on Appeal on April 6, 2022. The '353 Patent subsequently expired on April 18, 2022. *See* '634 Dec. 2–3, 13. Pursuant to 37 C.F.R. § 1.530(j), "[n]o amendment may be proposed for entry in an expired patent" and "no amendment, other than the cancellation

of claims, will be incorporated into the patent by a certificate issued after the expiration of the patent."

For the reasons explained in the '634 Decision on Appeal, the Board identified the status of the claims on appeal as "(Amended)" or "(New)" as of April 6, 2022. '634 Dec. 6–7. Otherwise, Requester would be deprived of its statutory rights to participation and appeal as to new and amended claims during the pendency of the reexamination. *Id.* As the Board further explained, the proposed claim amendments are now withdrawn by virtue of the expiration of the '353 Patent, including those amendments upon which Patent Owner attempted to rely to maintain that certain of the challenged claims (all claims with dependency from cancelled claims 1, 36, 118, 149, 252, and 317; and independent claims 70, 209, and 216, and their dependent claims) are patentably distinct from the claims cancelled during the '353 IPR. '634 Dec. 83–85. The Board did not include claims 320–322 among the claims it deemed to be impacted by the expiration of the '353 Patent.

Particularly, Requester argues:

> Claims 320-322 are new claims added during the pendency of this *inter partes* reexamination. *See* July 24, 2017 Amendment and Response at 53. Patent Owner also proposed these same new claims in *ex parte* reexamination 90/009,994 while this *inter partes* reexamination was pending. Requester asked the Office to merge this proceeding with that *ex parte* reexamination as provided by 37 C.F.R. § 1.989 and MPEP § 2686.01. August 23, 2017 Requester Comments at 8-9. Rather than merging the proceedings, the Office proceeded to conclude the *ex parte* reexamination, but did so ***subject to*** this pending *inter partes* reexamination and co-pending *inter partes* reexamination 95/002,132 requested by Motorola Inc.

> *Ex Parte* Reexamination Certificate (11231st) issued December 29, 2017 with the face expressly noting that ***it*** was "***subject to*** pending reexamination control numbers 95/000,634 and 95/002,132." Requester submits that claim 322 remained a ***proposed*** new claim, ***not an issued claim***, because proposed amendments are not "effective until the reexamination certificate is issued and published." 37 C.F.R. § 1.530(k). The pending reexaminations in which claims 320-322 were proposed-including this proceeding-remained uncompleted. The '353 Patent has now expired without examination being completed, so 37 C.F.R. § 1.530(j) should require claims 320-322 to be treated as cancelled. *See also SynQor, Inc. v. Vicar Corp.*, 988 F.3d 1341, 1355 (Fed. Cir. 2021) (holding that patent expiration rendered moot the patentability of claims added during reexamination).

Third Pty. Req Cmts. 4–5 (additional emphasis added).

We are not persuaded by the Requester that the Board erred in its conclusion that claims 320–322 are ***not*** impacted by the expiration of the '353 Patent. Requester's argument turns on a reading of the *Ex Parte* Reexamination Certificate (11231st) issued December 29, 2017 that makes the *Ex Parte* Reexamination Certificate (referred to in the quotation above as "it") still subject to the pending *inter partes* reexaminations. We disagree with Requester. Rather, we read the *Ex Parte* Reexamination Certificate as stating the '353 Patent (not the *Ex Parte* Reexamination Certificate) is still subject to the pending *inter partes* reexaminations. Therefore, we conclude that claims 320–322 are issued claims and not proposed claims as argued by Requester.

## IV. APPLICATION OF 37 C.F.R. § 42.73(d)(3)

### IV.A. Section 42.73(d)(3) Applies to this Reexamination

Patent Owner argues that § 42.73(d)(3)(i) only applies to estop a patent owner from "*obtaining* a new claim" and does not apply to previously issued claims, even if the previously issued claims are patentably indistinct from claims that were finally refused or cancelled in an IPR. PO Req. Reh'g 1–3. Patent Owner is mistaken.

By regulation, "[a] patent applicant or owner is precluded from taking action inconsistent with the adverse judgment, including obtaining in any patent[] (i) A claim that is not patentably distinct from a finally refused or canceled claim." 37 C.F.R. § 42.73(d)(3)(i). Patent Owner contends (at subsection IV.A.1.) that estoppel under § 42.73(d)(3) does not apply to any claim on appeal. We disagree. In the '634 Decision on Appeal, the Board determined that 42.73(d)(3) estoppel applies to claims under examination (including in reexamination) and prohibits Patent Owner from obtaining confirmation of patentability of patentably indistinct claims. '634 Dec. 29–30.

In the '634 Decision on Appeal, the Board held that § 42.73(d)(3)(i) "covers a claim that is not patentably distinct from a 'finally refused claim'" in an IPR and applies to all claims in a reexamination "for which a 'substantial new question of patentability'" is raised — *i.e.*, those claims undergoing examination. *Id.* at 27. The Board further explained the underlying policy that final cancellation of the claims in the '353 IPR served as notice that those claims are now in the public domain, and explained that when a notice is given to the public, the

public is entitled to rely upon that notice. *Id.* at 28 (citing *Vectra Fitness, Inc. v. TNWK Corp.*, 162 F.3d 1379, 1384 (Fed. Cir. 1998); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996)).

The Board addressed head on Patent Owner's argument that estoppel under § 42.73(d)(3)(i) is not applicable in reexamination because Patent Owner is not "obtaining" a claim. Patent Owner has not identified any matter misapprehended or overlooked. Indeed, Patent Owner repeatedly presents arguments already rejected by the Board. Patent Owner first points to commentary accompanying the Notice of Final Rulemaking, 77 Fed. Reg. 48612 (Rules of Practice for Trials Before the Patent Trial and Appeal Board and Judicial Review of Patent Trial and Appeal Board Decisions (Aug. 14, 2012)) ("Rules of Practice"), as purportedly indicating that § 42.73(d)(3)(i) applies only to new claims in reissue and continuations. PO Req. Reh'g 2. But the Board already identified the same response to Comment 213 as supporting applicability of estoppel. That commentary notes that "the Office is required to ***prescribe regulations setting forth the relationship between the review and other proceedings in the Office (e.g., examination)***" and that the final rule "merely provides estoppel against claims that are ***patentably indistinct*** from those claims that were lost." Rules of Practice, 77 Fed. Reg. at 48649 (emphasis added). The Board rightly concluded that reexamination, like examination, is one of the "other proceedings in the Office" and subject to the prohibition on patentably indistinct claims. '634 Dec. 29–30. After all, reexamination is based on an examinational and not an adjudicatory model. *Cuozzo Speed Techs.*,

*LLC v. Lee*, 136 S. Ct. 2131, 2143 (2016) ("The [AIA] converts *inter partes* reexamination from an examinational to an adjudicative proceeding." (quoting H.R. Rep. at 46–47)); *see also* 157 Cong. Rec. 3429–3430 (2011) (remarks of Sen. Kyl) (noting the "shift from an examinational to an adjudicative model" when enacting *inter partes* review).

The Board further considered and rejected Patent Owner's reliance on two non-precedential IPR decisions in IPR2017-00428 and IPR2015-00458. '634 Dec. 29, 30. Patent Owner again relies on the same cases in its Rehearing Request. PO Req. Reh'g 3. The Board correctly distinguished those IPR decisions because, unlike this case, those cases "involved no examination (or examination-like) action by the Office." '634 Dec. 30. And in both *inter partes* reexamination and *inter partes* review, when examination (or examination-like) action takes place, paragraph (d)(3) of § 42.73 applies. *See* Rules of Practice, 77 Fed. Reg. at 48649 ("Paragraph (d)(3) of § 42.73 applies to derivation proceedings, *inter partes* review, post-grant review, and covered business method review."); *see also id.* ("The Office will examine a claim presented in a subsequent proceeding on the merits and apply the estoppel if the claim is not patentably distinct from the finally refused or cancelled claim, similar to a ground of rejection based on *res judicata* (*see, e.g.*, MPEP § 706.03(w))" (emphasis added)).

Finally, Patent Owner's reliance on *Arthrex, Inc. v. Smith & Nephew, Inc.*, 880 F.3d 1345, 1347 (Fed. Cir. 2018), is misplaced. In that case, the Federal Circuit questioned the Board's authority to issue

adverse judgments prior to institution despite the patentee expressly requesting no adverse judgment. *Id.* at 1351 (O'Malley, J., concurring), 1355 (Newman, J., dissenting); PO Req. Reh'g 3. That case is not relevant here. The *Arthrex* court had no occasion to consider whether § 42.73(d)(3) applies to subsequent reexamination proceedings and did ***not*** hold, as Patent Owner contends, that the regulation would only affect prosecution of a pending patent application. PO Req. Reh'g 3; *cf.* Rules of Practice, 77 Fed. Reg. at 48649.

Patent Owner's assertion that the Board is applying estoppel to prevent "a patent owner from *arguing* in favor of the PTO confirming earlier issued claims" grossly overstates the rule. PO Req. Reh'g 1. Nothing in the estoppel rule would have prohibited Patent Owner from presenting claims that are patentably distinct from those cancelled in the IPR. Rules of Practice, 77 Fed. Reg. at 48649 ("[T]he patent owner may subsequently present in a continuing or reissue application claims that are patentably distinct from such [canceled] claims."). But Patent Owner did not do so and estoppel simply prohibits Patent Owner's effort to obtain confirmation of patentably indistinct claims in reexamination. Section 42.73(d)(3) serves to protect the public's reliance on a final IPR decision finding claimed subject matter unpatentable and thus in the public domain, and to prohibit repeated litigation of the same validity issues.

Other cases further support applicability of estoppel here. The Board previously addressed the applicability of § 42.73(d)(3) to subsequent reexamination proceedings in Reexamination Control No.

90/014,266. *See* Decision on Appeal in No. 2020-004978, dated December 31, 2020. There the Board rejected the patent owner's argument that estoppel under § 42.73(d)(3)(i) does not apply because it was not "obtaining" claims under reexamination. *Id.* at 8. The Board explained that a narrow focus on sub-section (i) ignores the broader prohibition in § 42.73(d)(3) that precludes a patent owner "from taking action inconsistent with the adverse judgment" in the prior IPR. *Id.* at 9. Directly to the point, the Board held that § 42.73(d)(3) "precludes a patent owner from taking any action in subsequent reexamination proceedings that are inconsistent with a prior adverse judgment." *Id.* at 9.

In sum, § 42.73(d)(3) prohibits confirming patentability of claims that are not patentably distinct from those subject to the final adjudication of unpatentability in the '353 IPR. The Board correctly analyzed estoppel in its '634 Decision on Appeal and maintains its '634 Decision.

### IV.B. The Office Had the Authority to Adopt and Followed Proper Notice-and-Comment

Patent Owner argues that applying § 42.73(d)(3) is contrary to law and exceeds the PTO's rulemaking authority. PO Req. Reh'g 3–6. Patent Owner is mistaken.

The governing statute requires the Director to "prescribe regulations . . . (4) establishing and governing *inter partes* review under this chapter and ***the relationship of such review to other proceedings under this title."*** 35 U.S.C. § 316(a)(4) (emphasis added). The same statute further provides that "[i]n prescribing regulations under this section, the Director shall consider the effect of any such regulation on

the economy, the integrity of the patent system, [and] the efficient administration of the Office . . . . " 35 U.S.C. § 316(b).

The USPTO adopted its Rules of Practice for Trials Before the Patent Trial and Appeal Board on August 14, 2012. 77 Fed. Reg. 48612. Consistent with the statute, the PTO explained that the "final rule is to establish a more efficient and streamlined patent system that will improve patent quality and limit unnecessary and counterproductive litigation costs." *Id.* The final rule specifically identified 35 U.S.C. § 316(a)(4) as providing rulemaking authority:

> Section 42.73(d)(3) applies estoppel against a party whose claim was cancelled or who requested an amendment to the specification or drawings that was denied. ***The rule is consistent with 35 U.S.C. 316(a)(4), as amended, and 326(a)(4), which require that the Office prescribe regulations establishing and governing the reviews and the relationship of such reviews to other proceedings under title 35.***

Rules of Practice, 77 Fed. Reg. at 48625 (emphasis added).

In establishing the final rules for implementing the administrative patent trials as required by the AIA, the PTO engaged in formal notice-and-comment rulemaking, including considering and responding to comments received. *See* Rules of Practice, 77 Fed. Reg. at 48650. Relevant here, the PTO responded to Comment 213 which "questioned whether there is statutory basis for the patent owner estoppel provisions set forth in proposed § 42.73(d)(3)." *Id.* at 48649. Again, the PTO pointed to 35 U.S.C. § 316(a)(4) under which "the Office is required to prescribe regulations setting forth the relationship between the review and other proceedings in the Office (e.g., examination)." *Id.* The PTO

further explained that "§ 42.73(d)(3) set forth in this final rule is consistent with the AIA, other statutory provisions, the common law related to estoppel, and the common law related to the recapture rule." *Id.* (citations omitted).

In addition to § 316(a)(4), the Office also had authority to adopt 37 C.F.R. § 42.73(d)(3) under the powers granted in 35 U.S.C. § 2(b). Section 2(b)(2)(A) provides the Office with broad authority to "establish regulations, not inconsistent with law, which-- (A) shall govern the conduct of proceedings in the Office." As noted in the final rulemaking, the estoppel rule of § 42.73(d)(3) is consistent with law. Rules of Practice, 77 Fed. Reg. at 48649. And the final rule, Part 42 of Title 37 of the Code of Federal Regulations, lists both 35 U.S.C. §§ 2(b)(2) and 316 as authority for the rules. *Id.* at 48670.

Patent Owner contends that there is no statutory provision that specifically provides for estoppel against the patent owner. PO Req. Reh'g 2–4. But Patent Owner has not identified any requirement that final rulemaking mirror statutory provisions, nor could it, because Congress explicitly gave rulemaking authority to the Director. 35 U.S.C. § 316(a). The estoppel provision was properly adopted pursuant to that authority, as explained above.

Patent Owner next contends that 35 U.S.C. §§ 301(a)(1) and 311 (pre-AIA) limit the grounds for *inter partes* reexamination to patents and printed publications and that estoppel cannot apply. PO Req. Reh'g 4. This is mistaken because the Federal Circuit has held that estoppel applies in *inter partes* reexamination. *SynQor*, 988 F.3d at 1347 (Issue

preclusion applies to *inter partes* reexamination.). Furthermore, estoppel prohibiting a patent owner from obtaining confirmation of patentably indistinct claims from claims finally adjudicated unpatentable in an IPR advances the requirement that *inter partes* reexamination proceedings "be conducted with special dispatch within the Office." 35 U.S.C. § 314(c) (pre-AIA). And because the grounds in an IPR are limited to patents and printed publications, estoppel based on a prior adverse decision in an IPR effectively operates as a rejection based on the patents or printed publications underlying the prior adverse decision. Stated differently, patents and printed publications were the foundation for the rejection that resulted in the cancellation of claims in the '353 IPR leading to cancelled claim estoppel; thus, even though analysis is based on cancelled claims, this estoppel is ultimately founded on patents and printed publications.

Patent Owner asserts that estoppel would violate Patent Owner's statutory right under 35 U.S.C. § 304 to make statements on the record about a substantial new question of patentability. PO Req. Reh'g 4–5. Not so. The estoppel provision of § 42.73(d) simply operates to prohibit patentably indistinct claims and in no way limits a patent owner's opportunity to explain why its claims are patentably distinct. Here, Patent Owner has had ample opportunity to make statements and, indeed, contends that its claims are patentably distinct from those canceled in the '353 IPR. The Board's rejection of Patent Owner's arguments and its finding of unpatentability has not violated any rights of Patent Owner under § 304.

Finally, Patent Owner again mistakenly argues that the estoppel provision exceeds the PTO's rulemaking authority because the statute does not include estoppel provisions against the Patent Owner. As explained above, rulemaking authority is provided by 35 U.S.C. §§ 316(a)(4) and 2(b)(2)(A). PO Req. Reh'g 5–6. Nothing in the statute or legislative history suggests that Congress intended a patent owner to have repeated opportunities to seek claims patentably indistinct from those already adjudicated invalid. To the contrary, Congress was focused on "the integrity of the patent system" and "the efficient administration of the Office" and expressly required the Director to prescribe regulations to further those goals. 35 U.S.C. § 316(b); *see also Thryv, Inc. v. Click-To-Call Techs.*, 140 S. Ct. 1367, 1374 (2020) (explaining that the AIA "sought to weed out bad patent claims efficiently" and was "designed to establish a more efficient and streamlined patent system that will improve patent quality and limit unnecessary and counterproductive litigation costs" (citation omitted)).

The Office had the authority to adopt § 42.73(d)(3) and we maintain the '634 Decision applying estoppel pursuant to that rule.

IV.C. The Board Must Preclude Claims that Are
Not Patentably Distinct from Claims Found Invalid in the IPR

Patent Owner argues that, in applying § 42.73(d)(3), "not patentably distinct" means "substantially the same" not as an obviousness-type double-patenting "patentably indistinct" determination where the cancelled claim operates as prior art against the claim for which not "patentably distinct" is asserted. PO Req. Reh'g 6. Patent Owner is mistaken.

The Board correctly held that the phrase "patentably distinct" is used in § 42.73(d)(3)(i) in the obviousness sense. '634 Dec. 31–32. As the Board reasoned, "patentably distinct" in many patent law contexts (e.g., interference and double patenting) means that the claim at issue is more than simply an obvious variation over a prior patent claim. *See* '634 Dec. 31 (*citing General Foods Corp. v. Studiengesellschaft Kahle mbH*, 972 F.2d 1272, 1278 (Fed. Cir. 1992), and *Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955, 968 (Fed. Cir. 2001) (double patenting); *see also* '634 Dec. 31 (*citing Davis v. Loesch*, 998 F.2d 963, 965 n.2 (Fed. Cir. 1993) (interference))).

Patent Owner's Request for Rehearing fails to show any points misapprehended or overlooked by the Board regarding the interpretation of "patentably distinct" in § 42.73(d)(3)(i). Indeed, Patent Owner's arguments are based on a misunderstanding of the PTO's rulemaking, a logical fallacy in attempting to recast a definition from Derivation practice, and a misinterpretation of Federal Circuit case law.

First, Patent Owner argues that the USPTO's originally proposed rule would have applied estoppel to "[a] claim to substantially the same invention," but, in the final rule, estoppel applies to "[a] claim that is not patentably distinct." PO Req. Reh'g 6 (emphases omitted). Patent Owner suggests that the result of this promulgation history is that "not patentably distinct" means "substantially the same invention." Nothing supports Patent Owner's assumption. The final rule adopted language ***different*** from "substantially the same invention," suggesting that the USPTO adopted a ***different*** standard from "substantially the same

invention." The more logical reading of this promulgation history is that, rather than adopting a new standard for determining when estoppel applies, the PTO simply adopted the same standard as used in other contexts (such as interferences and double patenting) – *i.e.*, that a subsequent claim is precluded if it is not patentably distinct in the obviousness sense.

Patent Owner next cites the definition of "same or substantially the same" in derivation proceedings (37 C.F.R § 42.401). PO Req. Reh'g 6–7. According to Patent Owner, because "same or substantially the same" has the meaning "patentably indistinct" in derivation proceedings, "[w]ritten in reverse form, the Definition becomes 'patentably indistinct [*i.e.*, not patentably distinct] means the same or substantially the same.'" PO Req. Reh'g 7. Patent Owner's argument is based on a logical fallacy. The fact that "same or substantially the same" in derivation proceedings means "patentably indistinct" does not mean the converse is true — "not patentably distinct" does ***not*** have the meaning "same or substantially the same" whenever the phrase "not patentably distinct" is used in other patent law contexts.

Finally, Patent Owner misinterprets Federal Circuit case law to attempt to narrow the proper scope of "patentably indistinct." PO Req. Reh'g 7–8. Patent Owner's reliance on *Simplair, Inc. v. Google LLC*, 884 F.3d 1160 (Fed. Cir. 2018), is based on the same logical fallacy as its reliance on the "same or substantially the same" definition discussed above. In *Simplair*, the issue was whether patent claims in two suits were "essentially the same." In the portion of *Simplair* Patent Owner quotes,

the Federal Circuit determined that "claims which are patentably indistinct are essentially the same." PO Req. Reh'g 7 (*quoting Simplair*, 884 F.3d at 1167) (emphasis omitted). As a result, under the Federal Circuit's holding, if claims are "patentably indistinct" in the obviousness sense, then they are "essentially the same" for claim preclusion to apply. The Federal Circuit did not hold the converse — *i.e.*, that claims are only patentably indistinct if they are "essentially the same."

*Soverain Software LLC v. Victoria's Secret Direct Brand Management, LLC*, 778 F.3d 1311 (Fed. Cir. 2015), does not support Patent Owner's arguments because the phrase "not patentably distinct" was not at issue and the court did not purport to define it. Finally, Patent Owner's citation *to MaxLinear, Inc. v. CF Crespe LLC*, 880 F.3d 1373 (Fed. Cir. 2018) (PO Req. Reh'g 7–8) demonstrates that the Board's interpretation of "not patentably distinct" in the obviousness sense was correct. As *MaxLinear* states, "precedent does not limit collateral estoppel to patent claims that are identical . . . . If the differences between the unadjudicated patent claims and adjudicated patent claims ***do not materially alter the question of invalidity***, collateral estoppel applies." *MaxLinear*, 880 F.3d at 1377 (*quoting Ohio Willow Wood Co. v. Alps South, LLC*, 735 F.3d 1333, 1342 (Fed. Cir. 2013)) (emphasis added).

IV.D. When Applying § 42.73(d)(3) The Board is Not Required To use Common Law Preclusion Doctrines

Patent Owner argues that § 42.73(d)(3) requires the Board to apply common law collateral estoppel and issue preclusion. PO Req. Reh'g 8–18. But there is no such requirement in the rules that § 42.73(d)(3) must be

applied through the lens of common law preclusion doctrines, and Patent Owner has cited no authority for importing common law collateral estoppel or res judicata into § 42.73(d)(3).

Patent Owner mistakenly asserts that "in promulgating the rule, the PTO stated § 42.73(d)(3) should be ***interpreted*** 'consistent with . . . the common law related to estoppel.'" PO Req. Reh'g 8 (emphasis added; original emphasis removed). The rulemaking does not address interpretation of the estoppel rule. Rather, the rulemaking simply states that "§ 42.73(d)(3) set forth in this final rule is consistent with the AIA, other statutory provisions, the common law related to estoppel, and the common law related to the recapture rule." Rules of Practice, 77 Fed. Reg. at 48648.[2] Federal Circuit case law supports this statement in the rulemaking. For example, in *MaxLinear*, the Court held that "the collateral-estoppel effect of an administrative decision of unpatentability generally requires the invalidation of related claims that present identical issues of patentability." *MaxLinear*, 880 F.3d at 1377. It does not matter whether the claims are identical. "[P]recedent does not limit collateral estoppel to patent claims that are identical . . . . If the differences between the unadjudicated patent claims and adjudicated patent claims do not materially alter the question of invalidity, collateral estoppel applies." *Id.* (quoting *Ohio Willow Wood*, 735 F.3d at 1342).

---

[2] Notably, Patent Owner does not give weight to the rulemaking's reference to the AIA, other statutory provisions, and the recapture rule. As such, § 42.73(d)(3) is not simply an adoption of common law estoppel but rather a new rule consistent with various statutes and law.

Patent Owner's reliance on *Regents of the University of Minnesota v. LSI Corp.*, 926 F.3d 1327 (Fed. Cir. 2019), does not support its argument. In that case, Judges Dyk, Wallach, and Hughes offered their additional views that the estoppel provisions in § 42.73(d)(3) are distinct from traditional principles of res judicata and collateral estoppel but yield the same result. *Id.* at 1345 n.5. The panel stated "[t]o the extent the estoppel provisions in 37 C.F.R. § 42.73(d)(3), prevent a patent owner from obtaining a patent on claims that are patentably indistinct from cancelled claims in an IPR proceeding, that result is no different than what is mandated under traditional principles of res judicata and collateral estoppel." *Id.* "In the absence of such a [regulatory] provision, the result would still be the same (i.e., the later claim is unpatentable for the same reasons as the earlier patentably indistinct claim)." *Id.*

While the result of estoppel under § 42.73(d)(3) and under the common law is the same, Patent Owner has not cited any authority under which a court is required to undertake the same analysis. As a policy matter, the Office has adopted a straightforward regulation that precludes a patent owner from relitigating patentability after having a full and fair opportunity to defend the patentability of a claim in an IPR. This straightforward rule rightly prohibits action inconsistent with the final adverse judgment, advances the efficiency goals of the AIA and protects the public's reliance on a final IPR decision finding claimed subject matter unpatentable and thus in the public domain. *Vectra Fitness*, 162

F.3d at 1384; *Vitronics Corp.*, 90 F.3d at 1583; '634 Dec. 28–29, 31 n.11. The Board's '634 Decision correctly applied estoppel in this proceeding.

## V. NOT PATENTABLY DISTINCT OVER THE CLAIMS CANCELLED IN THE PRIOR IPRs

Patent Owner presents a generalized argument that the claim construction controls whether or not the claims at issue in this proceeding are patentably distinct over the claims in the '353 IPR. PO Req. Reh'g 18. As stated above, Patent Owner's patentably distinct position is contradicted by Federal Circuit case law, which does not require identical claims. Instead, the Federal Circuit asks if the differences in claims "materially alter the question of invalidity." *MaxLinear*, 880 F.3d at 1377 (quoting *Ohio Willow Wood*, 735 F.3d at 1342).

Importantly, here the act of merely arguing a different claim construction standard (*Phillips* versus broadest reasonable interpretation (BRI)) exists does not affect the '634 Decision outcome. The Board's constructions in IPR2013-00007 were based on Patent Owner's own explanation of the meaning of the claimed features during prosecution and based on Patent Owner's own proposed *Phillips* standard claim constructions submitted in connection with *SoftView LLC v. Apple Inc.*, No. 10-389-LPS (D. DE July 26, 2012). *See* Requester Appeal Br. (Ex. 3, 7–14) ('926 FWD discussing that in the "Decision to Institute, we construed the claim terms as the Petitioner represented they were construed by the district court in co-pending litigation, *SoftView LLC v. Apple Inc.*, Case No. 10-389-LPS (D. DE). Dec. to Institute (Paper 12),

19-20); and Ex. 1 pp. 8-13 (analysis of '353 claims while confirming construction in '926 FWD).").

Patent Owner fails to identify any instance where the '634 Decision states it is relying on the BRI standard to determine patentability. Also, Patent Owner fails to identify any issue, including claim construction, that materially alters the question of patentability. Further, Patent Owner asserts in a conclusory manner that application of the BRI standard results in a different construction than *Phillips*, but never provides what the new construction should be or why the difference in standards would materially alter the question of patentability here. PO Req. Reh'g 18.

The focus of the analysis is on any differences between the adjudicated and non-adjudicated claims —not on prior art or record evidence, which would provide an easy end-run around preclusion rules designed to avoid repetitious litigation. Differences between applicable claim construction standards also does not prevent application of issue preclusion. *See, e.g.*, *Cisco Sys., Inc. v. Capella Photonics, Inc.*, No. 20-cv-01858, 2020 WL 7227153, at *5–6 (N.D. Cal. Dec. 8, 2020)(Due to the substantial interest in the finality of PTO decisions, the difference between the broadest reasonable interpretation standard and the Phillips standard was by itself insufficient to circumvented the effect of 37 C.F.R. § 42.73(d)(3)(i).). Contrast to *ContentGuard* where the patent owner in that case amended the invalidated claim *before* the PTAB issued a final written decision. *Google Inc. v. ContentGuard Holdings, Inc.*, PTAB No. CBM2015-00040 (PTAB June 21, 2016).

## V.A. Claim Construction

### V.A.1. Patent Owner's "Intent"

As a separate issue, Patent Owner argues that "[t]he 'at least a portion' language in claim 1 and the 'processing HTML-based Web content' language in claim 36 was intentional and carefully drafted." PO Req. Reh'g 21.

We do not find Patent Owner's intent to be relevant. Rather, Patent Owner's failure to address pertinent issues is evidenced by Patent Owner's rehashing over multiple pages its prior arguments about the page "layout, functionality and design" of a webpage as described in the patent specification and third-party documents. PO Req. Reh'g 19–28. However, the '634 Decision on Appeal addresses Patent Owner's arguments and goes into great length and detail about the layout, functionality, and design of the claims and references that form the basis of the rejections. '634 Dec. 20–23. Importantly, nothing in Patent Owner's Rehearing Request identifies a specific claim construction or how that hypothetical claim construction would materially alter the question of patentability. PO Req. Reh'g 19–28. Patent Owner instead relies on a theoretical difference between BRI and *Phillips* standards alone. *Id.* Such conclusory arguments without analysis does not persuade the Board to change its previous findings.

Furthermore, because Patent Owner's arguments about layout, functionality, and design were already considered and rejected by the Board, Patent Owner has also failed to identify anything "misapprehended or overlooked" in the Board's '634 Decision.

Accordingly, Patent Owner's failure is two-fold. Patent Owner fails to identify any construction that is material to patentability and fails to identify any argument that the Board had not already considered.

V.A.2. PTAB Claim Construction & "Impact" of Appeal

The Board properly considered the scope of the claims in the '353 FWD as a basis of applying estoppel to the claims at issue in this proceeding. Patent Owner repeats its statement that claim construction standards are different, BRI versus *Phillips*, but fails to provide a claim construction that would materially alter the question of patentability. PO Req. Reh'g 28–31. Furthermore, even if the claim construction were theoretically to differ under *Phillips*, that alone is not determinative of whether the claims at issue here are patentably distinct from the claims in the '353 FWD. PO Req. Reh'g 30–31. Again, Patent Owner ignores the fact that the patentability for these claims was previously decided. As the patentability was previously decided (regardless of construction used), the only issue now to consider is if the claims are patentably distinct.

Patent Owner also argues that the BRI standard was applied in the '353 FWD and is controlling because of the Rule 36 opinion issued by the Federal Circuit. PO Req. Reh'g 31–33. However, while the Federal Circuit opinion confirms the unpatentability of the claim in the '353 FWD, it says nothing about the application of estoppel in the current proceeding. Again, Patent Owner has not proposed a construction of any claim term, much less a construction that is material to the invalidity determination of the claims. Merely identifying a different standard for claim construction, does not prevent application of issue preclusion. *See,*

*e.g.*, *Cisco Sys.*, 2020 WL 7227153, at *5–6. Because the claims are not patentably distinct, the Board's '634 Decision is correct.

V.A.3. "Entire" vs. "Portion" Claim Construction

In the '634 Decision at pages 34–37 (Section III.B.2.f. *Entire vs. Portion*), the Board discusses the difference between the terms "portion" and "entire." The Board agrees with Patent Owner's Rebuttal Brief argument that "[b]ased on plain meaning, removing 'at least a portion' [from the claims] means you are left with a whole" (PO Rebuttal Br. 9) and "PO has not amended any claims to recite the [word] 'entire' because as discussed above by plain meaning and as supported throughout the prosecution history of the [']353 patent . . . this would not change the scope of the [amended] claims" (PO Rebuttal Br. 11).

The Board then explained in this section of the '634 Decision that Patent Owner's "entire" interpretation of the amended claims does not render them patentably distinct from the claims cancelled during the '353 IPR. This conclusion was reached because what is the "entire" preserved content in the amended claims encompasses the preserved "portion" in the cancelled claim given the obvious variation of simply removing completely from the cancelled claim processing the original web page content portion that is not preserved. '634 Dec. 35–37.

Patent Owner now points to this section of the '634 Decision and argues that the Board's claim construction of the term "preserving" is "inapposite" to the claim construction from the '353 FWD. PO Req. Reh'g 33–37. This argument is, at best, confusing. As its title makes clear, this section of the '634 Decision is directed to the relationship

between "entire" and "portion." We do not find where Patent Owner challenges the Board's explanation of this relationship. Rather, Patent Owner merely quotes the '634 Decision without identifying how the quoted language provides a new construction of the argued term "preserving." PO Req. Reh'g 33–34. The quoted section of the '634 Decision is simply a discussion by the Board providing an explanation for applying the art to the claims rather than proposing a new claim construction. '634 Dec. 36–37.

Finally, Patent Owner tries to distinguish the current case from *Vectra Fitness*, but fails to address the central issue. PO Req. Reh'g 36. Namely, the issue is whether the public should be able to rely on the Office's cancellation of claims that are not materially different from the current claims, thereby putting the public on notice that the subject matter of those claims is in the public domain. *Vectra Fitness*, 162 F.3d at 1384; *see also Vitronics Corp.*, 90 F.3d at 1583; '634 Dec. at 28–29, 31 n.11. Instead of addressing this core holding in *Vectra,* Patent Owner makes an unsupported argument that if a patent expires, then the public is required to review the file wrapper, undertake a new claim construction, and determine that the claims are not dedicated to the public, even if the claims are identical. PO Req. Reh'g 37. Thus, under Patent Owner's theory, a person could be sued a second time on the same patent, even though identical claims have already been found invalid, because the patent expired and prevents the application of issue preclusion. This defeats the entire purpose of § 42.73(d)(3) and must be rejected.

V.A.4. Claim Construction under *Phillips*

Patent Owner argues that "as the '353 patent is now expired, the *Phillips* standard must be applied in construing the claims for which estoppel is asserted." PO Req. Reh'g 37. Even assuming the Board were required to construe all claims anew to determine if estoppel applies (it is not), Patent Owner has failed to meet its burden and show that a construction under *Phillips* materially changes the question of patentability. *Soverain Software LLC*, 778 F.3d at 1319.

First, Patent Owner fails to provide a claim construction at all, much less apply that construction in a way that challenges the unpatentability of the claims. PO Req. Reh'g 38–39. In place of providing a claim construction, Patent Owner recommends, without asserting it is correct, for the Board to "consider" the District Court claim construction. PO Req. Reh'g 38. In addition, the District Court Order that merely provided a plain and ordinary meaning construction to the "preserving" limitation. Patent Owner has failed to state how a plain and ordinary meaning of "preserving" would make the claims patentably distinct.

Second, Patent Owner merely asserts, without argument or evidence, that claim 87 for example, is "clearly patentably distinct over claims 1 and 36." PO Req. Reh'g 39. Patent Owner is required to show some difference in the claim scope under the BRI versus *Phillips* standards and then identify how that difference materially alters the patentability determination. This prevents "repetitious litigation of what is essentially the same dispute." *SynQor*, 988 F.3d at 1353; *see also Ohio*

*Willow Wood*, 735 F.3d at 1343. Patent Owner has failed to provide any meaningful argument showing that there are any new issues raised when construing claims in accordance with *Phillips*.

V.B. Claim Limitations

Patent Owner argues that the Board addresses the dependent claims in isolation as a "delta" of the independent claims. PO Req. Reh'g 39. Patent Owner is mistaken.

The Board repeatedly states, when addressing dependent claims, that it "does not find any additional synergy" from the combination of cancelled claims, thereby clearly considering the subject matter as a whole. *See, e.g.*, '634 Dec. 45–46 (dependent claim 2). Accordingly, the Board's consideration of the dependent claims is proper, and while each argument will be detailed below, the arguments fail to identify any issue that was not previously considered by the Board, and no claim construction is proposed, much less used to identify a patentable distinction. The Board maintains the rejection of each dependent claim.

V.B.1. Effect of Patent Expiration

U.S. Patent 7,461,353, which is the subject of this *inter partes* reexamination, expired on April 18, 2022. *See* '634 Dec. 83–85. Patent Owner incorrectly argues that all cancelled claims now must be construed a second time in the current proceeding and in a different way than they were construed in the '353 FWD. PO Req. Reh'g 40–41. Patent Owner is mistaken.

Patent Owner provides no support for this argument and it is not at all clear why this additional construction step is necessary. Even if it

were necessary, Patent Owner provides no construction for the Board to assess or apply. As Patent Owner provides no argument or evidence that these claims would be patentable under a hypothetical new construction that is not provided, the issue of patentability of these claims is the same as was already decided in the ’353 FWD. Therefore, application of estoppel is appropriate as laid out in the Board’s ’634 Decision.

V.B.2. Real Time Rendering/Zooming

Patent Owner fails to provide a claim construction that would materially alter the patentability analysis provided by the Board. PO Req. Reh’g 41 (discussion of, *e.g.*, claim 3).

First, the Board’s ’634 Decision quotes from the Specification and determines that “real-time” is a “characteristic of using vectors for scaling.” ’634 Dec. 46. The Board specifically rejects a construction that has specific time frames, as proposed by Patent Owner. ’634 Dec. 46; PO Req. Reh’g 41–42. Instead of addressing the construction by the Board, Patent Owner argues that the Board’s summary of the specification is mistaken and reasserts results achieved as specific times frames (i.e., “a fraction of a second” and “no perceptible wait”), rather than how the ’353 Patent shows that result is achieved (i.e., using vectors). PO Req. Reh’g 41. Patent Owner fails to identify any issue misapprehended or overlooked by the Board.

Second, Patent Owner argues there are additional known ways to implement real time rendering besides the vectors relied upon by the Board. PO Req. Reh’g 42. This admission by Patent Owner, that there are multiple ways “devices were able to achieve real time rendering and

zooming" (PO Req. Reh'g 41), supports the Board's conclusion that adding "real-time zooming" does nothing that materially alters the question of patentability. Patent Owner states that "real-time zooming" was defined in the prosecution history. PO Req. Reh'g 42 (citing Ex. F, 75, 76). This is mistaken, as nothing in the cited pages qualifies as an explicit definition. Instead, Patent Owner merely provides comparisons of various contexts when using the phrase "real time." Ex. F at 75–76. Patent Owner fails to provide a construction or definition of "real time," fails to provide any argument or evidence that a hypothetical construction or definition would materially impact the invalidity determination, and fails to identify any issue misapprehended or overlooked by the Board.

In sum, Patent Owner fails to indicate any scenario where the Board's application of estoppel is mistaken, as real time rendering or real time zooming are not patentably distinct from the claims found unpatentable in the '353 FWD.

V.B.3. Column Tapping

Patent Owner argues that the "column tapping" claims must be construed under *Phillips* but fails to provide a construction. PO Req. Reh'g 42; '634 Dec. 52 (discussion of, *e.g.*, claim 13). Because there is no proposed construction of the claim terms, there is no indication of how a hypothetical construction would impact whether the claims are patentably distinct. Furthermore, there is no indication of what the Board misapprehended when these same arguments were presented and rejected. PO Rebuttal Br. 27–29. One example of why Patent Owner's argument fails is apparent from canceled claim 48, where the pertinent

claim language is "zoomed on a column . . . via a corresponding user input." Patent Owner admits "PO does not and never has denied" that "tapping is a known form of user input for a PDA" and that this fact has never been in dispute. PO Req. Reh'g 43. Based on this admission and the claim canceled in the '353 FWD, there is no reasonable dispute the user input of claim 48 can be "tapping," which is what is recited in, *e.g.*, claim 13 in the current proceeding.

Instead of addressing the fact that this issue had been previously determined in the '353 FWD, Patent Owner argues about the substance of the underlying claim rejections. PO Req. Reh'g 43. Patent Owner had a full and fair opportunity to litigate those underlying issues in the '353 IPR. There is no basis for Patent Owner to dispute the Board's prior decision, especially, as here, where the only alleged difference is something that Patent Owner admits is well-known and therefore not patentably distinct.

V.B.4. Paragraph Operations

Regarding paragraph operations, Patent Owner fails to provide any arguments or explanation regarding the materiality of any alleged differences between the subject matter of claims 18–21 and cancelled claims 11–14. PO Req. Reh'g 43–44; '634 Dec. 55–56 (discussion of, *e.g.*, claims 18–21). In place of any analysis is a conclusory assertion that the claims are not "essentially the same." PO Req. Reh'g 44. However, the Board provides a well-reasoned explanation for the paragraph operations of claims 18–21 being patentably indistinct from canceled claims 11–14 which are directed to a column. '634 Dec. 55. Patent

Owner's only other argument is a substantive argument about the teachings of Pad++. But again, the question for estoppel is whether the two claims are patentably distinct, and not re-arguing if the prior art teaches the claim limitation.

Accordingly, with no material differences identified by Patent Owner, estoppel is appropriate for claims 18–21.

V.B.5. Billions of Web Pages

Patent Owner argues that the claims regarding "preserving billions of web pages" is not an intended use, but instead a positive limitation of the claim. PO Req. Reh'g 44–46. However, the Board already considered this argument in detail, and found it lacking. '634 Dec. 61–62 (discussion of *e.g.*, claim 35). Patent Owner fails to identify anything that was misapprehended or misunderstood in the Board's '634 Decision.

Initially, the Board relied on *In re Anderson*, 662 F. App'x 958, 963 (Fed. Cir. 2016) to support its position that the disputed phrase is an intended use. '634 Dec. 61–62. Patent Owner makes no argument that the claim language adds a "structural limitation to the claimed system or method" and fails to address, much less distinguish, *In re Anderson.*

On a substantive level, the Board found that even if the language was not an intended use, the claim is still invalid because the number of webpages would have been obvious to a person of skill in the art (POSITA). '634 Dec. 62. Patent Owner fails to address this finding. It appears that Patent Owner views the claim as requiring evidence that a user actually visited over 1,000,000,000 web pages to invalidate the claim. PO Req. Reh'g 45. Patent Owner's position, which requires the

claims to be "practiced at the time," is a misstatement of the law and Patent Owner provides no support for this position. PO Req. Reh'g 45. The correct inquiry is what was obvious to a POSITA at the time of the invention — proof of a user actually practicing the invention is not required.

Accordingly, the disputed language does not alter the question of patentability, and the Board's application of estoppel is correct.

V.B.6. Cascaded Style Sheet

Regarding the rejection of claims 87, 106, 182, 204, 282, 304, and 322 that contain cascaded style sheet limitations, Patent Owner argues there is no evidence to support the rejection. PO Req. Reh'g 46–47. However, the Board's '634 Decision is supported by the record. Claim 87 states "preserving the original page layout, functionality, and design of the Web page [sic] content at each zoom level and panned view." Patent Owner provides no distinctions between the BRI and *Phillips* standards as it relates to the patentability of claim 87.

Regarding claim 106, 182, 204, 282, 304, and 322, the Request for Rehearing is similarly deficient. PO Req. Reh'g 46–47. Patent Owner merely asserts, without evidence or argument, that the scope of the claims is "not remotely close to 'essentially the same'" as canceled claim 66. PO Req. Reh'g 47. However, the language of canceled claim 66 and the language of claim 106 is substantively identical and Patent Owner has not provided any authority or evidence that explains why substantively identical claim language would be materially different with respect to patentability. '634 Dec. 69 (discussion of, *e.g.*, claim 106).

Also, regarding claim 322, the Board has already considered the argument that CSS 2 is required by the claim and Requester's rebuttal of this argument. PO Respondent Br. 30; TPR Appeal Br. 19–21; '634 Dec. 64–65. Patent Owner does not point to anything misapprehended in either argument; instead Patent Owner just restates a previously considered and rejected argument, while quoting a different Board decision that also does not mention CSS 2. PO Req. Reh'g 47. Accordingly, the Board's Decision finding that the "layout" and "design" are "well-known synonyms" is supported by the record and Patent Owner has not provided a reason why the Board's decision was improper. '634 Dec. 64–65. Estoppel is appropriate for claims 87, 106, 182, 204, 282, 304, and 322 because Patent Owner has not identified any issue that materially alters the question of invalidity, making estoppel appropriate.

V.B.7. XML Code

With respect to claim 105, Patent Owner argues the substantive point of the Board's reliance on Bray as teaching XML code. PO Req. Reh'g 47–48. However, the argument relies on a misunderstanding of the prior art and does not raise any issues that the Board misapprehended in its '634 Decision. '634 Dec. 69 (discussion of claim 105). Patent Owner focuses on the disclosure of Bray at "the time of the article" and not at the time of filing of the patent. PO Req. Reh'g 47. The fact that years had passed since the article published, not to mention the explicit disclosure of the reference itself, belies Patent Owner's argument that the POSITA could not fully implement XML. PO Req. Reh'g 47–48.

Furthermore, the Patent Owner provides no evidence for the idea that applying Bray's disclosure of XML to browsers would have been outside the skill in the art. The evidence of record is that Bray teaches that it is possible, and the Board's reliance on that teaching is not disputed. Patent Owner's argument that because the claims do not require "CSS or the DOM, both of which would be needed to make XML useful" (PO Req. Reh'g 48), does not raise a question about how the Board is applying Bray to claim 105. Finally, Patent Owner has already had a full and fair opportunity to address any substantive issues with the claims, and merely disagreeing with the Board's '634 Decision is not an appropriate use of a Rehearing Request. The Board has properly rejected claim 105 because the Patent Owner has not identified an issue that materially alters the question of patentability, making application of estoppel correct.

V.B.8. HTML Objects, Logical Groupings, and Bounding Boxes

Patent Owner's argues that "Pad++ created a single HTML object for the entire page – it did not create multiple HTML objects" and that "Pad++ did not support frames, table content, nor row content. Significantly, Pad++ did the opposite of grouping for paragraphs – it split paragraphs into multiple Pad++ text objects." PO Req. Reh'g 49.

As the Board noted in the '634 Decision at page 40, Patent Owner previously argued "[t]he HTML object is a Pad++ object corresponding to an entire Web page, which is treated in Pad++ as a single object." The Board specifically addresses this topic ('634 Decision at pages 37–41), stating in part:

> We agree with the reasoning of Cross-Appellant, Examiner, and the PTAB in its FWD, that Pad++ objects are inclusive of HTML objects. Similarly, the "objects" in the cancelled claims would be understood to be inclusive of HTML objects. Thus, we conclude that adding of "HTML" before "object" in the amended claims does nothing to render the amended claims patentably distinct from the cancelled claims. At best, addition of "HTML" before "object" merely limits the full scope of the cancelled claim to an obvious subset of that scope.

'634 Dec. 41. The Board provided a thorough discussion of this topic and Patent Owner points to no issue the Board misapprehended in its analysis.

To the extent that Patent Owner is arguing that known (as acknowledged by Patent Owner) use of Pad++ multiple objects in an HTML object (entire Web Page) would not suggest to an artisan the use of the known HTML paragraphs and tables as Pad++ objects treats the artisan as an automaton, we conclude Patent Owner's premise is contrary to our reviewing court's guidance. "A person of ordinary skill is also a person of ordinary creativity, not an automaton." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007). As the Examiner concluded, "the selection of which tags to implement is a matter that would be well within the knowledge and abilities of a person of ordinary skill in the art and would be obvious." RAN (Right of Appeal Notice) 74.

Also, Patent Owner argues the '353 IPR FWD did not properly address "logically grouping" and "bounding box." That issue was finally decided when the Federal Circuit affirmed the FWD. Patent Owner had a full and fair opportunity to litigate that issue. The question in this proceeding is if claims 5, 24, 60, 122, 174, 239, and 274 are

patentably distinct from the canceled claims in the ’353 FWD. Claims 138 and 139 were rejected in the ’353 FWD and use the phrases “logically grouping” and “bounding box.” ’634 Dec. 44–45, 65–67. The phrases are identical in the pending claims and the cancelled claims. The use of the same phrase in a different claim fails to materially alter the question of invalidity and confirms that estoppel is appropriate.

### V.C. The Board’s Decision Is Based on The Record And Is Not Arbitrary and Capricious

Patent Owner argues that it is arbitrary and capricious for the Board to reject appealed claims 5, 23–37, 60, 61, 122, 137, 140, 141, 147, 156, 174–177, 238–242, 248, 259, and 274–277 that recite identical claim language as like numbered claims that were confirmed in *ex parte* reexamination 90/009,994 (“the ’994 reexamination”) over substantially identical art and substantially identical rebuttal evidence. *See* 5 U.S.C. § 706. PO Req. Reh’g 49–50. Patent Owner is mistaken.

Importantly, unlike the *ex parte* ’994 reexamination, the current proceeding is *inter partes.* The findings of the ’994 reexamination are not applicable here because that decision was made based on a different record—a record developed by Patent Owner alone in an *ex parte* proceeding without consideration of the evidence or arguments provided by Requester during the pendency of this *inter partes* proceeding. *See Stevenson v. Sears, Roebuck & Co.*, 713 F.2d 705, 710 (Fed. Cir. 1983) (explaining that a “prior holding of validity is not necessarily inconsistent with [a] subsequent holding of invalidity” due to factors such as “different records”).

DECISION

Based on the record before us, we deny Patent Owner's Request for Rehearing. Patent Owner has not persuasively identified any points the panel misapprehended or overlooked.

SUMMARY OF DECISION

Outcome of Decision on Rehearing:

| Claim(s) Rejected | 35 U.S.C. § | Reference(s)/Basis | Denied | Granted |
|---|---|---|---|---|
| 2–28, 30–32, 34, 35, 37, 38, 41, 44–46, 50, 53–55, 60, 61, 69–83, 85–111, 122–126, 128–135, 137, 140, 141, 144, 145, 147, 150–152, 154, 156–159, 161–177, 182, 184–209, 215, 216, 226–236, 238–242, 245–248, 251, 253, 254, 257, 259, 264–271, 274–277, 282, 285–310, 318–322 | | Estoppel under 37 C.F.R. § 42.73(d) | 2–28, 30–32, 34, 35, 37, 38, 41, 44–46, 50, 53–55, 60, 61, 69–83, 85–111, 122–126, 128–135, 137, 140, 141, 144, 145, 147, 150–152, 154, 156–159, 161–177, 182, 184–209, 215, 216, 226–236, 238–242, 245–248, 251, 253, 254, 257, 259, 264–271, 274–277, 282, 285–310, 318–322 | |

Final Outcome of Appeal after Rehearing:

| Claim(s) Rejected | 35 U.S.C. § | Reference(s)/ Basis | Affirmed | Reversed | New Ground |
|---|---|---|---|---|---|
| 2–28, 31, 34, 35, 38, 41, 44–46, 50, 53–55, 60, 61, 69–80, 83, 85–104, 109–111, 122–126, 128–135, 137, 140, 141, 145, 147, 151, 152, 154, 156–159, 161–177, 184–202, 205, 207–209, 215, 216, 226–236, 238–242, 246, 248, 251, 254, 257, 259, 264–271, 274–277, 285–302, 307–310, 318, 319 | 103 | Pad++ | | 2–28, 31, 34, 35, 38, 41, 44–46, 50, 53–55, 60, 61, 69–80, 83, 85–104, 109–111, 122–126, 128–135, 137, 140, 141, 145, 147, 151, 152, 154, 156–159, 161–177, 184–202, 205, 207–209, 215, 216, 226–236, 238–242, 246, 248, 251, 254, 257, 259, 264–271, 274–277, 285–302, 307–310, 318, 319 | |

| Claim(s) Rejected | 35 U.S.C. § | Reference(s)/ Basis | Affirmed | Reversed | New Ground |
|---|---|---|---|---|---|
| 30, 32, 37, 81, 82, 107, 108, 144, 150, 205, 206, 245, 247, 253, 305, 306 | 103 | Pad++, Nokia, Palm | | 30, 32, 37, 81, 82, 107, 108, 144, 150, 205, 206, 245, 247, 253, 305, 306 | |
| 30, 32, 37, 81, 82, 107, 108, 144, 150, 205, 206, 245, 247, 253, 305, 306 | 103 | Pad++, Newton | | 30, 32, 37, 81, 82, 107, 108, 144, 150, 205, 206, 245, 247, 253, 305, 306 | |
| 30, 32, 37, 81, 82, 107, 108, 144, 150, 205, 206, 245, 247, 253, 305, 306 | 103 | Pad++, Locatio | | 30, 32, 37, 81, 82, 107, 108, 144, 150, 205, 206, 245, 247, 253, 305, 306 | |
| 105, 203, 303 | 103 | Pad++, Bray | | 105, 203, 303 | |

| Claim(s) Rejected | 35 U.S.C. § | Reference(s)/ Basis | Affirmed | Reversed | New Ground |
|---|---|---|---|---|---|
| 320, 321 | 103 | Pad++, common knowledge | | 320, 321 | |
| 5, 23–27, 60, 61, 70, 122, 137, 140, 141, 147, 156, 174–177, 216, 238–242, 248, 259, 274–277 | 103 | Pad++, HTML standards | | 5, 23–27, 60, 61, 70, 122, 137, 140, 141, 147, 156, 174–177, 216, 238–242, 248, 259, 274–277 | |
| 5, 23–27, 60, 61, 70, 122, 137, 140, 141, 147, 156, 174–177, 216, 238–242, 248, 259, 274–277 | 103 | Pad++, AAPA | | 5, 23–27, 60, 61, 70, 122, 137, 140, 141, 147, 156, 174–177, 216, 238–242, 248, 259, 274–277 | |

| Claim(s) Rejected | 35 U.S.C. § | Reference(s)/ Basis | Affirmed | Reversed | New Ground |
|---|---|---|---|---|---|
| 2–28, 30–32, 34, 35, 37, 38, 41, 44–46, 50, 53–55, 60, 61, 69–83, 85–111, 122–126, 128–135, 137, 140, 141, 144, 145, 147, 150–152, 154, 156–159, 161–177, 182, 184–209, 215, 216, 226–236, 238–242, 245–248, 251, 253, 254, 257, 259, 264–271, 274–277, 282, 285–310, 318–322 | | Estoppel under 37 C.F.R. § 42.73(d) | | | 2–28, 30–32, 34, 35, 37, 38, 41, 44–46, 50, 53–55, 60, 61, 69–83, 85–111, 122–126, 128–135, 137, 140, 141, 144, 145, 147, 150–152, 154, 156–159, 161–177, 182, 184–209, 215, 216, 226–236, 238–242, 245–248, 251, 253, 254, 257, 259, 264–271, 274–277, 282, 285–310, 318–322 |

| Claim(s) Rejected | 35 U.S.C. § | Reference(s)/ Basis | Affirmed | Reversed | New Ground |
|---|---|---|---|---|---|
| **Overall Outcome** | | | | 2–28, 30–32, 34, 35, 37, 38, 41, 44–46, 50, 53–55, 60, 61, 69–83, 85–105, 107–111, 122–126, 128–135, 137, 140, 141, 144, 145, 147, 150–152, 154, 156–159, 161–177, 184–203, 205–209, 215, 216, 226–236, 238–242, 245–248, 251, 253, 254, 257, 259, 264–271, 274–277, 285–303, 305–310, 318–321 | 2–28, 30–32, 34, 35, 37, 38, 41, 44–46, 50, 53–55, 60, 61, 69–83, 85–111, 122–126, 128–135, 137, 140, 141, 144, 145, 147, 150–152, 154, 156–159, 161–177, 182, 184–209, 215, 216, 226–236, 238–242, 245–248, 251, 253, 254, 257, 259, 264–271, 274–277, 282, 285–310, 318–322 |

DENIED

PATENT OWNER:

LAW OFFICE OF R. ALAN BURNETT
4108 131ST AVE SE
BELLEVUE, WA 98006

THIRD PARTY REQUESTER:

POLSINELLI PC
1000 LOUISIANA STREET, 53rd FLOOR
HOUSTON, TX 77002

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

Apple Inc.
Requester and Cross-Appellant

v.

Patent of SoftView LLC
Patent Owner and Appellant

Appeal 2021-005530
Reexamination Control 95/000,634
Patent US 7,461,353 B2
Technology Center 3900

Before ALLEN R. MacDONALD, ERIC B. CHEN, and BRIAN J. McNAMARA, *Administrative Patent Judges*.

MacDONALD, *Administrative Patent Judge*.

# DECISION ON APPEAL[1]

[1] Related Appeal 2022-000153 (Reexamination Control No. 95/002,132) is directed to a reexamination of the same patent as this appeal. Patent Owner's Appeal Br. 1. This appeal and its related appeal are directed to the same issues. These appeals are decided concurrently. This decision has been incorporated by reference into the related 2022-000153 decision.

# I. STATEMENT OF THE CASE[2]

Appellant appeals under 35 U.S.C. § 134 from a final decision of the Primary Examiner rejecting claims 2–28, 30–32, 34, 35, 37, 38, 41, 44–46, 50, 53–55, 60, 61, 69–83, 85–105, 107–111, 122–126, 128–135, 137, 140, 141, 144, 145, 147, 150–152, 154, 156–159, 161–177, 184–203, 205–209, 215, 216, 226–236, 238–242, 245–248, 251, 253, 254, 257, 259, 264–271, 274–277, 285–303, 305–310, and 318–321. We have jurisdiction under 35 U.S.C. § 315(b). We reverse the Examiner's decision rejecting these claims.

Cross-Appellant appeals under 35 U.S.C. § 134 from a final decision of the primary examiner favorable to the confirmation/patentability of claims 106, 182, 204, 282, 304, and 322. We have jurisdiction under 35 U.S.C. § 315(b). We reverse the Examiner's decision favorable to the confirmation /patentability of these claims.

# II. INTRODUCTION

## *A. Background*

U.S. Patent 7,461,353 issued December 2, 2008 from application No. 11/045,757, filed on January 28, 2005 as a division[3] of application No. 09/878,097, filed on June 8, 2001, now U.S. Patent 7,210,099, which is a continuation-in-part of application No. 09/828,511, filed on Apr. 7, 2001, now abandoned. At filing, application No. 11/045,757 claimed priority to application No. 09/828,511 (still pending at that time). Normally, U.S. Patents 7,210,099 and 7,461,353 would have each had an expiration date of

[2] Hearing held on December 8, 2021.

[3] Related U.S. Patent 7,831,926 issued November 9, 2010 from application No. 11/738,486, filed on April 21, 2007 as a continuation of application No. 09/878,097.

April 7, 2021. However, the term of U.S. Patent 7,210,099 was adjusted by 818 days to expire on July, 5, 2023, and the term of U.S. Patent 7,461,353 was adjusted by 376 days to expire on April 18, 2022.

As filed, application No. 11/045,757 contained sixteen (16) claims all directed to translating Web content from its original format into a scalable vector representation of the Web content.

During prosecution, amendments expanded the number of claims which then characterized the invention in essentially three ways.

1) translating at least a portion of HTML-based Web content from its original format into scalable content, and then scaling that scalable content while preserving the original page layout, functionality and design of the content;
2) processing HTML-based Web content to produce scalable content, and then scaling that scalable content while preserving the original page layout, functionality and design of the content at zoom levels and panned views; and
3) without limiting to either translating or processing, a) enabling a Web page to be browsed at various zoom levels and panned views while preserving the original page layout, functionality, and design of the Web content at each zoom level and panned view, or even more broadly, b) enabling a Web page to be browsed at various zoom levels and panned views.

As issued on December 2, 2008, U.S. Patent 7,461,353 contained 319 claims.

On May 20, 2011, Cross Appellant (Requester) filed a Request for Inter Partes Reexamination of U.S. Patent 7,461,353, which reexamination

95/000,634 is the subject of this appeal. On August 31, 2012, an unrelated Requester (Motorola Mobility LLC) filed a Request for Inter Partes Reexamination of U.S. Patent 7,461,353, which second reexamination 95/002,132 is not the subject of this appeal.[4] On April 13, 2012, the present Cross Appellant (Requester) filed a separate Request for Ex Parte Reexamination (Control No. 90/009,994) of U.S. Patent 7,461,353.

On October 2, 2012, Kyocera Corporation petitioned for an *inter partes* review challenging the patentability of claims 1, 33, 36, 43, 48, 51, 52, 58, 59, 66, 118, 138, 139, 149, 183, 252, 283, and 317 of U.S. Patent 7,461,353. On March 29, 2013, the Board entered a Decision in IPR2013-00007 to institute an *inter partes* review on the challenges raised by Kyocera Corporation. Subsequently, IPR2013-00256, brought by Motorola Mobility LLC on April 29, 2013, raised the same challenges and later was joined to the IPR2013-00007 proceeding. All challenged claims were determined to be unpatentable by a Final Written Decision (FWD) on March 27, 2014.

> We hold all of the challenged claims, i.e., claims 1, 33, 36, 43, 48, 51, 52, 58, 59, 66, 118, 138, 139, 149, 183, 252, 283, and 317 of the '353 Patent, are unpatentable under 35 U.S.C. §103(a). Specifically, the preponderance of the evidence shows that claims 1, 33, 36, 43, 48, 51, 52, 58, 59, 118, 138, 139, 149, 183, 252, 283, and 317 of the '353 Patent are unpatentable as obvious over the combination of Zaurus and Pad++. We further hold that

---

[4] Additionally, related U.S. Patent 7,831,926, (term adjusted to expire June 15, 2023) is the subject of two inter partes reexamination appeals which are before this Panel. Per the agreement of Patent Owner and both Third Party Requestors (2022-000153/2022-000154 Hearing Transcript 52–53, and 2022-000716 Hearing Transcript []), the transcripts of hearings in all four related inter partes reexamination appeals are being placed in the record for each of the four related inter partes reexaminations.

> the preponderance of the evidence shows that claim 66 of the '353 Patent is unpatentable over Zaurus, Pad++, and SVG.
>
> We also hold that, under a preponderance of the evidence, claims 1, 33, 36, 43, 48, 51, 52, 58, 59, 118, 138, 139, 149, 183, 252, 283, and 317 of the '353 Patent are unpatentable under 35 U.S.C. § 103(a) as obvious over the combination of Zaurus, Hara, and Tsutsumitake and that claim 66 is unpatentable over the combination of Zaurus, Hara, Tsutsumitake and SVG.

FWD 36–37.

The Board's FWD was then appealed to the United States Court of Appeals for the Federal Circuit by the Patent Owner. The Board's FWD was subsequently affirmed on February 9, 2015. *Softview LLC v. Kyocera Corp.*, 592 F. App'x 947 (Fed. Cir. 2015)(Rule 36). As a result, on January 12, 2016, the Office issued an "Inter Partes Review Certificate," thus indicating that further judicial review was not sought. The Certificate cancelled claims 1, 33, 36, 43, 48, 51, 52, 58, 59, 66, 118, 138, 139, 149, 183, 252, 283, and 317 of U.S. Patent 7,461,353. A "Cancelled Claim Appendix" containing copies of these cancelled claims is attached.

During the *inter partes* review, the processing of all reexaminations was stayed. That stay was lifted on November 27, 2015. Subsequently, Ex Parte Reexamination 90/009,994 confirmed amended claims 5, 23–27, 60, 61, 122, 137, 140, 141, 147, 156, 174–177, 238–242, 248, 259, and 274–277 to be patentable as amended, added new claims 320–322, and cancelled claims 84 and 220. The remaining claims were not reexamined. On December 29, 2017, the Ex Parte Reexamination Certificate for 90/009,994 was issued.[5]

---

[5] Related U.S. Patent 7,831,926 has followed a similar path with two Inter Partes Reexaminations (95/000,635 and 95/002,126), an Ex Parte

*B. Status of the Claims in the Present Appeal*

The Claims Appendix of Patent Owner's Appeal Brief lists the status of the appealed claims. Patent Owner's Appeal Brief 68–134. However, as to numerous claims, the Panel disagrees with the status listed in the appendix. This distinction between issued and amended/new claims is not result determinative under the Panel's interpretation of § 42.73(d)(3)(i). *See* Section III. B.2.b).(2). *infra*. However, while the Panel disagrees, Patent Owner argues that § 42.73(d)(3)(i) is not applicable in a reexamination confirming a previously ***issued*** claim. Should Patent Owner's view ultimately prevail, then the distinction between issued and amended/new claims may be critical.

First, in amendments included in the Patent Owner's Amendment and Response filed on July 24, 2017, many claims were labeled as "(Amended)." These claims include claims 5, 23–27, 60, 61, 122, 137, 140, 141, 147, 156, 174–177, 238–242, 248, 259 and 274–277. Also, in the July 24, 2017 amendments, claims 320–322 were labeled as "(New)." All these claims are now labeled in the Claim Appendix as "(Issued)." We presume that Patent Owner is labeling all these claims as "(Issued)" based on the Office procedure for handling an ex parte reexamination certificate when there is, as here, a still pending unmerged inter partes reexamination. The MPEP states:

---

Reexamination 90/009,995 (affirmed *In re Softview LLC*, 847 F. App'x 930 (Fed. Cir. 2021)(Rule 36)); and two *inter partes* reviews IPR2013-00004 and IPR2013-000257 (affirmed *Softview LLC v. Kyocera Corp.*, 592 F. App'x 949 (Fed. Cir. 2015)(Rule 36)). We do not otherwise discuss herein Patent 7,831,926 and its various proceedings.

> The second [reexamination] request is then considered based on the claims in the patent as indicated in the issued reexamination certificate, rather than the original claims of the patent.

MPEP § 2686.01 IV (9th ed. Rev. 10.2019, rev. June 2020). However, under Patent Owner's interpretation of § 42.73(d)(3)(i), this Office procedure would permit Patent Owner in an ex parte reexamination (where a Requestor has no appeal rights) to use an amendment in an ex parte reexamination certificate to extinguish (without recourse) the Requestor's statutory right to an appeal in an inter partes reexamination.

> THIRD-PARTY REQUESTER.— A third-party requester—
>
> (1) may appeal under the provisions of section 134, and may appeal under the provisions of sections 141 through 144, with respect to any final decision favorable to the patentability of any original or proposed amended or new claim of the patent[.]

35 U.S.C. § 315(b) (pre-AIA). Where there is a conflict between Office procedure and a statute, we determine that the statute prevails. Therefore, contrary to the MPEP procedure, until the time for appeal has expired or any appeal proceeding has terminated in this inter partes reexamination, the we treat all these claims as they are labeled ("(Amended)" or "(New)") in the Patent Owner's Amendment and Response filed on July 24, 2017.

Second, many dependent claims in the Claim Appendix are labeled as "(Issued)" when they have been amended via an amendment to another claim from which they depend. Such claims should have been labeled as "(Amended)," and include at least claims 9, 12–14, 16, 17, 19–21, 71–83, 85, 86, 88–111, 126, 129, 130, 132, 134, 135, 162–164, 166, 167, 215, 226–236, 245–247, 251, 265, 266, 268, 270, and 271.

*C. Exemplary Claims in the Present Appeal*

Exemplary independent claims 5, 37, and 87 under appeal read as follows:

> 5. A wireless device, comprising:
>
> processing means;
>
> wireless communications means, to facilitate wireless communication with a network that supports access to the Internet;
>
> a display;
>
> memory; and
>
> storage means, in which a plurality of instructions are stored that when executed by the processing means enable the wireless device to perform operations including,
>
> rendering a browser interface via which a user is enabled to request access to an original Web page, the Web page comprising HTML-based Web content having an original format defining an original width and height of the Web page and an original page layout, functionality, and design of content on the Web page;
>
> in response to a user request to access the Web page,
>
> retrieving the Web page via the wireless communication means, and translating the HTML-based Web content from its original format into scalable content that supports a scalable resolution-independent representation of the Web page that preserves the original page layout, functionality and design of the content defined by its original format when scaled and rendered; and
>
> scaling the scalable content to render the Web page on the display such that a width of the Web page is rendered to fit across the display; and
>
> parsing markup language code to determine the original page layout of display content within the Web page, wherein the original page layout defines a layout location for a plurality of HTML objects, including HTML text objects, HTML graphic layout objects, and HTML graphic image objects included in the HTML-based Web content for the Web page;

defining a primary datum corresponding to the original page layout; and, for each HTML object,

defining an object datum corresponding to the layout location for the HTML object;

generating a vector from the primary datum to the object datum for the HTML object; and

creating a reference that links the HTML object to the vector that is generated.

37. A mobile phone, comprising:

a processor,

a wireless communications device, to facilitate wireless communication with a network that supports access to the Internet;

a display; and

flash memory, operatively coupled to the processor, in which a plurality of instructions are stored that when executed by the processor enable the mobile phone to perform operations including,

rendering a browser interface via which a user is enabled to request access to a Web page comprising HTML-based Web content defining an original page layout, functionality, and design of content on the Web page;

retrieving the Web page via the wireless communications device, and processing the HTML-based Web content to produce scalable content; and

employing at least one of the scalable content or data derived therefrom to,

render the Web page on the display; and

re-render the display in response to associated user inputs to enable the Web page to be browsed at various zoom levels and panned views while preserving the original page layout, functionality, and design of the Web page content at each zoom level and panned view

[The mobile hand-held device of claim 36, wherein the device comprises a mobile phone].

87. A mobile hand-held device, comprising:

a processor,

a wireless communications interface, to facilitate wireless communication with a network that supports access to the Internet;

a display; and

non-volatile memory, operatively coupled to the processor, in which a plurality of instructions are stored that when executed by the processor enable the mobile hand-held device to perform operations including,

rendering a browser interface on the display via which a user is enabled to request access to a Web page comprising HTML-based Web content defining an original page layout, functionality, and design of content on the Web page;

in response to a user request of the Web page,

retrieving the Web page via the wireless communications interface;

rendering the Web page such that a width of the Web page is rendered to fit across the display; and

re-rendering the display in response to associated user inputs to enable the Web page to be browsed at various zoom levels and panned views while preserving the original page layout, functionality, and design of the Web [a e] page content at each zoom level and panned view.

*D. References*

The Examiner relies on the following references, collectively referred to as the Pad++ references:

| Name | Reference | Date |
|---|---|---|
| Bederson, Benjamin B., et al. (hereinafter "Bederson-1") | "Pad++: A Zoomable Graphical Interface System", CHI '95 Mosaic of Creativity | May 1995 |
| Bederson, Benjamin B., et al. (hereinafter "Bederson-2") | "Space-Scale Diagrams: Understanding Multiscale Interfaces," CHI '95 Proceedings | 1995 |

| | | |
|---|---|---|
| Bederson, Benjamin B., et al. (hereinafter "Bederson-3") | "A Zooming Web Browser," SPIE, Vol. 2667, 260–71 | May 1996 |
| Bederson, Ben, et al. (hereinafter "Bederson-4") | "Implementing a Zooming User Interface: Experience Building Pad++," Software-Practice and Experience, Vol. 28(1), 1101–35 | August 1998 |
| Bederson, Benjamin B., et al. (hereinafter "Bederson-5") | "Pad++: A Zoomable Graphical Sketchpad for Exploring Alternate Interface Physics," Journal of Visual Languages and Computing, Vol. 7, 3–31 | 1996 |
| Meyer, Jonathan (hereinafter "Pad++ Brief Tour") | A Brief Tour Through Pad++ | April 1997 |

Also, the Examiner relies on the following references:

| Name | Reference | Date |
|---|---|---|
| (hereinafter "Nokia") | Nokia Unveils World's First All-In-One Communicator for the Americas, Nokia Press Release | Sept. 19, 1996 |
| (hereinafter "Palm") | 3Com Announces the Palm VII Connected Organizer, the First Handheld Solution for Out-of-the-box Wireless Internet Access, Palm™ press release | Dec. 2, 1998 |
| Robles, Emilo, et al. (hereinafter "Newton") | Apple Outlines Plethora of Newton Wireless Communications Solutions at MessagePad 120 Launch | Jan. 30, 1995 |
| (hereinafter "Locatio") | Locatio Beginner's Guide | July 30, 1999 |

| | | |
|---|---|---|
| Bray, Tim (hereinafter "Bray") | "XML Support in IE5," http://www.xml.com/pub/a/1999/03/ie5/first-x.html | Mar. 18, 1999 |
| Hightower, Ron R., et al. (hereinafter "PadPrints") | "PadPrints: graphical multiscale Web histories." Proceedings of the 11th annual ACM symposium on User interface software and technology. ACM | 1998 |
| (hereafter "Reference Manual") | Pad++ Reference Manual version 0.2.7 | July 9, 1996 |
| (hereafter "Programmer's Guide") | Pad++ Programmer's Guide version 0.2.7 | June 10, 1996 |

Further, the Examiner relies on the following references, collectively referred to as "HTML Standards":

| Name | Reference | Date |
|---|---|---|
| (hereinafter "HTML 3.2 Standard") | W3C, "HTML 3.2 Reference Specification, W3C Recommendation," pp. 1–44 | Jan. 14, 1997 |
| (hereinafter "HTML 4.0 Standard") | W3C, "HTML 4.0 Specification, W3C Recommendation," pp. 1–363 | Dec. 18, 1997 |

Furthermore, the Panel relies on the following references:

| Name | Reference | Date |
|---|---|---|
| Morris | US 5,020,090 | May 28, 1991 |
| Culbert | US 5,708,816 | Jan. 13, 1998 |
| Kato | US 6,088,730 | July 11, 2000 |
| Ausems | US 6,434,403 B1 | Aug. 13, 2002 |
| O'Sullivan | US RE38,127 E | May 27, 2003 |

## III. ANALYSIS

We address herein Appellant's (Patent Owner's) appeal of the Examiner's rejections under 35 U.S.C. § 103, which we reverse.

We present herein a new ground of rejection as to all claims, which subsumes Cross-Appellant's (Requester's) appeal of the Examiner's final decision favorable to the patentability of claims 106, 182, 204, 282, 304, and 322. Therefore, except as to the ultimate conclusion reversing the Examiner's decision favorable to the confirmation/patentability of these claims, we do not separately address Cross-Appellant's appeal.

### *A. Examiner's Rejections*

#### *1. Listing of Section 103 Rejections*

##### *a) Pad++*

"[C]laims 2–28, 31, 34, 35, 38, 41, 44–46, 50, 53–55, 60, 61, 69–80, 83, 85–104, 109–111, 122–126, 128–135, 137, 140, 141, 145, 147, 151, 152, 154, 156–159, 161–177, 184–202, 205, 207–209, 215, 216, 226–236, 238–242, 246, 248, 251, 254, 257, 259, 264–271, 274–277, 285–302, 307–310, 318, and 319, . . . are rejected under 35 USC 103(a) as obvious over Pad++ (see: Request pages 19–21 and 30–60 and Claims Chart CC-A pages 1–1366, which are hereby incorporated by reference)." Right of Appeal Notice (RAN) 21–41.

##### *b) Pad++, Nokia, and Palm*

"[C]laims 30, 32, 37, 81, 82, 107, 108, 144, 150, 205, 206, 245, 247, 253, 305, and 306, . . . are rejected under 35 USC 103(a) as obvious over Pad++, in view of Nokia, and further in view of Palm (see: Request pages 21–22 and 60–61 and Claims Chart CC-B pages 1–13, which are hereby incorporated by reference)." RAN 41–42.

*c) Pad++ and Newton*

"[C]laims 30, 32, 37, 81, 82, 107, 108, 144, 150, 205, 206, 245, 247, 253, 305, and 306, . . . are rejected under 35 USC 103(a) as obvious over Pad++ in view of Newton (see: Request pages 22–23 and 61–62 and Claims Chart CC-C pages 1–15, which are hereby incorporated by reference)." RAN 42–43.

*d) Pad++ and Locatio*

"[C]laims 30, 32, 37, 81, 82, 107, 108, 144, 150, 205, 206, 245, 247, 253, 305, and 306, . . . are rejected under 35 USC 103(a) as obvious over Pad++ in view of Locatio (see: Request pages 23–24 and 62–63 and Claims Chart CC-D pages 1–30, which are hereby incorporated by reference)." RAN 44–45.

*e) Pad++ and Bray*

"[C]laims 105, 203, and 303, . . . are rejected under 35 USC 103(a) as obvious over Pad++ in view of Bray (see: Request pages 24–25 and 63–64 and Claims Chart CC-E pages 1–39, which are hereby incorporated by reference)." RAN 45–46.

*f) Pad++ and Common Knowledge*

"[C]laims 320 and 321, . . . are rejected under 35 USC 103(a) as obvious over Pad++ in view of Common Knowledge of One of Ordinary Skill in the Art (see: 3PR Comments at page 21 and Claims Chart CC-A pages 1–47, which are hereby incorporated by reference)." RAN 55–56.

*g) Pad++ and HTML Standards*

"[C]laims 5, 23–27, 60, 61, 70, 122, 137, 140, 141, 147, 156, 174–177, 216, 238–242, 248, 259, and 274–277, . . . are rejected under 35 USC 103(a) as obvious over Pad++ in view of the HTML Standards (see: 3PR

Comments at pages 32–33 and Claims Chart CC-A pages 1–1366, which are hereby incorporated by reference).” RAN 56.

*h) Pad++ and AAPA (Appellant's Admitted Prior Art)*

“[C]laims 5, 23–27, 60, 61, 70, 122, 137, 140, 141, 147, 156, 174–177, 216, 238–242, 248, 259, and 274–277, . . . are rejected under 35 USC 103(a) as obvious over Pad++ in view of the AAPA (see: 3PR Comments at pages 32 and Claims Chart CC-A pages 1–1366, which are hereby incorporated by reference).” RAN 56–57.

*2. Case Law*

As with an *ex parte* appeal, in an appeal of a 35 U.S.C. § 103 rejection in an *inter partes* reexamination:

> An appellant may attempt to overcome an examiner's obviousness rejection on appeal to the Board by submitting arguments and/or evidence to show that the examiner made an error in either (1) an underlying finding of fact upon which the final conclusion of obviousness was based, or (2) the reasoning used to reach the legal conclusion of obviousness. Similarly, the applicant may submit evidence of secondary considerations of non-obviousness.
>
> The panel then reviews the obviousness rejection for error based upon the issues identified by appellant, and in light of the arguments and evidence produced thereon. Specifically, the Board reviews the particular finding(s) contested by an appellant anew in light of all the evidence and argument on that issue.
>
> Filing a Board appeal does not, unto itself, entitle an appellant to *de novo* review of all aspects of a rejection. If an appellant fails to present arguments on a particular issue — or, more broadly, on a particular rejection — the Board will not, as a general matter, unilaterally review those uncontested aspects of the rejection.

*Ex parte Frye*, 94 USPQ2d 1072, 1075 (BPAI 2010) (precedential) (internal citations omitted).

As articulated by the Federal Circuit, the Examiner's burden of proving non-patentability is by a preponderance of the evidence. *See In re Caveney*, 761 F.2d 671, 674 (Fed. Cir. 1985) ("[P]reponderance of the evidence is the standard that must be met by the PTO in making rejections"). "A rejection based on section 103 clearly must rest on a factual basis[.]" *In re Warner*, 379 F.2d 1011, 1017 (CCPA 1967). "The Patent Office has the initial duty of supplying the factual basis for its rejection. It may not . . . resort to speculation, unfounded assumptions or hindsight reconstruction to supply deficiencies in its factual basis." *Id.*

### 3. *Patent Owner's Arguments*

Patent Owner (Appellant) raises numerous concerns about the Examiner's various rejections under 35 U.S.C. § 103. Patent Owner's Appeal Brief, Patent Owner's Respondent Brief, and Patent Owner's Rebuttal Brief. However, our review finds three concerns which we deem to be dispositive of the Examiner's rejections before us. We limit our discussion of the Examiner's rejections to those three concerns.

### 4. *The Panel's Analysis*

#### a) *Incorporation of the Claim Charts*

In Patent Owner's Appeal Brief, Patent Owner argues:

> The rejections follow a pattern where the Examiner adopts the rejections provided by the 3PR [third party requester] in the Reexamination Request, summarizes the arguments made by the PO and 3PR (as opposed to addressing the arguments in view of the evidence on record supporting the arguments), and then rejects arguments provided by PO without explaining why the Examiner accepts the prevailing argument (of the 3PR).

> . . . .
>
> For example, the Examiner states (RAN at 21–22)[:]
>
> > Referring to claims 2–28 ... and 319, said claims are rejected under 35 USC 103(a) as obvious over Pad++ (see: Request pages 19–21 and 30–60 and Claims Chart CC-A pages 1–1366, which are hereby incorporated by reference).
>
> This rejection ***merely parrots the assertions made in the Reexamination Request*** by 3PR (***without separate Examiner analysis*** for most/all claim elements), which does not establish a *prima facie* case of obviousness for any claim, much less all claims for which the request is asserted. See M.P.E.P. 2242.
>
> While M.P.E.P 2262 permits bodily incorporation of claim charts, it also requires, "The first Office action must be sufficiently detailed that the pertinency and manner of applying the cited prior art to the claims in each rejection is clearly set forth therein."
>
> ***Incorporation of a 1366-page claim chart does not meet this requirement***. This level of incorporation by reference will force the board to "play archeologist with the record." See, *Gen. Access Sols. v. Sprint Spectrum L.P.*, 2019-1856 (Fed. Cir. May. 11, 2020), where reference to a twenty-nine-page claim chart attached as an exhibit was held improper (absent separate presentation of evidence).
>
> Moreover, the materials incorporated by reference are merely attorney arguments that were adopted by the Examiner, with the Examiner not articulating separate substantial evidence to establish a *prima facie* case of obviousness including failure to construe and address all claim elements. This is improper.

Patent Owner's Appeal Brief 12–13 (emphasis added).

Essentially, Patent Owner presents a general (non-specific) argument that the rejections should be reversed based on (a) the large size of the claim chart incorporated by reference for the patent's 200+ claims, and (b) the rejections' obviousness determinations being "without separate Examiner

analysis." We disagree. First, contrary to Patent Owner, we do not find the rejections to be without separate Examiner analysis. E.g., pages 12–13 of the Patent Owner's Appeal Brief provides an example by quoting from the RAN at 21–22, but Patent Owner overlooks the rest of the Examiner's analysis at pages 22–41 of the RAN.

Second, as to the claim chart, it is not the size of the claim chart that controls. Rather, as recognized by Patent Owner in quoting the MPEP, it is whether "the pertinency and manner of applying the cited prior art to the claims in each rejection is clearly set forth" (MPEP § 2262) by the claim chart being used as part of the rejection.

Third, beyond the general argument *supra*, we do not find in Patent Owner's briefing any particular limitation argued where the Patent Owner specifies why the Examiner's incorporation by reference fails.

Fourth, we disagree with Patent Owner's generalized argument. However, to the extent that Patent Owner argues the rejection analysis is insufficient as to a particular limitation, our review necessarily requires "review[ing] the particular finding(s) contested by an appellant anew in light of all the evidence and argument on that issue" (*Frye*, 94 USPQ2d at 1075), including reviewing the sufficiency of the rejection analysis as to any incorporated by reference claim chart regarding that particular limitation.

*b) Issue Preclusion*

Also, Patent Owner argues:

> The Final Written Decisions in IPR2013-00004 & IPR2013-00257 ('926 FWD) and IPR2013-00007 and IPR2013-00256 ('353 FWD) were appealed to the Federal Circuit Court of Appeals, which issued two Rule 36 Orders without opinion.

> As stated in *Rates Technology, Inc. v. Mediatrix Telecom, Inc.*, 688 F.3d 742, 750 (Fed. Cir. 2012) (emphasis added),
>
> > Rule 36 allows us to "enter a judgment of affirmance without opinion" under certain circumstances. Since there is no opinion, a Rule 36 judgment simply confirms that the trial court entered the correct judgment. It does not endorse or reject any specific part of the trial court's reasoning.
>
> In *Phil-Insul Corp. v. AirLite Plastics Co.*, 854 F.3d 1344 (Fed. Cir. 2017), the Federal Circuit clarified that collateral estoppel cannot apply where the appellate court affirmed, without explanation, the judgment of a trial court that 'determined two issues, either of which could independently support the result,' because it is not known which issues were 'necessary' or 'essential' to the final appellate judgment. *Id.* at 1343-44.
>
> In the '353 FWD claims were rejected over two separate combinations of art: (1) Zaurus, Pad++, and SVF; and (2) Zaurus, Hara, Tsutsumitake, and SVF. SVG was added to both for claim 66.
>
> ***There cannot be preclusion*** with respect to any determination concerning any individual reference or combination of references, including Pad++ and SVF, ***as the Rule 36 Order did not identify*** which issues were 'necessary' or 'essential' to the cancellation of any claim.

Patent Owner's Respondent Brief 5 (emphasis added, some boldface omitted).

Essentially, Patent Owner argues a general rule exists that there cannot be issue preclusion when the Federal Circuit issues a Rule 36 Order because the Rule 36 Order does not identify which issues were "necessary" or "essential" to the cancellation of a claim. We disagree. Contrary to Patent Owner's argument, the *Phil-Insul Corp.* decision does not present such a holding. Rather, the decision states:

> [F]or estoppel to apply, there must be no uncertainty as to whether the precise issue was raised and determined ***in the prior suit***. *De Sollar v. Hanscome*, 158 U.S. 216, 221, 15 S.Ct. 816, 39 L.Ed. 956 (1895) ("[I]t is of the essence of estoppel by judgment that it is certain that the precise fact was determined ***by the former judgment***.").

*Phil-Insul Corp. v. Airlite Plastics Co.*, 854 F.3d at 1356–57 (emphasis added). It is the analysis of the former decision that is required, not identification of issues in the Rule 36 Order.

While we disagree with Patent Owner as to the Rule 36 phrasing of how issue preclusion is analyzed, we do agree with the general thrust of Patent Owner's argument, i.e., that a particularized analysis is required. Issue preclusion is only appropriate if the following conditions are met:

> (1) the issue is identical to one decided in the first action;
> (2) the issue was actually litigated in the first action;
> (3) resolution of the issue was essential to a final judgment in the first action; and
> (4) the party against whom estoppel is invoked had a full and fair opportunity to litigate the issue in the first action.

*Innovad Inc. v. Microsoft Corp.*, 260 F.3d 1326, 1334 (Fed. Cir. 2001).

To the extent that the Examiner relies on issue preclusion, our review necessarily requires determining if the Examiner has addressed how the four conditions *supra* are met.

*c) The Pad++ References*

In the Final Written Decision of IPR2013-00007, the panel determined that the combination of Zaurus and Pad++ (and alternatively, the combination of Zaurus, Hara, and Tsutsumitake) renders obvious zooming while preserving layout, functionality, and design of a web page. FWD 17

("Zaurus preserves the ***layout*** and ***design*** of the web page."), FWD 21 ("Bederson's [Pad++] disclosure of preserving hyperlinking capability demonstrates preserving the ***functionality*** of HTML in a zoomed view.") (Emphasis added).

In the present Inter Partes Reexamination, each independent claim under reexamination recites the "layout and design" and "functionality" limitations, and the Examiner relies solely on Pad++ to teach such limitations. For example:

> Pad++ teaches operations including rendering a browser interface via which a user is enabled to request access to an original Web page, the Web page comprising HTML based Web content having an original format defining an original width and height of the Web page and an original page ***layout, functionality, and design*** of content on the Web page (Bederson-3 at 260, 262, 264; Bederson-5 at 12–13; Bederson-4 at 1103. Pad++ enables "navigation of WWW pages written using standard HTML .... [and that] HTML provides [Web content defining] text, images, bullets items, and horizontal rules." Bederson-3 at 264.)

RAN 23.

Essentially, Patent Owner argues at pages 32–40 of Patent Owner's Appeal Brief that the Examiner has not adequately explained the findings of facts as to Pad++ teaching the claimed original page layout and design of content on the Web page. We agree with Appellant that more is required as to the layout and design requirement.

The Examiner finds:

> Pad++ teaches translating the HTML based Web content from its original format into scalable content that supports a scalable resolution independent representation of the Web page that preserves the original page ***layout, functionality and design*** of the content defined by its original format when scaled and

> rendered (Bederson-2 at 4; Bederson-3 at 260, 262, 264; Bederson-4 at 1104, 1120, 1128–1129, 1131–1132; Bederson-5 at 23.)

RAN 24 (emphasis added). Additionally, as discussed *supra*, the Examiner incorporates by reference the claim chart regarding these particular limitation. However, for amended claim 5, reviewing the Examiner's analysis and the claim chart (CC-A-1–23 and CC-A-38–47) for patent claims 1 and 5, we are unable to determine what particular features in Pad++ the Examiner believes correspond to the layout and design. The Examiner's analysis for each independent claim is similarly structured.

The Examiner attempts to further supplement this analysis by pointing out:

> [W]hile the simple Pad++ browser does not implement each and every feature of HTML, the Pad++ references do disclose preserving the layout, functionality, and design of the Web page. The Examiner notes the PTAB reached a similar determination in the Final Written Decision issued 03/27/2014 (see: Final Written Decision, p. 22: "Although...nor Bederson implements each and every feature of HTML...***Bederson disclose preserving the layout, functionality, and design*** of the part of the web page that is translated" . . . )."

RAN 68–69.

We agree with the Examiner that the FWD analysis is sufficient to show Pad++ teaches the functionality limitation for the reasons set forth in the FWD. *See* FWD 20–22. However, we disagree with the Examiner that the FWD holds that "Bederson disclose preserving the layout and design of the part of the web page that is translated." FWD 22. This phrase appears in the FWD as part of the sentence:

> Although neither Zaurus nor Bederson implements each and every feature of HTML, as discussed above, both Zaurus and

> Bederson disclose preserving the layout, functionality and design of the part of the web page that is translated (claim 1) or processed (claim 36).

FWD 22. When we review the phrase in its sentence and in the context of the full analysis of the FWD (where layout and design are found in Zaurus, and functionality is found in Pad++), we conclude that the meaning is not that found by the Examiner. Rather, we read the sentence as stating that "[together] Zaurus and Bederson disclose preserving the layout, functionality and design of the part of the web page that is translated" as that is consistent with the remainder of the FWD analysis.

We conclude, consistent with Patent Owner's arguments, that there is currently insufficient articulated reasoning to support the Examiner's finding that Pad++, alone or in the proposed combinations, teach, suggest, or otherwise render obvious the layout and design limitation of the claims.

Therefore, we conclude that there is insufficient articulated reasoning to support the Examiner's final conclusion that the claims would have been obvious to one of ordinary skill in the art at the time of Appellant's invention.[6]

---

[6] The Final Written Decision (FWD) on March 27, 2014 provides the opportunity to supplement the Examiner's findings as to the layout and design limitation of the claims via new ground of rejection based on the FWD findings as to Zaurus (e.g., by way of issue preclusion). However, we exercise our discretion to not pursue that path at this time as the new ground we do pursue herein (based on 37 C.F.R. § 42.73(d)(3)(i) Estoppel) is more comprehensive.

### *B. New Ground of Rejection – 37 C.F.R. § 42.73(d)(3)(i)*

#### *1. Rules of Practice Before the Patent Trial and Appeal Board*

##### *a) The Rules*

We quote from both Part 41 (Appeals and Interferences) and Part 42 (Trial Proceedings) to show their parallel terminology and structure.

37 C.F.R. § 41.1 (a) reads as follows (emphasis added):

> *Scope.* Part 41 ***governs appeals and interferences*** before the Patent Trial and Appeal Board.

37 C.F.R. § 42.1 (a) reads as follows (emphasis added):

> *Scope.* Part 42 ***governs proceedings*** before the Patent Trial and Appeal Board.

37 C.F.R. § 42.2 **Definitions** includes the following:

> *Judgment* means a final written decision by the Board, or a termination of a proceeding.

37 C.F.R. § 42.73 **Judgment**. (a) and (b) read as follows:

> (a) A judgment, except in the case of a termination, disposes of all issues that were, or by motion reasonably could have been, raised and decided.
>
> (b) *Request for adverse judgment.* A party may request judgment against itself at any time during a proceeding. Actions construed to be a request for adverse judgment include:
>
> (1) Disclaimer of the involved application or patent;
>
> (2) Cancellation or disclaimer of a claim such that the party has no remaining claim in the trial;
>
> (3) Concession of unpatentability or derivation of the contested subject matter; and
>
> (4) Abandonment of the contest.

37 C.F.R. § 42.73 *Estoppel* at (d)(3)(i) reads as follows:

> *Patent applicant or owner*. A patent applicant or owner is precluded from taking action inconsistent with the adverse judgment, including obtaining in any patent:
>
> > A claim that is not patentably distinct from a finally refused or cancelled claim.

37 C.F.R. § 41.127 **Judgment**. (a) and (b) read as follows (emphasis added):

> (a) *Effect within Office*—
>
> (1) *Estoppel*. A judgment disposes of all issues that were, or by motion could have properly been, raised and decided. A losing party who could have properly moved for relief on an issue, but did not so move, may not take action in the Office after the judgment that is inconsistent with that party's failure to move, except that a losing party shall not be estopped with respect to any contested subject matter for which that party was awarded a favorable judgment.
>
> (2) *Final disposal of claim*. ***Adverse judgment*** against a claim is a final action of the Office requiring no further action by the Office to dispose of the claim permanently.
>
> (b) *Request for adverse judgment*. A party may at any time in the proceeding request judgment against itself. Actions construed to be a request for adverse judgment include:
>
> (1) Abandonment of an involved application such that the party no longer has an application or patent involved in the proceeding;
>
> (2) Cancellation or disclaiming of a claim such that the party no longer has a claim involved in the proceeding;
>
> (3) Concession of priority or unpatentability of the contested subject matter; and
>
> (4) Abandonment of the contest.

*b) Application of 37 C.F.R. § 42.73(d)(3)(i)*

As to both of the following points of Patent Owner and Examiner agreement during this reexamination, we disagree for the reasons set forth *infra*. Patent Owner and the Examiner mistakenly agree that the claims on appeal are all patentably distinct from the claims cancelled during an *inter partes* review of the patent. RAN 61–62, 99–101. Thus, Patent Owner and the Examiner mistakenly agree § 42.73(d)(3)(i) estoppel is not applicable.

Also, Patent Owner appears to argue that § 42.73(d)(3)(i) is limited to only circumstances covered by § 42.73(b) *Request for adverse judgment.*

> § 42.73(d)(3)(i) was recently addressed by the Federal Circuit. In *Arthrex, Inc. v. Smith & Nephew, Inc.*, [880 F.3d 1345, (Fed. Cir. 2018)], the patent owner appealed from the PTAB's entry of an adverse judgment under 37 C.F.R. § 42.73(b). The issue on appeal was whether the PTAB erred in doing so, because the patent owner disclaimed all claims the petitioner challenged before the PTAB issued an institution decision. The patent owner was aggrieved because "[t]he purpose of § 42.73(b) is to define the circumstances in which the estoppel provision of 37 C.F.R. § 42.73(d) applies.["] [*Arthrex*, 880 F.3d at 1350].

Patent Owner's Rebuttal Brief at page 2.[7]

We disagree with Patent Owner's interpretation of the rule. Although § 42.73(b) does include adverse judgments that are requested by a party, the court in *Arthrex* does not say the purpose of § 42.73(b) is to define the ***only*** circumstances in which the estoppel provision of 37 C.F.R. § 42.73(d) apply. Nor does § 42.73(d)(3)(i) expressly limit itself to only "requested" adverse

[7] Patent Owner also points to the *Choon's Design, LLC v. Zenacon, LLC* holding that 37 C.F.R. § 42.73(d)(3)(i) is not applicable in an infringement action. 2015 WL 539441 (E.D. Mich. 2015). We fail to see the relevance of this decision as it is not disputed that the Rule is limited to proceedings before the Office.

judgments. To the contrary, we conclude § 42.73(d)(3)(i) more expansively covers a claim that is not patentably distinct from a "finally refused claim," when the adverse judgment is under either § 42.73(a) or § 42.73(b). Further, the use of the term "adverse judgment" elsewhere in the rules supports a more inclusive interpretation of "adverse judgment" in practice before the Patent Trial and Appeal Board:

> Adverse judgment against a claim is a final action of the Office requiring no further action by the Office to dispose of the claim permanently.

§ 41.127(a)(2).

However, we do conclude that applicability of § 42.73(d)(3) to a pre-AIA *inter partes* reexamination of the issued patent claims (request filed prior to September 16, 2012) is limited by statute to only those issued patent claims for which a "substantial new question of patentability" is raised (35 U.S.C. § 312 (pre-AIA)[8]) "on the basis of any prior art cited under the provisions of section 301" (35 U.S.C. § 311 (pre-AIA)[9]). On August 8, 2011, the Examiner determined:

> A substantial new question of patentability ("SNQ") affecting claims 1–319 of USPN 7,461,353 B2 to Rohrabaugh et al. is raised by the inter partes reexamination request filed 05/20/2011.

Order Granting Request for Inter Partes Reexamination 2. We do not find before us where Patent Owner disputes Examiner's determination that an SNQ is raised as to claims 1–319.

For the reasons set forth *infra*, we reject claims 2–28, 30–32, 34, 35, 37, 38, 41, 44–46, 50, 53–55, 60, 61, 69–83, 85–111, 122–126, 128–135,

---

[8] As in effect for a request filed prior to September 16, 2011.

[9] As in effect for a request filed prior to September 16, 2011.

137, 140, 141, 144, 145, 147, 150–152, 154, 156–159, 161–177, 182, 184–209, 215, 216, 226–236, 238–242, 245–248, 251, 253, 254, 257, 259, 264–271, 274–277, 282, 285–310, and 318–322 (all the claims subject to this reexamination) based on estoppel under 37 C.F.R. § 42.73(d)(3)(i) as not being patentably distinct from claims finally cancelled during an *inter partes* review of the patent which is the subject of this reexamination.

### 2. *Preliminary Matters*

Certain issues appear repeatedly throughout the new grounds. Rather than addressing these issues repeatedly, we address each issue once here.

#### a) *Applicable Section 103 Arguments*

The majority of Patent Owner's appeal arguments are not directed to the issue of estoppel upon which the new ground is based. However, as a courtesy to Patent Owner, we address those § 103 arguments we deem equally relevant to whether the claims are patentably distinct.

#### b) *The Effect of the IPR Certificate*

*(1)*

An "Inter Partes Review Certificate," cancelled claims 1, 33, 36, 43, 48, 51, 52, 58, 59, 118, 138, 139, 149, 183, 252, 283, and 317 of U.S. Patent 7,461,353. *See* attached Cancelled Claim Appendix. The cancelation of these claims by the Certificate put the public on notice that these claims are now in the public domain. *Cf. Vectra Fitness, Inc. v. TNWK Corp.*, 162 F.3d 1379, 1384 (Fed. Cir. 1998) (in interpreting 35 U.S.C. § 253, the court stating that "[t]he public is entitled to rely upon the public record of a patent in determining the scope of the patent's claims. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed.Cir.1996). This reliance

enables businesses, as well as others, to plan their future conduct in as certain an environment as possible. *See id.*").

*(2)*

On January 6, 2022, Patent Owner in a hearing for a first related second Inter Partes Reexamination 95/002,132 raised the argument that estoppel under § 42.73(d)(3)(i) is not applicable in a reexamination because Patent Owner is not "obtaining" a claim as set forth in the rule. Also, Patent Owner points to two non-precedential PTAB decisions (IPR2017-00428 and IPR2015-00458) as showing that "obtaining" in the rule also does not include "confirming" of an issued claim in an *inter partes* review. Thus, Patent Owner argues "the regulation is inapplicable to the PTO confirming issued unamended claims in a patent subject to reexamination." 2022-000153/2022-000154 Hearing Transcript 17.

This argument is unpersuasive. First, as to Patent Owner's argument that § 42.73(d)(3)(i) is not applicable in a reexamination confirming a previously issued claim, Patent Owner is mistaken. The Notice of Final Rule Making, 77 Federal Register 48612, in response to Comment 213 states:

> Under 35 U.S.C. 316(a)(4), as amended, and 35 U.S.C. 326(a)(4), the Office is required to prescribe regulations setting forth ***the relationship between the review and other proceedings in the Office*** (***e.g., examination***). Section 42.73(d)(3)(i), as adopted in this final rule, merely provides estoppel against claims that are ***patentably indistinct*** from those claims that were lost, and claim amendments that were presented and denied, during a trial.

77 Fed. Reg. 48649 (emphasis added). We conclude that, like examination, a reexamination is one of the "other proceedings in the Office," and is

covered by Section 42.73(d)(3)(i) that "provides estoppel against claims that are patentably indistinct from claims that were lost." *Id.*

Second, as to Patent Owner's argument that § 42.73(d)(3)(i) is not applicable to an *inter partes* reexamination because this rule has been held to not be applicable in an *inter partes* review confirming a previously issued claim, Patent Owner is partially mistaken. In the PTAB's *inter partes* review decisions cited by Patent Owner, the patent owners were merely defending a challenged claim against a charge of unpatentability by petitioner; these cited *inter partes* review proceedings involved no examination (or examination-like) action by the Office. However, had such an examination (or examination-like) action occurred, then § 42.73(d)(3)(i) is applicable (e.g., for claims amended in an *inter partes* review).[10] "Paragraph (d)(3) of § 42.73 applies to derivation proceedings, *inter partes* review, post-grant review, and covered business method review." 77 Fed. Reg. 48649. 35 U.S.C. § 316(a)(pre-AIA) covering an inter partes reexamination and 35 U.S.C. § 328(b) covering a final written decision in an *inter partes* review each use the identical "confirming any claim of the patent determined to be patentable" language. However, Patent Owner overlooks that while the term "confirming" is used in each statute, the two activities of reviewing the patentability of a claim challenged by a petitioner

[10] In an *inter partes* review, it is an amendment that triggers the examination of the amended claims. However, in an inter partes reexamination, even though they also may include an amendment that similarly triggers the examination of the amended claims, it is the substantial new question of patentability that triggers the examination of the issued patent claims.

and examination of a claim by the Office are not the same and lead to different results under § 42.73(d)(3)(i).

For these reasons, and given the strong concern with protecting the public[11], we conclude "obtaining" in the rule includes "confirming" in a reexamination. We conclude that § 42.73(d)(3)(i) is applicable for those claims in a reexamination for which a "substantial new question of patentability" is raised.

*(3)*

Also, on January 6, 2022, in a hearing for a second related second Inter Partes Reexamination 95/002,126, the Patent Owner raised an argument that "patentably distinct" under § 42.73(d)(3)(i) is not in the obviousness sense. 2022-000153/2022-000154 Hearing Transcript 59.

This argument is unpersuasive. The phrase "patentably distinct" is used elsewhere in the Rules (i.e., § 41.201 Definitions (in Patent Interferences)) and has been interpreted to mean "a claim is patentably distinct from the interference count, in the sense of 35 U.S.C. § 103, if the apparatus claimed by the count does not render what is being claimed by the claim at issue obvious." *Davis v. Loesch*, 998 F.2d 963, 965 n.2 (Fed. Cir.1993). Similarly, in double patenting situations, "patentably distinct" has been interpreted to mean "[i]f the rejected claim defines *more* than an obvious variation, it is *patentably distinct.*" *General Foods Corp. v. Studiengesellschaft Kohle mbH*, 972 F.2d 1272, 1278 (Fed. Cir. 1992). *Eli Lilly and Co. v. Barr Laboratories, Inc.*, 251 F.3d 955, 968 (Fed. Cir. 2001)

[11] As we note *supra*, the public is entitled to rely upon the public record of a patent in determining the scope of the patent's claims.

("A later patent claim is not patentably distinct from an earlier patent claim if the later claim is obvious over, or anticipated by, the earlier claim.").

We conclude that the proper interpretation of the phrase "patentably distinct" in § 42.73(d)(3)(i) is in the obviousness sense.

*(4)*

Further, on January 27, 2022, in a hearing for a third related second Inter Partes Reexamination 95/000,634, the Patent Owner raised an argument that a proceeding is not subsequent as discussed in the comments to § 42.73 if that proceeding was commenced prior to the related *inter partes* review. 2022-000716 Hearing Transcript [].

This argument is unpersuasive. The Federal Circuit stated:

> When the Board entered an adverse judgment, an estoppel effect attached, as 37 C.F.R. § 42.73(d)(3)(i) precludes a patent owner "from taking action inconsistent with the adverse judgment, including obtaining in any patent . . . [a] claim that is not patentably distinct from a finally refused or canceled claim." At the time of the adverse judgment, Arthrex had two ***pending*** continuation patent applications that ***this estoppel provision would impact***. Those two applications have since issued as patents.

*Arthrex*, 880 F.3d at 1347 (emphasis added). In *Arthrex*, the "two pending continuation patent applications" were filed in 2005 and 2014, and the *inter partes* review was filed in 2016.

We conclude that § 42.73(d)(3)(i) is applicable here where the current Inter Partes Reexamination was filed before the now completed related *inter partes* review, but the reexamination is still pending before the Office.

*c) The Form of Our New Ground of Rejection*

For simplicity, we present the estoppel issues *infra* in the same format the Office uses for rejections under 35 U.S.C. § 103.

Also, in view of the circumstances of this case where the patentability of the cancelled claims has been fully decided with no further judicial review possible, we discern no need to discuss with particularity the limitations of the cancelled claims, even to the extent they are included in the challenged claims of this Inter Partes Reexamination.

*d) The Form of Any Patent Owner Response*

We conclude that Patent Owner is estopped from arguing that limitations of the relevant cancelled claims render the challenged claims patentable over those cancelled claims because of the issuance in IPR2013-00007 on the Certificate cancelling those claims. Therefore, if Patent Owner intends to assert such arguments, Patent Owner should explain why it is not estopped from arguing that the limitations of those cancelled claims, which are incorporated into challenged claims, demonstrate patentability.

*e) Translating vs. Processing vs. Zooming*

As we noted *supra* in Section II.A. *Background*, U.S. Patent 7,461,353 issued with claims which characterized the invention as either (a) translating into scalable content, then scaling the content (e.g., claim 1), (b) processing to produce scalable content, then scaling the content (e.g., claim 36), or (c) zooming without limiting to either translating or processing (e.g., claim 317). Also as noted *supra*, the Office cancelled each of claims 1, 36, and 317 as a result of *inter partes* review.

We conclude that there is no meaningful difference between claiming "translating into scalable content, then scaling the content," and "processing to produce scalable content, then scaling the content." That is, we conclude that this claim difference does not render claims patentably distinct from

each another. This conclusion is supported by the Specification which uses the word "process" in describing "translating":

> With reference to the flowchart of FIG. 5, the process for translating the HTML content into a scalable vector representation proceeds as follows.

Spec. 15:43–55.

Further, we conclude a claim to zooming without limiting to either translating or processing is not patentably distinct from claims that differ by being limited to (a) translating into scalable content, then scaling the content or (b) processing to produce scalable content, then scaling the content. We reach this conclusion because "zooming" is merely a generic recitation of the function accomplished by the scaling in (a) and (b). This conclusion is supported by the Specification which shows the phrase "to be scaled" is understood as "zoomed":

> In accordance with aspects of the invention, mobile devices enabled to support resolution-independent scalable display of Internet (Web) content to allow Web pages to be scaled (zoomed) and panned for better viewing on smaller screen sizes are disclosed.

Spec. 2:22–25.

In summary, we conclude that characterizing the invention in these three ways does not by itself render such claims patentably distinct from each other.

*f) Entire vs. Portion*

The Cross-Appellant correctly points out that "the claims do not recite preserving 'the ***entire*** HTML-based Web content.'" Third Party Requester's Respondent Brief 7. In the face of this, Patent Owner argues (Patent Owner's Rebuttal Brief 5–6) that the broadest reasonable interpretation of

many of the amended claims now requires that in those amended claims all the HTML-based content (i.e., the entire HTML-based content) that defines the original page layout and functionality of the web page content must be preserved. These amendments consist of (a) deleting the phrase "at least a portion of" (e.g., amended claim 5), or (b) inserting the article "the" to limit the antecedent basis of "HTML-based Web content" (e.g., amended claims 37 and 38). Patent Owner's Amendment and Response to 2nd Non-final Action 56–58. We agree with Patent Owner that these amendments have the effect of limiting the amended claims to preserving the entire HTML-based Web content.

However, we disagree with Patent Owner's (and the Examiner's) conclusion that "preserving 'the ***entire*** HTML-based Web content'" renders the so amended claims patentably distinct from the claims cancelled during an *inter partes* review of the patent. We explain our conclusion by focusing on the difference between limitations in cancelled patent claim 1 and amended claim 5 on appeal (formerly claim 5/1). Cancelled claim 1 recites:

> the Web page comprising HTML-based Web content having an original format defining an original width and height of the Web page and an original page layout, functionality, and design of content on the Web page,

and

> translating ***at least a portion of*** the HTML-based Web content from its original format into scalable content that supports a scalable resolution-independent representation of the Web page that preserves the original page layout, functionality and design of the content defined by its original format when scaled and rendered.

Cancelled Claims Appendix (emphasis added). The related portions of amended claim 5 on appeal differ in that the "at least a portion of" has been

deleted. As discussed *supra*, the effect of this amendment is to require the entire HTML-based Web content be translated.

Essentially, cancelled claim 1 required HTML-based Web content that includes A=(layout), B=(functionality), C=(design), and X=(additional content), and only the ABC portion of the content was required to be translated and preserved when scaling. The phrase "at least a portion of" in cancelled claim 1 defines the relationship between the starting content and the translated and preserved content. Deleting the phrase in amended claim 5 has the effect of requiring that the entire HTML-based Web content be translated and preserved when scaling. Not unreasonably, Patent Owner and Examiner appear to construe amended claim 5 as covering having HTML-based Web content that includes A=(layout), B=(functionality), C=(design), and X=(additional content), and the entirety of the ABCX content is required to be translated and preserved when scaling. However, we conclude that while amended claim 5 covers this situation, amended claim 5 is not so limited. Rather, because the "at least a portion of" limitation in cancelled claim 1 was what required the Web content to have X=(additional content) before the translation, removal of the "at least a portion of" limitation means that in amended claim 5 the HTML-based Web content is not required to have additional content X. Thus, appealed claim 5 also covers situations where the translated and preserved ABC (as in claim 1) is the entire HTML-based Web content (i.e., additional content X is not required).

We conclude the Examiner was mistaken in determining the amended claims to be patentably distinct based on their "preserving 'the ***entire*** HTML-based Web content.'" We conclude that this limitation includes situations that differ from the cancelled claims only in that the now claimed

starting HTML-based Web content (to ultimately be preserved and scaled) is more limited than in the cancelled claims (but is otherwise fully encompassed (i.e., only lacking X)). Thus, the amended claims and cancelled claims includes situations that are identical as to the HTML-based Web content that is translated, preserved, and scaled (i.e., ABC).

Stated differently, as compared to the cancelled "at least a portion of" claims, the amended claims directed to translating (or alternatively processing) the "entire" HTML-based Web content now covers two embodiments (1) starting with ***the same*** HTML-based Web content as in the cancelled claims, and translating/processing, preserving, and scaling ***more*** Web content than in the cancelled claim, and (2) starting with ***less than*** the HTML-based Web content in the cancelled claims, and translating /processing, preserving, and scaling ***the same*** Web content as in the cancelled claim. It is based on embodiment (2) that we conclude the amendment, to preserve/scale the "entire" Web content, does not result in the so amended claims being patentably distinct from the cancelled claims.

*g) HTML Objects vs. Pad++ Objects*

In the '353 Final Written Decision, the Board determined:

> The standard objects supported by Pad++ include colored text, graphics, portal and HTML, with standard input widgets (buttons, sliders, etc.) supplied as extensions. [Ex. 1006] at 156 [Bederson-5 at page 6].

FWD 21. Specifically, Bederson-5 states "[t]he standard objects that pad++ supports are colored text, graphics, images, portals and hypertext markup language (HTML)."

During the prosecution of this *inter partes reexamination*, the Examiner determined:

> Clearly the HTML document content processed and rendered by Pad++ are derived from regular HTML objects (see: Bederson-1, p. 24: "Pad++ can read in hypertext files written in Hypertext Markup Language (HTML)"; Bederson-3, p. 261: "visualization of standard HTML pages", p. 264: "visualization and navigation of WWW pages written using standard HTML. . .include text, images, bullet items, and horizontal rules. . .HTML provides header tags"; Bederson-4, p. 1104: "object such as an HTML page composed of many characters, line segments and image"; Bederson-5, p. 6: "pad++ supports. . .hypertext markup language (HTML)", p. 12: "Pad++ reads hypertext written in....HTML. . . can follow links across the internet. . .zooming mechanisms are employed"; Pad++ Tour, p. 86-89: "An HTML browser. . . Pad++ displaying an HTML document", p. 91-93: "relevant document is loaded into Pad++"). . . .
>
> The Examiner notes the PTAB reached a similar determination regarding the obviousness of HTML objects in general in the Final Written Decision issued 03/27/2014 (see: Final Written Decision, pp. 21-22: "Bederson describes objects in the Pad++ hierarchy. . .standard objects supported by Pad++ include colored text, graphics, portal and HTML. . .Bederson disclose preserving the layout, functionality and design of the part of the web page that is translated"). Similarly, the PTAB also found PO's argument unpersuasive that Pad++ only generates Pad++ objects and treats entire Web pages in Pad++ as a single object (see: Final Written Decision, p. 26: "features of Pad++. . .pertain to moving objects as a whole, which in the case of an HTML item would be an entire web page. . .Bederson discloses an example of Pad++ to zoom in on a portion of Bederson's home web page (an HTML document). . .Pad++ discloses zooming on a portion of a web page. . .the selection of which tags to implement is a matter that would be well within the knowledge and abilities of a person of ordinary skill in the art and would be obvious").

RAN 72–74.

Patent Owner argues Pad++ does not teach HTML objects and states, "[c]laims under Issue 1 were amended to clarify the objects were HTML objects." Patent Owner's Appeal Brief 30.

> Pad++ clearly does not teach HTML objects. As observed by Howard, 90. . . . In the Pad++ browser, the HTML content for a Web page is parsed and Pad++ objects including Pad++ text objects and Pad++ image objects are generated, along with hyperlinks associated with some of text and image objects. There are no HTML objects that are generated. The Pad++ object hierarchy is shown below. The HTML object is a Pad++ object corresponding to an entire Web page, which is treated in Pad++ as a single object.

Patent Owner's Appeal Brief 32.

The Cross-Appellant responds:

> Patent Owner argues that the claims are patentable because the claims "were amended to clarify the objects were HTML objects." PO Brief p.30. However, these amendments do not meaningfully narrow the claims from those found unpatentable during IPR.

Third Party Requester's Respondent Brief 13.

> Importantly, the '353 Patent specification does not define or even use the term "HTML objects" or distinguish "HTML objects" from any other object. Rather, the specification simply uses the term "objects" to refer to objects created from HTML content on a web page. Indeed, the "objects" recited in the claims prior to amendment were *generated from* the HTML-based Web content. Thus, a POSITA would have understood that the "objects" in the claims prior to amendment were necessarily *HTML* objects to begin with, and therefore PO's amendment to insert the word "HTML" before "object" does nothing to narrow the claims in any way. Ex. N ¶¶15–23.
>
> . . . .
>
> The specification makes clear that the term "objects" refers to logical groupings of HTML content. ['353 Patent],

> 16:19–20. Those logical groupings of HTML content may include, for example, text content and images, parsed from an HTML document. *Id.*, 16:22–31. Therefore, a POSITA would understand the description of "objects" in the specification to refer to "HTML" objects. Ex. N ¶¶24–35. In fact, Patent Owner cites this description as support for the claim amendment "HTML object" in the July 24, 2017 Response. See Appendix A, claim 25 (citing as support 12:48–17:41); FIGs. 4B, 5. There is no written description to support Patent Owner's erroneous assertion that an "HTML object" is different from the objects described in the specification and recited in the original claims. Therefore, because the addition of "HTML" before "object" does nothing to further limit the claims, the Board's finding that Pad++ discloses "objects" applies equally to "HTML" objects in the amended claims.

Third Party Requester's Respondent Brief 14–15 (emphasis omitted).

Patent Owner then argues in rebuttal:

> While a POSITA may have understood the "objects" in the claims prior to amendment were necessarily HTML objects to begin with, the PTAB panels members clearly were not POSITAs in the HTML and CSS arts and construed "object" to cover the use of object in Pad++. Pad++ creates what is refers to as a single HTML object (item) for the entire page. The claims require generation of multiple HTML objects.

Patent Owner's Rebuttal Brief 21–22. Patent Owner then repeats:

> As observed by Howard, 90. . . . In the Pad++ browser, the HTML content for a Web page is parsed and Pad++ objects including Pad++ text objects and Pad++ image objects are generated, along with hyperlinks associated with some of text and image objects. There are no HTML objects that are generated. The Pad++ object hierarchy is shown below. The HTML object is a Pad++ object corresponding to an entire Web page, which is treated in Pad++ as a single object.

Patent Owner's Rebuttal Brief 22.

We agree with the reasoning of Cross-Appellant, Examiner, and the PTAB in its FWD, that Pad++ objects are inclusive of HTML objects. Similarly, the "objects" in the cancelled claims would be understood to be inclusive of HTML objects. Thus, we conclude that adding of "HTML" before "object" in the amended claims does nothing to render the amended claims patentably distinct from the cancelled claims. At best, addition of "HTML" before "object" merely limits the full scope of the cancelled claim to an obvious subset of that scope.

*3. Independent Claim 37*

We reject appealed claim 37 based on estoppel under 37 C.F.R. § 42.73(d)(3)(i) as not being patentably distinct from claim 36 which was finally cancelled during an *inter partes* review of the '353 patent which is the subject of this reexamination.

Appealed claim 37 differs from cancelled claim 36 in that it includes the article "the" to limit the antecedent basis of "HTML-based Web content" to be the entire HTML-based Web content. However, for the reasons discussed *supra* in Section III.B.2.f., such an amendment does not render claim 37 patentably distinct.

Also, appealed claim 37 differs from cancelled claim 36 in that it includes a "mobile phone" limitation. As to the § 103 rejection, Patent Owner argues:

> Pad++ was never implemented on a mobile device, PDA, or mobile phone. A PHOSITA at the time of the invention would not have any motivation to attempt to do so, could not do so without undue experimentation, and would have no reasonable expectation of success.

Patent Owner's Appeal Brief 51. We do not find Patent Owner's mobile phone argument applicable here because, other than the mobile phone limitation, claim 37 is directed to a mobile hand-held device with Web page rendering that is not otherwise patentably distinct from the mobile hand-held device of cancelled claim 36 (Cancelled Claim Appendix attached).

The only remaining issue is whether it would have been obvious to supplement with telephone functionality the processor of the mobile hand-held device of cancelled claim 36. We conclude that it would have been obvious to do so as the combination of a processor/computer and a mobile telephone was known well before Patent Owner's earliest June 12, 2000 filing date. *See* for example Morris, US 5,020,090, issued May 28, 1991; and O'Sullivan US RE38,127 E, issued May 27, 2003 (filed February 5, 1992). Particularly, O'Sullivan states, "[i]t is a primary object of the present invention to provide a novel and improved portable hybrid communication system incorporating an integrated, portable unit which includes a personal computer, cellular transmitter." O'Sullivan, col. 2:45–48. O'Sullivan also states, "[t]he portable personal computer 90 may be any programmable computing device, such as a hand-held calculator or portable computer." O'Sullivan, col. 5:63–65.

*4. Independent Claim 38*

We reject appealed claim 38 based on estoppel under 37 C.F.R. § 42.73(d)(3)(i) as not being patentably distinct from claim 36 which was finally cancelled during an *inter partes* review of the '353 patent which is the subject of this reexamination.

As with appealed claim 37, appealed claim 38 differs from cancelled claim 36 in that it includes the article "the" to limit the antecedent basis of

"HTML-based Web content" to be the entire HTML-based Web content. However, for the reasons discussed *supra* in Section III.B.2.f., such an amendment does not render claim 37 patentably distinct.

Similar to claim 37, appealed claim 38 differs from cancelled claim 36 in that it includes a "Personal Digital Assistant (PDA)" limitation. Again, the only remaining issue is whether it would have been obvious to supplement the processor of the mobile hand-held device of cancelled claim 36 by adding PDA utilities. We conclude that it would have been obvious to do so because a PDA is a known form of computing device and appealed claim 38 does not require any particular PDA utilities (even a basic calendar function would suffice). *See* for example: Culbert US 5,708,816, issued January 13, 1998; and *see* Kato US 6,088,730 issued July 11, 2000 (filed January 12, 1998).

> Personal computing has undergone a revolution over the past decade. The steady increase in the computing power of microchips, coupled with advances in the miniaturization of electronics and the development of strong, lightweight materials and batteries, has fostered the creation of a large market in ever smaller computing devices. Such computing devices include notebook computers, such as Apple Computer, Incorporated's PowerBook™ and Duo™ notebook computers, which are lightweight and offer the computing power of desktop computers. ***Smaller still are the relatively new hand held computing devices, otherwise known as personal digital assistants, or PDAs***.

Culbert, col. 1:14–25 (emphasis added).

> A primary use of a PDA is to manage and to browse personal information or PIM (Personal Information Manager) data, such as a calendar, a schedule, an address book, a memorandum book or the like.

Kato, col. 2:8–11. Further, the Examiner finds "Pad++ discloses the device comprises one of a Personal Digital Assistant (PDA) or hand-held computer [e.g., PDAs running Pad++]. Bederson-5 at 5." RAN 38. Given that adding software utility tools to processor devices is ubiquitous in the art, we conclude that adding minimal PDA utility to cancelled claim 36 would have been obvious.

*5. Independent Claim 5*

We reject appealed claim 5 based on estoppel under 37 C.F.R. § 42.73(d)(3)(i) as not being patentably distinct from claim 1 and claim 138/118 which were finally cancelled during an *inter partes* review of the '353 patent which is the subject of this reexamination.

Except for the limitations discussed *infra*, claim 5 is a combination of the cancelled sub-combination claims 1 and 138/118. Our review does not find any additional synergy from the combination of cancelled claims 1 and 138/118. Rather, in the combination the limitations merely perform as they did in each sub-combination. Therefore, we conclude that based on the combined limitations, appealed claim 5 is not patentably distinct from the cancelled sub-combination claims.

Also, appealed claim 5 differs from cancelled claims 1 and 138/118 in that it is amended to remove the "at least a portion" limitation of cancelled claims 1 and 118. However, for the reasons discussed *supra* in Section III.B.2.f., such an amendment does not render claim 5 patentably distinct from cancelled claims 1 and 138/118.

Further, appealed claim 5 is amended to recite "HTML" objects. However, for the reasons discussed *supra* in Section III.B.2.g., such an

amendment does not render claim 5 patentably distinct from cancelled claims 1 and 138/118.

Finally, amended claim 5 includes text objects, graphic layout objects, and graphic image objects. Cancelled claim 138/118 recites parsing HTML-based code and logically grouping selected content into objects. Bederson-3 at page 264 discloses "visualization and navigation of WWW pages written using standard HTML" in Pad++ and states "HTML provides very few basic types. Examples include text, images, bullets items, and horizontal rules." We conclude an artisan would understand these examples to be text objects, graphic layout objects, and graphic image objects. Given that cancelled claim 138/118 includes HTML objects and standard HTML includes as basic types the claimed text objects, graphic layout objects, and graphic image objects. We conclude that adding use of text objects, graphic layout objects, and graphic image objects to the combination of cancelled claims 1 and 138/118 would have been obvious and does not render appealed claim 5 patentably distinct over the cancelled claims.

*6. Claims Depending from Claim 5*

*a) Dependent Claim 2 – User Selectable Portion*

We reject appealed claim 2/5 based on estoppel under 37 C.F.R. § 42.73(d)(3)(i) as not being patentably distinct from claim 1, claim 138/118, and claim 48/36 which were finally cancelled during an *inter partes* review of the '353 patent which is the subject of this reexamination.

Appealed claim 2/5 adds "a user-selectable portion of a display" to its parent appealed claim 5. The resulting claim 2/5 is a combination of the cancelled sub-combination claims 1, 138/118, and 48/36 (a user selected column).

Our review does not find any additional synergy from the combination of cancelled claims 1, 138/118, and 48/36. Rather, in the combination the limitations merely perform as they did in each sub-combination. Therefore, we conclude that based on the combined limitations, appealed claim 2/5 is not patentably distinct from the cancelled sub-combination claims.

*b) Dependent Claim 3 – Real Time Rendering*

We reject appealed claim 3/5 based on estoppel under 37 C.F.R. § 42.73(d)(3)(i) as not being patentably distinct from claim 33/1 (the scalable content comprises vector-based content) and claim 138/118 which were finally cancelled during an *inter partes* review of the '353 patent which is the subject of this reexamination.

Appealed claim 3/5 adds "re-rendered in real-time" to its parent appealed claim 5. "Real-time" in U.S. Patent 7,461,353, is described as follows, "because the resulting file graphics are handled as vectors, the end user can control real time changes in the size of text and graphics as well as what portion of the file is viewable in the display." '353, col. 4:67–5:3. We conclude the '353 patent describes "real time changes" as a characteristic of using vectors for scaling. Contrary to Patent Owner's arguments (e.g., Patent Owner's Appeal Brief 45–47), the '353 patent does not describe "real-time" in terms of a particular length of time or a user's perception of time.

Our review does not find any additional synergy from the combination of cancelled claims 33/1 and 138/118. Rather, in the combination the limitations merely perform as they did in each sub-combination. Therefore, we conclude that based on the combined limitations, appealed claim 3/5 is not patentably distinct from the cancelled sub-combination claims.

*c) Dependent Claim 4 - Hyperlink*

We reject appealed claim 4/5 based on estoppel under 37 C.F.R. § 42.73(d)(3)(i) as not being patentably distinct from claim 1, claim 138/118, and claim 317 which were finally cancelled during an *inter partes* review of the '353 patent which is the subject of this reexamination.

Appealed claim 4/5 adds "at least one hyperlink" to its parent appealed claim 5. The resulting claim 4/5 is a combination of the cancelled sub-combination claims 1, 138/118, and 317 (at least one hyperlink).

Our review does not find any additional synergy from the combination of cancelled claims 1, 138/118, and 317. Rather, in the combination the limitations merely perform as they did in each sub-combination. Therefore, we conclude that based on the combined limitations, appealed claim 4/5 is not patentably distinct from the cancelled sub-combination claims.

*d) Dependent Claim 6 – Different Resolutions*

We reject appealed claim 6/5 based on estoppel under 37 C.F.R. § 42.73(d)(3)(i) as not being patentably distinct from claim 1 and claim 138/118 which were finally cancelled during an *inter partes* review of the '353 patent which is the subject of this reexamination.

Appealed claim 6/5 adds "displayed at different resolutions by scaling" to its parent appealed claim 5. The resulting claim 6/5 is a combination of the cancelled sub-combination claims 1 ("a scalable resolution-independent representation") and 138/118 ("a scalable resolution-independent representation").

Our review does not find any additional synergy from the combination of cancelled claims 1 and 138/118. Rather, in the combination the limitations merely perform as they did in each sub-combination. Therefore,

we conclude that based on the combined limitations, appealed claim 6/5 is not patentably distinct from the cancelled sub-combination claims.

*e) Dependent Claim 7 – Return to Previous View*

We reject appealed claim 7/5 based on estoppel under 37 C.F.R. § 42.73(d)(3)(i) as not being patentably distinct from claim 1, claim 138/118, and claim 317 which were finally cancelled during an *inter partes* review of the '353 patent which is the subject of this reexamination.

Appealed claim 7/5 adds "returning the display of the Web page to a previous view" to its parent appealed claim 5. The resulting claim 7/5 is a combination of the cancelled sub-combination claims 1, 138/118, and 317 (zoom out to a previous view of the Web page).

Our review does not find any additional synergy from the combination of cancelled claims 1, 138/118, and 317. Rather, in the combination the limitations merely perform as they did in each sub-combination. Therefore, we conclude that based on the combined limitations, appealed claim 7/5 is not patentably distinct from the cancelled sub-combination claims.

*f) Dependent Claim 8 – Pan a View*

We reject appealed claim 8/5 based on estoppel under 37 C.F.R. § 42.73(d)(3)(i) as not being patentably distinct from claim 1, claim 138/118, and claim 36 which were finally cancelled during an *inter partes* review of the '353 patent which is the subject of this reexamination.

Appealed claim 8/5 adds "pan a view" to its parent appealed claim 5. The resulting claim 8/5 is a combination of the cancelled sub-combination claims 1, 138/118, and 36 (panned views).

Our review does not find any additional synergy from the combination of cancelled claims 1, 138/118, and 48/36. Rather, in the combination the

limitations merely perform as they did in each sub-combination. Therefore, we conclude that based on the combined limitations, appealed claim 8/5 is not patentably distinct from the cancelled sub-combination claims.

*g) Dependent Claim 9 – Real Time Panning*

We reject appealed claim 9/8/5 based on estoppel under 37 C.F.R. § 42.73(d)(3)(i) as not being patentably distinct from claim 33/1, claim 138/118, and claim 36 which were finally cancelled during an *inter partes* review of the '353 patent which is the subject of this reexamination.

Appealed claim 9/8/5 adds "panned in real-time" to its parent appealed claim 8/5. As discussed *supra* for appealed claim 3, the resulting claim 9/8/5 is a combination of the cancelled sub-combination claims 33/1 (the scalable content comprises vector-based content), 138/118, and 36 (panned views).

Our review does not find any additional synergy from the combination of cancelled claims 33/1, 138/118, and 48/36. Rather, in the combination the limitations merely perform as they did in each sub-combination. Therefore, we conclude that based on the combined limitations, appealed claim 9/8/5 is not patentably distinct from the cancelled sub-combination claims.

*h) Dependent Claim 10 – Different Aspect Ratio*

We reject appealed claim 10/5 based on estoppel under 37 C.F.R. § 42.73(d)(3)(i) as not being patentably distinct from claim 1 and claim 138/118 which were finally cancelled during an *inter partes* review of the '353 patent which is the subject of this reexamination.

Appealed claim 10/5 differs from cancelled claims 1 and 138/118 in that it adds "different aspect ratios" to its parent appealed claim 5. The patent discloses:

> By enabling different scaling factors to be applied to the X and Y axes, the present invention enables the aspect ratio of a rendered display image to be adjusted to better fit the aspect ratio of the client device.

'353, col. 21:10–13.

The issue is whether it would have been obvious to add different aspect ratios to the limitations of claim 5 discussed *supra*. That is, would it have been obvious to separately modify the X and Y axes. We conclude that it would have been obvious to do so because Bederson-4 at 1132 discloses that calculations can be done on the x-axis separately (as the Examiner and Third Party Requester both point out; RAN 30; Claim Chart A at 58–64).

Our review does not find any additional synergy from the combination of cancelled claims 1 and 138/118. Rather, in the combination the limitations merely perform as they did in each sub-combination. Therefore, we conclude that based on the combined limitations, appealed claim 10/5 is not patentably distinct from the cancelled sub-combination claims.

*i) Dependent Claim 11 – Column Zoom*

We reject appealed claim 11/5 based on estoppel under 37 C.F.R. § 42.73(d)(3)(i) as not being patentably distinct from claim 1, claim 138/118, and claim 48/36 which were finally cancelled during an *inter partes* review of the '353 patent which is the subject of this reexamination.

Appealed claim 11/5 adds "zoom on a column" to its parent appealed claim 5. The resulting claim 11/5 is a combination of the cancelled sub-

combination claims 1, 138/118, and 48/36 (zoom a user selected column to fit across the display).

Our review does not find any additional synergy from the combination of cancelled claims 1, 138/118, and 48/36. Rather, in the combination the limitations merely perform as they did in each sub-combination. Therefore, we conclude that based on the combined limitations, appealed claim 11/5 is not patentably distinct from the cancelled sub-combination claims.

*j) Dependent Claim 12 – Column Reformatted*

We reject appealed claim 12/11/5 based on estoppel under 37 C.F.R. § 42.73(d)(3)(i) as not being patentably distinct from claim 1, claim 138/118, and claim 48/36 which were finally cancelled during an *inter partes* review of the ’353 patent which is the subject of this reexamination.

Appealed claim 12/11/5 differs from cancelled claims 1, 138/118, and 48/36 in that it adds “the column is reformatted to fit characteristics of the display” to its parent appealed claim 11/5. We agree with the Examiner that adding such to appealed claim 11/5 would have been obvious because:

> Pad++ is designed to support that panning and zooming of “standard objects ... (broadly disclosing column objects)” Bederson-5 at 6. Pad++ zooms and pans HTML objects such as “HTML...text, images, bullets items, and horizontal rules.” Bederson-3 at 264. Pad++ discloses that “[c]licking on a page when it is distant causes Pad++ to pan and zoom so that the page fills most of the screen (reformatted to fit characteristics of the display when re-rendered).” Bederson-5 at 14. Also See Bederson-5 at 10. As a column is a frame object identified by horizontal rules and text, one of ordinary skill in the art would understand that Pad++ reformats the content of the column to fit characteristics of the display when re-rendering.

RAN 31–32.

Our review does not find any additional synergy from the combination of cancelled claims 1, 138/118, and 48/36. Rather, in the combination the limitations merely perform as they did in each sub-combination. Therefore, we conclude that based on the combined limitations, appealed claim 12/11/5 is not patentably distinct from the cancelled sub-combination claims.

*k) Dependent Claim 13 – Column Tapping*

We reject appealed claim 13/11/5 based on estoppel under 37 C.F.R. § 42.73(d)(3)(i) as not being patentably distinct from claim 1, claim 138/118, and claim 48/36 which were finally cancelled during an *inter partes* review of the ’353 patent which is the subject of this reexamination.

Appealed claim 13/11/5 differs from cancelled claims 1, 138/118, and 48/36 in that it adds “user input comprises tapping on the column” to its parent appealed claim 11/5. We conclude that it would have been obvious to do so because a tapping is a known form of user input for a PDA. *See* for example: Ausems US 6,434,403 B1, issued August 13, 2002 (filed February 19, 1999).

> The user may select the item by tapping the location on display 145 at which the item is displayed.

Ausems, col. 7:24–25 (emphasis added).

Our review does not find any additional synergy from the combination of cancelled claims 1, 138/118, and 48/36. Rather, in the combination the limitations merely perform as they did in each sub-combination. Therefore, we conclude that based on the combined limitations, appealed claim 13/11/5 is not patentably distinct from the cancelled sub-combination claims.

*l) Dependent Claim 14 – Column Across Display*

We reject appealed claim 14/11/5 based on estoppel under 37 C.F.R. § 42.73(d)(3)(i) as not being patentably distinct from claim 1, claim 138/118, and claim 48/36 which were finally cancelled during an *inter partes* review of the ’353 patent which is the subject of this reexamination.

Appealed claim 14/11/5 adds “rendered to fit across the display” to its parent appealed claim 11/5. The resulting claim 14/11/5 is a combination of the cancelled sub-combination claims 1 (rendered to fit across the display), 138/118, and 48/36.

Our review does not find any additional synergy from the combination of cancelled claims 1, 138/118, and 48/36. Rather, in the combination the limitations merely perform as they did in each sub-combination. Therefore, we conclude that based on the combined limitations, appealed claim 14/11/5 is not patentably distinct from the cancelled sub-combination claims.

*m) Dependent Claim 15 – Image Zoom*

We reject appealed claim 15/5 based on estoppel under 37 C.F.R. § 42.73(d)(3)(i) as not being patentably distinct from claim 1, claim 138/118, and claim 51/36 which were finally cancelled during an *inter partes* review of the ’353 patent which is the subject of this reexamination.

Appealed claim 15/5 adds “zoom on an image” to its parent appealed claim 5. The resulting claim 15/5 is a combination of the cancelled sub-combination claims 1, 138/118, and 51/36 (zoom on an image).

Our review does not find any additional synergy from the combination of cancelled claims 1, 138/118, and 51/36. Rather, in the combination the limitations merely perform as they did in each sub-combination. Therefore,

we conclude that based on the combined limitations, appealed claim 15/5 is not patentably distinct from the cancelled sub-combination claims.

*n) Dependent Claim 16 – Image Tapping*

We reject appealed claim 16/15/5 based on estoppel under 37 C.F.R. § 42.73(d)(3)(i) as not being patentably distinct from claim 1, claim 138/118, and claim 52/51/36 which were finally cancelled during an *inter partes* review of the '353 patent which is the subject of this reexamination.

Appealed claim 16/15/5 adds "tapping" to its parent appealed claim 15/5. The resulting claim 16/15/5 is a combination of the cancelled sub-combination claims 1, 138/118, and 52/51/36 (tapping on an image).

Our review does not find any additional synergy from the combination of cancelled claims 1, 138/118, and 52/51/36. Rather, in the combination the limitations merely perform as they did in each sub-combination. Therefore, we conclude that based on the combined limitations, appealed claim 16/15/5 is not patentably distinct from the cancelled sub-combination claims.

*o) Dependent Claim 17 – Image Across Display*

We reject appealed claim 17/15/5 based on estoppel under 37 C.F.R. § 42.73(d)(3)(i) as not being patentably distinct from claim 1, claim 138/118, and claim 51/36 which were finally cancelled during an *inter partes* review of the '353 patent which is the subject of this reexamination.

Appealed claim 17/15/5 adds "rendered to fit across the display" to its parent appealed claim 15/5. The resulting claim 17/15/5 is a combination of the cancelled sub-combination claims 1 (rendered to fit across the display), 138/118, and 51/36 (rendered to fit across the display).

Our review does not find any additional synergy from the combination of cancelled claims 1, 138/118, and 51/36. Rather, in the combination the limitations merely perform as they did in each sub-combination. Therefore, we conclude that based on the combined limitations, appealed claim 17/15/5 is not patentably distinct from the cancelled sub-combination claims.

*p) Dependent Claims 18–21 – Paragraph Operations*

We reject appealed claims 18/5, 19/18/5, 20/18/5, and 21/18/5 based on estoppel under 37 C.F.R. § 42.73(d)(3)(i) as not being patentably distinct from claims which were finally cancelled during an *inter partes* review of the '353 patent which is the subject of this reexamination. Our reasons are the same as for claims 11/5, 12/11/5, 13/11/5, and 14/11/5 discussed *supra*.

Although the operations in claims 18–21 are directed to a paragraph and the operations in claims 11–14 are directed to a column, we find no meaningful difference. A paragraph is a distinct portion of written or printed material dealing with a particular idea, and a column is a vertical arrangement on a page of horizontal lines of type. Both are well-known arrangements of printed material, and the claimed computer/display operations performed on one would be recognized by an artisan as equally applicable to the other.

*q) Dependent Claim 22 – Text/Layout Connection & Image Connection*

We reject appealed claim 22/5 based on estoppel under 37 C.F.R. § 42.73(d)(3)(i) as not being patentably distinct from claim 1 and claim 138/118 which were finally cancelled during an *inter partes* review of the '353 patent which is the subject of this reexamination.

Appealed claim 22/5 differs from cancelled claims 1 and 138/118 in that it adds "receiving . . . text and layout attributes via a first connection"

and "receiving . . . at least one image via a second connection" to its parent appealed claim 5. We agree with the Examiner that adding such to appealed claim 5 would have been obvious because:

> Citations to '353 evidence what was known in the art, that Web pages in the prior art included text, layout attributes, and images. See '353 at 7:38–65. '353 suggests that content could be received via a first connection and other content could be received via a second connection. '353, at 7:28–65, 8:5–18, 16:39–67 ("conventional web content retrieval techniques", retrieving files that may be stored locally on the web server and web page's content may comprise one or more documents that are stored at remote locations ... / references to other objects... image files...stored locally to the server or stored on a remote server). '353 at 7:56–67, "HTML is a standardized language that describes the layout of content on a web page, and attributes of that content...defined by sets of tags..." As evidenced above, the receiving of content by way of a first and second connection was well known in the art at the time of the filing of the '353 patent. Thus, one of ordinary skill in the art would have found this feature obvious. See '353 at 17:31–34, "As will be recognized by those skilled in the art, the functions performed in blocks 150, 152, and 154 are commonly performed by conventional browsers during a pre-rendering process."

RAN 37–38.

Our review does not find any additional synergy from the combination of cancelled claims 1 and 138/118. Rather, in the combination the limitations merely perform as they did in each sub-combination. Therefore, we conclude that based on the combined limitations, appealed claim 22/5 is not patentably distinct from the cancelled sub-combination claims.

*r) Dependent Claim 23 – Different Scale Factors*

We reject appealed claim 23/5 based on estoppel under 37 C.F.R. § 42.73(d)(3)(i) as not being patentably distinct from claim 33/1 and claim 138/118 which were finally cancelled during an *inter partes* review of the '353 patent which is the subject of this reexamination.

Appealed claim 23/5 differs from cancelled claims 1 and 138/118 in that it adds "a vector-based display list associated with the scalable content" and "re-render the display at different scale factors" to its parent appealed claim 5. However, scalable content comprising vector-based content is found in cancelled claim 33/1, and we conclude that re-rendering at different scale factors is merely another way of saying "scaling the scalable content" found in cancelled claims 1 and 118.

Our review does not find any additional synergy from the combination of cancelled claims 33/1 and 138/118. Rather, in the combination the limitations merely perform as they did in each sub-combination. Therefore, we conclude that based on the combined limitations, appealed claim 23/5 is not patentably distinct from the cancelled sub-combination claims.

*s) Dependent Claim 28 – Scalable Font*

We reject appealed claim 28/5 based on estoppel under 37 C.F.R. § 42.73(d)(3)(i) as not being patentably distinct from claim 1 and claim 138/118 which were finally cancelled during an *inter partes* review of the '353 patent which is the subject of this reexamination.

Appealed claim 28/5 differs from cancelled claims 1 and 138/118 in that it adds "scaling a scalable font" to its parent appealed claim 5. We agree with the Examiner that adding such to appealed claim 5 would have been obvious because:

> "In Pad++, all the fonts used with the renderer share two global font caches...The font cache mechanism accelerates rendering of small-sized text...The font cache lets Pad++ zoom text quickly ..." (scaling a scalable font to render the scalable text content) Bederson-4 at 1109.

RAN 38.

Our review does not find any additional synergy from the combination of cancelled claims 1 and 138/118. Rather, in the combination the limitations merely perform as they did in each sub-combination. Therefore, we conclude that based on the combined limitations, appealed claim 28/5 is not patentably distinct from the cancelled sub-combination claims.

*t) Dependent Claim 30 – Mobile Phone*

We reject appealed claim 30/5 based on estoppel under 37 C.F.R. § 42.73(d)(3)(i) as not being patentably distinct from claim 1 and claim 138/118 which were finally cancelled during an *inter partes* review of the '353 patent which is the subject of this reexamination.

Appealed claim 30/5 differs from cancelled claims 1 and 138/118 in that it adds "mobile phone" to its parent appealed claim 5. The issue is whether it would have been obvious to supplement with telephone functionality the processing means of the wireless device of cancelled claim 1. We conclude that it would have been obvious to do so for the same reasons set forth for claim 37 *supra*.

Our review does not find any additional synergy from the combination of cancelled claims 1 and 138/118. Rather, in the combination the limitations merely perform as they did in each sub-combination. Therefore, we conclude that based on the combined limitations, appealed claim 30/5 is not patentably distinct from the cancelled sub-combination claims.

*u) Dependent Claim 31 – PDA or Hand-held Computer*

We reject appealed claim 31/5 based on estoppel under 37 C.F.R. § 42.73(d)(3)(i) as not being patentably distinct from claim 1 and claim 138/118 which were finally cancelled during an *inter partes* review of the '353 patent which is the subject of this reexamination.

Appealed claim 31/5 differs from cancelled claims 1 and 138/118 in that it adds "Personal Digital Assistant (PDA) or hand-held computer" to its parent appealed claim 5. The issue is whether it would have been obvious to supplement with PDA utilities the processing means of the wireless device of cancelled claim 1. We conclude that it would have been obvious to do so for the same reasons set forth for claim 38 *supra*. Further, Pad++ suggests it is beneficial to combine PDA utilities with a zoomable interface (such as in cancelled claims 1 and 138/118):

> This new system, Pad++, serves as a substrate for exploration of novel interfaces for information visualization and browsing in complex, information-intensive domains. The system is being designed to operate on platforms ranging from high-end graphics workstations to PDAs (Personal Digital Assistants) and interactive set-top cable boxes.

Bederson-5 at 5.

Our review does not find any additional synergy from the combination of cancelled claims 1 and 138/118. Rather, in the combination the limitations merely perform as they did in each sub-combination. Therefore, we conclude that based on the combined limitations, appealed claim 31/5 is not patentably distinct from the cancelled sub-combination claims.

*v) Dependent Claim 32 - Mobile Service Provider Network*

We reject appealed claim 32/5 based on estoppel under 37 C.F.R. § 42.73(d)(3)(i) as not being patentably distinct from claim 1 and claim 138/118 which were finally cancelled during an *inter partes* review of the '353 patent which is the subject of this reexamination.

Appealed claim 32/5 differs from cancelled claims 1 and 138/118 in that it adds "a mobile service provider network" to its parent appealed claim 5. The issue is whether it would have been obvious to supplement with a mobile service provider network the processing means of the wireless device of cancelled claim 1. We conclude that it would have been obvious to do so as Pad++ suggests it is beneficial to combine a mobile service provider network with a zoomable interface (such as in cancelled claims 1 and 138/118):

> Today, there is much more information available than we can access readily and effectively. The situation is further complicated by the fact that we are on the threshold of a vast increase in the availability of information because of new network and computational technologies. Paradoxically, while we continuously process massive amounts of perceptual data as we experience the world, we have perceptual access to very little of the information that resides within our computing systems or that is reachable via network connections.

Bederson-5 at 5.

Our review does not find any additional synergy from the combination of cancelled claims 1 and 138/118. Rather, in the combination the limitations merely perform as they did in each sub-combination. Therefore, we conclude that based on the combined limitations, appealed claim 32/5 is not patentably distinct from the cancelled sub-combination claims.

*w) Dependent Claim 34 – Desktop, Notebook, or Laptop*

We reject appealed claim 34/5 based on estoppel under 37 C.F.R. § 42.73(d)(3)(i) as not being patentably distinct from claim 1 and claim 138/118 which were finally cancelled during an *inter partes* review of the ’353 patent which is the subject of this reexamination.

Appealed claim 34/5 differs from cancelled claims 1 and 138/118 in that it adds “one of a desktop computer, notebook computer or laptop computer” to its parent appealed claim 5. The issue is whether it would have been obvious to use desktop hardware to implement the processing means of the wireless device of cancelled claim 1. We conclude that it would have been obvious to do so for the same reasons set forth for claim 31 *supra*.

Our review does not find any additional synergy from the combination of cancelled claims 1 and 138/118. Rather, in the combination the limitations merely perform as they did in each sub-combination. Therefore, we conclude that based on the combined limitations, appealed claim 34/5 is not patentably distinct from the cancelled sub-combination claims.

*x) Dependent Claim 35 – Billions of Web Pages*

We reject appealed claim 35/5 based on estoppel under 37 C.F.R. § 42.73(d)(3)(i) as not being patentably distinct from claim 1 and claim 138/118 which were finally cancelled during an *inter partes* review of the ’353 patent which is the subject of this reexamination.

Appealed claim 35/5 differs from cancelled claims 1 and 138/118 in that it adds to its parent appealed claim 5:

> 35. The wireless device of claim 5, wherein the device enables a user to browse, zoom, and pan billions of Web pages in a manner that preserves the original layout, functionality, and design of the HTML-based Web page content of each Web page.

We conclude that the "enables" limitation is a statement of intended use. That is, the "enables a user" limitation is merely "for use" claim language. Such, "for use" language does not add a structural limitation to the claimed system or method. *See In re Anderson*, 662 F. App'x 958, 963 (Fed. Cir. 2016).

Moreover, as Patent Owner acknowledges, 3,000,000+ websites existed in 1999. Patent Owner's Appeal Brief 38. Patent Owner's contends that there is "no . . . evidence that billions of 'simple' HTML-based Web pages existed by June 2001." Patent Owner's Appeal Brief 50. However, an artisan would recognize that the layout, functionality (e.g., clicking on a hyperlink to a website), and design of cancelled claim 1 would potentially include billions of such "simple" web pages having two hyperlinks linking to two unique websites from the 3,000,000+ websites (i.e., 3,000,000 x 2,999,999). Patent Owner correctly contends "[t]he number of 'simple' HTML-based Web pages by June 2001 was not remotely close to a billion." Patent Owner's Appeal Brief 50. However, Patent Owner's contention is unpersuasive because it fails to consider the vast number of Web pages that would have been obvious to an artisan at that time. Accordingly, even assuming that the "for use" language were to be construed as limiting, the prior art renders obvious the "billions" limitation.

Our review does not find any additional synergy from the combination of cancelled claims 1 and 138/118. Rather, in the combination the limitations merely perform as they did in each sub-combination. Therefore, we conclude that based on the combined limitations, appealed claim 35/5 is not patentably distinct from the cancelled sub-combination claims.

*y) Dependent Claim 320 – HTML Paragraph Objects*

We reject appealed claim 320/5 based on estoppel under 37 C.F.R. § 42.73(d)(3)(i) as not being patentably distinct from claim 1 and claim 138/118 which were finally cancelled during an *inter partes* review of the '353 patent which is the subject of this reexamination.

Appealed claim 320/5 differs from cancelled claims 1 and 138/118 in that it adds to its parent appealed claim 5:

> 320. The wireless device of claim 5, wherein the HTML text objects include HTML paragraph objects.

We conclude that it would have been obvious to include paragraph objects for the same reasons set forth for claims 18–21 *supra*.

Our review does not find any additional synergy from the combination of cancelled claims 1 and 138/118. Rather, in the combination the limitations merely perform as they did in each sub-combination. Therefore, we conclude that based on the combined limitations, appealed claim 320/5 is not patentably distinct from the cancelled sub-combination claims.

*z) Dependent Claim 321 – HTML table object, HTML table row objects, and HTML table data objects*

We reject appealed claim 321/5 based on estoppel under 37 C.F.R. § 42.73(d)(3)(i) as not being patentably distinct from claim 1, claim 138/118, and claim 48/36 which were finally cancelled during an *inter partes* review of the '353 patent which is the subject of this reexamination.

Appealed claim 321/5 differs from cancelled claims 1 and 138/118 in that it adds to its parent appealed claim 5:

> 321. The wireless device of claim 5, wherein the plurality of HTML objects include an HTML table object, a plurality of HTML table row objects, and a plurality of HTML table data objects.

We conclude that it would have been obvious to include table objects for the same reasons set forth for columns as to claim 11 *supra*. An artisan would recognize that a table is a well-known arrangement of plural columns of printed material, and the claimed computer/display operations performed on a column would be recognized by an artisan as equally applicable to constructing a table. Further, an artisan would recognize that such column operation need only be performed redundantly to construct such table.

Our review does not find any additional synergy from the combination of cancelled claims 1, 138/118, and 48/36. Rather, in the combination the limitations merely perform as they did in each sub-combination. Therefore, we conclude that based on the combined limitations, appealed claim 321/5 is not patentably distinct from the cancelled sub-combination claims.

*aa) Dependent Claim 322 – Cascaded Style Sheet Defining Layout*

We reject appealed claim 322/321/5 based on estoppel under 37 C.F.R. § 42.73(d)(3)(i) as not being patentably distinct from claim 1, claim 138/118, claim 48/36. and claim 66/36 (cascaded style sheet data defining aspects of the Web page design) which were finally cancelled during an *inter partes* review of the '353 patent which is the subject of this reexamination.

Appealed claim 322/321/5 differs from cancelled claims 1, 138/118, and 48/36 in that it adds to its parent appealed claim 321/5:

> 322 (emphasis added). The wireless device of claim 321, wherein the HTML-based Web content includes Cascaded Style Sheet (CSS) content ***defining formatting used to layout content*** associated with the HTML table object.

Although claim 322 differs from cancelled claim 66 in that claim 321 is directed to "layout" and claim 66 was directed to "design," we find no

meaningful difference as layout and design are well-known synonyms of each other. Therefore, an artisan would recognize that cancelled claim 66 CSS operations directed to design are equally applicable to layout.

*7. Independent Claim 24*

We reject appealed claim 24 based on estoppel under 37 C.F.R. § 42.73(d)(3)(i) as not being patentably distinct from claim 1 and claim 138/118 which were finally cancelled during an *inter partes* review of the ’353 patent which is the subject of this reexamination.

We reject claim 24 for the same reasons set forth for claim 5 *supra*. Our review does not find any additional synergy from the combination of cancelled claims 1 and 138/118. Rather, in the combination the limitations merely perform as they did in each sub-combination. Therefore, we conclude that based on the combined limitations, appealed claim 24 is not patentably distinct from the cancelled sub-combination claims.

*8. Claims Depending from Claim 24*

*a) Dependent Claim 25 – Bounding Box*

We reject appealed claim 25/24 based on estoppel under 37 C.F.R. § 42.73(d)(3)(i) as not being patentably distinct from claim 1 and claim 139/138/118 which were finally cancelled during an *inter partes* review of the ’353 patent which is the subject of this reexamination.

Appealed claim 25/24 adds “generating a bounding box” to its parent appealed claim 24. The resulting claim 25/24 is a combination of the cancelled sub-combination claims 1 and 139/138/118 (generating a bounding box).

Our review does not find any additional synergy from the combination of cancelled claims 1 and 139/138/118. Rather, in the combination the

limitations merely perform as they did in each sub-combination. Therefore, we conclude that based on the combined limitations, appealed claim 25/24 is not patentably distinct from the cancelled sub-combination claims.

*b) Dependent Claim 26 – Mapping to Virtual Display*

We reject appealed claim 26/25/24 based on estoppel under 37 C.F.R. § 42.73(d)(3)(i) as not being patentably distinct from claim 1 and claim 139/138/118 which were finally cancelled during an *inter partes* review of the ’353 patent which is the subject of this reexamination.

Appealed claim 26/25/24 adds “mapping . . . to a virtual display in memory” to its parent appealed claim 25/24. The issue is whether it would have been obvious to supplement with mapping to a virtual display the processing means of the wireless device of cancelled claim 1. We conclude that it would have been obvious to do so for reasons set forth for by the Examiner:

> Pad++ discloses dynamic memory employed for rendering purposes, building a display list via use of the scalable content and rendering display list content on a virtual display in the dynamic memory and scaling the display list content to re-render the display of the Web page. See Bederson-3 at 262 and tree layout (display list) system that permits users to dynamically add to and reorganize a tree of web pages. Bederson-4 at 1121 teaches retrieving objects in display-list order, so they can be drawn with the correct overlapping behavior. See discussion on R-tree hierarchical structure (display list content) based on bounding regions. Bederson-4 at 1120.

RAN 39–40.

Our review does not find any additional synergy from the combination of cancelled claims 1 and 139/138/118. Rather, in the combination the limitations merely perform as they did in each sub-combination. Therefore,

we conclude that based on the combined limitations, appealed claim 26/25/24 is not patentably distinct from the cancelled sub-combination claims.

*c) Dependent Claim 27 – User-Selectable Zoom And Pan*

We reject appealed claim 27/26/25/24 based on estoppel under 37 C.F.R. § 42.73(d)(3)(i) as not being patentably distinct from claim 33/1, claim 139/138/118, and 48/36 which were finally cancelled during an *inter partes* review of the '353 patent which is the subject of this reexamination.

Appealed claim 27/26/25/24 recites a host of limitations (e.g., user-selectable, scale factor, zoom level, panned view, virtual display, bounding boxes) discussed *supra*. We conclude that it would have been obvious to include these limitations of claim 27/26/25/24 for the same reasons set forth for claims 2, 23, and 26 *supra*.

Our review does not find any additional synergy from the combination of cancelled claims 33/1, 139/138/118, and 48/36. Rather, in the combination the limitations merely perform as they did in each sub-combination. Therefore, we conclude that based on the combined limitations, appealed claim 27/26/25/24 is not patentably distinct from the cancelled sub-combination claims.

*9. Independent Claim 87*

We reject appealed claim 87 based on estoppel under 37 C.F.R. § 42.73(d)(3)(i) as not being patentably distinct from claim 1 and claim 36 which were finally cancelled during an *inter partes* review of the '353 patent which is the subject of this reexamination.

Except for the limitations discussed *infra*, claim 87 is a combination of the cancelled sub-combination claims 1 and 36. Our review does not find

any additional synergy from the combination of cancelled claims 1 and 36. Rather, in the combination the limitations merely perform as they did in each sub-combination. Therefore, we conclude that based on the combined limitations, appealed claim 87 is not patentably distinct from the cancelled sub-combination claims.

*10. Claims Depending from Claim 87*

*a) Dependent Claim 99 – Pan While Zoomed*

We reject appealed claim 99/87 based on estoppel under 37 C.F.R. § 42.73(d)(3)(i) as not being patentably distinct from claim 1 and claim 36 which were finally cancelled during an *inter partes* review of the '353 patent which is the subject of this reexamination.

Appealed claim 99/87 differs from cancelled claims 1 and 36 in that it adds "pan a view of the web page while in a zoomed state" to its parent appealed claim 87. We conclude that it would have been obvious to do so because Pad++ discloses that panning while zoomed is a known form of display navigation.

> This gives both a sense of context to the viewer as well as speeding up the animation since most of the panning is performed when zoomed out which covers much more ground than ***panning while zoomed in***.

Bederson-5 at 7 (emphasis added).

Our review does not find any additional synergy from the combination of cancelled claims 1 and 36. Rather, in the combination the limitations merely perform as they did in each sub-combination. Therefore, we conclude that based on the combined limitations, appealed claim 99/87 is not patentably distinct from the cancelled sub-combination claims.

*b) Dependent Claim 105 – XML Code*

We reject appealed claim 105/87 based on estoppel under 37 C.F.R. § 42.73(d)(3)(i) as not being patentably distinct from claim 1 and claim 36 which were finally cancelled during an *inter partes* review of the '353 patent which is the subject of this reexamination.

Appealed claim 105/87 differs from cancelled claims 1 and 36 in that it adds "comprises XML code" to its parent appealed claim 87. We conclude that it would have been obvious to do so because Bray discloses that XML can be used with HTML, "you could just take XML and turn it into HTML and deliver that." Bray 1.

Our review does not find any additional synergy from the combination of cancelled claims 1 and 36. Rather, in the combination the limitations merely perform as they did in each sub-combination. Therefore, we conclude that based on the combined limitations, appealed claim 105/87 is not patentably distinct from the cancelled sub-combination claims.

*c) Dependent Claim 106 – Cascaded Style Sheet Defining Design*

We reject appealed claim 106/87 based on estoppel under 37 C.F.R. § 42.73(d)(3)(i) as not being patentably distinct from claim 1 and claim 66/36 which were finally cancelled during an *inter partes* review of the '353 patent which is the subject of this reexamination.

Our review does not find any additional synergy from the combination of cancelled claims 1 and 66/36. Rather, in the combination the limitations merely perform as they did in each sub-combination. Therefore, we conclude that based on the combined limitations, appealed claim 106/87 is not patentably distinct from the cancelled sub-combination claims.

*d) Dependent Claim 110 – LAN or WAN*

We reject appealed claim 110/87 based on estoppel under 37 C.F.R. § 42.73(d)(3)(i) as not being patentably distinct from claim 1 and claim 36 which were finally cancelled during an *inter partes* review of the ’353 patent which is the subject of this reexamination.

Appealed claim 110/87 differs from cancelled claims 1 and 36 in that it adds “a Local Area Network or a Wide Area Network” to its parent appealed claim 87. We agree with the Examiner that adding such to appealed claim 87 would have been obvious because:

> Bederson-3 at 269 discusses students zooming (student LAN) into a web page (World Wide Web on wide area network). Furthermore, ’353 at 7:38-55 evidences what was known in the art, that LAN and WAN connections were used to access web page content.

RAN 40.

Our review does not find any additional synergy from the combination of cancelled claims 1 and 36. Rather, in the combination the limitations merely perform as they did in each sub-combination. Therefore, we conclude that based on the combined limitations, appealed claim 110/87 is not patentably distinct from the cancelled sub-combination claims.

*11. Independent Claim 122*

We reject appealed claim 24 based on estoppel under 37 C.F.R. § 42.73(d)(3)(i) as not being patentably distinct from claim 1 and claim 58/36 which were finally cancelled during an *inter partes* review of the ’353 patent which is the subject of this reexamination.

We reject claim 122 for similar reasons set forth for claim 5 *supra*, including its discussion of cancelled claim 138/118 which parallels cancelled

claim 58/36. Our review does not find any additional synergy from the combination of cancelled claims 1 and 58/36. Rather, in the combination the limitations merely perform as they did in each sub-combination. Therefore, we conclude that based on the combined limitations, appealed claim 122 is not patentably distinct from the cancelled sub-combination claims.

*12. Claims Depending from Claim 122*

*a) Dependent Claim 145 – Hand-held Device*

We reject appealed claim 145/122 based on estoppel under 37 C.F.R. § 42.73(d)(3)(i) as not being patentably distinct from claim 1 and claim 58/36 which were finally cancelled during an *inter partes* review of the ’353 patent which is the subject of this reexamination.

Our review does not find any additional synergy from the combination of cancelled claims 1 and 58/36. Rather, in the combination the limitations merely perform as they did in each sub-combination. Therefore, we conclude that based on the combined limitations, appealed claim 145/122 is not patentably distinct from the cancelled sub-combination claims.

*b) Dependent Claim 147 – Vector-based Content*

We reject appealed claim 147/122 based on estoppel under 37 C.F.R. § 42.73(d)(3)(i) as not being patentably distinct from claim 1, claim 58/36, and claim 43/36 (scalable vector-based content) which were finally cancelled during an *inter partes* review of the ’353 patent which is the subject of this reexamination.

Our review does not find any additional synergy from the combination of cancelled claims 1, 58/36, and 43/36. Rather, in the combination the limitations merely perform as they did in each sub-combination. Therefore,

we conclude that based on the combined limitations, appealed claim 145/122 is not patentably distinct from the cancelled sub-combination claims.

*13. Independent Claim 285*

We reject appealed claim 285 based on estoppel under 37 C.F.R. § 42.73(d)(3)(i) as not being patentably distinct from claim 1 and claim 317 which were finally cancelled during an *inter partes* review of the '353 patent which is the subject of this reexamination.

Our review does not find any additional synergy from the combination of cancelled claims 1 and 317. Rather, in the combination the limitations merely perform as they did in each sub-combination. Therefore, we conclude that based on the combined limitations, appealed claim 285 is not patentably distinct from the cancelled sub-combination claims.

*14. Claims Depending from Claim 285*

*a) Dependent Claim 309 – Web Browser*

We reject appealed claim 309 based on estoppel under 37 C.F.R. § 42.73(d)(3)(i) as not being patentably distinct from claim 1 and claim 317 which were finally cancelled during an *inter partes* review of the '353 patent which is the subject of this reexamination.

Appealed claim 309/285 differs from cancelled claims 1 and 317 in that it adds "a Web browser" to its parent appealed claim 285. We agree with the Examiner that adding such to appealed claim 285 would have been obvious because:

> Pad++ teaches operations including rendering a browser interface via which a user is enabled to request access to an original Web page, the Web page comprising HTML based Web content having an original format defining an original width and height of the Web page and an original page layout, functionality,

> and design of content on the Web page (Bederson-3 at 260, 262, 264; Bederson-5 at 12-13; Bederson-4 at 1103. Pad++ enables "navigation of WWW pages written using standard HTML .... [and that] HTML provides [Web content defining] text, images, bullets items, and horizontal rules." Bederson-3 at 264.).

RAN 23.

Our review does not find any additional synergy from the combination of cancelled claims 1 and 317. Rather, in the combination the limitations merely perform as they did in each sub-combination. Therefore, we conclude that based on the combined limitations, appealed claim 309 is not patentably distinct from the cancelled sub-combination claims.

*15. Remaining Independent Claims*

*a) Independent Claim 50*

We reject appealed claim 50 based on estoppel under 37 C.F.R. § 42.73(d)(3)(i) as not being patentably distinct from claim 48/36 which was finally cancelled during an *inter partes* review of the '353 patent which is the subject of this reexamination.

Appealed claim 50 differs from cancelled claim 48/36 in that it includes a "user input comprises tapping" limitation. The only remaining issue is whether it would have been obvious to supplement with tapping for user input the mobile hand-held device of cancelled claim 48/36. We conclude that it would have been obvious to do so because tapping is a known form of user input as discussed *supra* with regard to claim 13.

*b) Independent Claim 53*

We reject appealed claim 50 based on estoppel under 37 C.F.R. § 42.73(d)(3)(i) as not being patentably distinct from claim 48/36 which was finally cancelled during an *inter partes* review of the '353 patent which is the subject of this reexamination.

Appealed claim 53 differs from cancelled claim 48/36 in that it includes paragraph operations. The only remaining issue is whether it would have been obvious to supplement the mobile hand-held device of cancelled claim 48/36 with such paragraph operations. We conclude that it would have been obvious to do so as discussed *supra* with regard to claims 18–21.

*c) Independent Claim 60*

We reject appealed claim 60 based on estoppel under 37 C.F.R. § 42.73(d)(3)(i) as not being patentably distinct from claim 59/58/36 which was finally cancelled during an *inter partes* review of the '353 patent which is the subject of this reexamination.

Appealed claim 60 differs from cancelled claim 59/58/36 in that it does not include the "at least a portion" limitation of cancelled claim 36. However, for the reasons discussed *supra* in Section III.B.2.f., such does not render claim 60 patentably distinct from cancelled claim 36.

Also, appealed claim 60 differs in that it includes "HTML" objects. However, for the reasons discussed *supra* in Section III.B.2.g., such does not render claim 60 patentably distinct from cancelled claim 36.

Further, appealed claim 60 differs in that it includes "mapping . . . to a virtual display." However, we conclude that including such would have been obvious for reasons set forth *supra* for claim 26.

*d) Independent Claim 69*

We reject appealed claim 69 based on estoppel under 37 C.F.R. § 42.73(d)(3)(i) as not being patentably distinct from claim 36 which was finally cancelled during an *inter partes* review of the '353 patent which is the subject of this reexamination.

Appealed claim 69 differs from cancelled claim 36 in that it does not include the "at least a portion" limitation of cancelled claim 36. However, for the reasons discussed *supra* in Section III.B.2.f., such does not render claim 69 patentably distinct from cancelled claim 36.

Also, appealed claim 69 differs in that it includes "enables a user to browse, zoom, and pan billions of Web pages." However, we conclude that including such would have been obvious for reasons set forth *supra* for claim 35.

*e) Independent Claim 70*

We reject appealed claim 70 based on estoppel under 37 C.F.R. § 42.73(d)(3)(i) as not being patentably distinct from claim 36 which was finally cancelled during an *inter partes* review of the '353 patent which is the subject of this reexamination.

Appealed claim 70 differs from cancelled claim 36 in that it does not include the "at least a portion" limitation of cancelled claim 36. However, for the reasons discussed *supra* in Section III.B.2.f., such does not render claim 70 patentably distinct from cancelled claim 36.

*f) Independent Claim 133*

We reject appealed claim 133 based on estoppel under 37 C.F.R. § 42.73(d)(3)(i) as not being patentably distinct from claim 43/36 and claim

138/118 which were finally cancelled during an *inter partes* review of the ’353 patent which is the subject of this reexamination.

We reject appealed claim 133 for the reasons discussed *supra* as to appealed claims 5 and 18–21.

*g) Independent Claim 144*

We reject appealed claim 144 based on estoppel under 37 C.F.R. § 42.73(d)(3)(i) as not being patentably distinct from claim 118 which was finally cancelled during an *inter partes* review of the ’353 patent which is the subject of this reexamination.

Also, we reject appealed claim 144 for the reasons discussed *supra* as to appealed claim 37.

*h) Independent Claim 150*

We reject appealed claim 150 based on estoppel under 37 C.F.R. § 42.73(d)(3)(i) as not being patentably distinct from claim 149 which was finally cancelled during an *inter partes* review of the ’353 patent which is the subject of this reexamination.

Also, we reject appealed claim 150 for the reasons discussed *supra* as to appealed claim 37.

*i) Independent Claim 151*

We reject appealed claim 151 based on estoppel under 37 C.F.R. § 42.73(d)(3)(i) as not being patentably distinct from claim 149 which was finally cancelled during an *inter partes* review of the ’353 patent which is the subject of this reexamination.

Also, we reject appealed claim 151 for the reasons discussed *supra* as to appealed claim 38.

*j) Independent Claim 174*

We reject appealed claim 174 based on estoppel under 37 C.F.R. § 42.73(d)(3)(i) as not being patentably distinct from claim 58/36 which was finally cancelled during an *inter partes* review of the '353 patent which is the subject of this reexamination.

Also, we reject appealed claim 174 for the reasons discussed *supra* as to appealed claim 5.

*k) Independent Claim 182*

We reject appealed claim 182 based on estoppel under 37 C.F.R. § 42.73(d)(3)(i) as not being patentably distinct from claim 66/36 which was finally cancelled during an *inter partes* review of the '353 patent which is the subject of this reexamination.

Appealed claim 182 differs from cancelled claim 66/36 in that it does not include the "at least a portion" limitation of cancelled claim 36. However, for the reasons discussed *supra* in Section III.B.2.f., such does not render claim 182 patentably distinct from cancelled claim 66/36.

*l) Independent Claim 184*

We reject appealed claim 184 based on estoppel under 37 C.F.R. § 42.73(d)(3)(i) as not being patentably distinct from claim 149 which was finally cancelled during an *inter partes* review of the '353 patent which is the subject of this reexamination.

Appealed claim 184 differs from cancelled claim 149 in that it includes "the" to eliminate an "at least a portion" interpretation such as for of cancelled claim 36. However, for the reasons discussed *supra* in Section III.B.2.f., such does not render claim 184 patentably distinct from cancelled claim 149.

Also, appealed claim 184 differs in that it includes "enabl[es] a user to browse, zoom, and pan billions of Web pages." However, we conclude that including such would have been obvious for reasons set forth *supra* for claim 35.

*m) Independent Claim 185*

We reject appealed claim 185 based on estoppel under 37 C.F.R. § 42.73(d)(3)(i) as not being patentably distinct from claim 48/36 which was finally cancelled during an *inter partes* review of the '353 patent which is the subject of this reexamination.

Appealed claim 185 differs from cancelled claim 48/36 in that it does not include an "at least a portion" limitation such as for of cancelled claim 36. However, for the reasons discussed *supra* in Section III.B.2.f., such does not render claim 185 patentably distinct from cancelled claim 48/36.

Also, appealed claim 185 differs in that it includes "enables a user . . . to browse, zoom, and pan billions of Web pages." However, we conclude that including such would have been obvious for reasons set forth *supra* for claim 35.

*n) Independent Claim 209*

We reject appealed claim 209 based on estoppel under 37 C.F.R. § 42.73(d)(3)(i) as not being patentably distinct from claim 138/118 which was finally cancelled during an *inter partes* review of the '353 patent which is the subject of this reexamination.

Appealed claim 209 differs from cancelled claim 138/118 in that it does not include an "at least a portion" limitation such as for of cancelled claim 118. However, for the reasons discussed *supra* in Section III.B.2.f.,

such does not render claim 209 patentably distinct from cancelled claim 138/118.

*o) Independent Claim 216*

We reject appealed claim 216 based on estoppel under 37 C.F.R. § 42.73(d)(3)(i) as not being patentably distinct from claim 118 which was finally cancelled during an *inter partes* review of the ’353 patent which is the subject of this reexamination.

Appealed claim 216 differs from cancelled claim 118 in that it does not include an “at least a portion” limitation such as for of cancelled claim 118. However, for the reasons discussed *supra* in Section III.B.2.f., such does not render claim 216 patentably distinct from cancelled claim 118.

*p) Independent Claim 239*

We reject appealed claim 239 based on estoppel under 37 C.F.R. § 42.73(d)(3)(i) as not being patentably distinct from claim 138/118 which was finally cancelled during an *inter partes* review of the ’353 patent which is the subject of this reexamination.

Appealed claim 239 differs from cancelled claim 138/118 in that it does not include an “at least a portion” limitation such as for of cancelled claim 118. However, for the reasons discussed *supra* in Section III.B.2.f., such does not render claim 239 patentably distinct from cancelled claim 138/118.

*q) Independent Claim 253*

We reject appealed claim 253 based on estoppel under 37 C.F.R. § 42.73(d)(3)(i) as not being patentably distinct from claim 36 which was finally cancelled during an *inter partes* review of the ’353 patent which is the subject of this reexamination.

Appealed claim 253 differs from cancelled claim 36 in that it includes a "mobile phone" limitation. The issue is whether it would have been obvious to supplement with telephone functionality the processing means of the wireless device of cancelled claim 36. We conclude that it would have been obvious to do so for the same reasons set forth for claim 37 *supra*.

Also, appealed claim 253 differs from cancelled claim 36 in that it does not include an "at least a portion" limitation such as for of cancelled claim 36. However, for the reasons discussed *supra* in Section III.B.2.f., such does not render claim 253 patentably distinct from cancelled claim 36.

Further, appealed claim 253 differs in that it includes "enables a user . . . to browse, zoom, and pan billions of Web pages." However, we conclude that including such would have been obvious for reasons set forth *supra* for claim 35.

*r) Independent Claim 254*

We reject appealed claim 254 based on estoppel under 37 C.F.R. § 42.73(d)(3)(i) as not being patentably distinct from claim 36 which was finally cancelled during an *inter partes* review of the '353 patent which is the subject of this reexamination.

Appealed claim 254 differs from cancelled claim 36 in that it does not include an "at least a portion" limitation such as for of cancelled claim 36. However, for the reasons discussed *supra* in Section III.B.2.f., such does not render claim 254 patentably distinct from cancelled claim 36.

Also, appealed claim 254 differs in that it includes "enables a user . . . to browse, zoom, and pan billions of Web pages." However, we conclude that including such would have been obvious for reasons set forth *supra* for claim 35.

*s) Independent Claim 274*

We reject appealed claim 274 based on estoppel under 37 C.F.R. § 42.73(d)(3)(i) as not being patentably distinct from claim 58/36 which was finally cancelled during an *inter partes* review of the '353 patent which is the subject of this reexamination.

Appealed claim 274 differs from cancelled claim 58/36 in that it does not include an "at least a portion" limitation such as for of cancelled claim 36. However, for the reasons discussed *supra* in Section III.B.2.f., such does not render claim 274 patentably distinct from cancelled claim 58/36.

Also, appealed claim 274 differs in that it includes "HTML" objects. However, for the reasons discussed *supra* in Section III.B.2.g., such does not render claim 274 patentably distinct from cancelled claim 58/36.

Further, appealed claim 274 differs in that it includes "enables a user . . . to browse, zoom, and pan billions of Web pages." However, we conclude that including such would have been obvious for reasons set forth *supra* for claim 35.

*t) Independent Claim 282*

We reject appealed claim 282 based on estoppel under 37 C.F.R. § 42.73(d)(3)(i) as not being patentably distinct from claim 66/36 which was finally cancelled during an *inter partes* review of the '353 patent which is the subject of this reexamination.

Appealed claim 282 differs from cancelled claim 66/36 in that it does not include an "at least a portion" limitation such as for of cancelled claim 36. However, for the reasons discussed *supra* in Section III.B.2.f., such does not render claim 282 patentably distinct from cancelled claim 66/36.

Also, appealed claim 282 differs in that it includes "enables a user . . . to browse, zoom, and pan billions of Web pages." However, we conclude that including such would have been obvious for reasons set forth *supra* for claim 35.

*u) Independent Claim 318*

We reject appealed claim 318 based on estoppel under 37 C.F.R. § 42.73(d)(3)(i) as not being patentably distinct from claim 317 and claim 36 which were finally cancelled during an *inter partes* review of the '353 patent which is the subject of this reexamination.

Our review does not find any additional synergy from the combination of cancelled claims 317 and 36. Rather, in the combination the limitations merely perform as they did in each sub-combination. Therefore, we conclude that based on the combined limitations, appealed claim 318 is not patentably distinct from the cancelled sub-combination claims.

*16. All Remaining Claims*

The remaining claims are dependent claims which limit their independent claims by adding *one or more limitations* discussed *supra* for other claims. We conclude that adding these one or more limitations would have been obvious for the reasons already discussed *supra*.

*17. 37 C.F.R. § 41.77(b)*

This decision contains a new ground of rejection pursuant to 37 C.F.R. § 41.77(b). 37 C.F.R. § 41.77(b) provides "a new ground of rejection pursuant to this paragraph shall not be considered final for judicial review."

37 C.F.R. § 41.77(b) also provides that the owner, WITHIN ONE MONTH FROM THE DATE OF THE DECISION, must exercise one of the following two options with respect to the new grounds of rejection to avoid termination of the appeal as to the rejected claims:

> (1) Reopen prosecution. The owner of the patent may file a response requesting reopening of prosecution before the examiner. . . .
>
> (2) Request rehearing. Request that the proceeding be reheard under § 41.79 by the Board upon the same record. . . .

IV. EFFECT OF THE EXPIRATION OF 7,461,353

As we note *supra*, U.S. Patent 7,461,353, which is the subject of this inter partes reexamination, will expire on April 18, 2022. If this inter partes reexamination is still pending at that time, any further proceedings will be consistent with 37 C.F.R. § § 1.530(j) and (k).

> (j) *No enlargement of claim scope.* No amendment may enlarge the scope of the claims of the patent or introduce new matter. No amendment may be proposed for entry in an expired patent. Moreover, no amendment, other than the cancellation of claims, will be incorporated into the patent by a certificate issued after the expiration of the patent.
>
> (k) *Amendments not effective until certificate.* Although the Office actions will treat proposed amendments as though they have been entered, the proposed amendments will not be effective until the reexamination certificate is issued and published.

*A. Effect on the Claims*

Upon expiration of U.S. Patent 7,461,353, all amendments proposed during this inter partes reexamination will be withdrawn *except for* amendments cancelling claims and any claim amendments herein that were also set forth in the related Ex Parte Reexamination Certificate that issued on December 29, 2017 covering amendments to claims 5, 23–27, 60, 61, 122, 137, 140, 141, 147, 156, 174–177, 238–242, 248, 259 and 274–277, and adding new claims 320–322. For all other remaining claims which are not cancelled, any proposed amendments are withdrawn and those claims will be as they were when this inter partes reexamination was filed. In this case, they will be as they were issued.

The following claims will revert to depending from a claim that was cancelled during the *inter partes* review of U.S. Patent 7,461,353.

Claims 2–4, 6–22, 28, 30–32, 34, and 35, will revert back to dependency from cancelled claim 1.

Claims 37, 38, 41, 44–46, and 69, will revert back to dependency from cancelled claim 36.

Claims 123–126, 128–135, 144, and 145, will revert back to dependency from cancelled claim 118.

Claims 150–152, 154, 157–159, 161–173, 182, and 184, will revert back to dependency from cancelled claim 149.

Claims 253, 254, 257, 264–271, and 282, will revert back to dependency from cancelled claim 252.

Claims 318 and 319, will revert back to dependency from cancelled claim 317.

The following claims will revert back to a claim as originally issued in U.S. Patent 7,461,353, that is, revert back to a claim that lacks limitations the Patent Owner relies on to argue (but we disagree) the amended claim is patentably distinct.

> Independent claim 70, will revert back to "processing ***at least a portion*** of the HTML-based Web content" as will its dependent claims 71–83, 85, and 86.
>
> Independent claim 209, will revert back to "translating ***at least a portion*** of the HTML-based Web content" as will its dependent claim 215.
>
> Independent claim 216, will revert back to "translating ***at least a portion*** of the HTML-based Web content" as will its dependent claims 226–236, 245–247, and 251.

*B. Effect on this Decision*

Upon expiration of U.S. Patent 7,461,353, the only effect on this Decision will be that the analysis simplifies as to all limitations added to the claims by proposed amendments that will be withdrawn. For example, the "Entire vs. Portion" discussion at Section III. B. 2. f). *supra* and the "HTML Objects" discussion at Section III. B. 2. g). *supra* each becomes moot for claims with dependency from cancelled claims 1, 36, 118, 149, and 252, as well as for claims 70, 209, and 216 and the claims depending therefrom, because these added limitations will no longer be present in these claims.

## V. CONCLUSIONS

The Examiner erred in rejecting claims 2–28, 30–32, 34, 35, 37, 38, 41, 44–46, 50, 53–55, 60, 61, 69–83, 85–105, 107–111, 122–126, 128–135, 137, 140, 141, 144, 145, 147, 150–152, 154, 156–159, 161–177, 184–203, 205–209, 215, 216, 226–236, 238–242, 245–248, 251, 253, 254, 257, 259, 264–271, 274–277, 285–303, 305–310, and 318–321 as being unpatentable under 35 U.S.C. § 103.

The Examiner erred in making a final decision favorable to the patentability of claims 106, 182, 204, 282, 304, and 322.

We newly reject all claims subject to this reexamination based on 37 C.F.R. § 42.73(d) estoppel as not being patentably distinct from claims finally cancelled during an *inter partes* review of the patent which is the subject of this reexamination.

In summary:

| Claim(s) Rejected | 35 U.S.C. § | Reference(s)/ Basis | Affirmed | Reversed | New Ground |
|---|---|---|---|---|---|
| 2–28, 31, 34, 35, 38, 41, 44–46, 50, 53–55, 60, 61, 69–80, 83, 85–104, 109–111, 122–126, 128–135, 137, 140, 141, 145, 147, 151, 152, 154, 156–159, 161–177, 184–202, 205, 207–209, 215, 216, 226–236, 238–242, 246, 248, 251, 254, 257, 259, 264–271, 274–277, 285–302, 307–310, 318, 319 | 103 | Pad++ | | 2–28, 31, 34, 35, 38, 41, 44–46, 50, 53–55, 60, 61, 69–80, 83, 85–104, 109–111, 122–126, 128–135, 137, 140, 141, 145, 147, 151, 152, 154, 156–159, 161–177, 184–202, 205, 207–209, 215, 216, 226–236, 238–242, 246, 248, 251, 254, 257, 259, 264–271, 274–277, 285–302, 307–310, 318, 319 | |

| Claim(s) Rejected | 35 U.S.C. § | Reference(s)/ Basis | Affirmed | Reversed | New Ground |
|---|---|---|---|---|---|
| 30, 32, 37, 81, 82, 107, 108, 144, 150, 205, 206, 245, 247, 253, 305, 306 | 103 | Pad++, Nokia, Palm | | 30, 32, 37, 81, 82, 107, 108, 144, 150, 205, 206, 245, 247, 253, 305, 306 | |
| 30, 32, 37, 81, 82, 107, 108, 144, 150, 205, 206, 245, 247, 253, 305, 306 | 103 | Pad++, Newton | | 30, 32, 37, 81, 82, 107, 108, 144, 150, 205, 206, 245, 247, 253, 305, 306 | |
| 30, 32, 37, 81, 82, 107, 108, 144, 150, 205, 206, 245, 247, 253, 305, 306 | 103 | Pad++, Locatio | | 30, 32, 37, 81, 82, 107, 108, 144, 150, 205, 206, 245, 247, 253, 305, 306 | |
| 105, 203, 303 | 103 | Pad++, Bray | | 105, 203, 303 | |

| Claim(s) Rejected | 35 U.S.C. § | Reference(s)/ Basis | Affirmed | Reversed | New Ground |
|---|---|---|---|---|---|
| 320, 321 | 103 | Pad++, common knowledge | | 320, 321 | |
| 5, 23–27, 60, 61, 70, 122, 137, 140, 141, 147, 156, 174–177, 216, 238–242, 248, 259, 274–277 | 103 | Pad++, HTML standards | | 5, 23–27, 60, 61, 70, 122, 137, 140, 141, 147, 156, 174–177, 216, 238–242, 248, 259, 274–277 | |
| 5, 23–27, 60, 61, 70, 122, 137, 140, 141, 147, 156, 174–177, 216, 238–242, 248, 259, 274–277 | 103 | Pad++, AAPA | | 5, 23–27, 60, 61, 70, 122, 137, 140, 141, 147, 156, 174–177, 216, 238–242, 248, 259, 274–277 | |

| Claim(s) Rejected | 35 U.S.C. § | Reference(s)/ Basis | Affirmed | Reversed | New Ground |
|---|---|---|---|---|---|
| 2–28, 30–32, 34, 35, 37, 38, 41, 44–46, 50, 53–55, 60, 61, 69–83, 85–111, 122–126, 128–135, 137, 140, 141, 144, 145, 147, 150–152, 154, 156–159, 161–177, 182, 184–209, 215, 216, 226–236, 238–242, 245–248, 251, 253, 254, 257, 259, 264–271, 274–277, 282, 285–310, 318–322 | | Estoppel under 37 C.F.R. § 42.73(d) | | | 2–28, 30–32, 34, 35, 37, 38, 41, 44–46, 50, 53–55, 60, 61, 69–83, 85–111, 122–126, 128–135, 137, 140, 141, 144, 145, 147, 150–152, 154, 156–159, 161–177, 182, 184–209, 215, 216, 226–236, 238–242, 245–248, 251, 253, 254, 257, 259, 264–271, 274–277, 282, 285–310, 318–322 |
| **Overall Outcome** | | | | 2–28, 30–32, 34, 35, 37, 38, 41, 44–46, 50, | 2–28, 30–32, 34, 35, 37, 38, 41, 44–46, 50, |

| | | | | | |
|---|---|---|---|---|---|
| | | | | 53–55, 60, 61, 69–83, 85–105, 107–111, 122–126, 128–135, 137, 140, 141, 144, 145, 147, 150–152, 154, 156–159, 161–177, 184–203, 205–209, 215, 216, 226–236, 238–242, 245–248, 251, 253, 254, 257, 259, 264–271, 274–277, 285–303, 305–310, 318–321 | 53–55, 60, 61, 69–83, 85–111, 122–126, 128–135, 137, 140, 141, 144, 145, 147, 150–152, 154, 156–159, 161–177, 182, 184–209, 215, 216, 226–236, 238–242, 245–248, 251, 253, 254, 257, 259, 264–271, 274–277, 282, 285–310, 318–322 |

REVERSED; 37 C.F.R. § 41.77(b)

## CANCELLED CLAIMS APPENDIX

The following claims 1, 33, 36, 43, 48, 51, 52, 58, 59, 66, 118, 138, 139, 149, 183, 252, 283, and 317 of U.S. Patent 7,461,353 B2 were finally cancelled by IPR2013-00007 and IPR2013-00256. Emphasis added.

1. A ***wireless device***, comprising:

[A.] processing means;

[B.] wireless communications means, to facilitate wireless communication with a network that supports access to the Internet;

[C.] a display;

[D.] memory; and

[E.] storage means, in which a plurality of instructions are stored that when executed by the processing means enable the wireless device to perform operations including,

[i.] rendering a browser interface via which a user is enabled to request access to an original Web page, the Web page comprising HTML-based Web content having an original format defining an original width and height of the Web page and ***an original page layout, functionality, and design of content on the Web page***;

[ii.] in response to a user request to access the Web page,

[a.] retrieving the Web page via the wireless communication means, and ***translating at least a portion*** of the HTML-based Web content from its original format into scalable content that supports a scalable resolution-independent representation of the Web page that ***preserves*** the original page layout, functionality and design of the content defined by its original format ***when scaled and rendered***; and

[b.] scaling the scalable content to render the Web page on the display such that a width of the Web page is rendered to fit across the display.

33. The wireless device of claim 1, wherein a portion of the scalable content comprises ***vector-based content***.

36. A ***mobile hand-held device***, comprising:

[A.] a processor,

[B.] a wireless communications device, to facilitate wireless communication with a network that supports access to the Internet;

[C.] a display; and

[D.] flash memory, operatively coupled to the processor, in which a plurality of instructions are stored that when executed by the processor enable the mobile hand-held device to perform operations including,

- [i.] rendering a browser interface via which a user is enabled to request access to a Web page comprising HTML-based Web content ***defining an original page layout, functionality, and design of content on the Web page***;
- [ii.] retrieving the Web page via the wireless communications device, and ***processing*** HTML-based Web content ***to produce scalable content***; and
- [iii.] employing at least one of the scalable content or data derived therefrom to,
  - [a.] render the Web page on the display; and
  - [b.] re-render the display in response to associated user inputs to enable the Web page to be browsed at various zoom levels and panned views while ***preserving*** the original page layout, functionality, and design of the Web page content ***at each zoom level and panned view***.

43. The mobile hand-held device of claim 36, wherein at least a portion of the scalable content comprises ***scalable vector-based content***.

48. The mobile hand-held device of claim 36, wherein execution of the instructions performs further operations comprising enabling a ***user*** to ***zoom on a column*** of the Web content via a corresponding user input, wherein in response thereto, the display is re-rendered such that content corresponding to the ***selected*** column is ***rendered to fit across the display***.

51. The mobile hand-held device of claim 36, wherein the Web content includes ***at least one image***, and wherein execution of the instructions performs further operations comprising enabling a ***user*** to ***zoom on an image*** via a corresponding user input, wherein in response thereto, the display is re-rendered such that the ***image*** is rendered to ***fit across the display***.

52. The mobile hand-held device of claim 51, wherein the corresponding user input comprises ***tapping*** on the ***image*** via the display.

58. The mobile hand-held device of claim 36, wherein execution of the instructions performs further operations comprising:

[iv.] parsing HTML-based code corresponding to the retrieved Web page to determine the original page layout of the content on the Web page;

[v.] ***logically grouping selected content into objects***;

[vi.] ***defining a primary datum*** corresponding to the original page layout; and,

[vii.] for each object

[a.] ***defining an object datum*** corresponding to a layout location datum for the object's associated display content;

[b.] ***generating a vector*** from the primary datum to the object datum for the object; and

[c.] creating a reference that links the object to the vector that is generated.

59. The mobile hand-held device of claim 58, wherein execution of the instructions performs further operations comprising:

[viii.] ***generating a bounding box for each object***, the bounding box representing a portion of a rendered display page occupied by the object's associated group of content.

66. The mobile hand-held device of claim 36, wherein a portion of the HTML-based Web content comprises ***cascaded style sheet data*** defining aspects of the Web page design that are preserved at each zoom level and panned view.

118. A method, comprising:

[A.] rendering a browser interface on a display of a device via which a user is enabled to request access to a Web page, the Web page comprising HTML-based Web content having an original format defining an original width and height of the Web page and an original page layout, functionality, and design of content on the Web page;

[B.] in response to a user request to access the Web page, retrieving the Web page via the device, and translating at least a portion of the HTML-based Web content from its original format into scalable content that supports a scalable resolution-independent representation of the Web page that preserves the original page layout, functionality and design of the content defined by its original format when scaled and rendered; and

[C.] scaling the scalable content to render the Web page on the display such that a width of the Web page is rendered to fit across the display.

138. The method of claim 118, further comprising:

[D.] parsing markup language code corresponding to the retrieved Web page to determine the original page layout of the content on the Web page;

[E.] ***logically grouping selected content into objects***;

[F.] ***defining a primary datum*** corresponding to the original page layout; and,

[G.] for each object,

- [i.] ***defining an object datum*** corresponding to a layout location datum for the object's associated display content;
- [ii.] ***generating a vector*** from the primary datum to the object datum for the object; and
- [iii.] creating a reference that links the object to the vector that is generated.

139. The method of claim 138, further comprising:

[H.] ***generating a bounding box for each object***, the bounding box representing a portion of a rendered display page occupied by the object's associated group of content.

149. A method, comprising:

[A.] rendering a browser interface on a ***hand-held device*** via which a user is enabled to request access to a Web page comprising HTML-based Web content ***defining an original page layout, functionality, and design of content*** on the Web page;

[B.] retrieving the Web page via the hand-held device, and ***processing*** HTML-based Web content ***to produce scalable content***; and

[C.] employing at least one of the scalable content or data derived therefrom to;

[i.] render the Web page on a display of the hand-held device; and

[ii.] re-render the display in response to associated user inputs to enable the Web page to be browsed at various zoom levels and panned views while ***preserving*** the original page layout, functionality, and design of the Web page content ***at each zoom level and panned view***.

183. The method of claim 149, wherein a portion of the scalable content comprises ***vector-based content***.

252. A machine-readable medium having a plurality of instructions comprising a Web browser tangibly stored thereon, which when executed enable a device to perform operations comprising:

[A.] rendering a browser interface on a display associated with the device via which a user is enabled to request access to a Web page comprising HTML-based Web content defining an original page layout, functionality, and design of content on the Web page;

[B.] retrieving the Web page and ***processing*** HTML-based Web content ***to produce scalable content***; and

[C.] employing at least one of the scalable content or data derived therefrom to,

[i.] render the Web page on the display; and

[ii.] re-render the display in response to associated user inputs to enable the Web page to be browsed at various zoom levels and panned views while preserving the original page layout, functionality, and design of the Web page content at each zoom level and panned view of the Web page,

wherein the Web browser enables a user of the device to browse, zoom, and pan ***billions of Web pages*** in a manner that ***preserves*** the original layout, functionality, and design of the HTML-based Web page content of each Web page ***at each zoom level and panned view***.

283. The machine-readable medium of claim 252, wherein a portion of the scalable content comprises ***vector-based content***.

317. A ***hand-held wireless device***, comprising:

[A.] a processor,

[B.] a wireless communications interface, to facilitate wireless communication with a network that supports access to the Internet;

[B.] a display; and

[C.] non-volatile memory, operatively coupled to the processor, in which software comprising a browser is stored, the browser comprising a plurality of instructions that when executed by the processor enable the device to perform operations including,

- [i.] rendering a browser interface on the display via which a user is enabled to request access to a Web page including at least one image, at least one column, at least one ***hyperlink*** to an external reference and having a width and height;
- [ii.] retrieving the Web page via the wireless communications interface;
- [iii.] rendering the Web page on the display such that at least one of the width and height of the Web page is fully displayed; and
- [iv.] enabling the ***user*** to,
  - [a.] ***zoom and pan*** a view of the Web page;
  - [b.] ***activate a currently displayed hyperlink*** to an external reference while at a given zoom level and panned view, wherein in response to an activation of a hyperlink to an external reference, Web content associated with the external reference is retrieved and rendered on the display;

[c.] ***zoom in on an image*** of the Web page ***by tapping*** on the image via the display;
[d.] ***zoom in on a column*** of the Web page ***by tapping*** on the column via the display; and
[e.] ***zoom out to a previous view of the Web page***.

FOR PATENT OWNER:

LAW OFFICE OF R. ALAN BURNETT
4108 131ST AVE SE
BELLEVUE, WA 98006

FOR THIRD PARTY REQUESTER:

POLSINELLI PC
1000 LOUISIANA STREET, 53rd FLOOR
HOUSTON, TX 77002

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

MOTOROLA MOBILITY, LLC
Requester and Cross-Appellant,

v.

SOFTVIEW LLC
Patent Owner and Appellant.

Appeal 2022-000153
Reexamination Control 95/002,132
Patent 7,461,353 B2
Technology Center 3900

Before ALLEN R. MacDONALD, ERIC B. CHEN, and BRIAN J. McNAMARA, *Administrative Patent Judges*.

MacDONALD, *Administrative Patent Judge*.

DECISION ON REQUEST FOR REHEARING

Patent Owner SoftView LLC ("Patent Owner") filed a Request for Rehearing ("PO Req. Reh'g")[1] under 37 C.F.R. § 41.77(b), requesting that

[1] The request for rehearing must address any new ground of rejection and state with particularity the points believed to have been misapprehended or overlooked in entering the new ground of rejection. 37 C.F.R. § 41.77(b)(2).

we reconsider our Decision ("Dec." or "Decision") of April 6, 2022, wherein we reversed the Examiner's rejections of all claims appealed by the Patent Owner, and entered a new ground of rejection against all pending claims. We have reconsidered our Decision in light of Patent Owner's comments in the Request, and are not persuaded that we misapprehended or overlooked arguments presented by Patent Owner.

Patent Owner's request is denied.

## I. INTRODUCTION

Appeal 2022-000153 (Reexamination Control No. 95/002,132) is directed to a reexamination of the same patent as related Appeal 2021-005530 (Reexamination Control No. 95/000,634). PO Appeal Br. 1. This appeal and its related appeal are directed to the same issues. The appeals were decided concurrently and those Decisions are referenced respectively herein as the '132 Decision (or "'132 Dec.") and the'634 Decision (or "'634 Dec."). The '132 Decision incorporated by reference to the related '634 Decision. '132 Dec. 1.

The Board found the subject matter of the claims at issue is patentably indistinct from the challenged claims already found unpatentable in the prior IPR2013-00007 ("the '353 IPR") of U.S. Patent No. 7,461,353 B2 ("the '353 Patent"). The Board found the Patent Owner had a full and fair opportunity to contest patentability in the prior '353 IPR and appeal of the '353 IPR decision to the Federal Circuit. In the '353 IPR, after considering all of Patent Owner's arguments the Board found the claims challenged in the '353 IPR to be unpatentable ('353 IPR FWD 36 (IPR2013-00007, Paper No. 51, at 36)), and the Federal

Circuit affirmed that determination (*Softview LLC v. Kyocera Corp.*, No. 14-1600 (Fed. Cir. Feb. 9, 2015)). The claims that were cancelled in the '353 IPR are now subject to a final adjudication of invalidity, and the patentably indistinct claims at issue in this '132 proceeding are likewise deemed invalid. '132 Dec. 15. The Board precluded Patent Owner from taking action inconsistent with the Board's earlier decision in the '353 IPR and its affirmance by the Federal Circuit.

II. CLAIMS SUBJECT TO THIS APPEAL

Third Party Requester Motorola Mobility, LLC (hereinafter "Requester") argues that the '132 Decision on Appeal mistakenly "address[es] claims ***that were rejected*** by the Examiner ***and were not appealed*** by Patent Owner in its September 25, 2020 Notice of Appeal or its November 24, 2020 Appeal Brief." Third Party Requester Comments ("Third Pty. Req. Cmts.") 2 (emphasis added). The Requester requests that the Board correct the status of the claims in its decision on Patent Owner's Rehearing Request.

The Requester asserts

> Patent Owner stated . . . "[t]he appealed claims are: 5, 24, 25, 60, 70, 122, 174, 216, 239, 240, 274, 275, 320, and 321." Requester in turn filed a Notice of Appeal directed only to claim 322 on September 28, 2020.

Third Pty. Req. Cmts. 2.

The Requester also asserts:

> The ['132] Decision on Appeal [mistakenly addresses] the Examiner's rejection of claims 5, 6, 23-27, 60-61, 70, 122, 137, 140, 141, 147, 156, 174-177, 216, 238-242, 248, 259, 274-277, 320, 321, and 322 [all pending claims]—a broader

> set of claims than those appealed by Patent Owner. ['132] Decision at 2, 15.

Third Pty. Req. Cmts. 3.

37 C.F.R. § 41.61(c) requires "[t]he notice of appeal or cross appeal in the proceeding must ***identify*** the appealed claim(s)," and 37 C.F.R. § 41.67(c)(1)(iii) requires the appellant's brief "must also ***identify*** the rejected claims whose rejection is being appealed." Emphasis added. Although the Requester's above quotation from the Notice of Appeal and Patent Owner's Appeal Brief is factually correct, we disagree with the ultimate conclusion reached by the Requester. The form of the identification is not set forth in the rules, and it is not uncommon to have conflicting identification of the appealed claims.

Patent Owner's Notice of Appeal contained the appealed claim quotation above, but is also deemed to have identified a *broader set* of appealed claims as appealed (i.e., all rejected claims) by stating "Applicant hereby appeals to the Patent Trial and Appeal Board from the last decision of the examiner." Notice of Appeal (emphasis omitted). Such a Notice of Appeal conflict is typically resolved by the subsequent Appeal Brief's identification of the rejected claims whose rejection is being appealed. However, that is not the situation before us.

Although Patent Owner's Appeal Brief repeats the appealed claim quotation above at its cover page, it also identifies by claim number the above broader set of appealed claims (i.e., all rejected claims) among the issues to be reviewed on appeal. PO Appeal Br. 7. Further, throughout the Appeal Brief Patent Owner also identifies and argues rejected claims that are not identified on the Appeal Brief cover page. *See* PO Appeal Br.

32, 52 ,55, 57, and 58 ("CLAIMS 5, 23–27, 60, 61, 70, 122, 137, 140, 141, 147, 156, 174–177, 216, 238–242, 248, 259, AND 274–277") (emphasis omitted).

Given the Patent Owner's Notice of Appeal and Appeal Brief each at least once identifies (in some form) that the Patent Owner's appealed claims are all the rejected claims, we are not persuaded by the Requester that the Board erred by addressing all pending claims in its '132 Decision.

III. PATENT EXPIRATION EFFECT

Requester argues that the Board's '132 Decision overlooked that claims 320–322 are impacted by the expiration of the '353 Patent. Requester submits that claims 320–322 should not be considered as issued claims. Third Party Requester Comments at 4–5.

The Board issued its '132 Decision on Appeal on April 6, 2022. The '353 Patent subsequently expired on April 18, 2022. *See* '634 Dec. 2–3, 13. Pursuant to 37 C.F.R. § 1.530(j), "[n]o amendment may be proposed for entry in an expired patent" and "no amendment, other than the cancellation of claims, will be incorporated into the patent by a certificate issued after the expiration of the patent."

For the reasons explained in the '132 Decision on Appeal, the Board identified the status of the claims on appeal as "(Amended)" or "(New)" as of April 6, 2022. '132 Dec. 6–7. Otherwise, Requester would be deprived of its statutory rights to participation and appeal as to new and amended claims during the pendency of the reexamination. *Id.* As the Board further explained, the proposed claim amendments are now

withdrawn by virtue of the expiration of the ’353 Patent, including those amendments upon which Patent Owner attempted to rely to maintain that certain of the challenged claims (all claims with dependency from cancelled claim 1; and independent claims 70 and 216) are patentably distinct from the claims cancelled during the ’353 IPR. ’132 Dec. 14. The Board did not include claims 320–322 among the claims it deemed to be impacted by the expiration of the ’353 Patent.

Particularly, Requester argues:

> Claims 320-322 are new claims added during the pendency of this *inter partes* reexamination. *See* June 7, 2017 Amendment and Response at 23-24. Patent Owner also proposed these same new claims in *ex parte* reexamination 90/009,994 while this *inter partes* reexamination was pending. Requester asked the Office to merge this proceeding with that *ex parte* reexamination as provided by 37 C.F.R. § 1.989 and MPEP § 2686.01. July 28, 2017 Requester Comments at 4-5. Rather than merging the proceedings, the Office proceeded to conclude the *ex parte* reexamination, but did so ***subject to*** this pending *inter partes* reexamination and co-pending *inter partes* reexamination 95/000,634 requested by Apple Inc.[] *Ex Parte* Reexamination Certificate (11231st) issued December 29, 2017 with the face expressly noting that ***it*** was "***subject to*** pending reexamination control numbers 95/000,634 and 95/002,132." Requester submits that claim 322 remained a ***proposed*** new claim, ***not an issued claim***, because proposed amendments are not "effective until the reexamination certificate is issued and published." 37 C.F.R. § 1.530(k). The pending reexaminations in which claims 320-322 were proposed—including this proceeding—remained uncompleted. The ’353 Patent has now expired without examination being completed, so 37 C.F.R. § 1.530(j) should require claims 320-322 to be treated as cancelled. *See also SynQor, Inc. v. Vicar Corp.*, 988 F.3d 1341, 1355 (Fed. Cir.

> 2021) (holding that patent expiration rendered moot the patentability of claims added during reexamination).

Third Pty. Req. Cmts. 4 (additional emphasis added).

We are not persuaded by the Requester that the Board erred in its conclusion that claims 320–322 are ***not*** impacted by the expiration of the '353 Patent. Requester's argument turns on a reading of the *Ex Parte* Reexamination Certificate (11231st) issued December 29, 2017 that makes the *Ex Parte* Reexamination Certificate (referred to in the quotation above as "it") still subject to the pending *inter partes* reexaminations. We disagree with Requester. Rather, we read the *Ex Parte* Reexamination Certificate as stating the '353 Patent (not the *Ex Parte* Reexamination Certificate) is still subject to the pending *inter partes* reexaminations. Therefore, we conclude that claims 320–322 are issued claims and not proposed claims as argued by Requester.

## IV. APPLICATION OF 37 C.F.R. § 42.74(d)(3)

### IV.A. Section 42.73(d)(3) Applies to this Reexamination

Patent Owner argues that § 42.73(d)(3)(i) only applies to estop a patent owner from "*obtaining* a new claim" and does not apply to previously issued claims, even if the previously issued claims are patentably indistinct from claims that were finally refused or cancelled in an IPR. PO Req. Reh'g 1–3. Patent Owner is mistaken.

By regulation, "[a] patent applicant or owner is precluded from taking action inconsistent with the adverse judgment, including obtaining in any patent[] (i) A claim that is not patentably distinct from a finally refused or canceled claim." 37 C.F.R. § 42.73(d)(3)(i). Patent Owner contends (at subsection IV.A.1.) that estoppel under § 42.73(d)(3) does

not apply to any claim on appeal. We disagree. In the '634 Decision on Appeal (incorporated by reference ('132 Dec. 12)), the Board determined that 42.73(d)(3) estoppel applies to claims under examination (including in reexamination) and prohibits Patent Owner from obtaining confirmation of patentability of patentably indistinct claims. '634 Dec. 29–30.

In the '634 Decision on Appeal, the Board held that § 42.73(d)(3)(i) "covers a claim that is not patentably distinct from a 'finally refused claim'" in an IPR and applies to all claims in a reexamination "for which a 'substantial new question of patentability'" is raised — *i.e.*, those claims undergoing examination. *Id.* at 27. The Board further explained the underlying policy that final cancellation of the claims in the '353 IPR served as notice that those claims are now in the public domain, and explained that when a notice is given to the public, the public is entitled to rely upon that notice. *Id.* at 28 (citing *Vectra Fitness, Inc. v. TNWK Corp.*, 162 F.3d 1379, 1384 (Fed. Cir. 1998); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996)).

The Board addressed head on Patent Owner's argument that estoppel under § 42.73(d)(3)(i) is not applicable in reexamination because Patent Owner is not "obtaining" a claim. Patent Owner has not identified any matter misapprehended or overlooked. Indeed, Patent Owner repeatedly presents arguments already rejected by the Board. Patent Owner first points to commentary accompanying the Notice of Final Rulemaking, 77 Fed. Reg. 48612 (Rules of Practice for Trials Before the Patent Trial and Appeal Board and Judicial Review of Patent

Trial and Appeal Board Decisions (Aug. 14, 2012)) ("Rules of Practice"), as purportedly indicating that § 42.73(d)(3)(i) applies only to new claims in reissue and continuations. PO Req. Reh'g 2. But the Board already identified the same response to Comment 213 as supporting applicability of estoppel. That commentary notes that "the Office is required to ***prescribe regulations setting forth the relationship between the review and other proceedings in the Office (e.g., examination)***" and that the final rule "merely provides estoppel against claims that are ***patentably indistinct*** from those claims that were lost." Rules of Practice, 77 Fed. Reg. at 48649 (emphasis added). The Board rightly concluded that reexamination, like examination, is one of the "other proceedings in the Office" and subject to the prohibition on patentably indistinct claims. '634 Dec. 29–30. After all, reexamination is based on an examinational and not an adjudicatory model. *Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2143 (2016) ("The [AIA] converts *inter partes* reexamination from an examinational to an adjudicative proceeding." (quoting H.R. Rep., at 46–47)); *see also* 157 Cong. Rec. 3429–3430 (2011) (remarks of Sen. Kyl) (noting the "shift from an examinational to an adjudicative model" when enacting *inter partes* review).

The Board further considered and rejected Patent Owner's reliance on two non-precedential IPR decisions in IPR2017-00428 and IPR2015-00458. '634 Dec. 29, 30. Patent Owner again relies on the same cases in its Rehearing Request. PO Req. Reh'g 3. The Board correctly distinguished those IPR decisions because, unlike this case,

those cases "involved no examination (or examination-like) action by the Office." '634 Dec. 30. And in both *inter partes* reexamination and *inter partes* review, when examination (or examination-like) action takes place, paragraph (d)(3) of § 42.73 applies. *See* Rules of Practice, 77 Fed. Reg. at 48649 ("Paragraph (d)(3) of § 42.73 applies to derivation proceedings, *inter partes* review, post-grant review, and covered business method review."); *see also id.* ("The Office will examine a claim presented in a subsequent proceeding on the merits and apply the estoppel if the claim is not patentably distinct from the finally refused or cancelled claim, similar to a ground of rejection based on *res judicata* (*see, e.g.*, MPEP § 706.03(w))" (emphasis added)).

Finally, Patent Owner's reliance on *Arthrex, Inc. v. Smith & Nephew, Inc.*, 880 F.3d 1345, 1347 (Fed. Cir. 2018), is misplaced. In that case, the Federal Circuit questioned the Board's authority to issue adverse judgments prior to institution despite the patentee expressly requesting no adverse judgment. *Id.* at 1351 (O'Malley, J., concurring), 1355 (Newman, J., dissenting); PO Req. Reh'g 3. That case is not relevant here. The *Arthrex* court had no occasion to consider whether § 42.73(d)(3) applies to subsequent reexamination proceedings and did ***not*** hold, as Patent Owner contends, that the regulation would only affect prosecution of a pending patent application. PO Req. Reh'g 3; *cf.* Rules of Practice, 77 Fed. Reg. at 48649.

Patent Owner's assertion that the Board is applying estoppel to prevent "a patent owner from *arguing* in favor of the PTO confirming earlier issued claims" grossly overstates the rule. PO Req. Reh'g 1.

Nothing in the estoppel rule would have prohibited Patent Owner from presenting claims that are patentably distinct from those cancelled in the IPR. Rules of Practice, 77 Fed. Reg. at 48649 ("[T]he patent owner may subsequently present in a continuing or reissue application claims that are patentably distinct from such [canceled] claims."). But Patent Owner did not do so and estoppel simply prohibits Patent Owner's effort to obtain confirmation of patentably indistinct claims in reexamination. Section 42.73(d)(3) serves to protect the public's reliance on a final IPR decision finding claimed subject matter unpatentable and thus in the public domain, and to prohibit repeated litigation of the same validity issues.

Other cases further support applicability of estoppel here. The Board previously addressed the applicability of § 42.73(d)(3) to subsequent reexamination proceedings in Reexamination Control No. 90/014,266. *See* Decision on Appeal in No. 2020-004978, dated December 31, 2020. There the Board rejected the patent owner's argument that estoppel under § 42.73(d)(3)(i) does not apply because it was not "obtaining" claims under reexamination. *Id.* at 8. The Board explained that a narrow focus on sub-section (i) ignores the broader prohibition in § 42.73(d)(3) that precludes a patent owner "from taking action inconsistent with the adverse judgment" in the prior IPR. *Id.* at 9. Directly to the point, the Board held that § 42.73(d)(3) "precludes a patent owner from taking any action in subsequent reexamination proceedings that are inconsistent with a prior adverse judgment." *Id.* at 9.

In sum, § 42.73(d)(3) prohibits confirming patentability of claims that are not patentably distinct from those subject to the final adjudication of unpatentability in the ’353 IPR. The Board correctly analyzed estoppel in its ’634 Decision on Appeal and maintains its ’132 Decision.

IV.B. The Office Had the Authority to Adopt and Followed Proper Notice-and-Comment

Patent Owner argues that applying § 42.73(d)(3) is contrary to law and exceeds the PTO’s rulemaking authority. PO Req. Reh’g 3–6. Patent Owner is mistaken.

The governing statute requires the Director to “prescribe regulations . . . (4) establishing and governing *inter partes* review under this chapter and ***the relationship of such review to other proceedings under this title.”*** 35 U.S.C. § 316(a)(4) (emphasis added). The same statute further provides that “[i]n prescribing regulations under this section, the Director shall consider the effect of any such regulation on the economy, the integrity of the patent system, [and] the efficient administration of the Office . . . . ” 35 U.S.C. § 316(b).

The USPTO adopted its Rules of Practice for Trials Before the Patent Trial and Appeal Board on August 14, 2012. 77 Fed. Reg. 48612. Consistent with the statute, the PTO explained that the “final rule is to establish a more efficient and streamlined patent system that will improve patent quality and limit unnecessary and counterproductive litigation costs.” *Id.* The final rule specifically identified 35 U.S.C. § 316(a)(4) as providing rulemaking authority:

> Section 42.73(d)(3) applies estoppel against a party whose claim was cancelled or who requested an amendment to the specification or drawings that was denied. ***The rule is consistent with 35 U.S.C. 316(a)(4), as amended, and 326(a)(4), which require that the Office prescribe regulations establishing and governing the reviews and the relationship of such reviews to other proceedings under title 35.***

Rules of Practice, 77 Fed. Reg. at 48625 (emphasis added).

In establishing the final rules for implementing the administrative patent trials as required by the AIA, the PTO engaged in formal notice-and-comment rulemaking, including considering and responding to comments received. *See* Rules of Practice, 77 Fed. Reg. at 48650. Relevant here, the PTO responded to Comment 213 which "questioned whether there is statutory basis for the patent owner estoppel provisions set forth in proposed § 42.73(d)(3)." *Id.* at 48649. Again, the PTO pointed to 35 U.S.C. § 316(a)(4) under which "the Office is required to prescribe regulations setting forth the relationship between the review and other proceedings in the Office (e.g., examination)." *Id.* The PTO further explained that "§ 42.73(d)(3) set forth in this final rule is consistent with the AIA, other statutory provisions, the common law related to estoppel, and the common law related to the recapture rule." *Id.* (citations omitted).

In addition to § 316(a)(4), the Office also had authority to adopt 37 C.F.R. § 42.73(d)(3) under the powers granted in 35 U.S.C. § 2(b). Section 2(b)(2)(A) provides the Office with broad authority to "establish regulations, not inconsistent with law, which-- (A) shall govern the conduct of proceedings in the Office." As noted in the final rulemaking, the estoppel rule of § 42.73(d)(3) is consistent with law. Rules of Practice, 77 Fed. Reg. at 48649. And the final rule, Part 42 of Title 37 of

the Code of Federal Regulations, lists both 35 U.S.C. §§ 2(b)(2) and 316 as authority for the rules. *Id* at 48670.

Patent Owner contends that there is no statutory provision that specifically provides for estoppel against the patent owner. PO Req. Reh'g 3. But Patent Owner has not identified any requirement that final rulemaking mirror statutory provisions, nor could it, because Congress explicitly gave rulemaking authority to the Director. 35 U.S.C. § 316(a). The estoppel provision was properly adopted pursuant to that authority, as explained above.

Patent Owner next contends that 35 U.S.C. §§ 301(a)(1) and 311 (pre-AIA) limit the grounds for *inter partes* reexamination to patents and printed publications and that estoppel cannot apply. PO Req. Reh'g 4. This is mistaken because the Federal Circuit has held that estoppel applies in *inter partes* reexamination. *SynQor*, 988 F.3d at 1347 (Issue preclusion applies to *inter partes* reexamination.). Furthermore, estoppel prohibiting a patent owner from obtaining confirmation of patentably indistinct claims from claims finally adjudicated unpatentable in an IPR advances the requirement that *inter partes* reexamination proceedings "be conducted with special dispatch within the Office." 35 U.S.C. § 314(c) (pre-AIA). And because the grounds in an IPR are limited to patents and printed publications, estoppel based on a prior adverse decision in an IPR effectively operates as a rejection based on the patents or printed publications underlying the prior adverse decision. Stated differently, patents and printed publications were the foundation for the rejection that resulted in the cancellation of claims in the '353 IPR leading to cancelled

claim estoppel; thus, even though analysis is based on cancelled claims, this estoppel is ultimately founded on patents and printed publications.

Patent Owner asserts that estoppel would violate Patent Owner's statutory right under 35 U.S.C. § 304 to make statements on the record about a substantial new question of patentability. PO Req. Reh'g 4–5. Not so. The estoppel provision of § 42.73(d) simply operates to prohibit patentably indistinct claims and in no way limits a patent owner's opportunity to explain why its claims are patentably distinct. Here, Patent Owner has had ample opportunity to make statements and, indeed, contends that its claims are patentably distinct from those canceled in the '353 IPR. The Board's rejection of Patent Owner's arguments and its finding of unpatentability has not violated any rights of Patent Owner under § 304.

Finally, Patent Owner again mistakenly argues that the estoppel provision exceeds the PTO's rulemaking authority because the statute does not include estoppel provisions against the Patent Owner. As explained above, rulemaking authority is provided by 35 U.S.C. §§ 316(a)(4) and 2(b)(2)(A). PO Req. Reh'g 5–6. Nothing in the statute or legislative history suggests that Congress intended a patent owner to have repeated opportunities to seek claims patentably indistinct from those already adjudicated invalid. To the contrary, Congress was focused on "the integrity of the patent system" and "the efficient administration of the Office" and expressly required the Director to prescribe regulations to further those goals. 35 U.S.C. § 316(b); *see also Thryv, Inc. v. Click-To-Call Techs.*, 140 S. Ct. 1367, 1374 (2020) (explaining that the

AIA "sought to weed out bad patent claims efficiently" and was "designed to establish a more efficient and streamlined patent system that will improve patent quality and limit unnecessary and counterproductive litigation costs" (citation omitted)).

The Office had the authority to adopt § 42.73(d)(3) and we maintain the '132 Decision applying estoppel pursuant to that rule.

IV.C. The Board Must Preclude Claims that Are
Not Patentably Distinct from Claims Found Invalid in the IPR

Patent Owner argues that, in applying § 42.73(d)(3), "not patentably distinct" means "substantially the same" not as an obviousness-type double-patenting "patentably indistinct" determination where the cancelled claim operates as prior art against the claim for which not "patentably distinct" is asserted. PO Req. Reh'g 6. Patent Owner is mistaken.

The Board correctly held that the phrase "patentably distinct" is used in § 42.73(d)(3)(i) in the obviousness sense. '634 Dec. 31–32. As the Board reasoned, "patentably distinct" in many patent law contexts (e.g., interference and double patenting) means that the claim at issue is more than simply an obvious variation over a prior patent claim. *See* '634 Dec. 31 (*citing General Foods Corp. v. Studiengesellschaft Kahle mbH*, 972 F.2d 1272, 1278 (Fed. Cir. 1992), and *Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955, 968 (Fed. Cir. 2001) (double patenting); *see also* '634 Dec. 31 (*citing Davis v. Loesch*, 998 F.2d 963, 965 n.2 (Fed. Cir. 1993) (interference))).

Patent Owner's Request for Rehearing fails to show any points misapprehended or overlooked by the Board regarding the interpretation

of "patentably distinct" in § 42.73(d)(3)(i). Indeed, Patent Owner's arguments are based on a misunderstanding of the PTO's rulemaking, a logical fallacy in attempting to recast a definition from Derivation practice, and a misinterpretation of Federal Circuit case law.

First, Patent Owner argues that the USPTO's originally proposed rule would have applied estoppel to "[a] claim to substantially the same invention," but, in the final rule, estoppel applies to "[a] claim that is not patentably distinct." PO Req. Reh'g 6 (emphases omitted). Patent Owner suggests that the result of this promulgation history is that "not patentably distinct" means "substantially the same invention." Nothing supports Patent Owner's assumption. The final rule adopted language ***different*** from "substantially the same invention," suggesting that the USPTO adopted a ***different*** standard from "substantially the same invention." The more logical reading of this promulgation history is that, rather than adopting a new standard for determining when estoppel applies, the PTO simply adopted the same standard as used in other contexts (such as interferences and double patenting) — *i.e.*, that a subsequent claim is precluded if it is not patentably distinct in the obviousness sense.

Patent Owner next cites the definition of "same or substantially the same" in derivation proceedings (37 C.F.R § 42.401). PO Req. Reh'g 6–7. According to Patent Owner, because "same or substantially the same" has the meaning "patentably indistinct" in derivation proceedings, "[w]ritten in reverse form, the Definition becomes 'patentably indistinct [*i.e.*, not patentably distinct] means the same or substantially the same.'"

PO Req. Reh'g 7. Patent Owner's argument is based on a logical fallacy. The fact that "same or substantially the same" in derivation proceedings means "patentably indistinct" does not mean the converse is true —"not patentably distinct" does ***not*** have the meaning "same or substantially the same" whenever the phrase "not patentably distinct" is used in other patent law contexts.

Finally, Patent Owner misinterprets Federal Circuit case law to attempt to narrow the proper scope of "patentably indistinct." PO Req. Reh'g 7–8. Patent Owner's reliance on *Simplair, Inc. v. Google LLC*, 884 F.3d 1160 (Fed. Cir. 2018), is based on the same logical fallacy as its reliance on the "same or substantially the same" definition discussed above. In *Simplair*, the issue was whether patent claims in two suits were "essentially the same." In the portion of *Simplair* Patent Owner quotes, the Federal Circuit determined that "claims which are patentably indistinct are essentially the same." PO Req. Reh'g 7 (*quoting Simplair*, 884 F.3d at 1167) (emphasis omitted). As a result, under the Federal Circuit's holding, if claims are "patentably indistinct" in the obviousness sense, then they are "essentially the same" for claim preclusion to apply. The Federal Circuit did not hold the converse —*i.e.*, that claims are only patentably indistinct if they are "essentially the same."

*Soverain Software LLC v. Victoria's Secret Direct Brand Management, LLC*, 778 F.3d 1311 (Fed. Cir. 2015), does not support Patent Owner's arguments because the phrase "not patentably distinct" was not at issue and the court did not purport to define it. Finally, Patent Owner's citation *to MaxLinear, Inc. v. CF Crespe LLC*, 880 F.3d 1373

(Fed. Cir. 2018) (PO Req. Reh'g 7–8) demonstrates that the Board's interpretation of "not patentably distinct" in the obviousness sense was correct. As *MaxLinear* states, "precedent does not limit collateral estoppel to patent claims that are identical . . . . If the differences between the unadjudicated patent claims and adjudicated patent claims ***do not materially alter the question of invalidity***, collateral estoppel applies." *MaxLinear*, 880 F.3d at 1377 (*quoting Ohio Willow Wood Co. v. Alps South, LLC*, 735 F.3d 1333, 1342 (Fed. Cir. 2013)) (emphasis added).

IV.D. When Applying § 42.73(d)(3) The Board is Not Required To use Common Law Preclusion Doctrines

Patent Owner argues that § 42.73(d)(3) requires the Board to apply common law collateral estoppel and issue preclusion. PO Req. Reh'g 8–18. But there is no such requirement in the rules that § 42.73(d)(3) must be applied through the lens of common law preclusion doctrines, and Patent Owner has cited no authority for importing common law collateral estoppel or res judicata into § 42.73(d)(3).

Patent Owner mistakenly asserts that "in promulgating the rule, the PTO stated § 42.73(d)(3) should be ***interpreted*** 'consistent with . . . the common law related to estoppel.'" PO Req. Reh'g 8 (emphasis added; original emphasis omitted). The rulemaking does not address interpretation of the estoppel rule. Rather, the rulemaking simply states that "§ 42.73(d)(3) set forth in this final rule is consistent with the AIA, other statutory provisions, the common law related to estoppel, and the common law related to the recapture rule."

Rules of Practice, 77 Fed. Reg. at 48648.[2] Federal Circuit case law supports this statement in the rulemaking. For example, in *MaxLinear*, the Court held that "the collateral-estoppel effect of an administrative decision of unpatentability generally requires the invalidation of related claims that present identical issues of patentability." *MaxLinear*, 880 F.3d at 1377. It does not matter whether the claims are identical. "[P]recedent does not limit collateral estoppel to patent claims that are identical . . . . If the differences between the unadjudicated patent claims and adjudicated patent claims do not materially alter the question of invalidity, collateral estoppel applies." *Id.* (quoting *Ohio Willow Wood Co. v. Alps South, LLC*, 735 F.3d 1333, 1342 (Fed. Cir. 2013)).

Patent Owner's reliance on *Regents of the University of Minnesota v. LSI Corp.*, 926 F.3d 1327 (Fed. Cir. 2019), does not support its argument. In that case, Judges Dyk, Wallach, and Hughes offered their additional views that the estoppel provisions in § 42.73(d)(3) are distinct from traditional principles of res judicata and collateral estoppel but yield the same result. *Id.* at 1345 n.5. The panel stated "[t]o the extent the estoppel provisions in 37 C.F.R. § 42.73(d)(3), prevent a patent owner from obtaining a patent on claims that are patentably indistinct from cancelled claims in an IPR proceeding, that result is no different than what is mandated under

[2] Notably, Patent Owner does not give weight to the rulemaking's reference to the AIA, other statutory provisions, and the recapture rule. As such, § 42.73(d)(3) is not simply an adoption of common law estoppel but rather a new rule consistent with various statutes and law.

traditional principles of res judicata and collateral estoppel." *Id.* "In the absence of such a [regulatory] provision, the result would still be the same (i.e., the later claim is unpatentable for the same reasons as the earlier patentably indistinct claim)." *Id.*

While the result of estoppel under § 42.73(d)(3) and under the common law is the same, Patent Owner has not cited any authority under which a court is required to undertake the same analysis. As a policy matter, the Office has adopted a straightforward regulation that precludes a patent owner from relitigating patentability after having a full and fair opportunity to defend the patentability of a claim in an IPR. This straightforward rule rightly prohibits action inconsistent with the final adverse judgment, advances the efficiency goals of the AIA and protects the public's reliance on a final IPR decision finding claimed subject matter unpatentable and thus in the public domain. *Vectra Fitness*, 162 F.3d at 1384; *Vitronics Corp.*, 90 F.3d at 1583; '634 Dec. 28–29, 31 n.11. The Board's '634 Decision correctly applied estoppel in this proceeding.

## V. NOT PATENTABLY DISTINCT OVER THE CLAIMS CANCELLED IN THE PRIOR IPRs

Patent Owner presents a generalized argument that the claim construction controls whether or not the claims at issue in this proceeding are patentably distinct over the claims in the '353 IPR. PO Req. Reh'g 19–20. As stated above, Patent Owner's patentably distinct position is contradicted by Federal Circuit case law, which does not require identical claims. Instead, the Federal Circuit asks if the differences in claims "materially alter the question of invalidity."

*MaxLinear*, 880 F.3d at 1377 (quoting *Ohio Willow Wood*, 735 F.3d at 1342).

Importantly, here the act of merely arguing a different claim construction standard (*Phillips* versus broadest reasonable interpretation (BRI)) exists does not affect the ’634 Decision outcome. The Board’s constructions in IPR2013-00007 were based on Patent Owner’s own explanation of the meaning of the claimed features during prosecution and based on Patent Owner’s own proposed *Phillips* standard claim constructions submitted in connection with *SoftView LLC v. Apple Inc.*, Case 10-389-LPS (D. DE July 26, 2012). *See* Requester Appeal Br. (Ex. 3, 7–14) (’926 FWD discussing that in the “Decision to Institute, we construed the claim terms as the Petitioner represented they were construed by the district court in co-pending litigation, *SoftView LLC v. Apple Inc.*, Case No. 10-389-LPS (D. DE). Dec. to Institute (Paper 12), 19-20); and Ex. 1 pp. 8-13 (analysis of ’353 claims while confirming construction in ’926 FWD).”).

Patent Owner fails to identify any instance where the ’634 Decision states it is relying on the BRI standard to determine patentability. Also, Patent Owner fails to identify any issue, including claim construction, that materially alters the question of patentability. Further, Patent Owner asserts in a conclusory manner that application of the BRI standard results in a different construction than *Phillips*, but never provides what the new construction should be or why the difference in standards would materially alter the question of patentability here. PO Req. Reh’g 19.

The focus of the analysis is on any differences between the adjudicated and non-adjudicated claims —not on prior art or record evidence, which would provide an easy end-run around preclusion rules designed to avoid repetitious litigation. Differences between applicable claim construction standards also does not prevent application of issue preclusion. *See, e.g.*, *Cisco Sys., Inc. v. Capella Photonics, Inc.*, No. 20-cv-01858, 2020 WL 7227153, at *5–6 (N.D. Cal. Dec. 8, 2020)(Due to the substantial interest in the finality of PTO decisions, the difference between the broadest reasonable interpretation standard and the Phillips standard was by itself insufficient to circumvented the effect of 37 C.F.R. § 42.73(d)(3)(i).). Contrast to *ContentGuard* where the patent owner in that case amended the invalidated claim *before* the PTAB issued a final written decision. *Google Inc. v. ContentGuard Holdings, Inc.*, PTAB No. CBM2015-00040 (PTAB June 21, 2016).

V.A. Claim Construction

V.A.1. Patent Owner's "Intent"

As a separate issue, Patent Owner argues that "[t]he 'at least a portion' language in claim 1 and the 'processing HTML-based Web content' language in claim 36 was intentional and carefully drafted." PO Req. Reh'g 22.

We do not find Patent Owner's intent to be relevant. Rather, Patent Owner's failure to address pertinent issues is evidenced by Patent Owner's rehashing over multiple pages its prior arguments about the page "layout, functionality and design" of a webpage as described in the patent specification and third-party documents. PO Req. Reh'g 20–29.

However, the ’634 Decision on Appeal addresses Patent Owner’s arguments and goes into great length and detail about the layout, functionality, and design of the claims and references that form the basis of the rejections. ’634 Dec. 20–23. Importantly, nothing in Patent Owner’s Rehearing Request identifies a specific claim construction or how that hypothetical claim construction would materially alter the question of patentability. PO Req. Reh’g 20–29. Patent Owner instead relies on a theoretical difference between BRI and *Phillips* standards alone. *Id.* Such conclusory arguments without analysis does not persuade the Board to change its previous findings.

Furthermore, because Patent Owner’s arguments about layout, functionality, and design were already considered and rejected by the Board, Patent Owner has also failed to identify anything “misapprehended or overlooked” in the Board’s ’634 Decision. Accordingly, Patent Owner’s failure is two-fold. Patent Owner fails to identify any construction that is material to patentability and fails to identify any argument that the Board had not already considered.

V.A.2. PTAB Claim Construction & “Impact” of Appeal

The Board properly considered the scope of the claims in the ’353 FWD as a basis of applying estoppel to the claims at issue in this proceeding. Patent Owner repeats its statement that claim construction standards are different, BRI versus *Phillips,* but fails to provide a claim construction that would materially alter the question of patentability. PO Req. Reh’g 29–32. Furthermore, even if the claim construction were theoretically to differ under *Phillips*, that alone is not determinative of

whether the claims at issue here are patentably distinct from the claims in the ’353 FWD. PO Req. Reh’g 31–32. Again, Patent Owner ignores the fact that the patentability for these claims was previously decided. As the patentability was previously decided (regardless of construction used), the only issue now to consider is if the claims are patentably distinct.

Patent Owner also argues that the BRI standard was applied in the ’353 FWD and is controlling because of the Rule 36 opinion issued by the Federal Circuit. PO Req. Reh’g 32–34. However, while the Federal Circuit opinion confirms the unpatentability of the claim in the ’353 FWD, it says nothing about the application of estoppel in the current proceeding. Again, Patent Owner has not proposed a construction of any claim term, much less a construction that is material to the invalidity determination of the claims. Merely identifying a different standard for claim construction, does not prevent application of issue preclusion. *See, e.g.*, *Cisco Sys.*, 2020 WL 7227153, at *5–6. Because the claims are not patentably distinct, the Board’s ’634 Decision is correct.

V.A.3. “Entire” vs. “Portion” Claim Construction

In the ’634 Decision at pages 34–37 (Section III.B.2.f. *Entire vs. Portion*), the Board discusses the difference between the terms “portion” and “entire.” The Board agrees with Patent Owner’s Rebuttal Brief argument that “based on plain meaning, removing ‘at least a portion’ [from the claims] means you are left with a whole” (PO Rebuttal Br. 11) and “PO has not amended any claims to recite the [word] ‘entire’ because as discussed above by plain meaning and as supported

throughout the prosecution history of the [’]353 patent . . . this would not change the scope of the [amended] claims” (PO Rebuttal Br. 13).

The Board then explained in this section of the ’634 Decision that Patent Owner’s “entire” interpretation of the amended claims does not render them patentably distinct from the claims cancelled during the ’353 IPR. This conclusion was reached because what is the “entire” preserved content in the amended claims encompasses the preserved “portion” in the cancelled claim given the obvious variation of simply removing completely from the cancelled claim processing the original web page content portion that is not preserved. ’634 Dec. 35–37.

Patent Owner’s now points to this section of the ’634 Decision and argues that the Board’s claim construction of the term “preserving” is “inapposite” to the claim construction from the ’353 FWD. PO Req. Reh’g 34–38. This argument is, at best, confusing. As its title makes clear, this section of the ’634 Decision is directed to the relationship between “entire” and “portion.” We do not find where Patent Owner challenges the Board’s explanation of this relationship. Rather, Patent Owner merely quotes the ’634 Decision without identifying how the quoted language provides a new construction of the argued term “preserving.” PO Req. Reh’g 34. The quoted section of the ’634 Decision is simply a discussion by the Board providing an explanation for applying the art to the claims rather than proposing a new claim construction. ’634 Dec. 36–37.

Finally, Patent Owner tries to distinguish the current case from *Vectra Fitness*, but fails to address the central issue. PO Req. Reh’g 37.

Namely, the issue is whether the public should be able to rely on the Office's cancellation of claims that are not materially different from the current claims, thereby putting the public on notice that the subject matter of those claims is in the public domain. *Vectra Fitness*, 162 F.3d at 1384; *see also Vitronics Corp.*, 90 F.3d at 1583; '634 Dec. 28–29, 31 n.11. Instead of addressing this core holding in *Vectra,* Patent Owner makes an unsupported argument that if a patent expires, then the public is required to review the file wrapper, undertake a new claim construction, and determine that the claims are not dedicated to the public, even if the claims are identical. PO Req. Reh'g 38. Thus, under Patent Owner's theory, a person could be sued a second time on the same patent, even though identical claims have already been found invalid, because the patent expired and prevents the application of issue preclusion. This defeats the entire purpose of § 42.73(d)(3) and must be rejected.

V.A.4. Claim Construction under *Phillips*

Patent Owner argues that "as the '353 patent is now expired, the *Phillips* standard must be applied in construing the claims for which estoppel is asserted." PO Req. Reh'g 38. Even assuming the Board were required to construe all claims anew to determine if estoppel applies (it is not), Patent Owner has failed to meet its burden and show that a construction under *Phillips* materially changes the question of patentability. *Soverain Software LLC*, 778 F.3d at 1319.

First, Patent Owner fails to provide a claim construction at all, much less apply that construction in a way that challenges the unpatentability of the claims. PO Req. Reh'g 39–40. In place of

providing a claim construction, Patent Owner recommends, without asserting it is correct, for the Board to "consider" the District Court claim construction. PO Req. Reh'g 39. In addition, the District Court Order that merely provided a plain and ordinary meaning construction to the "preserving" limitation. Patent Owner has failed to state how a plain and ordinary meaning of "preserving" would make the claims patentably distinct.

Second, Patent Owner merely asserts, without argument or evidence, that claim 5 for example, is "clearly patentably distinct over claims 1 and 138/118." PO Req. Reh'g 40. Patent Owner is required to show some difference in the claim scope under the BRI versus *Phillips* standards and then identify how that difference materially alters the patentability determination. This prevents "repetitious litigation of what is essentially the same dispute." *SynQor*, 988 F.3d at 1353; *see also Ohio Willow Wood*, 735 F.3d at 1343. Patent Owner has failed to provide any meaningful argument showing that there are any new issues raised when construing claims in accordance with *Phillips.*

V.B. Claim Limitations

Patent Owner argues that the Board addresses the dependent claims in isolation as a "delta" of the independent claims. PO Req. Reh'g 43. Patent Owner is mistaken.

The Board repeatedly states, when addressing dependent claims, that it "does not find any additional synergy" from the combination of cancelled claims, thereby clearly considering the subject matter as a whole. *See, e.g.*, '634 Dec. 45–46 (dependent claim 2). Accordingly,

the Board's consideration of the dependent claims is proper, and while each argument will be detailed below, the arguments fail to identify any issue that was not previously considered by the Board, and no claim construction is proposed, much less used to identify a patentable distinction. The Board maintains the rejection of each dependent claim.

V.B.1. Effect of Patent Expiration

U.S. Patent 7,461,353, which is the subject of this *inter partes* reexamination, expired on April 18, 2022. *See* '634 Dec. 83–85. Patent Owner incorrectly argues that all cancelled claims now must be construed a second time in the current proceeding and in a different way than they were construed in the '353 FWD. PO Req. Reh'g 43–44. Patent Owner is mistaken.

Patent Owner provides no support for this argument and it is not at all clear why this additional construction step is necessary. Even if it were necessary, Patent Owner provides no construction for the Board to assess or apply. As Patent Owner provides no argument or evidence that these claims would be patentable under a hypothetical new construction that is not provided, the issue of patentability of these claims is the same as was already decided in the '353 FWD. Therefore, application of estoppel is appropriate as laid out in the Board's '634 Decision.

V.B.2. Billions of Web Pages

Patent Owner argues that the claims regarding "preserving billions of web pages" is not an intended use, but instead a positive limitation of the claim. PO Req. Reh'g 47–49. However, the Board already considered this argument in detail, and found it lacking. '634 Dec. 61–

62 (discussion of, *e.g.*, claim 35). Patent Owner fails to identify anything that was misapprehended or misunderstood in the Board's '634 Decision.

Initially, the Board relied on *In re Anderson*, 662 F. App'x 958, 963 (Fed. Cir. 2016) to support its position that the disputed phrase is an intended use. '634 Dec. 61–62. Patent Owner makes no argument that the claim language adds a "structural limitation to the claimed system or method" and fails to address, much less distinguish, *In re Anderson.*

On a substantive level, the Board found that even if the language was not an intended use, the claim is still invalid because the number of webpages would have been obvious to a person of skill in the art (POSITA). '634 Dec. 62. Patent Owner fails to address this finding. It appears that Patent Owner views the claim as requiring evidence that a user actually visited over 1,000,000,000 web pages to invalidate the claim. PO Req. Reh'g 48. Patent Owner's position, which requires the claims to be "practiced at the time," is a misstatement of the law and Patent Owner provides no support for this position. PO Req. Reh'g 48. The correct inquiry is what was obvious to a POSITA at the time of the invention — proof of a user actually practicing the invention is not required.

Accordingly, the disputed language does not alter the question of patentability, and the Board's application of estoppel is correct.

V.B.3. Cascaded Style Sheet

Regarding the rejection of claim 322 that contains cascaded style sheet limitations, Patent Owner argues there is no evidence to support the rejection. PO Req. Reh'g 46–47. However, the Board's '634 Decision is

supported by the record. Patent Owner provides no distinctions between the BRI and *Phillips* standards as it relates to the patentability of claim 322.

Regarding claim 322, Patent Owner merely asserts, without evidence or argument, that the scope of the claims is "not remotely close to 'essentially the same'" as canceled claim 66. PO Req. Reh'g 47. However, the language of canceled claim 66 and the language of claim 322 is substantively identical and Patent Owner has not provided any authority or evidence that explains why substantively identical claim language would be materially different with respect to patentability. '634 Dec. 64–65 (discussion of claim 322).

Also, regarding claim 322, the Board has already considered the argument that CSS 2 is required by the claim and Requester's rebuttal of this argument. PO Respondent Br. 47–48; Requester Appeal Br. 17; '634 Dec. 64–65. Patent Owner does not point to anything misapprehended in either argument, instead Patent Owner just restates a previously considered and rejected argument, while quoting a different Board decision that also does not mention CSS 2. PO Req. Reh'g 47. Accordingly, the Board's Decision finding that the "layout" and "design" are "well-known synonyms" is supported by the record and Patent Owner has not provided a reason why the Board's decision was improper. '634 Dec. 64–65. Estoppel is appropriate for claim 322 because Patent Owner has not identified any issue that materially alters the question of invalidity, making estoppel appropriate.

V.B.4. HTML Objects, Logical Groupings, and Bounding Boxes

Patent Owner's argues that "Pad++ created a single HTML object for the entire page – it did not create multiple HTML objects" and that "Pad++ did not support frames, table content, nor row content. Significantly, Pad++ did the opposite of grouping for paragraphs – it split paragraphs into multiple Pad++ text objects." PO Req. Reh'g 42.

As the Board noted in the '634 Decision at page 40, Patent Owner previously argued "[t]he HTML object is a Pad++ object corresponding to an entire Web page, which is treated in Pad++ as a single object." The Board specifically addresses this topic ('634 Decision at pages 37–41), stating in part:

> We agree with the reasoning of Cross-Appellant, Examiner, and the PTAB in its FWD, that Pad++ objects are inclusive of HTML objects. Similarly, the "objects" in the cancelled claims would be understood to be inclusive of HTML objects. Thus, we conclude that adding of "HTML" before "object" in the amended claims does nothing to render the amended claims patentably distinct from the cancelled claims. At best, addition of "HTML" before "object" merely limits the full scope of the cancelled claim to an obvious subset of that scope.

'634 Dec. 41. The Board provided a thorough discussion of this topic and Patent Owner points to no issue the Board misapprehended in its analysis.

To the extent that Patent Owner is arguing that known (as acknowledged by Patent Owner) use of Pad++ multiple objects in an HTML object (entire Web Page) would not suggest to an artisan the use of the known HTML paragraphs and tables as Pad++ objects treats the artisan as an automaton, we conclude Patent Owner's premise is contrary to

our reviewing courts guidance. “A person of ordinary skill is also a person of ordinary creativity, not an automaton.” *KSR Int’l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007). We agree with the Examiner’s conclusion that:

> [T]he selection of which HTML tags (e.g., HTML paragraph objects, HTML table objects, HTML table row objects, HTML table data objects, non-visible HTML layout objects, etc.) to implement is a matter that would be well within the knowledge and abilities of a person of ordinary skill in the art and thus would be obvious.

RAN (Right of Appeal Notice) 26.

V.B.5. HTML Paragraph and Table Objects

Patent Owner argues that the “HTML paragraph object” limitation of claim 320 and “HTML table object,” “HTML table row object,” and “HML table data object” limitation of claim 321 renders the claims patentably distinct. PO Req. Reh’g 44–46.

However, there is no indication of what the Board misapprehended or where these same arguments were presented and overlooked. PO Rebuttal Br. 27–29. Instead of addressing the fact this issue had been previously determined in the ’353 IPR FWD, Patent Owner reargues the substance of the underlying claim rejections. PO Req. Reh’g 44–46. But as the Board held in the ’353 IPR FWD and as the Examiner correctly determined, “implementing any available HTML tag within the Pad++ HTML browser would have been well within the knowledge and abilities of a PHOSITA.” RAN 93 (mailed Aug 28, 2020 (citing ’353 IPR FWD)). For at least this reason, estoppel is appropriate because claims 320 and 321 are not patentably distinct from those canceled in the ’353 IPR, and Patent Owner has not shown otherwise.

V.C. The Board's Decision Is Based on The Record And Is Not Arbitrary and Capricious

Patent Owner argues that it is arbitrary and capricious for the Board to reject appealed claims 5, 23–37, 60, 61, 122, 137, 140, 141, 147, 156, 174–177, 238–242, 248, 259, and 274–277 that recite identical claim language as like numbered claims that were confirmed in *ex parte* reexamination 90/009,994 ("the '994 reexamination") over substantially identical art and substantially identical rebuttal evidence. *See* 5 U.S.C. § 706. PO Req. Reh'g 49–50. Patent Owner is mistaken.

Importantly, unlike the *ex parte* '994 reexamination, the current proceeding is *inter partes*. The findings of the '994 reexamination are not applicable here because that decision was made based on a different record—a record developed by Patent Owner alone in an *ex parte* proceeding without consideration of the evidence or arguments provided by Requester during the pendency of this *inter partes* proceeding. *See Stevenson v. Sears, Roebuck & Co.*, 713 F.2d 705, 710 (Fed. Cir. 1983) (explaining that a "prior holding of validity is not necessarily inconsistent with [a] subsequent holding of invalidity" due to factors such as "different records").

## CONCLUSION

Based on the record before us, we deny Patent Owner's Request for Rehearing. Patent Owner has not persuasively identified any points the panel misapprehended or overlooked.

## DECISION SUMMARY

Outcome of Decision on Rehearing:

| Claim(s) Rejected | 35 U.S.C. § | Reference(s)/Basis | Denied | Granted |
|---|---|---|---|---|
| 5, 6, 23–27, 60, 61, 70, 122, 137, 140, 141, 147, 156, 174–177, 216, 238–242, 248, 259, 274–277, 320–322 | | Estoppel under 37 C.F.R. § 42.73(d) | 5, 6, 23–27, 60, 61, 70, 122, 137, 140, 141, 147, 156, 174–177, 216, 238–242, 248, 259, 274–277, 320–322 | |

Final Outcome of Appeal after Rehearing:

| Claim(s) Rejected | 35 U.S.C. § | Reference(s)/ Basis | Affirmed | Reversed | New Ground |
|---|---|---|---|---|---|
| 5, 23–27, 60, 61, 70, 122, 137, 140, 141, 147, 156, 174–177, 216, 238–242, 248, 259, 274–277 | 103 | Pad++ | | 5, 23–27, 60, 61, 70, 122, 137, 140, 141, 147, 156, 174–177, 216, 238–242, 248, 259, 274–277 | |

| | | | | | |
|---|---|---|---|---|---|
| 5, 23–27, 60, 61, 70, 122, 137, 140, 141, 147, 156, 174–177, 216, 238–242, 248, 259, 274–277 | 103 | Pad++, SVF references | | 5, 23–27, 60, 61, 70, 122, 137, 140, 141, 147, 156, 174–177, 216, 238–242, 248, 259, 274–277 | |
| 5, 23–27, 60, 61, 70, 122, 137, 140, 141, 147, 156, 174–177, 216, 238–242, 248, 259, 274–277 | 103 | Pad++, VML | | 5, 23–27, 60, 61, 70, 122, 137, 140, 141, 147, 156, 174–177, 216, 238–242, 248, 259, 274–277 | |
| **Claim(s) Rejected** | **35 U.S.C. §** | **Reference(s)/ Basis** | **Affirmed** | **Reversed** | **New Ground** |
| 320, 321 | 103 | Pad++, common knowledge | | 320, 321 | |
| 5, 23–27, 60, 61, 70, 122, 137, 140, 141, 147, 156, 174–177, 216, 238–242, 248, 259, 274–277 | 103 | Pad++, HTML standards | | 5, 23–27, 60, 61, 70, 122, 137, 140, 141, 147, 156, 174–177, 216, 238–242, 248, 259, 274–277 | |

| | | | | | |
|---|---|---|---|---|---|
| 5, 6, 23–27, 60, 61, 70, 122, 137, 140, 141, 147, 156, 174–177, 216, 238–242, 248, 259, 274–277 | 103 | Pad++, AAPA | | 5, 6, 23–27, 60, 61, 70, 122, 137, 140, 141, 147, 156, 174–177, 216, 238–242, 248, 259, 274–277 | |
| **Claim(s) Rejected** | **35 U.S.C. §** | **Reference(s)/ Basis** | **Affirmed** | **Reversed** | **New Ground** |
| 5, 6, 23–27, 60, 61, 70, 122, 137, 140, 141, 147, 156, 174–177, 216, 238–242, 248, 259, 274–277, 320-322 | | Estoppel | | | 5, 6, 23–27, 60, 61, 70, 122, 137, 140, 141, 147, 156, 174–177, 216, 238–242, 248, 259, 274–277, 320–322 |
| **Overall Outcome** | | | | 5, 6, 23–27, 60, 61, 70, 122, 137, 140, 141, 147, 156, 174–177, 216, 238–242, 248, 259, 274–277, 320, 321 | 5, 6, 23–27, 60, 61, 70, 122, 137, 140, 141, 147, 156, 174–177, 216, 238–242, 248, 259, 274–277, 320–322 |

DENIED

PATENT OWNER:

LAW OFFICE OF R. ALAN BURNETT
4108 131ST AVE SE
BELLEVUE, WA 98006

THIRD PARTY REQUESTER:

JOHN S. PRATT, ESQ.
KILPATRICK TOWNSEND & STOCKTON LLP
1100 PEACHTREE STREET
SUITE 2800
ATLANTA, GA 30309

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

Motorola Mobility, LLC
Requester and Cross-Appellant

v.

Patent of SoftView LLC
Patent Owner and Appellant

---

Appeal 2022-000153
Reexamination Control 95/002,132
Patent US 7,461,353 B2
Technology Center 3900

---

Before ALLEN R. MacDONALD, ERIC B. CHEN, and BRIAN J. McNAMARA, *Administrative Patent Judges*.

MacDONALD, *Administrative Patent Judge*.

DECISION ON APPEAL[1]

---

[1] Related Appeal 2021-005530 (Reexamination Control No. 95/000,634) is directed to a reexamination of the same patent as this appeal. Patent Owner's Appeal Br. 1. This appeal and its related appeal are directed to the same issues. These appeals are decided concurrently. This decision incorporates by reference the related 2021-005530 decision.

## I. STATEMENT OF THE CASE[2]

Appellant appeals under 35 U.S.C. § 134 from a final decision of the Primary Examiner rejecting claims 5, 6, 23–27, 60, 61, 70, 122, 137, 140, 141, 147, 156, 174–177, 216, 238–242, 248, 259, 274–277, 320, and 321. We have jurisdiction under 35 U.S.C. § 315(b). We reverse the Examiner's decision rejecting these claims.

Cross-Appellant appeals under 35 U.S.C. § 134 from a final decision of the primary examiner favorable to the confirmation/patentability of claim 322. We have jurisdiction under 35 U.S.C. § 315(b). We reverse the Examiner's decision favorable to the confirmation/patentability of this claim.

## II. INTRODUCTION

### *A. Background*

U.S. Patent 7,461,353 issued December 2, 2008 from application No. 11/045,757, filed on January 28, 2005 as a division[3] of application No. 09/878,097, filed on June 8, 2001, now U.S. Patent 7,210,099, which is a continuation-in-part of application No. 09/828,511, filed on Apr. 7, 2001, now abandoned. At filing, application No. 11/045,757 claimed priority to application No. 09/828,511 (still pending at that time). Normally, U.S. Patents 7,210,099 and 7,461,353 would have each had an expiration date of April 7, 2021. However, the term of U.S. Patent 7,210,099 was adjusted by

---

[2] Hearing held on January 6, 2022.

[3] Related U.S. Patent 7,831,926 issued November 9, 2010 from application No. 11/738,486, filed on April 21, 2007 as a continuation of application No. 09/878,097.

818 days to expire on July, 5, 2023, and the term of U.S. Patent 7,461,353 was adjusted by 376 days to expire on April 18, 2022.

As filed, application No. 11/045,757 contained sixteen (16) claims all directed to translating Web content from its original format into a scalable vector representation of the Web content.

During prosecution, amendments expanded the number of claims which then characterized the invention in essentially three ways.

1) translating at least a portion of HTML-based Web content from its original format into scalable content, and then scaling that scalable content while preserving the original page layout, functionality and design of the content;
2) processing HTML-based Web content to produce scalable content, and then scaling that scalable content while preserving the original page layout, functionality and design of the content at zoom levels and panned views; and
3) without limiting to either translating or processing, a) enabling a Web page to be browsed at various zoom levels and panned views while preserving the original page layout, functionality, and design of the Web content at each zoom level and panned view, or even more broadly, b) enabling a Web page to be browsed at various zoom levels and panned views.

As issued on December 2, 2008, U.S. Patent 7,461,353 contained 319 claims.

On August 31, 2012, Cross Appellant (Requester) filed a Request for Inter Partes Reexamination of U.S. Patent 7,461,353, which reexamination 95/002,132 is the subject of this appeal. On May 20, 2011, an unrelated

Requester (Apple Inc.) filed a Request for Inter Partes Reexamination of U.S. Patent 7,461,353, which second reexamination 95/000,634 is not the subject of this appeal.[4] On April 13, 2012, Apple Inc. filed a separate Request for Ex Parte Reexamination (Control No. 90/009,994) of U.S. Patent 7,461,353.

On October 2, 2012, Kyocera Corporation petitioned for an *inter partes* review challenging the patentability of claims 1, 33, 36, 43, 48, 51, 52, 58, 59, 66, 118, 138, 139, 149, 183, 252, 283, and 317 of U.S. Patent 7,461,353. On March 29, 2013, the Board entered a Decision in IPR2013-00007 to institute an *inter partes* review on the challenges raised by Kyocera Corporation. Subsequently, IPR2013-00256, brought by Motorola Mobility LLC on April 29, 2013, raised the same challenges and later was joined to the IPR2013-00007 proceeding. All challenged claims were determined to be unpatentable by a Final Written Decision (FWD) on March 27, 2014.

> We hold all of the challenged claims, i.e., claims 1, 33, 36, 43, 48, 51, 52, 58, 59, 66, 118, 138, 139, 149, 183, 252, 283, and 317 of the '353 Patent, are unpatentable under 35 U.S.C. §103(a). Specifically, the preponderance of the evidence shows that claims 1, 33, 36, 43, 48, 51, 52, 58, 59, 118, 138, 139, 149, 183, 252, 283, and 317 of the '353 Patent are unpatentable as obvious over the combination of Zaurus and Pad++. We further hold that the preponderance of the evidence shows that claim 66 of the '353 Patent is unpatentable over Zaurus, Pad++, and SVG.

---

[4] Additionally, related U.S. Patent 7,831,926, is the subject of two *inter partes* reexamination appeals which are before this Panel. Per the agreement of Patent Owner and both Third Party Requestors (2022-000153/2022-000154 Hearing Transcript 52–53, and 2022-000716 Hearing Transcript 23), the transcripts of hearings in all four related *inter partes* reexamination appeals are being placed in the record for each of the four related *inter partes* reexaminations.

> We also hold that, under a preponderance of the evidence, claims 1, 33, 36, 43, 48, 51, 52, 58, 59, 118, 138, 139, 149, 183, 252, 283, and 317 of the ’353 Patent are unpatentable under 35 U.S.C. § 103(a) as obvious over the combination of Zaurus, Hara, and Tsutsumitake and that claim 66 is unpatentable over the combination of Zaurus, Hara, Tsutsumitake and SVG.

FWD 36.

The Board’s FWD then appealed to the United States Court of Appeals for the Federal Circuit by the Patent Owner. The Board’s FWD was subsequently affirmed on February 9, 2015. *Softview LLC v. Kyocera Corp.*, 592 F. App’x 947 (Fed. Cir. 2015)(Rule 36). As a result, on January 12, 2016, the Office issued an “Inter Partes Review Certificate,” thus indicating that further judicial review was not sought. The Certificate cancelled claims 1, 33, 36, 43, 48, 51, 52, 58, 59, 66, 118, 138, 139, 149, 183, 252, 283, and 317 of U.S. Patent 7,461,353. A “Cancelled Claim Appendix” containing copies of these cancelled claims is attached.

During the *inter partes* review, the processing of all reexaminations was stayed. That stay was lifted on November 27, 2015. Subsequently, Ex Parte Reexamination 90/009,994 confirmed amended claims 5, 23–27, 60, 61, 122, 137, 140, 141, 147, 156, 174–177, 238–242, 248, 259, and 274–277 to be patentable as amended, added new claims 320–322, and cancelled claims 84 and 220. The remaining claims were not reexamined. On December 29, 2017, the Ex Parte Reexamination Certificate for 90/009,994 was issued.[5]

---

[5] Related U.S. Patent 7,831,926 has followed a similar path with two Inter Partes Reexaminations (95/000,635 and 95/002,126), an Ex Parte Reexamination 90/009,995 (affirmed *In re SoftView LLC*, 847 F. App’x 930 (Fed. Cir. 2021) (Rule 36)); and two Inter Partes Reviews IPR2013-00004

*B. Status of the Claims in the Present Appeal*

The Claims Appendix of Patent Owner's Appeal Brief lists the status of the appealed claims. Patent Owner's Appeal Brief 61–82. However, as to numerous claims, the Panel disagrees with the status listed in the appendix. For the reasons we set forth at Section III.B.2.b).(2) of our decision directed to related appeal 2021-005530, this distinction between issued and amended/new claims is not result determinative under the Panel's interpretation of § 42.73(d)(3)(i). We incorporate that decision here in full.

However, while the Panel disagrees, Patent Owner argues that § 42.73(d)(3)(i) is not applicable in a reexamination confirming a previously ***issued*** claim. Should Patent Owner's view ultimately prevail, then the distinction between issued and amended/new claims may be critical.

In amendments included in the Patent Owner's Amendment and Response filed on June 28, 2017, many claims were labeled as "(Amended)." These claims include claims 5, 23–25, 60, 122, 137, 140, 147, 156, 174, 175, 238–240, 248, 259, 274, and 275. Also, in the June 28, 2017 amendments, claims 26, 27, 61, 141, 176, 177, 241, 242, 276, and 277, are labeled as "(Issued)" when they are amended via an amendment to another claim from which they depend. Such claims should have been labeled as "(Amended)." Further, in the June 28, 2017 amendments, claims 320–322 were labeled as "(New)." All these claims are now labeled in the Claim Appendix as "(Issued)." We presume that Patent Owner is labeling all these claims as "(Issued)" based on the Office procedure for handling an

---

and IPR2013-000257 (affirmed *Softview LLC v. Kyocera Corp.*, 592 F. App'x 949 (Fed. Cir. 2015)(Rule 36)). We do not otherwise discuss herein Patent 7,831,926 and its various proceedings.

*ex parte* reexamination certificate when there is, as here, a still pending unmerged *inter partes* reexamination. The MPEP states:

> The second [reexamination] request is then considered based on the claims in the patent as indicated in the issued reexamination certificate, rather than the original claims of the patent.

MPEP § 2686.01 IV (9th ed. Rev. 10.2019, rev. June 2020). However, under Patent Owner's interpretation of § 42.73(d)(3)(i), this Office procedure would permit Patent Owner in an *ex parte* reexamination (where a Requestor has no appeal rights) to use an amendment in an *ex parte* reexamination certificate to extinguish (without recourse) the Requestor's statutory right to an appeal in an *inter partes* reexamination.

> THIRD-PARTY REQUESTER.— A third-party requester—
>
> (1) may appeal under the provisions of section 134, and may appeal under the provisions of sections 141 through 144, with respect to any final decision favorable to the patentability of any original or proposed amended or new claim of the patent[.]

35 U.S.C. § 315(b) (pre-AIA). Where there is a conflict between Office procedure and a statute, we determine that the statute prevails. Therefore, contrary to the MPEP procedure, until the time for appeal has expired or any appeal proceeding has terminated in this *inter partes* reexamination, that we treat all these claims as they are labeled ("(Amended)" or "(New)") in the Patent Owner's Amendment and Response filed on June 28, 2017.

### *C. Exemplary Claim in the Present Appeal*

Exemplary independent claim 5 under appeal reads as follows:

> 5. A wireless device, comprising:
>
> processing means;
>
> wireless communications means, to facilitate wireless communication with a network that supports access to the Internet;
>
> a display;
>
> memory; and
>
> storage means, in which a plurality of instructions are stored that when executed by the processing means enable the wireless device to perform operations including,
>
> rendering a browser interface via which a user is enabled to request access to an original Web page, the Web page comprising HTML-based Web content having an original format defining an original width and height of the Web page and an original page layout, functionality, and design of content on the Web page;
>
> in response to a user request to access the Web page,
>
> retrieving the Web page via the wireless communication means, and translating the HTML-based Web content from its original format into scalable content that supports a scalable resolution-independent representation of the Web page that preserves the original page layout, functionality and design of the content defined by its original format when scaled and rendered; and
>
> scaling the scalable content to render the Web page on the display such that a width of the Web page is rendered to fit across the display; and
>
> parsing markup language code to determine the original page layout of display content within the Web page, wherein the original page layout defines a layout location for a plurality of HTML objects, including HTML text objects, HTML graphic layout objects, and HTML graphic image objects included in the HTML-based Web content for the Web page;
>
> defining a primary datum corresponding to the original page layout; and, for each HTML object,

defining an object datum corresponding to the layout location for the HTML object;

generating a vector from the primary datum to the object datum for the HTML object; and

creating a reference that links the HTML object to the vector that is generated.

### *D. References*

The Examiner relies on the following references, collectively referred to as the Pad++ references:

| Name | Reference | Date |
|---|---|---|
| Bederson, Benjamin B., et al. (hereinafter "Bederson-1") | "Pad++: A Zoomable Graphical Interface System", CHI '95 Mosaic of Creativity | May 1995 |
| Bederson, Benjamin B., et al. (hereinafter "Bederson-2") | "Space-Scale Diagrams: Understanding Multiscale Interfaces," CHI '95 Proceedings | 1995 |
| Bederson, Benjamin B., et al. (hereinafter "Bederson-3") | "A Zooming Web Browser," SPIE, Vol. 2667, 260–71 | May 1996 |
| Bederson, Ben, et al. (hereinafter "Bederson-4") | "Implementing a Zooming User Interface: Experience Building Pad++," Software-Practice and Experience, Vol. 28(1), 1101–35 | August 1998 |
| Bederson, Benjamin B., et al. (hereinafter "Bederson-5") | "Pad++: A Zoomable Graphical Sketchpad for Exploring Alternate Interface Physics," Journal of Visual Languages and Computing, Vol. 7, 3–31 | 1996 |
| Meyer, Jonathan (hereinafter "Pad++ Brief Tour") | A Brief Tour Through Pad++ | April 1997 |

| | | |
|---|---|---|
| (hereafter "Reference Manual") | Pad++ Reference Manual version 0.2.7 | July 9, 1996 |
| (hereafter "Programmer's Guide") | Pad++ Programmer's Guide version 0.2.7 | June 10, 1996 |

Also, the Examiner relies on the following reference:

| Name | Reference | Date |
|---|---|---|
| Matthews, et al. (hereinafter "VML") | Vector Markup Language (VML), World Wide Web Consortium Note, , Note-VML-19980513, http://www.w3.org/TR/1998/Note-VML 19980513 | May 13, 1998 |

Further, the Examiner relies on the following references, collectively referred to as "the SVF references":

| Name | Reference | Date |
|---|---|---|
| (hereinafter "SVF") | Specification for the Simple Vector Format (SVF) vl.1 | Jan. 16, 1995 |
| (hereinafter "SVF Press 1") | New CAD System Works With AutoCAD Drawings Without Translation, retrieved from http://web.archive.org/web/19961019052917/http://soft:source.com/netnews.html | June 17, 1996 |
| (hereinafter "SVF Press 2") | Bring New CAD Viewing Power to the Internet, retrieved from http://web.archive.org/web/19961019052917/http://softsource.com/netnews.html | Mar. 4, 1996 |

Furthermore, the Examiner relies on the following references, collectively referred to as "HTML Standards":

| Name | Reference | Date |
|---|---|---|
| (hereinafter "HTML 3.2 Standard") | W3C, "HTML 3.2 Reference Specification, W3C Recommendation," pp. 1–44 | Jan. 14, 1997 |
| (hereinafter "HTML 4.0 Standard") | W3C, "HTML 4.0 Specification, W3C Recommendation," pp. 1–363 | Dec. 18, 1997 |

Also further, the Panel relies on the following references:

| Name | Reference | Date |
|---|---|---|
| Morris | US 5,020,090 | May 28, 1991 |
| Culbert | US 5,708,816 | Jan. 13, 1998 |
| Kato | US 6,088,730 | July 11, 2000 |
| Ausems | US 6,434,403 B1 | Aug. 13, 2002 |
| O'Sullivan | US RE38,127 E | May 27, 2003 |

## III. ANALYSIS

We address herein Appellant's (Patent Owner's) appeal of the Examiner's rejections under 35 U.S.C. § 103, which we reverse.

As to claim 322, Cross-Appellant (Requester) proposes five issues for review on appeal. Four issues are listed on page 10 of the Third Party Requestor's Appeal Brief as issues under 35 U.S.C. §§ 103 and 112. The fifth issue is stated on pages 11 and 15–16 of the Third Party Requestor's Appeal Brief as unpatentable based on 37 C.F.R. § 42.73(d)(3)(i). We do not adopt Cross-Appellant's (Requester's) proposed § 103 rejections as they contain the same deficiencies as the Examiner's rejections discussed *infra*. We do not adopt Cross-Appellant's (Requester's) proposed § 112 rejection

because it is presented as contingent on an issue we do not reach ("if the Board maintains the finding that implementing CSS, was outside the skill of a PHOSITA at the time of the invention" (Third Party Requestor's Appeal Brief 26)). As to Cross-Appellant's (Requester's) 37 C.F.R. § 42.73(d)(3)(i) based appeal of the Examiner's final decision favorable to the patentability of claim 322, we present herein a new ground of rejection as to all claims, which subsumes that appeal. Therefore, except as to the ultimate conclusion reversing the Examiner's decision favorable to the confirmation/patentability of these claims, we do not further address Cross-Appellant's appeal.

*A. Examiner's Rejections*

The Examiner rejects the claims herein on essentially the same basis as the rejection of the claims in related appeal 2021-005530. The arguments Patent Owner presents in this appeal are the same arguments presented in related appeal 2021-005530. We reverse the Examiner's rejections herein for the reasons we set forth in our decision directed to related appeal 2021-005530. To the extent that the Examiner relies on additional references in this appeal, those additional references do not cure the deficiencies we set forth in the 2021-005530 decision. We incorporate that decision here in full.

*B. New Ground of Rejection – 37 C.F.R. § 42.73(d)(3)(i)*

*1.*

We reject claims 5, 6, 23–27, 60, 61, 70, 122, 137, 140, 141, 147, 156, 174–177, 216, 238–242, 248, 259, 274–277, and 320–322, herein for the reasons we set forth in our decision directed to related appeal 2021-005530. We incorporate that decision here in full.

*2.*

This decision contains a new ground of rejection pursuant to 37 C.F.R. § 41.77(b). 37 C.F.R. § 41.77(b) provides "a new ground of rejection pursuant to this paragraph shall not be considered final for judicial review."

37 C.F.R. § 41.77(b) also provides that the owner, WITHIN ONE MONTH FROM THE DATE OF THE DECISION, must exercise one of the following two options with respect to the new grounds of rejection to avoid termination of the appeal as to the rejected claims:

> (1) Reopen prosecution. The owner of the patent may file a response requesting reopening of prosecution before the examiner. . . .
>
> (2) Request rehearing. Request that the proceeding be reheard under § 41.79 by the Board upon the same record. . . .

## IV. EFFECT OF THE EXPIRATION OF 7,461,353

As we note *supra*, U.S. Patent 7,461,353, which is the subject of this *inter partes* reexamination, will expire on April 18, 2022. If this *inter partes* reexamination is still pending at that time, any further proceedings will be consistent with 37 C.F.R. § § 1.530(j) and (k).

> (j) *No enlargement of claim scope.* No amendment may enlarge the scope of the claims of the patent or introduce new matter. No amendment may be proposed for entry in an expired patent. Moreover, no amendment, other than the cancellation of claims, will be incorporated into the patent by a certificate issued after the expiration of the patent.
>
> (k) *Amendments not effective until certificate.* Although the Office actions will treat proposed amendments as though they have been entered, the proposed amendments will not be effective until the reexamination certificate is issued and published.

*A. Effect on the Claims*

Upon expiration of U.S. Patent 7,461,353, all amendments proposed during this *inter partes* reexamination will be withdrawn *except for* amendments cancelling claims and any claim amendments herein that were also set forth in the related Ex Parte Reexamination Certificate that issued on December 29, 2017 covering amendments to claims 5, 23–27, 60, 61, 122, 137, 140, 141, 147, 156, 174–177, 238–242, 248, 259, and 274–277, and adding new claims 320–322. For all other remaining claims which are not cancelled, any proposed amendments are withdrawn and those claims will be as they were when this *inter partes* reexamination was filed. In this case, they will be as they were issued.

The following claim will revert to depending from a claim that was cancelled during the *inter partes* review of U.S. Patent 7,461,353. Claim 6, will revert back to dependency from cancelled claim 1.

The following claims will revert back to a claim as originally issued in U.S. Patent 7,461,353, that is, revert back to a claim that lacks limitations the Patent Owner relies on to argue (but we disagree) the amended claim is patentably distinct. Independent claim 70, will revert back to "processing ***at least a portion*** of the HTML-based Web content." Independent claim 216, will revert back to "translating ***at least a portion*** of the HTML-based Web content."

*B. Effect on this Decision*

Upon expiration of U.S. Patent 7,461,353, the only effect on this Decision will be that the analysis simplifies as to all limitations added to the claims by proposed amendments that will be withdrawn. For example, the "Entire vs. Portion" discussion at Section III. B. 2. f). of our decision

directed to related appeal 2021-005530 (decision incorporated herein by reference) and the "HTML Objects" discussion at Section III. B. 2. g). of our decision directed to related appeal 2021-005530 (decision incorporated herein by reference) each becomes moot for claim 6 with dependency from cancelled claim 1, as well as for claims 70 and 216, because these added limitations will no longer be present in these claims.

## V. CONCLUSIONS

The Examiner erred in rejecting claims 5, 6, 23–27, 60, 61, 70, 122, 137, 140, 141, 147, 156, 174–177, 216, 238–242, 248, 259, 274–277, 320, and 321 as being unpatentable under 35 U.S.C. § 103.

The Examiner erred in making a final decision favorable to the patentability of claim 322.

We newly reject all claims subject to this reexamination based on 37 C.F.R. § 42.73(d) estoppel as not being patentably distinct from claims finally cancelled during an *inter partes* review of the patent which is the subject of this reexamination.

In summary:

| Claim(s) Rejected | 35 U.S.C. § | Reference(s)/ Basis | Affirmed | Reversed | New Ground |
|---|---|---|---|---|---|
| 5, 23–27, 60, 61, 70, 122, 137, 140, 141, 147, 156, 174–177, 216, 238–242, 248, 259, 274–277 | 103 | Pad++ | | 5, 23–27, 60, 61, 70, 122, 137, 140, 141, 147, 156, 174–177, 216, 238–242, 248, 259, 274–277 | |
| 5, 23–27, 60, 61, 70, 122, 137, 140, 141, 147, 156, 174–177, 216, 238–242, 248, 259, 274–277 | 103 | Pad++, the SVF references | | 5, 23–27, 60, 61, 70, 122, 137, 140, 141, 147, 156, 174–177, 216, 238–242, 248, 259, 274–277 | |
| 5, 23–27, 60, 61, 70, 122, 137, 140, 141, 147, 156, 174–177, 216, 238–242, 248, 259, 274–277 | 103 | Pad++, VML | | 5, 23–27, 60, 61, 70, 122, 137, 140, 141, 147, 156, 174–177, 216, 238–242, 248, 259, 274–277 | |

| **Claim(s) Rejected** | **35 U.S.C. §** | **Reference(s)/ Basis** | **Affirmed** | **Reversed** | **New Ground** |
|---|---|---|---|---|---|
| 320, 321 | 103 | Pad++, common knowledge | | 320, 321 | |
| 5, 23–27, 60, 61, 70, 122, 137, 140, 141, 147, 156, 174–177, 216, 238–242, 248, 259, 274–277 | 103 | Pad++, HTML standards | | 5, 23–27, 60, 61, 70, 122, 137, 140, 141, 147, 156, 174–177, 216, 238–242, 248, 259, 274–277 | |
| 5, 6, 23–27, 60, 61, 70, 122, 137, 140, 141, 147, 156, 174–177, 216, 238–242, 248, 259, 274–277 | 103 | Pad++, AAPA | | 5, 6, 23–27, 60, 61, 70, 122, 137, 140, 141, 147, 156, 174–177, 216, 238–242, 248, 259, 274–277 | |

| Claim(s) Rejected | 35 U.S.C. § | Reference(s)/ Basis | Affirmed | Reversed | New Ground |
|---|---|---|---|---|---|
| 5, 6, 23–27, 60, 61, 70, 122, 137, 140, 141, 147, 156, 174–177, 216, 238–242, 248, 259, 274–277, 320-322 | | Estoppel under 37 C.F.R. § 42.73(d) | | | 5, 6, 23–27, 60, 61, 70, 122, 137, 140, 141, 147, 156, 174–177, 216, 238–242, 248, 259, 274–277, 320–322 |
| **Overall Outcome** | | | | 5, 6, 23–27, 60, 61, 70, 122, 137, 140, 141, 147, 156, 174–177, 216, 238–242, 248, 259, 274–277, 320, 321 | 5, 6, 23–27, 60, 61, 70, 122, 137, 140, 141, 147, 156, 174–177, 216, 238–242, 248, 259, 274–277, 320–322 |

REVERSED; 37 C.F.R. § 41.77(b)

CANCELLED CLAIMS APPENDIX

The following claims 1, 33, 36, 43, 48, 51, 52, 58, 59, 66, 118, 138, 139, 149, 183, 252, 283, and 317 of U.S. Patent 7,461,353 B2 were finally cancelled by IPR2013-00007 and IPR2013-00256. Emphasis added.

1. A ***wireless device***, comprising:

[A.] processing means;

[B.] wireless communications means, to facilitate wireless communication with a network that supports access to the Internet;

[C.] a display;

[D.] memory; and

[E.] storage means, in which a plurality of instructions are stored that when executed by the processing means enable the wireless device to perform operations including,

[i.] rendering a browser interface via which a user is enabled to request access to an original Web page, the Web page comprising HTML-based Web content having an original format defining an original width and height of the Web page and ***an original page layout, functionality, and design of content on the Web page***;

[ii.] in response to a user request to access the Web page,

[a.] retrieving the Web page via the wireless communication means, and ***translating at least a portion*** of the HTML-based Web content from its original format into scalable content that supports a scalable resolution-independent representation of the Web page that ***preserves*** the original page layout, functionality and design of the content defined by its original format ***when scaled and rendered***; and

[b.] scaling the scalable content to render the Web page on the display such that a width of the Web page is rendered to fit across the display.

33. The wireless device of claim 1, wherein a portion of the scalable content comprises ***vector-based content***.

36. A ***mobile hand-held device***, comprising:

[A.] a processor,

[B.] a wireless communications device, to facilitate wireless communication with a network that supports access to the Internet;

[C.] a display; and

[D.] flash memory, operatively coupled to the processor, in which a plurality of instructions are stored that when executed by the processor enable the mobile hand-held device to perform operations including,

[i.] rendering a browser interface via which a user is enabled to request access to a Web page comprising HTML-based Web content ***defining an original page layout, functionality, and design of content on the Web page***;

[ii.] retrieving the Web page via the wireless communications device, and ***processing*** HTML-based Web content ***to produce scalable content***; and

[iii.] employing at least one of the scalable content or data derived therefrom to,

[a.] render the Web page on the display; and

[b.] re-render the display in response to associated user inputs to enable the Web page to be browsed at various zoom levels and panned views while ***preserving*** the original page layout, functionality, and design of the Web page content ***at each zoom level and panned view***.

43. The mobile hand-held device of claim 36, wherein at least a portion of the scalable content comprises ***scalable vector-based content***.

48. The mobile hand-held device of claim 36, wherein execution of the instructions performs further operations comprising enabling a ***user*** to ***zoom on a column*** of the Web content via a corresponding user input, wherein in response thereto, the display is re-rendered such that content corresponding to the ***selected*** column is ***rendered to fit across the display***.

51. The mobile hand-held device of claim 36, wherein the Web content includes ***at least one image***, and wherein execution of the instructions performs further operations comprising enabling a ***user*** to ***zoom on an image*** via a corresponding user input, wherein in response thereto, the display is re-rendered such that the ***image*** is rendered to ***fit across the display***.

52. The mobile hand-held device of claim 51, wherein the corresponding user input comprises ***tapping*** on the ***image*** via the display.

58. The mobile hand-held device of claim 36, wherein execution of the instructions performs further operations comprising:

[iv.] parsing HTML-based code corresponding to the retrieved Web page to determine the original page layout of the content on the Web page;

[v.] ***logically grouping selected content into objects***;

[vi.] ***defining a primary datum*** corresponding to the original page layout; and,

[vii.] for each object

[a.] ***defining an object datum*** corresponding to a layout location datum for the object's associated display content;

[b.] ***generating a vector*** from the primary datum to the object datum for the object; and

[c.] creating a reference that links the object to the vector that is generated.

59. The mobile hand-held device of claim 58, wherein execution of the instructions performs further operations comprising:

[viii.] ***generating a bounding box for each object***, the bounding box representing a portion of a rendered display page occupied by the object's associated group of content.

66. The mobile hand-held device of claim 36, wherein a portion of the HTML-based Web content comprises ***cascaded style sheet data*** defining aspects of the Web page design that are preserved at each zoom level and panned view.

118. A method, comprising:

[A.] rendering a browser interface on a display of a device via which a user is enabled to request access to a Web page, the Web page comprising HTML-based Web content having an original format defining an original width and height of the Web page and an original page layout, functionality, and design of content on the Web page;

[B.] in response to a user request to access the Web page, retrieving the Web page via the device, and translating at least a portion of the HTML-based Web content from its original format into scalable content that supports a scalable resolution-independent representation of the Web page that preserves the original page layout, functionality and design of the content defined by its original format when scaled and rendered; and

[C.] scaling the scalable content to render the Web page on the display such that a width of the Web page is rendered to fit across the display.

138. The method of claim 118, further comprising:

[D.] parsing markup language code corresponding to the retrieved Web page to determine the original page layout of the content on the Web page;

[E.] ***logically grouping selected content into objects***;

[F.] ***defining a primary datum*** corresponding to the original page layout; and,

[G.] for each object,

- [i.] ***defining an object datum*** corresponding to a layout location datum for the object's associated display content;
- [ii.] ***generating a vector*** from the primary datum to the object datum for the object; and
- [iii.] creating a reference that links the object to the vector that is generated.

139. The method of claim 138, further comprising:

[H.] ***generating a bounding box for each object***, the bounding box representing a portion of a rendered display page occupied by the object's associated group of content.

149. A method, comprising:

[A.] rendering a browser interface on a ***hand-held device*** via which a user is enabled to request access to a Web page comprising HTML-based Web content ***defining an original page layout, functionality, and design of content*** on the Web page;

[B.] retrieving the Web page via the hand-held device, and ***processing*** HTML-based Web content ***to produce scalable content***; and

[C.] employing at least one of the scalable content or data derived therefrom to;

[i.] render the Web page on a display of the hand-held device; and

[ii.] re-render the display in response to associated user inputs to enable the Web page to be browsed at various zoom levels and panned views while ***preserving*** the original page layout, functionality, and design of the Web page content ***at each zoom level and panned view***.

183. The method of claim 149, wherein a portion of the scalable content comprises ***vector-based content***.

252. A machine-readable medium having a plurality of instructions comprising a Web browser tangibly stored thereon, which when executed enable a device to perform operations comprising:

[A.] rendering a browser interface on a display associated with the device via which a user is enabled to request access to a Web page comprising HTML-based Web content defining an original page layout, functionality, and design of content on the Web page;

[B.] retrieving the Web page and ***processing*** HTML-based Web content ***to produce scalable content***; and

[C.] employing at least one of the scalable content or data derived therefrom to,

[i.] render the Web page on the display; and

[ii.] re-render the display in response to associated user inputs to enable the Web page to be browsed at various zoom levels and panned views while preserving the original page layout, functionality, and design of the Web page content at each zoom level and panned view of the Web page,

wherein the Web browser enables a user of the device to browse, zoom, and pan ***billions of Web pages*** in a manner that ***preserves*** the original layout, functionality, and design of the HTML-based Web page content of each Web page ***at each zoom level and panned view***.

283. The machine-readable medium of claim 252, wherein a portion of the scalable content comprises ***vector-based content***.

317. A ***hand-held wireless device***, comprising:

[A.] a processor,

[B.] a wireless communications interface, to facilitate wireless communication with a network that supports access to the Internet;

[B.] a display; and

[C.] non-volatile memory, operatively coupled to the processor, in which software comprising a browser is stored, the browser comprising a plurality of instructions that when executed by the processor enable the device to perform operations including,

- [i.] rendering a browser interface on the display via which a user is enabled to request access to a Web page including at least one image, at least one column, at least one ***hyperlink*** to an external reference and having a width and height;
- [ii.] retrieving the Web page via the wireless communications interface;
- [iii.] rendering the Web page on the display such that at least one of the width and height of the Web page is fully displayed; and
- [iv.] enabling the ***user*** to,
  - [a.] ***zoom and pan*** a view of the Web page;
  - [b.] ***activate a currently displayed hyperlink*** to an external reference while at a given zoom level and panned view, wherein in response to an activation of a hyperlink to an external reference, Web content associated with the external reference is retrieved and rendered on the display;

> [c.] ***zoom in on an image*** of the Web page ***by tapping*** on the image via the display;
> [d.] ***zoom in on a column*** of the Web page ***by tapping*** on the column via the display; and
> [e.] ***zoom out to a previous view of the Web page***.

FOR PATENT OWNER:

LAW OFFICE OF R. ALAN BURNETT
4108 131ST AVE SE
BELLEVUE, WA 98006

FOR THIRD PARTY REQUESTER:

JOHN S. PRATT, ESQ.
KILPATRICK TOWNSEND & STOCKTON LLP
1100 PEACHTREE STREET
SUITE 2800
ATLANTA, GA 30309

US007461353B2

(12) **United States Patent**
**Rohrabaugh et al.**

(10) **Patent No.: US 7,461,353 B2**
(45) **Date of Patent: *Dec. 2, 2008**

(54) **SCALABLE DISPLAY OF INTERNET CONTENT ON MOBILE DEVICES**

(75) Inventors: **Gary B. Rohrabaugh**, Bellingham, WA (US); **Scott A. Sherman**, Bellingham, WA (US)

(73) Assignee: **Gary Rohrabaugh**, Bellingham, WA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 376 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **11/045,757**

(22) Filed: **Jan. 28, 2005**

(65) **Prior Publication Data**

US 2005/0131887 A1 Jun. 16, 2005

**Related U.S. Application Data**

(60) Division of application No. 09/878,097, filed on Jun. 8, 2001, now Pat. No. 7,210,099, which is a continuation-in-part of application No. 09/828,511, filed on Apr. 7, 2001, now abandoned.

(60) Provisional application No. 60/217,345, filed on Jul. 11, 2000, provisional application No. 60/211,019, filed on Jun. 12, 2000.

(51) **Int. Cl.**
***G06F 17/00*** (2006.01)

(52) **U.S. Cl.** ....................... **715/815**; 715/760; 715/234; 715/239; 715/249

(58) **Field of Classification Search** ................. 715/517, 715/700–864
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,966,135 A 10/1999 Roy et al.

(Continued)

FOREIGN PATENT DOCUMENTS

WO PCT/US01/40920 12/2001

(Continued)

OTHER PUBLICATIONS

http://www.w3.org/TR/1999/WD-SVG-19990211/—Pub Feb. 11, 1999 by W3C pp. 1-7 (A complet details can be down load at by the provides URL above).*

(Continued)

*Primary Examiner*—Doug Hutton
*Assistant Examiner*—Quoc A Tran
(74) *Attorney, Agent, or Firm*—Law Office of R. Alan Burnett; R. Alan Burnett

(57) **ABSTRACT**

Mobile devices enabled to support resolution-independent scalable display of Internet (Web) content to allow Web pages to be scaled (zoomed) and panned for better viewing on smaller screen sizes. The mobile devices employ software-based processing of original Web content, including HTML-based content, XML, cascade style sheets, etc. to generate scalable content. The scalable content and/or data derived therefrom are then employed to enable the Web content to be rapidly rendered, zoomed, and panned. Moreover, the rendered displays provide substantially the same or identical layout as the original Web page, enabling users to easily navigate to selected content and features on familiar Web pages. Display lists may also be employed to provide further enhancements in rendering speed. Additionally, hardware-based programmed logic may be employed to facilitate various operations.

**319 Claims, 22 Drawing Sheets**



## U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 6,011,905 | A | 1/2000 | Huttenlocher et al. | |
| 6,057,854 | A | 5/2000 | Davis, Jr. et al. | |
| 6,185,625 | B1 | 2/2001 | Tso et al. | |
| 6,300,947 | B1 | 10/2001 | Kanevsky | |
| 6,421,733 | B1 | 7/2002 | Tso et al. | |
| 6,466,203 | B2 | 10/2002 | Van Ee | |
| 6,546,397 | B1 | 4/2003 | Rempell | |
| 6,615,212 | B1 | 9/2003 | Dutta et al. | |
| 6,642,925 | B2 * | 11/2003 | Roy et al. | 345/427 |
| 6,674,445 | B1 * | 1/2004 | Chithambaram et al. | 345/619 |
| 6,857,102 | B1 | 2/2005 | Bickmore et al. | |
| 6,886,034 | B2 * | 4/2005 | Blumberg | 709/217 |
| 7,219,309 | B2 | 5/2007 | Kaasila et al. | |
| 2001/0047428 | A1 | 11/2001 | Hunter | |
| 2002/0112237 | A1 | 8/2002 | Ketts | |
| 2004/0049598 | A1 | 3/2004 | Tucker et al. | |
| 2005/0144256 | A1 | 6/2005 | Blumberg | |

## FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO | PCT/US01/40920 | 6/2002 |

## OTHER PUBLICATIONS

Combined Printout of HTML Help Files for Opera 3.60 (HTML pages printed to PDF docs and combined), Available on May 12, 1999.

Screenshots compilations of Web pages using Opera 3.60, including: www.Altavista.com—May 1, 1999 www.cnet.com—May 8, 1999 www.excite.com—May 8, 1999 www.nytimes.com—Apr. 22, 1999 www.softsource.com—Apr. 17, 1999 www.utexas.edu—Apr. 27, 1999 www.uspto.gov—May 5, 1999 www.yahoo.com—May 8, 1999.

Benjamin B. Bederson et al., Pad++: A Zoomable Graphical Sketchpad For Exploring Alternate Interface Physics, Sep. 19, 1995, http://www.cs.unm.edu/pad++.

Benjamin B. Bederson et al., A Zooming Web Browser, SPIE 1996, http://www.cs.umd.edu/hcil/jazz/learn/papers/spie-96-webbrowser.pdf.

Specification for Simple Vector Format (SVF) v1.1 Jan. 16, 1995.

Specification for Simple Vector Format (SVF) v2.0 Dec. 6, 2000, http://www.svf.org/spec.html.

Changes to SVF, (Date unknown).

Scalable Vector Graphics (SVG) Specification, W3C Working Draft Feb. 11, 1999 WD-SVG-19990211, http://www.w3.org/TR/1999/WD-SVG-19990211/ (HTML format—initial page).

Scalable Vector Graphics (SVG) Specification, W3C Working Draft Apr. 12, 1999 WD-SVG-19990412, http://www.w3.org/TR/1999/WD-SVG-19990412/ (HTML format—initial page).

Scalable Vector Graphics (SVG) 1.0 Specification, W3C Candidate Recommendation Nov. 2, 2000.

Introduction to SVG, part of WD-SVG-19990211, http://www.w3.org/TR/1999/ WD-SVG-19990211/intro. html#Document . . . .

Steve Mulder, Sneak Peak at SVG, Mar. 4, 1999, http://www.webmonkey.com/99/10/index3a.html?tw=eg1999102.

Janus Boye, SVG Brings Fast Vector Graphics to Web, Jul. 29, 1999 http://www.irt.org/articles/js176/.

Vector Markup Language (VML), World Wide Web Consortium Note May 13, 1998, NOTE-VML-19980513, http://www.w3.org/TR/1998/NOTE-VML_19980513.

Precision Graphics Markup Language (PGML), World Wide Web Consortium NOTE Apr. 10, 1998, NOTE-PGML-19980410, http://www.w3.org/TR/1998/NOTE-PGML-19980410.

Rick Graham, Mobile SVG at BitFlash Inc., May 2001, http://www.w3.org/Talks/2002/1007-DI-Helsinki/bitflash/index.html.

U.S. Appl. No. 60/296,327 Available on PAIR.

U.S. Appl. No. 60/288,287, filed May 2, 2001. Available on PAIR—electronic copy previously filed via IDS submission of Sep. 18, 2007.

U.S. Appl. No. 60/296,275, filed Jun. 5, 2001. Available on PAIR—electronic copy previously filed via IDS submission of Sep. 18, 2007.

U.S. Appl. No. 60/296,237, filed Jun. 5, 2001. Available on PAIR—electronic copy previously filed via IDS submission of Sep. 18, 2007.

U.S. Appl. No. 60/296,274, filed Jun. 5, 2001. Available on PAIR—electronic copy previously filed via IDS submission of Sep. 18, 2007.

U.S. Appl. No. 60/296,284, filed Jun. 5, 2001. Available on PAIR—electronic copy previously filed via IDS submission of Sep. 18, 2007.

U.S. Appl. No. 60/296,231, filed Jun. 5, 2001. Available on PAIR—electronic copy previously filed via IDS submission of Sep. 18, 2007.

U.S. Appl. No. 60/296,224, filed Jun. 5, 2001. Available on PAIR—electronic copy previously filed via IDS submission of Sep. 18, 2007.

U.S. Appl. No. 60/296,426, filed Jun. 5, 2001. Available on PAIR—electronic copy previously filed via IDS submission of Sep. 18, 2007.

U.S. Appl. No. 60/296,273, filed Jun. 5, 2001. Available on PAIR—electronic copy previously filed via IDS submission of Sep. 18, 2007.

U.S. Appl. No. 60/296,283, filed Jun. 5, 2001. Available on PAIR—electronic copy previously filed via IDS submission of Sep. 18, 2007.

U.S. Appl. No. 60/296,281, filed Jun. 5, 2001. Available on PAIR—electronic copy previously filed via IDS submission of Sep. 18, 2007.

U.S. Appl. No. 60/296,327, filed Jun. 5, 2001. Available on PAIR—electronic copy previously filed via IDS submission of Sep. 18, 2007.

* cited by examiner

FIG. 1A


10A
12
WIRELESS CLIENTS
14
70
16
THIN CLIENT
68
SVC PROVIDER DATA CENTER
72
36
REQUEST URL PROXY URL
34
18
INTERNET
VECTORIZED CONTENT
62
BITMAP CONTENT
64
58
LAND-LINE CLIENTS
20
22
24
56
52
HTML
54
BMP, JPEG, GIF, ETC.
40
26
WEB SERVER
42
PRIMARY
REFS
HTML
44
IMAGES
46
48
28
HTML
IMAGES
50
WEB SERVER
30
FTP SITE
FTP DOCS
51
REQ URL
38
32
REQ URL
38
66
PROXY SERVER
HTML TRANSLATOR
58
IMAGE TRANSLATOR
60


10B
WIRELESS CLIENTS
12
14
16
70
HTML TRANSLATOR
58
IMAGE TRANSLATOR
60
SVC PROVIDER DATA CENTER
72
THIN CLIENT
68
18
REQ URL
39
VECTORIZED CONTENT
62
BITMAP CONTENT
64
58
INTERNET
24
67
41
26
WEB SERVER
42
PRIMARY
REFS
HTML
44
IMAGES
46
28
WEB SERVER
48
HTML
IMAGES
50
30
FTP SITE
FTP DOCS
51
20
22
LAND-LINE CLIENTS

FIG. 1B



10C
52
HTML
54
BMP, JPEG, GIF, ETC.
HTML TRANSLATOR
58
IMAGE TRANSLATOR
60
69
VECTORIZED CONTENT
62
BITMAP CONTENT
64
THIN CLIENT
68
18
SCALABLE RENDERED CONTENT AND USER INTERFACE
71
58
REQ URL
37
INTERNET
24
41
26
WEB SERVER
42
PRIMARY
REFS
HTML
44
IMAGES
46
48
28
HTML
WEB SERVER
IMAGES
50
30
FTP SITE
FTP DOCS
51


FIG. 1C

FIG. 2A


CLIENT SENDS CONTENT REQUEST INCLUDING LOCATION INDICIA (E.G., URL) TO PROXY SERVER
100
PROXY SERVER RECEIVES REQUEST, CHECKS CACHE, AND SENDS REQUEST TO WEB SERVER CORRESPONDING TO URL ADDRESS
102
WEB SERVER TRANSMITS PARENT HTML DOCUMENT BACK TO PROXY SERVER
104
PROXY SERVER PARSES HTML SEARCHING FOR REFERENCES TO EXTERNAL OBJECTS
106
REFERENCED OBJECT: HTML DOC OR IMAGE FILE
44, 46, 48, 50
ANY REFS?
108
YES
NO
PROXY SERVER REQUESTS REFERENCED OBJECT FROM APPROPRIATE SERVER
110
HTML, XML, CSS CONTENT IS TRANSLATED INTO SCALABLE VECTOR REPRESENTATION
114
IMAGE CONTENT TRANSLATED INTO COMPRESSED BITMAP FORMAT
116
VECTORIZED CONTENT AND COMPRESSED BITMAPS ARE STREAMED FROM PROXY SERVER TO CLIENT
118
VECTORIZED CONTENT AND BITMAP CONTENT PROCESSED AND SCALED USING THIN CLIENT TO RENDER CONTENT ON CLIENT DEVICE
120

FIG. 2B


CLIENT SENDS CONTENT REQUEST TO NETWORK SITE (E.G., WEB URL)
101
HTTP NEGOTIATION PERFORMED TO DETERMINE FORMAT CONTENT IS TO BE DELIVERED IN; SERVER CACHE CHECKED
103
WEB SERVER RETRIEVES PARENT HTML DOCUMENT
105
WEB SERVER PARSES HTML SEARCHING FOR REFERENCES TO EXTERNAL OBJECTS
107
REFERENCED OBJECT: HTML DOC OR IMAGE FILE
44, 46, 48, 50
ANY REFS?
109
YES
NO
WEB SERVER RETRIEVES REFERENCED OBJECT LOCALLY OR RETRIEVES REFERENCED OBJECT FROM AN APPROPRIATE SERVER
111
HTML, XML, CSS CONTENT IS TRANSLATED INTO SCALABLE VECTOR REPRESENTATION
114
IMAGE CONTENT TRANSLATED INTO COMPRESSED BITMAP FORMAT
116
VECTORIZED CONTENT AND COMPRESSED BITMAPS ARE STREAMED FROM WEB SERVER TO CLIENT
119
VECTORIZED CONTENT AND BITMAP CONTENT PROCESSED AND SCALED USING THIN CLIENT TO RENDER CONTENT ON CLIENT DEVICE
120

*FIG. 2C*



CLIENT SENDS CONTENT REQUEST TO NETWORK SITE (E.G., WEB URL) TO RETRIEVE CONTENT
113
NETWORK SITE SENDS PARENT HTML DOCUMENT
115
CLIENT PARSES HTML SEARCHING FOR REFERENCES TO EXTERNAL OBJECTS
117
REFERENCED OBJECT: HTML DOC OR IMAGE FILE
44, 46, 48, 50
ANY REFS?
119
YES
CLIENT RETRIEVES REFERENCED OBJECT FROM AN APPROPRIATE SERVER
121
NO
HTML, XML, CSS CONTENT IS TRANSLATED INTO SCALABLE VECTOR REPRESENTATION
114
IMAGE CONTENT TRANSLATED INTO COMPRESSED BITMAP FORMAT
116
VECTORIZED CONTENT AND BITMAP CONTENT PROCESSED AND SCALED USING THIN CLIENT TO RENDER CONTENT ON CLIENT DEVICE
120


14
HTML TRANSLATOR
32
58
75
CLIENT MANAGER
REQUEST MANAGER
CACHE
74
73
IMAGE TRANSLATOR
18
60
ARBITRARY INTERNET CONTENT
78

FIG. 3


DISPLAY
521
MAIN MEMORY
504
READ ONLY MEMORY
506
MASS STORAGE DEVICE
507
KEYBOARD
522
BUS
501
CURSOR CONTROL DEVICE
523
PROCESSOR
502
COMMUNICATION DEVICE
525
500

FIG. 10


MARKET HOME
FILE EDIT VIEW GO FAVORITES HELP
BACK FORWARD STOP REFRESH HOME SEARCH FAVORITES HISTORY
ADDRESS
HTTP://<ADDRESS PATH>
LINKS
238A
240A
QUOTES
HOT PICKS
CALENDARS
NEWS
236A
242A
244A
WHERE THE PROS SEEK ADVICE
BULLMARKET.COM
246A
216A
218A
MARKETS
222A
DOW
NASDAQ
224A
OPTIONS
226A
CHARTS
228A
220A
INVESTMENTS
230A
MUTUAL FUNDS
IRA, 401K OPTIONS
TAX INFORMATION
34A
NEWS SPARKS MARKET
248A
254A
ACCOUNT #
255A
ACCESS CODE
256A
LOGIN
257A
Dow Jones 30 Industrials (5-min Chart)
10831
10799
10767
10735
10703
11am
1pm
3pm
250A
NASDAQ Composite Index (5-min Chart)
4170
4154
4138
4122
4106
4090
4074
4058
11am
1pm
3pm
252A
NetVest's Mutual Fund Mart gives you access to over 250 fund companies and funds, including 1,265 no load funds.
258A
32A
Our no-fee IRA* combined with Fund Mart is the vehicle that will get you where you want to go. Learn more ...
260A
212
210A
214

*FIG. 4A*


MARKET HOME
FILE EDIT VIEW GO FAVORITES HELP
BACK FORWARD STOP REFRESH HOME SEARCH FAVORITES HISTORY
ADDRESS
HTTP://<ADDRESS PATH>
LINKS
238B
240B
LOGO GRAPHIC OBJECT #1
216B
218B
TEXT HEADER #1
GRAPHIC #2; LINK #1 222B
GRAPHIC #3; LINK #2 224B
GRAPHIC #4; LINK #3 226B
GRAPHIC #5; LINK #4
220B
228B
TEXT HEADER #2
GRAPHIC #6; LINK #5 230A
GRAPHIC #7; LINK #6 232B
GRAPHIC # 8; LINK #7 234B
LINK #8
LINK #9
LINK #10
LINK #11
244B
236B
242B
ADD BANNER GRAPHIC OBJECT #9
246B
HEADLINE OBJECT
248B
254B
GRAPHIC OBJECT #11
INPUT 1 255B
INPUT 2 256B
LOGIN
257B
GRAPHIC OBJECT #10
250B
GRAPHIC OBJECT #12
252B
TEXT OBJECT #1
258B
TEXT OBJECT #2
260B
212
214
210B

*FIG. 4B*


MARKET HOME
262
238D
214D
264
246C
238C
238B
240C
240B
242C
242B
244C
244B
248D
246C
216B
246B
250D
254D
248C
248B
218C
218B
222C
222B
250C
254C
254B
255C
255B
252C
224C
224B
256C
256B
257B
250B
226C
226B
257C
252C
228C
228B
258D
220C
220B
252B
230C
230A
258C
260C
232C
232B
258B
260C
234C
234B
260B
212
214
210C

FIG. 4C



MARKET HOME
130, 0
266
262
214D
214C
264
0, 0
266
0, 0
266'
250D'
250D
268'
20, 225
252D'
150, 225
252D
268
250C
H1 = 180
270'
20, 425
250B
252C
150, 425
270
H2 = 200
252B
W = 350
212
210D
214


FIG. 4D


MARKET HOME
EDIT VIEW GO FAVORITES HELP
BACK FORWARD STOP REFRESH HOME SEARCH HISTORY
ADDRESS HTTP://<ADDRESS PATH> LINKS
BULLMARKET.COM
ARKETS
DOW
ASDAQ
PTIONS
HARTS
ESTMENTS
UAL FUNDS
RA, 401K
)PTIONS
TAX
ORMATION
NEWS SPARKS MARKET
Dow Jones 30 Industrials (5-min Chart)
10831
10799
10767
10735
10703
11am
1pm
3pm
NASDAQ Composite Index (5-min Chart)
4170
4154
4138
4122
4106
4090
4074
4058
11am
1pm
3pm
ACCOU
ACCESS
LOG
NetVest's Mutual Fund Mart gives you access to over 250 fund companies and funds, including 1,265 no load funds.
Our no-fee IRA* combined with Fund Mart is the vehicle that will get you where you want to go. Learn more
210E

*FIG. 4E*



262'
MARKET HOME
-ΔY
216C
262
216B
-ΔX
238C
238B
240C
240B
242C
242B
244C
244B
246C
246B
264
218C
218B
248C
248B
222C
222B
224C
224B
226C
226B
228C
228B
220C
220B
230C
230A
232C
232B
234C
234B
250C
250B
252C
252B
254C
254B
255C
255B
256C
256B
257B
257C
258C
258B
260C
260B
266
210F


FIG. 4F


262'
MARKET HOME
-ΔY
262
264
-ΔX
250D"
252D"
150 * SF - ΔX , 225 * SF - ΔY
268"
250C'
H1' = 180 * SF
250B'
252C'
150 * SF - ΔX , 425 * SF - ΔY
270"
H2' = 300 * SF
252B'
W' = 350 * SF
212'
210G
214'
266

*FIG. 4G*


PARSE HTML CONTENT TO IDENTIFY LAYOUT INFORMATION TAGS
150
SEPARATE CONTENT INTO OBJECTS AND DEFINE BOUNDING BOX FOR EACH OBJECT
152
DEFINE PAGE LAYOUT BASED ON BOUNDING BOXES
154
DEFINE DATUM POINT FOR PAGE AND FOR EACH OBJECT BOUNDING BOX
156
GENERATE VECTOR FROM PRIMARY DATUM TO BOUNDING BOX DATUM FOR EACH OBJECT
158
CREATING A REFERENCE THAT LINKS EACH OBJECT TO ITS VECTOR AND BOUNDING BOX
160

*FIG. 5*


GATHER VECTOR REPRESENTATION DATA CORRESPONDING TO WEB PAGE
160
BUILD DISPLAY LIST OF VECTORS
162
DETERMINE USER-SELECTABLE ZOOM SCALE AND OFFSET
164
PROCESS VECTORS AND BOUNDARY BOXES TO DETERMINE VIRTUAL LAYOUT OF DISPLAY; DETERMINE DISPLAY LIMIT BOUNDING BOX
166
RETRIEVE CONTENT CORRESPONDING TO OBJECTS HAVING AT LEAST A PORTION OF THEIR BOUNDING BOXES FALL WITHIN THE DISPLAY LIMIT BOUNDING BOX
168
SCALE CONTENT; SCALE BITMAPS, RETRIEVE/ BUILD APPROPRIATE FONTS; SCALE SEPARATOR LINES AND BORDERS
170
RENDER THOSE PORTIONS OF SCALED CONTENT FALLING WITHIN THE DISPLAY LIMIT BOUNDING BOX
172

*FIG. 6*




FIG. 7A


Palm IIIc
Clear View
Marketplace
Yahoo! PayDirect - send and receive money online
Get your own Web domain
Y! Travel - buy tickets, check arrival times
Broadcast Events
7pm ET : Nets vs. 76ers
8pm : Penguins vs. Stars

*FIG. 7B*




FIG. 8A




FIG. 8B




*FIG. 9A*


Palm IIIc
Text
graphics
May Resign (AP) - President Joseph Estrada's hold on power fell apart as military and political allies abandoned him and hundreds of thousands of Filipinos threatened to march on the presidential palace at dawn Saturday to force him out. The former movie star, beleaguered for months by corruption allegations, was reportedly negotiating over terms for his resignation. More ...
* Chronology of Philippine corruption scandal (AFP)
abc
123

FIG. 9B

# SCALABLE DISPLAY OF INTERNET CONTENT ON MOBILE DEVICES

## RELATED APPLICATIONS

The present application is a Divisional Application of U.S. application Ser. No. 09/878,097, filed Jun. 8, 2001, now U.S. Pat. No. 7,210,099, which is a Continuation-in-Part of U.S. Non-Provisional application Ser. No. 09/828,511, filed Apr. 7, 2001, now abandoned, entitled "RESOLUTION INDEPENDENT VECTOR DISPLAY OF INTERNET CONTENT," the benefit of the filing date of which is claimed under 35 U.S.C. § 120. This application further claims the benefit of the filing dates of U.S. Provisional Application No. 60/211,019, filed Jun. 12, 2000, entitled "METHOD AND SYSTEM FOR RESOLUTION INDEPENDENT DISPLAY OF HTML AND XML CONTENT" and U.S. Provisional Application No. 60/217,345, filed Jul. 11, 2000, entitled "METHOD AND SYSTEM FOR SELECTION, RETRIEVAL, AND CONVERSION OF COMPUTER CONTENT TO VECTOR FORMAT FOR RESOLUTION INDEPENDENT DISPLAY," under 35 U.S.C. § 119(e).

The present application is also related to U.S. application Ser. No. 11/735,477 filed on Apr. 15, 2007, U.S. application Ser. No. 11/735,482 filed on Apr. 15, 2007, U.S. application Ser. No. 11/738,486 filed on Apr. 21, 2007, and U.S. application Ser. No. 11/738,932 filed on Apr. 23, 2007, each of which are continuations of U.S. application Ser. No. 09/878,097, now U.S. Pat. No. 7,210,099.

## COPYRIGHT NOTICE

Contained herein is material that is subject to copyright protection. The copyright owner has no objection to the facsimile reproduction of the patent disclosure by any person as it appears in the Patent and Trademark Office patent files or records, but otherwise reserves all rights to the copyright whatsoever.

## BACKGROUND OF THE INVENTION

1. Field of the Invention

The invention relates generally to translation of Internet and World Wide Web content to scalable vector representation. More particularly, the invention relates to apparatus and methods for zoom enabling the display of content in an Internet information browser by retrieving and translating HyperText Markup Language (HTML), extensible Markup Language (XML), and other Internet content to vector representations of that content.

2. Description of the Related Art

Text only Internet information browsers began as a project at the CERN, European Organization for Nuclear Research, facility in Geneva Switzerland. From its inception the intent was to provide a mesh or web of access to data with a common user interface. Browsers moved from the academic environment when NCSA, the National Center for Supercomputing Applications at the University of Illinois in Urbana-Champaign developed Mosaic, an Internet information browser and World Wide Web client.

Internet content is stored in multiple file formats. These formats include HTML (Hyper Text Markup Language) and XML (extended Markup Language) as well as graphic file format GIF (Graphics Interchange Format) and JPEG (Joint Photographic Experts Group). These four file formats constitute the majority of Internet content. Font size and resizing display area for content can alter the size of the display of



Internet content in existing browsers. The majority of Internet content displays as a flat single resolution with no browser support for zoom.

Much of the Internet content has been designed for display on desktop computers with a single target resolution. Even though HTML has the ability to adapt to changes in screen resolution, major Internet content providers have chosen to create their Web pages using fixed resolution structures, such as tables. This gives them the ability to control the look and feel of their Web sites. This fixed resolution approach has evolved to the point that the fixed resolution layout of Web pages has become the most common method to brand or uniquely identify Web sites. While this fixed resolution approach is good for site branding and product differentiation it does present a daunting technical problem for display of Internet content (designed for desktop computers) on small screen, low resolution, or different aspect ratio devices, such as cell phones and hand held computers.

## BRIEF SUMMARY OF THE INVENTION

In accordance with aspects of the invention, mobile devices enabled to support resolution-independent scalable display of Internet (Web) content to allow Web pages to be scaled (zoomed) and panned for better viewing on smaller screen sizes are disclosed. The mobile devices employ novel processing of original Web content, including HTML-based content, XML, cascade style sheets, etc. to generate scalable content. The scalable content and/or data derived therefrom are then employed to enable the Web content to be rapidly rendered, zoomed, and panned. Moreover, the rendered displays provide substantially the same or identical layout as the original Web page, enabling users to easily navigate to selected content and features on familiar Web pages. Display lists may also be employed to provide further enhancements in rendering speed. Additionally, hardware-based programmed logic may also be employed to facilitate various operations.

According to further aspects, some mobile devices may employ touch-sensitive display screens that enable users to provide various inputs to control display of content within Web pages. Exemplary user inputs include tap-based inputs to selectively zoom in on columns, images, and paragraphs. Users can also define a window to zoom in on via the touch-sensitive display.

According to additional aspects of the invention, methods and software for enabling support for resolution-independent scalable display of Web content are provided. The methods and software enable users of various devices, from handheld devices with small screens, to desktop PC's and laptops, to very large screen devices, to view and interact with Web pages in a manner independent of the screen resolution of such device's built-in or associated display, while maintaining the look and feel of browsing such pages with a conventional desktop browser. Thus, users of various devices having different screen resolutions are enabled to browse Web pages from among literally billions of Web pages while providing a full Web browsing experience.

Other features of the present invention will be apparent from the accompanying drawings and from the detailed description that follows.

## BRIEF DESCRIPTION OF THE DRAWINGS

The appended claims set forth the features of the invention with particularity. The invention, together with its advan-

tages, may be best understood from the following detailed description taken in conjunction with the accompanying drawings of which:

FIG. **1**A is a block schematic diagram illustrating a first exemplary system infrastructure in accordance with the present invention in which content translation services are performed by a third-party proxy service that translates content requested from a client that is retrieved from one or more network resources into a scalable vector representation and delivers the translated content to the client;

FIG. **1**B is a block schematic diagram illustrating a second exemplary system infrastructure in which the translation of content is performed at a content provider's web site and delivered directly to the requesting client;

FIG. **1**C is a block schematic diagram illustrating a third exemplary system infrastructure in which content received from one or more network sources is translated into a scalable vector representation at the client;

FIG. **2**A is a flowchart illustrating how data is retrieved, processed and transferred in accordance with the system infrastructure of FIG. **1**A;

FIG. **2**B is a flowchart illustrating how data is retrieved, processed and transferred in accordance with the system infrastructure of FIG. **1**B;

FIG. **2**C is a flowchart illustrating how data is retrieved, processed and transferred in accordance with the system infrastructure of FIG. **1**C;

FIG. **3** is a block schematic diagram illustrating an exemplary architecture corresponding to the proxy server of FIG. **1**A;

FIG. **4**A is a representation of an exemplary web page has displayed on a conventional browser;

FIG. **4**B is a schematic diagram illustrates various objects that are generated based on the HTML code of the web page of FIG. **4**A;

FIG. **4**C is a schematic diagram illustrating a set of vectors and bounding boxes corresponding to the objects generated in FIG. **4**B;

FIG. **4**D is a schematic diagram illustrating how various vectors and bounding boxes may be defined in accordance with the invention;

FIG. **4**E is a representation of the web page of FIG. **4**A after it has been offset and scaled in accordance with the invention;

FIG. **4**F is a schematic diagram illustrating new datum points and bounding boxes corresponding to the scaled and offset web page;

FIG. **4**G is a schematic diagram illustrating new vectors and bounding box parameters for a pair of objects in the scaled and offset web page;

FIG. **5** is a flowchart illustrating the logic used by the invention when translating content into a scalable vector representation of that content;

FIG. **6** is a flowchart illustrating client-side operations that are performed to create a rendered display page based on the translated content the client receives and user-input;

FIGS. **7**A and **7**B are representations of a nominal and a zoomed in column view of an exemplary web page as they might appear on a Palm device;

FIGS. **8**A and **8**B are representation of nominal and zoomed in view of an exemplary graphic image as they might appear on the Palm device;

FIGS. **9**A and **9**B are representations of a nominal and zoomed in view of a text portion of a web page as they might appear on the Palm device; and

FIG. **10** illustrates an exemplary computer system that may be used for implementing various aspects of embodiments of the invention.

## DETAILED DESCRIPTION OF THE INVENTION

Apparatus and methods are described for creating resolution independent vector display of Internet content to allow it to be scaled (zoomed) larger and smaller for better viewing or to fit any resolution or screen size. In addition, infrastructure and methods are provided for delivering such content to clients.

In the following description, for the purposes of explanation, numerous specific details are set forth in order to provide a thorough understanding of the present invention. It will be apparent, however, to one skilled in the art that the present invention may be practiced without some of these specific details. In other instances, well-known structures and devices are shown in block diagram form.

The present invention includes various operations, which will be described below. The operations of the present invention may be performed by hardware components or may be embodied in machine-executable instructions, which may be used to cause a general-purpose or special-purpose processor or logic circuits programmed with the instructions to perform the operations. Alternatively, the operations may be performed by a combination of hardware and software.

The present invention may be provided as a computer program product that may include one or more machine-readable mediums having stored thereon instructions, which may be used to program a computer (or other electronic devices) to perform a process according to the present invention. The machine-readable medium may include, but is not limited to, floppy diskettes, optical disks, CD-ROMs, and magneto-optical disks, ROMs, RAMs, EPROMs, EEPROMs, magnetic or optical cards, flash memory, or other type of media/machine-readable medium suitable for storing electronic instructions. Moreover, the present invention may also be downloaded as a computer program product, wherein the program may be transferred from a remote computer (e.g., a server) to a requesting computer (e.g., a client) by way of data signals embodied in a carrier wave or other propagation medium via a communication link (e.g., a modem or network connection). Accordingly, herein, a carrier wave shall be regarded as comprising a machine-readable medium.

### Client Overview

According to one embodiment, an ultra-thin client-side viewer provides the graphics, linking, caching, and function handling capabilities necessary for extending the web to almost any platform. It is designed as a lightweight browser (micro-browser) running directly on device operating systems. In alternative embodiments, the client-side viewer may be deployed as a standard browser plug-in, or Java applet for extending browser functionality. In one embodiment, the client-side viewer attains its small size and efficiency by taking advantage of the power of SVF (Simple Vector Format) to describe almost any current web content. SVF files can be handled with a tiny fraction of the client code required by normal web browsers because current browsers must interpret a large and growing number of file types and their idiosyncrasies. SVF was originally designed to handle a superset of the most commonly used file formats in the complex world of CAD. It can accommodate not only new graphical functions, but the storage and transfer of almost any foreseeable new functional capability. SVF has been under consideration by the W3C (World Wide Web Consortium) for adoption as a standard for vector content on the World Wide Web.

By working tightly with a server-side content translator, web content and functionality can be passed seamlessly to the end user platform without any degradation in the look or feel of the output. In addition, because the resulting file graphics

are handled as vectors, the end user can control real time changes in the size of text and graphics as well as what portion of the file is viewable in the display. This "zoom and pan" capability, familiar to CAD and other vector content software users, adds dramatically to the usability of non-standard display sizes. For very small displays, real time zooming and panning allows the user to see graphics and text at sizes that make them easily readable, and then "back up" to view an entire page for context or pan in any direction for navigation. Because the client-side viewer manipulates vectors, there is no loss in quality as the display is zoomed. The graphics rendering engine within the client is so efficient that file manipulation happens in a fraction of a second. There is no perceptible wait for the user as the file is resized, or the window is repositioned. Content created for one display resolution now can be sized, real time, for any other display without degradation. Besides making small displays eminently usable, this technology extends web content into some surprising new arenas. For example, it enables normal desktop displays to be effective for individuals with visual impairment, or for content designed for 640×480 standard PC monitors to be shown without degradation on web billboards now appearing in cities like Seattle and San Francisco.

With a client of such extraordinary power packed in a tiny footprint, end user device manufacturers can free up valuable memory space for pre-fetching, caching and pre-loading content, dramatically improving performance for use in low bandwidth and portable applications. In the example of a wireless handheld device where expensive flash memory must be used instead of more cost effective bulk storage technology, the difference between consuming 10's of megabytes of flash memory with a standard browser versus running the client-side viewer described herein is dramatic.

Those "saved" megabytes of memory are now available for impressive interfaces, caching of often used content, and pre-fetching of intelligently selected linked files or pre-loading of content for targeted applications. For example, in a mapping application, the map tiles surrounding the viewed map could be downloaded and stored while the user was working with the initial tile, enabling an experience remarkably free from the current frustrations of waiting for a new map to be transferred for even the smallest change in magnification or coverage. If the user knows ahead of time what city they will visit on a business trip, maps and additional travel information in great detail could also be pre-loaded using a high bandwidth connection at home or in the office before heading out to shop or conduct business in the city. Additionally, SVF is a more efficient way to store web content. Resulting content files are reduced in size by anywhere from 20 to 80 percent over their source. SVF is also very compressible. With target file size reduction in the range of 90%, SVF files can take up as little as $1/10^{th}$ the space of the web files in current use. This means that pre-translated content can be moved up to 10 times the rate of current web pages, and as much as 10 times as many pages, maps, stock charts, etc. can be stored for instant retrieval on the hand held platform as can be handled with current web technology.

When used on content created natively in SVF, additional capability can be extended to the client-side viewer.

Graphing the performance of stocks over time is only one use of SVF's ability to handle streams of data. Handling the output from financial systems, transactional systems, ERP packages, and CRM systems becomes easier and more flexible. Of course, systems integrators don't have to use these powerful capabilities to start with. If the target system provides web interfaces, these can be viewed, as designed, with no additional software to write, and no changes to the design or layout of the interface.



Server Overview

Enabling the client-side viewer to be so small and powerful is the server-side content translator. The server-side content translator rapidly translates Web content to SVF, compresses and encrypts the SVF results if desired, and transfers the vector formatted results to the client-side viewer. Alternatively, SVF files can be cached or stored in a file system for fetching and transfer at a later time. Pre-translated or cached content transfers are significantly faster as no conversion overhead is incurred, and file sizes are reduced using the more efficient SVF. Combine that with standard compression algorithms selectable for use with the client-side viewer for additional performance improvements.

During the translation process, and in the process of serving cached, pre-translated, or native SVF content, output files are "streamed" to the client-side viewer. Although this does not decrease the total time for file transfer, it can significantly improve the effective system performance for the end user. Content can be selectively streamed, with text and links coming through first, followed by graphic images and other content, for example. Should the user be accessing a link, rather than having interest in the entire file served, links can be selected early in the transfer and the next file download started immediately. In addition to streaming, the server-side content converter may also layer the content by type. This means that text can be put in one layer, links in another, GIF images in another, Javascript in another and so on. Layers can be turned on or off depending upon client capabilities, making files for less capable clients, or for users interested in a reduced functionality, higher transfer performance mode to be handled automatically.

All operational modes may be controlled through an administrative interface or accessible through a straightforward API (Application Program Interface). Furthermore, the system works with existing firewalls and within standard security protocols. In more secure modes, the server-side content converter and the client-side viewer may operate using Public/Private key authentication and encryption.

Exemplary System Infrastructures

In the following paragraphs, a description of three exemplary system infrastructures is provided. Schematic illustrations of these system infrastructures are shown in FIGS. **1**A, **1**B, and **1**C. It is noted that like-numbered components in these Figures perform substantially the same function. Therefore, any discussion of the functions of a component with reference to one or more of the infrastructures generally may apply to the other infrastructures as well, unless specifically noted otherwise.

A first of exemplary system infrastructure **10**A for implementing the invention is shown in FIG. **1**A. Infrastructure **10**A enables various clients, including wireless devices such as a cellular phone **12**, a wireless-enabled PDA **14**, and a wireless-enabled laptop computer **16**, as well as landline computers **18**, **20**, and **22**, to request content that is accessible via a network such as the Internet **24** to be retrieved from selected network resources, including web servers **26** and **28** and an FTP site **30**, wherein the content is translated into a scalable vector representation (e.g., SVF, also referred to herein as "vectorized content") through use of a proxy server **32** and sent to the requesting client. Upon being received by the client, the vectorized content is processed and rendered using a thin client to enable a user to view the content on the client device.

With reference to the flowchart of FIG. **2**A, the foregoing process is initiated by a client in a block **100**, wherein the client submits a request to proxy server **32** to retrieve and convert selected content. As depicted by a transfer path **34**, this comprises sending data **36**, which includes content network location indicia from which the content can be retrieved and proxy server network location information by which the content request may be delivered to over Internet **24** to proxy server **32**. Typically, it will be desired to retrieve a particular web page. Accordingly, the content network location indicia will comprise a URL (uniform resource locator) for the web page. Similarly, the proxy server network location information may also comprise a URL corresponding to a network access point for the proxy server. Optionally, the location information may comprise a network IP address for one or both of the content location and the proxy server location. If the content is to be retrieved from an Internet resource, the request will typically be sent using the HyperText Transfer Protocol (HTTP) over the TCP/IP transport.

Next, in a block **102**, the request is received by the proxy server and the proxy server checks its cache to see if it already has the request content in its cache. If it does, it sends this cached content back to the client. If it does not have the requested content cached, the proxy server sends out a request to retrieve the content from the network resource. For illustrative purposes, it will be assumed for the present example that the desired content comprises a web page that is stored on web server **26**. Typically, when the requested content comprises a web page, the content may be retrieved using conventional web content retrieval techniques, such as that employed by various modem browser clients, including Netscape Navigator and Internet Explorer. This generally comprises providing routing information, such as the URL for the web page (URL **38**) to routing services provided by Internet **24**, which routes the request to an appropriate network resource (e.g., web server **26**), as depicted by a transfer path **40**.

Typically, the URL will correspond to a web page whose content is stored by the web server in an HTML (HyperText Markup Language) document comprising HTML code and embedded text content, in addition to other optional content languages, that may contain references to other objects (e.g., HTML documents and graphic image files) stored locally to the server or stored on a remote server. For example, the HTML content corresponding to a single-frame web page is often stored in a single file, while multiple-frame web pages may comprise content that is stored in a single file or in multiple files. These files may be stored locally on the web server (e.g., on one of the server's hard disks), or on a local storage device connected to the web server via a local area network (LAN), such as a network attached storage (NAS) filer. Optionally, some of the web page's content may comprise one or more documents that are stored at remote locations that may be accessed via a WAN (wide area network) or the Internet.

HTML is a standardized language that describes the layout of content on a web page, and attributes of that content. This layout and attribute information is defined by sets of tags contained in HTML code corresponding to the page. The tags define various HTML layout and display information, including tables, paragraph boundaries, graphic image positions and bounding box sizes, typeface styles, sizes, and colors, borders, and other presentation attributes. A portion or all of a web page's text content may be contained in the parent HTML document corresponding to the URL. In addition to basic HTML, web page documents may contain XML (eXtensable markup language) code, as well as scripting language code, such as javascript. However, for simplicity, any documents containing web page content other than only graphic content that are discussed herein will be referred to as HTML documents.

In addition to HTML and other markup and scripting language content, it is very common for web pages to include graphical content. In general, graphical content is usually stored in an image file or files that are external from the parent HTML document for the web page. For example, the parent HTML document may contain one or more embedded image tags that reference the location where those images are stored. As before, the graphic images may be stored locally, or may be stored on remote servers that are accessed by the web server via a WAN, or the Internet. These files will typically comprise data stored in one of several well-known graphic formats, including bitmap files (BMP), GIF (Graphics Interchange Format) files, and JPEG (Joint Photographic Experts Group) files.

In response to receiving the request for content, web server **26** begins sending a parent HTML document **42** back to proxy server **32** in a block **104**. In a block **106**, the HTML content of the parent HTML document is parsed to search for references to external objects such as HTML frames and graphics. In a decision block **108**, a determination is made to whether any references are found. For each reference to an external object that is found, proxy server **32** requests to have the object retrieved from an appropriate network resource (e.g., a web server) in a block **110**, and data corresponding to the object is transmitted back to the proxy server, as depicted by locally accessible HTML documents **44** and graphic images **46**, as well as remotely accessible HTML documents **48** and graphic images **50**, which may be accessed via web server **28**. If the external object is a graphic image, there is no further processing of the object at this point. If the object is an HTML document, the functions provided by blocks **106** and **108** are repeated. Generally, this set of processing functions is repeated iteratively until all of the external objects are retrieved. However, as described below, there will be some instances in which certain objects will be retrieved at a later point in time. In addition to content stored on web servers that are accessed using HTTP, content may also be retrieved from various network sites using the File Transfer Protocol (FTP), such as FTP documents **51**, which are accessed via FTP server **30**.

In general, HTML documents and graphic files will be sent as packetized data streams using HTTP over one or more TCP/IP network connections, wherein the data streams will usually be asynchronous. Retrieval of HTML documents and graphic files corresponding to the embedded references will usually require additional transfer time. Furthermore, graphic content oftentimes comprises significantly larger file sizes than HTML content, leading to significant transfer times in some instances. For simplicity, the transfer of the various HTML documents and graphic files for the content request are depicted by HTML documents **52** and graphic documents **54**, which are transferred over a transfer path **56**.

When the HTML documents and graphic content are received by proxy server **32**, a scalable vector representation of the web page is generated in a block **114** by an HTML translator **58**. In brief, HTML translator **58** translates HTML, XML, and cascaded style sheet (CSS) layout content into a scalable vector representation, such as SVF. Details of the HTML translation process are contained below. In addition, the graphic images are converted into a compressed bitmap format in a block **116** by a graphics translator **60**. The vectorized content **62** and compressed bitmaps **64** are then streamed back to the client (i.e., computer **18**) in a block **118**,

as depicted by a transfer path **66**. In one embodiment, the content portions are sent in separate streams using multiple connections. In another embodiment, the content portions are sent via a multiplexed stream using a single connection. As the vectorized content and compressed bitmap data are received by the client device, they are processed by a thin client **68** running on the client device, whereby a representation of the original web page content may be rendered on the client device's display screen at various user-selectable scaled resolutions and pan offsets in a block **120**, thereby enabling a user to more clearly see an overview or details in the web page. Further details of the client side processing are provided below.

As discussed above, wireless clients may also access the vectorized network (e.g., web site) content provided via proxy server **24**. The majority of this process is identical to that described above for land-line clients (e.g., computers **18**, **20**, and **22**), except for provisions required for sending data to and receiving data from wireless devices. In general, most wireless devices will access the Internet via a wireless service provider (i.e., a wireless telecommunications carrier) that is particular to that wireless device. Accordingly, a portion of the transmission path to and from proxy server **24** will comprise infrastructure provided by that service provider and/or shared with other service providers. For simplicity, this infrastructure is shown as a cellular tower **70** and a service provider data center **72**, although it will be understood by those skilled in the art that the connection path may comprise additional infrastructure components, including appropriate gateways and routers, that enable wireless devices to access proxy server **24**.

In some implementations, there will be no special formatting/protocol services that need to be performed by proxy service **24**—from the viewpoint of the proxy service, it will be immaterial whether the client is a land-based or wireless client; the special handling provisions for wireless devices will be handled entirely by the service providers infrastructure transparently at both ends of the communications path. In other instances, it may be desired or necessary to reformat the data content delivered to the wireless device at the proxy service. This will generally be dependent on the particular wireless protocol used, and what services are provided by the service provider for the wireless client.

Currently, in the United States, wireless clients generally access Internet **24** by using the Wireless Application Protocol (WAP). In Japan, the most popular access means is NTT DoCoMo's i-Mode wireless protocol. In addition to these wireless standards, new standards are anticipated to be in force in the near future, including NTT DoCoMo's FOMA (Freedom of Mobile Multimedia Access), which is transported over W-CDMA (Wideband Code Division Multiple Access), and CDMA-2000. For the purposes of the invention herein, it will be understood that those skilled in the mobile telecommunications arts will be knowledgeable about any particular format and/or transport protocol requirements that pertain to the particular protocol that is to be used.

A second exemplary system infrastructure **10**B for implementing the invention is shown in FIG. **1**B. As will be readily recognized, much of infrastructure **10**B is similar to infrastructure **10**A; however, rather than have a separate proxy server perform the proxy functions (retrieve and translate content), these functions are performed on machines operated by the web site in infrastructure **10**B.

The logic implemented by the invention when providing content to a client using infrastructure **10**B is illustrated in the flowchart of FIG. **2**B, wherein the process begins in a block **101** in which the client sends a content request **39** directly to the network site (e.g., web server **26**), as depicted by a transfer path **41**. In a block **103**, HTTP negotiations are performed to determine the format the content is to be delivered in. For example, the request may contain indicia identifying the type of content requested, such as an SVF MIME type (e.g., image/vnd.svf). This is to inform the web server that the request is for specially-formatted content rather than conventional content. The server first checks to see if it already has cached the requested content. If it has, it sends the content to the requesting client; otherwise, it retrieves the parent HTML document in a block **107**. It then performs processing steps in blocks **107**, **109**, and **111** to retrieve content referenced through embedded tags in a manner substantially similar to that discussed above with reference to respective blocks **106**, **108**, and **110**. The primary difference in this instance is that the web server does not receive requests from or send documents to a proxy server—rather, the content is retrieved and processed at the web server, wherein the retrieved content may be stored local to the web server or retrieved from a remote server in a manner similar to that described above.



As before, the retrieved HTML documents are translated into scalable vector representations by HTML translator **58** in a block **114**, while the graphic images are translated into a compressed bitmap format by image translator **60** in a block **116**, as depicted by vectorized content **62** and bitmap content **64**. The vectorized content and bitmap content are then streamed from the web server to the client in a block **119**, as depicted by a transfer path **67**. Upon arriving at the client, the vectorized content and bitmap content are processed, scaled, and rendered on the client in a block **120**.

A third exemplary system infrastructure **10**C for implementing the invention is shown in FIG. **1**C. In this configuration, the proxy functions are performed at the client. As shown by a block **113** in FIG. **2**C, the process for providing vectorized content to a client in accordance with infrastructure **10**C begins in a block **113**, in which the client sends a content request **37** to a network site, such as web server **26**, via Internet **24**. In response, the network site retrieves the parent HTML document and sends it to the requesting client in a block **115**. In a manner similar to that discussed above with reference to blocks **106**, **108**, and **110** of FIG. **1**A, the client first parses the parent HTML document searching for embedded references to external objects and retrieves these objects, whereupon the embedded reference search is performed on the newly retrieved document until all of the content corresponding to the original content request has been retrieved. This content is depicted by HTML documents **52** and image files **54**, which are sent from the network site to the client via a transfer path **69**. At this point, the client performs translations on the HTML content and the graphic image content that are substantially similar to that performed by the proxy server in FIG. **1**A or at the web site in FIG. **1**B, as provided by blocks **114** and **116**. The vectorized and image content is then processed and scaled by thin client **68** in a block **120**, as depicted by device output **71**.

Attention now is focused on the functionality provided by proxy server **24** in system infrastructure **10**A of FIG. **1**. Fundamentally, the proxy server functions as a proxy. It accepts requests for content from client devices as full URLs using standard HTTP mechanisms carried over a multiplexed TCP connection. Standard HTTP content negotiations features specify the formats in which content is to be delivered (SVF, bitmap, and possibly others, which can be handed off to cooperating client-side display software). As described in further details below, in some embodiments the proxy server appears for the client as a normal proxy (that is, the client

knows it is retrieving content via the proxy), while in other embodiments the proxy is transparent to the client.

The proxy server responds to client content requests by delivering content in one of the requested formats, by retrieving the content in an appropriate format from its cache, or from an upstream content source (again using standard HTTP content negotiation features), or by translating upstream content from a supported original format to SVF or the client bitmap format.

Requests from the server installation to its cache and from the cache to upstream content sources are made in HTTP carried over TCP using simple straightforward Web content requests. For example, requests from clients to the proxy server comprise HTTP proxy requests (e.g., "GET http://www/xyz.com/some_page.html HTTP/1.0 . . . ") carried over TCP or over a lightweight multiplexing protocol over TCP. The multiplexing protocol allows the server to push image thumbnails to the client before the SVF stream is available, as well as offering a channel for control and status information, more simultaneous channels than the client operating system may support, and a mechanism for prioritizing information flow from server to client under loose client control. In addition to HTTP requests, the proxy server architecture supports other user-level protocols, such as FTP and Gopher.

Details of some of the primary components of the proxy server architecture are shown in FIG. **3**. Internally, the proxy server comprises a suite of coordinated processes connecting to upstream content through an HTTP cache **74**. In one embodiment all functions except caching are performed in a single process, wherein multiple threads are used to effect asynchronous I/O. Separate processes communicated via persistent multiplexed connections carried over the most efficient reliable transport available (e.g., Unix sockets over single processor and symmetric multiprocessor (SMP) computers; TCP sockets between separate computers). All processes are capable of servicing multiple requests simultaneously. No process maintains client state outside the context of a single request, so all components can be repeated and load balanced across multiple CPU's of an SMP computer or across separate computers on a LAN.

The various content translators used by the proxy server accept (via HTTP PUT) or request (driven by HTTP proxy GET/POST) content in supported, but client-unsupported, formats; and return (via HTTP PUT or GET/POST response) one or more representations of that content in a client-supported format. In the embodiments illustrated in FIG. **1**A-C, two translators are used: HTML translator **58** and image translator **60**. Future content types may be accommodated by new translators, by extending existing translators to cover the new content types, or by extending the client's capabilities. Standard HTTP content negotiation mechanisms are used to inform the proxy server of the client's capabilities and expectations on each request.

Managers at the proxy server coordinate the operations of other components. Two managers are presently defined; a client manager **73** that handles client proxy requests, and a request manager **75** that handles unproxied HTTP requests from other services. The managers accept requests, attempt to service them from HTTP cache **74**, and drive HTML translator **58** and image translator **60** when content does not match the clients' requirements. Managers also handle translator requests for inline content (e.g., image dimensions for page layout), and push translated content into HTTP cache **74**. Additionally, the client manager coordinates delivery of primary and inlined content, and provides process and status information to the clients.

As discussed above, HTML translator **58** creates a scalable vector representation of the original HTML content of a requested web page. In order to better explain how translation of HTML content is performed, one embodiment of a translation process is described below as applied to an exemplary web page. In addition, details of conventional web page client and server-side processing are provided so as to clarify how web content is laid out during a pre-rendering process on the client.

FIG. **4** shows a representation of a web page **210** served from an exemplary stock brokerage Internet web site as it would appear when rendered on a modern Internet browser, such as Microsoft's Internet Explorer or Netscape's Navigator. Web page **210** is exemplary of many web pages that implement frames, and includes two adjacent frames **212** and **214**. A logo graphic object **216**A is displayed at the top of frame **212**, which additionally includes a "MARKETS" text header **218**A, an "INVESTMENTS" text header **220**A, and a plurality of links with overlaying graphic objects, including a "DOW" link **222**A, a "NASDAQ" link **224**A, an "OPTIONS" link **226**A, a "CHARTS" link **228**A, a "MUTUAL FUNDS" link **230**A, a "IRA, 401K OPTIONS" link **232**A, and a "TAX INFORMATION" link **234**.

A horizontal group of links **236** is disposed at the top of frame **214**, and includes a "QUOTES" link **238**A, a "HOT PICKS" link **240**A, a "CALENDARS" link **242**A, and a "NEWS" link **244**A. An advertisement banner **246**A is displayed just below the horizontal group of links and just above a "NEWS SPARKS MARKET" headline **248**A. Frame **214** also includes a pair of graphic image objects, including a DOW chart **250**A and a NASDAQ chart **252**A. A set of user input objects is disposed adjacent to DOW chart **250**A within a graphic object **254**A, including an "ACCOUNT #" input box **255**A, an "ACCESS CODE" input box **256**A, and a "LOGIN" button **257**A. In addition to the foregoing objects, frame **214** also includes text objects **258**A and **260**A.

An HTML listing corresponding to web page **210** is presented below as LISTING 1. Note that LISTING 1 sometimes refers to object descriptions and link paths rather than the text or path location of actual objects for simplicity, and that other elements commonly found in HTML pages, such as META entries, are omitted for clarity.

Listing 1

```
<html>
<head><title>"MARKET HOME"</title></head>

<body bgcolor="#FFFFFF" link="0033CC" vlink="0033CC">

<frameset cols="25%,75% frameborder=0 border=0>
<frame>
<align=left><align=top>
<img src="/directory path/logo.gif" align = left border="0" height="80" width="100">
```

-continued

```
<br><br>
<t3>TEXT HEADER #1 align=left</t3><br>
<table width="90%" border=0 cellspacing=10 cellpadding=0 bgcolor="#000000"
  align=center>
    <tr>
          <a href="URL or path for LINK #5" <img src="/directory
          path/GRAPHIC#2" height="50" width ="150></a>
    <tr>
          <a href="URL or path for LINK #6" <img src="/directory
          path/GRAPHIC#3" height="50" width ="150></a>
    <tr>
          <a href="URL or path for LINK #7" <img src="/directory
          path/GRAPHIC#4" height="50" width ="150></a>
    <tr>
          <a href="URL or path for LINK #8" <img src="/directory
          path/GRAPHIC#5" height="50" width ="150></a>
</table>
    <br>
          <t3>TEXT HEADER #1 align=left</t3>
    <br>
<table width="90%" border=0 cellspacing=10 cellpadding=0 bgcolor="#000000"
align=center>
    <tr>
          <a href="URL or path for LINK #9" <img src="/directory
          path/GRAPHIC#6" height="50" width ="150></a>
    <tr>
          <a href="URL or path for LINK #10" <img src="/directory
          path/GRAPHIC#7" height="50" width ="150></a>
    <tr>
          <a href="URL or path for LINK #11" <img src="/directory
          path/GRAPHIC#8" height="50" width ="150></a>
</table>
</frame>
<frame>
<table>
    <tr>
          <table width="100%" border=0 cellspacing=15 cellpadding=0
          bgcolor="#000000" align=center>
       <tr>
          <td><a href="URL or path for link#1"> alt="QUOTES"</a>
          <td><a href="URL or path for link#2"> alt="HOT PICKS"</a>
          <td><a href="URL or path for link#3> alt="CALENDERS"</a>
          <td><a href="URL or path for link#4>alt="NEWS"</a>
</table><br>
    <br>
          <img src="URL for GRAPHIC #9" align=center
          border="0" height="80" width="325">
    <br><t1>HEADLINE TEXT>/t1>
    <table>
       <Colgroup span="2">
          <Col width = "400" align="center">
          <Col width = "200" align="center">
          <tr><td>
                <img src="/directory path/GRAPHIC #10" align = center
                border="0" height="180" width="350">
          <td>
    /* INPUT FOR ACCOUNT NUMBER AND ACCESS CODE */
    <SCRIPT LANGUAGE ="Javascript">
    <!---
             [Javascript variable declarations]
             [Javascript functions to enable login] ---!>
    </SCRIPT>
       <table>
          <td>
             <img src="/directory path/GRAPHIC #11" align = center>
             <table width="150" height="25">
             <td>
             <font size=-2 face="arial,helvetica,verdana">Account#</font>
             <tr><input type=text name="USERID" maxlength=9 size=20>
             <tr><font size=-2 face="arial, helvetica">Access Code:</font>
             <tr><input type=password name="PASSWORD" maxlength=10 size=20
                   onKeyDown="SuppressEnterBell(event)"
                   onKeyPress="SuppressEnterBell(event)"
                   onKeyUp="SubmitOnEnter(event)">
             <br>&amp;nbsp;
```

-continued

```
89.             <br><input type="button" value="Login"
90.             OnClick="ProcessForm( )">&amp;nbsp;&amp;nbsp;<input type="reset">
91.             <br>&amp;nbsp;
92.             </td>
93.             </table>
94.         </table>
95.     <tr>
96.             <img src="/directory path/GRAPHIC #12" border="0
97.             height="200" width="350">
98.     <tr>
99.                 <p>TEXT FOR TEXT OBJECT #1</p><br>
100.                <p>TEXT FOR TEXT OBJECT #2</p>
101.        </table>
102.    </frame>
103. </frameset>
104. </html>
```

Web page documents comprise HTML code that is parsed, interpreted, and rendered by a browser. An HTML document comprises a plurality of HTML "markup" elements (tags) with corresponding attributes, that are used to describe the layout and formatting of various objects, including plain text and graphic objects, embedded between tag pairs. Exemplary elements include text tags (e.g., <b></b> for bolding text), links (e.g., <a href="URL"></a>), formatting (e.g., <p></p> for creating a new paragraph, graphical (e.g., <img src="name">), wherein "name" defines an absolute or relative location at where an image is stored, tables (e.g., <table></table>) creates a table, and forms (e.g., <form></form> creates all forms).

As of Netscape Navigator **3.0** (and other later browsers), web pages could include frames. When using frames, the display page is divided into multiple framed areas. Framing enables a single display page to include source code from several HTML documents (one for each frame) or optionally, enables a single document to include more complicated grouping of contents whereby different content groups are contained in separate frames. Frames are commonly found on the web pages at sites that display a great deal of text and graphical content, such as MSN.com, ESPN.com, and USA-Today.com.

With reference to the flowchart of FIG. **5**, the process for translating the HTML content into a scalable vector representation proceeds as follows. The process is initiated when the proxy server receives the HTML corresponding to the parent document (and frame documents, if appropriate), whereupon a pre-rendering parsing of the HTML is performed to determine where to place the various objects on the display page in a block **150**. For example, elements such as tables, column definitions, graphic images, paragraphs and line breaks are identified. If frames are included, each frame is examined in the sequential order it appears in the HTML document, or the order in which the HTML documents corresponding to the frames in a frameset are downloaded to the browser. During further processing, the actual objects are rendered in their respective positions. Some of these objects are rendered almost immediately, such as plain text, while other objects, such as graphic objects, must first be retrieved prior to being fully-rendered. With respect to tables, there are some instances in which all of the objects corresponding to the cells in the table must be retrieved prior to rendering any of the table, while a well-designed table can be rendered incrementally. For example, by using Column grouping, the format of the corresponding table can be quickly determined by the browser. In some instances, one or more bitmaps may actually need to be fetched before the page layout can be determined.

Next, in a block **152**, the content is separated into objects based on logical groupings of content portions and a page layout is built using bounding boxes that are produced for each object. As the primary HTML document is parsed, logical groupings of content will emerge. For instance, text content contained within paragraph tags <p></p> forms a logical grouping of text content. In essence, a logical grouping means the content should appear together as a logical group, such as within a substantially rectangular outline, in the rendered page. Other logical groupings include frames, table content, row content, single line entries such as headlines and headers, and user-interface objects, as well as graphic layout objects, such as separator bars, and graphic images. In addition to logically grouping content into objects, a "bounding box" is defined for each object. In general, the bounding box defines an outlined shape within which the content (text or graphic image) will appear. In most instances, the bounding box will be substantially rectangular in shape. However, bounding boxes comprising more complex shapes may also be produced.

In further detail, the following explains how objects corresponding to graphic images are produced. In HTML, objects comprising graphic content are identified by an <img src="/local directory path/graphic image file" (for a local graphic image) or "URL" (for a remote graphic image)> or <object> or other tags. In the foregoing tag, local graphic images are typically stored on the same server as the web page, or another computer that is local to the site's server, and generally are located through a local directory path (absolute or relative to the location of the present page) that points to the graphic image file. Remote images are those images that are stored on servers at sites that are remote to the web server. For example, with reference to LISTING 1, when the parser encounters line 9, the browser identifies that data comprising a graphic image corresponding to logo graphic object **1** will be arriving (or may have already been received), and the displayed image is to have a height of 80 pixels and a width of 100 pixels. The location of each object on a display page will be dependent on previous HTML layout elements, such as tables, paragraphs, line breaks, and other graphic objects. The size and location of the other graphic objects (i.e., graphic objects #**2**-**12**) on the page are determined in a similar manner. The HTML code for these objects are shown in lines **16**, **19**, **22**, **25**, **34**, **37**, **40**, **59**, **67**, **78** and **96**, respectively. As identified in the HTML code, data corresponding to graphic objects #**9** (advertisement banner **46**A) is forwarded to the browser from an external site (as indicated by the URL to GRAPHIC #**9**), while graphic objects **1**-**8** and **10**-**12** are sent from the web site the parent HTML document is sent from.

In a similar manner, the foregoing technique is applied to the HTML code in the primary document to identify other types of objects as well. In addition to parsing the primary HTML document, similar processing is performed on referenced documents, such as documents that include frame content that is defined and stored separate from the primary HTML document.

A representation of the results of the functions performed in block **152** are shown in FIG. **4**B. In the Figure, objects corresponding to the original content of FIG. **4**A are shown with an appended "B" that is added to each object's root reference number, wherein the root reference number for an object is that same as the logically grouped content in FIG. **4**A that it corresponds to, e.g., an object **248**B is generated for "NEWS SPARKS MARKET" headline **248**A, etc.

Next, in a block **154**, the page layout is defined based on the bounding boxes. In actuality, generation of the page layout information is performed in conjunction with defining the boundary boxes for the objects, wherein the location of a given object is based on the location of other related (e.g., if within a table) or non-related objects corresponding to HTML content that have been previously parsed. For example, the location of a given paragraph will depend on the other content for the page that are listed prior to the definition for the paragraph in the primary HTML document or referenced document, if applicable. As the HTML content of the primary and any referenced HTML documents are parsed, the page layout is generated based on the various HTML tags and the content embedded between tag pairs and/or referenced by a tag pair statement (e.g., graphic images).

As will be recognized by those skilled in the art, the functions performed in blocks **150**, **152**, and **154** are commonly performed by conventional browsers during a pre-rendering process. In some browsers, these functions are performed by the Mozilla rendering engine, which comprises open source software that is readily available for use by developers. At present, the software for the Mozilla rendering engine may be accessed via the Internet at www.mozilla.org. Accordingly, in one embodiment, the present invention uses core functionality provided by the Mozilla rendering engine source code to perform the functions of block **150**, **152**, and **154**.

At this point, the present invention deviates substantially from the prior art by using the various object layout data generated during the pre-rendering process to generate a scalable vector representation of the original page content. First, in a block **156**, a datum point is defined for the page and the bounding box for each object. For example, as shown in FIG. **4**C, a rendered page datum **262** is defined to be coincident with the upper left hand corner of the display frame of the rendered page for the web page. Generally, any point on the page may be used as the page datum—the only requirement is that the page datum that is selected is used consistently throughout the process. The use of the upper left hand corner of the display frame is advantageous since the location of the first object encountered in the HTML code for a page is located relative to this corner.

In general, the datum points for each object may also be located any place on the object, as long as the object datum points are used in a predictable manner. For example, as depicted in FIG. **4**C, various datum points for corresponding objects are defined to be coincident with the upper left hand corner of the bounding box for that object, wherein the object's datum point shares the root reference number of the object with an appended "C."

Once the page's datum point and an object's datum point are known, a vector between these points is generated for each object in a block **158**. With reference to FIG. **4**D, in one embodiment, wherein the page datum point corresponds to the upper left and corner of the display frame and is assigned an XY value 266 of 0,0, the vector for a given object may be stored as the XY value of the datum point of that object relative to 0,0, such as a value of 150, 225 (ref. num. **268**) for a vector **250**D pointing to an object datum **250**C, and a value of 150, 425 (ref. num. **270**) for a vector **252**D pointing to an object datum **252**C. In another embodiment, each vector may be stored as XY data relative to a 0,0 datum point corresponding to the upper left hand corner of the frame the object belongs to. For example, a vector **250**D' from a frame datum **214**D to object datum **250**C is stored as 20, 200 (ref. num. **268'**), while a vector **252**D from frame datum **214**D to object datum **252**C is stored as 20, 425. In this embodiment, offset information for each frame relative to a known datum will also be stored, as depicted by a vector **214**D.



The scalable vector representation is completed in a block **160**, wherein a reference is created for each object that includes or links an object's content and attributes, such as object type (e.g., text, image), object typeface, and boundary box parameters, to the object's vector. For example, object **250**B is a graphic image having a vector **250**D and a bounding box that is 180 pixels high and 350 pixels wide, while object **252**B is a graphic image having a vector **252**D and a bounding box that includes a height of 200 pixels and a width of 350 pixels. This enables client-side operations to be performed that only initially consider the vectors, wherein if it is determined that a vector's endpoint (and/or the bounding box corresponding to the object the vector points to) would appear off of a display, there is no need to retrieve the content and attribute data linked to the vector. This concept is explained in further detail in the following section.

It is noted that a portion of the display content produced on a client device will never contain any rendered content, as this portion is reserved for the browser's user interface. In WINDOWS™ environments, this portion will include the browser's window frame, as well as the pulldown and icon menus provided in the browser's user interface, which are depicted by a box **264** in the Figures herein.

Client-Side Software and Processing

As discussed above, the present invention supports a wide variety of clients, including land-based clients and wireless clients. Each client requires some client-side software that enables the scalable vector content data provided to it to be rendered at a user-selectable scale factor and offset on the client's display, such as a monitor or built-in LCD screen.

By enabling original content from a web site to be displaced in such a resolution-independent manner, users will be able to view content in a manner that did not previously exist, greatly enhancing the user experience. For example, in some implementations the client may be a personal computer (PC). Using a least-common denominator approach, many web pages are designed for a smaller resolution (for example 640×480 pixels, a minimum resolution commonly supported by nearly all PC's, including legacy PC's) than the resolution provided by the video output capabilities available with many of today's PC's, such as 1024×768 pixels, 1280×1024 pixels, and even 1600×1200 pixels. As a result, when these web pages are displayed on a high-resolution display, they occupy only a portion of the display, making portions of the pages, especially those portions containing small text, difficult to read. By enabling users to selectively magnify the entire page, these design flaws are easily overcome. Alternatively, the client may be a small device, such as a hand held computer or a cell phone, which has a smaller display resolution than common Web pages are designed for. As explained below, through use of the invention's scalable vector representation

and client-side processing, users are enabled to view the entire content of billions of existing Web pages using hand-held devices in a simple and reasonable way.

In one embodiment, the client software may be a plug-in to a Web browser, such as Netscape Navigator or Microsoft Internet Explorer. Such a plug-in might have the browser download the data and display it in a sub-window of the browser. Alternatively, the client software may be a Java applet running in a browser. As another option, the client software may be a stand-alone program that interfaces with the proxy server or proxy software directly. The client software may bypass the proxy when requesting information that won't be translated to vectors, such as bitmaps.

With reference to FIG. **6**, client-side processing proceeds in the following manner. In a block **160**, the vector representation data (i.e., vectorized HTML content and compressed bitmap content) for the web page is gathered at the client. Typically, this data will be stored in a cache at the client as it is being received, and the client simply retrieved the data from the cache. In a block **162**, a display list of vectors is built. This process is well known in the CAD arts, and is enabling rapid zooming of vector-based objects. In a block **164**, user selectable scale and offset (pan) values are determined. Based on various user interactions with the user-interface of the client, the user is enabled to control the zoom (size) and offset of the rendered page. For example, suppose the user provides zoom and offset inputs to produce a rendered page **210**E, as shown in FIG. **4**E. In this rendered page, the original origin is now off of the screen (the page image is shifted upward and toward the left—see FIG. **4**F), and the view has been scaled approximately 1.3 times.

Next, in a block **166**, the vectors and boundary boxes are processed based on the scale and offset, and a bounding box defining the limits of the display content is determined. The results of this step are shown in FIG. **4**F, while FIG. **4**G shows specific details one how the vectors and bounding boxes corresponding to image objects **250**B and **250**B (now **250**B' and **252**B', respectively) are processed. Logically, there are generally two ways to scale and offset the rendered content. In one embodiment, vectors and bounding boxes are mapped to a virtual display area in memory that has much greater resolution (e.g., 100,000×100,000 pixels) than any real display, and a virtual display limit bounding box is scaled and moved around over the virtual display area. Accordingly, during subsequent processing described below, objects falling within the display bounding box are rendered by reducing the scaling of those objects in the virtual display to how the objects will appear on the client device display relative to the virtual display bounding box. In the alternate, a fixed reference frame corresponding to the display resolution of the client device screen is maintained, wherein all vectors and bounding boxes are scaled and offset relative to the fixed reference frame. Each scheme has its advantages and disadvantages. One advantage of the second method is that the display bounding box is always maintained to have a size that matches the resolution of the content display area on the client device.

As shown in FIG. **4**G, respective offsets in X and Y, (−ΔX and −ΔY in the Figure) are applied to the starting point of each of the vectors. The vectors are then scaled by a scale factor "SF." The results of the new vectors are depicted by vectors **250**D" and **252**D". This produces a new datum for each object's bounding box that is relative to rendered page datum **262**, which remains fixed. As discussed above, only a portion of the display screen will actually be used to display content (as defined by a display limit bounding box **266** in this embodiment), while other portions of the screen, including box **264**, will comprise a generally fixed-size user interface. Accordingly, rendered page datum **262** is not located at the upper left hand corner of the display area, although it possibly could be located at this point when either the current user interface is inactive (i.e., the display portion of the user interface is temporary disabled) or the user interface is contained in other portions of the display.

This foregoing process establishes a starting point (the new datum) for where the content in each object's bounding box will be rendered. At this point, each object's bounding box is then drawn from its new datum using the scaling factor. For example, in the original web page **210**D (FIG. **4**D), bounding box **250**B had an X-axes datum of **150** pixels, a Y-axis datum of 225 pixels, and a height and width of 180×350 pixels. In contrast, after being offset and scaled, bounding box **250**B' has an X-axis datum of 150* SF−ΔX, a Y-axis datum of 225*SF−ΔY, and a height and width of 180*SF×350*SF.

Returning to the flowchart of FIG. **6**, once the vectors and bounding boxes are offset and scaled, content corresponding to objects having at least a portion of their bounding boxes falling within the display limit bounding box is retrieved from the client device's display list in a block **168**. For examples, as shown in FIG. **4**F, content corresponding to all of the objects except for those falling entirely outside of display limit bounding box **266** (objects **216**, **238**, **240**, **242** and **244**) is retrieved from the display list. That content is then scaled in a block **170**. For image content, this comprises decompressing and scaling the compressed bitmaps corresponding to those images. For text content, this comprises scaling the font (i.e., typeface) that the text content portions of the web page are written in the parent HTML document and any referenced documents. There are various techniques for typeface scaling that may be implemented here, depending on the available resources provided by the operating system of the client device. For example, for WINDOWS™ operating systems, many TRUETYPE™ fonts are available, which use a common scalable definition for each font, enabling those fonts to be scaled to just about any size. In other cases, such as current PDA (e.g., Palm Pilots) operating systems, there is no existing feature that supports scaling fonts. As a result, bitmapped fonts of different font sizes and styles may be used. In addition to scaling image and text content, other types of content, such as separator lines and borders may also be scaled by block **170**.

The process is completed in a block **172**, wherein those portions of the scaled content falling within the display limit bounding box are rendered on the client device's display.

As discussed above, it is foreseen that the invention will be used with client devices having small, low resolution displays, such as PDAs and pocket PCs. Examples of various views of an exemplary web pages obtained from the YAHOO™ web site are shown in FIGS. **7**A-B, **8**A-B and **9**A-B. For instance, FIG. **7**A represents how the YAHOO™ home page might appear on a Palm IIIc color PDA.

In addition to directly scaling and offsetting content, the client user-interface software for PDA's provides additional functionality. For instance, a user may select to view a column (results represented in FIG. **7**B by tapping that column with a stylus, a shown in FIG. **7**A. Similarly, the user may select to zoom in on an image by tapping the image with the stylus, as shown in FIGS. **8**A and **8**B, or select to view a paragraph in an article by tapping on the paragraph, as shown in FIGS. **9**A and **9**B. It is noted that in some instances, the display of the paragraph may be reformatted to fit the characteristics of the display, rather than following the original format in the zoom-out view.

It is further noted that that different scaling factors can be applied to the X and Y axis so as to change the aspect ratio of the display. For example, a Web page may be designed to be displayed on a computer having a resolution of 800×600 pixels, or a 4X to 3Y aspect ratio. In this case, the display corresponds to a "landscape" layout, wherein there are more pixels along the X axis than along the Y axis. Conversely, many handheld devices display images having a "portrait" layout, wherein there are more pixels along the Y axis than the X axis. By enabling different scaling factors to be applied to the X and Y axes, the present invention enables the aspect ratio of a rendered display image to be adjusted to better fit the aspect ratio of the client device.

An Exemplary Computer Architecture

An exemplary machine in the form of a computer system **500** in which features of the present invention may be implemented will now be described with reference to FIG. **10**. Computer system **500** may represent a workstation, host, server, print server, or printer controller. Computer system **500** comprises a bus or other communication means **501** for communicating information, and a processing means such as processor **502** coupled with bus **501** for processing information. Computer system **500** further comprises a random access memory (RAM) or other dynamic storage device **504** (referred to as main memory), coupled to bus **501** for storing information and instructions to be executed by processor **502**. Main memory **504** also may be used for storing temporary variables or other intermediate information during execution of instructions by processor **502**. Computer system **500** also comprises a read only memory (ROM) and/or other static storage device **506** coupled to bus **501** for storing static information and instructions for processor **502**.

A data storage device **507** such as a magnetic disk or optical disc and its corresponding drive may also be coupled to bus **501** for storing information and instructions. Computer system **500** can also be coupled via bus **501** to a display device **521**, such as a cathode ray tube (CRT) or Liquid Crystal Display (LCD), for displaying information to an end user. Typically, an alphanumeric input device **522**, including alphanumeric and other keys, may be coupled to bus **501** for communicating information and/or command selections to processor **502**. Another type of user input device is cursor control **523**, such as a mouse, a trackball, or cursor direction keys for communicating direction information and command selections to processor **502** and for controlling cursor movement on display **521**.

A communication device **525** is also coupled to bus **501**. Depending upon the particular presentation environment implementation, the communication device **525** may include a modem, a network interface card, or other well-known interface devices, such as those used for coupling to Ethernet, token ring, or other types of physical attachment for purposes of providing a communication link to support a local or wide area network, for example. In any event, in this manner, the computer system **500** may be coupled to a number of clients and/or servers via a conventional network infrastructure, such as a company's Intranet and/or the Internet, for example.

Importantly, the present invention is not limited to having all of the routines located on the same computer system. Rather, individual objects, program elements, or portions thereof may be spread over a distributed network of computer systems. Additionally, it is appreciated that a lesser or more equipped computer system than the example described above may be desirable for certain implementations. Therefore, the configuration of computer system **500** will vary from implementation to implementation depending upon numerous factors, such as price constraints, performance requirements,



and/or other circumstances. For example, according to one embodiment of the present invention, a cell phone or a hand held computer may comprise only a processor or a micro controller and a memory, such as a micro code ROM or RAM, for storing static or dynamically loaded instructions and/or data.

In the foregoing specification, the invention has been described with reference to specific embodiments thereof. It will, however, be evident that various modifications and changes may be made thereto without departing from the broader spirit and scope of the invention. The specification and drawings are, accordingly, to be regarded in an illustrative rather than a restrictive sense.

What is claimed is:

**1**. A wireless device, comprising:

processing means;

wireless communications means, to facilitate wireless communication with a network that supports access to the Internet;

a display;

memory; and

storage means, in which a plurality of instructions are stored that when executed by the processing means enable the wireless device to perform operations including,

rendering a browser interface via which a user is enabled to request access to an original Web page, the Web page comprising HTML-based Web content having an original format defining an original width and height of the Web page and an original page layout, functionality, and design of content on the Web page;

in response to a user request to access the Web page,

retrieving the Web page via the wireless communication means, and translating at least a portion of the HTML-based Web content from its original format into scalable content that supports a scalable resolution-independent representation of the Web page that preserves the original page layout, functionality and design of the content defined by its original format when scaled and rendered; and

scaling the scalable content to render the Web page on the display such that a width of the Web page is rendered to fit across the display.

**2**. The wireless device of claim **1**, wherein execution of the instructions performs further operations comprising enabling the user to zoom in on a user-selectable portion of a display of the Web page in response to a corresponding user interface input.

**3**. The wireless device of claim **2**, wherein the display of the Web page is re-rendered in real-time to effect zooming operations.

**4**. The wireless device of claim **1**, wherein the Web page includes at least one hyperlink, and wherein execution of the instructions performs further operations comprising:

enabling the user to select the hyperlink; and, in response thereto,

retrieving and translating Web content associated with the hyperlink to produce additional scalable content; and

employing the additional scalable content to render the Web content associated with the hyperlink on the display.

**5**. The wireless device of claim **1**, wherein execution of the instructions performs further operations comprising:

parsing markup language code to determine the original page layout of display content within the Web page, wherein the original page layout defines a layout loca-

tion for a plurality of objects, including at least one of text objects, graphic layout objects, or graphic image objects included in the Web page;

defining a primary datum corresponding to the original page layout; and, for each object,

defining an object datum corresponding to the layout location for the object;

generating a vector from the primary datum to the object datum for the object; and

creating a reference that links the object to the vector that is generated.

**6**. The wireless device of claim **1**, wherein execution of the instructions performs further operations comprising enabling the Web page to be displayed at different resolutions by scaling the scalable content to re-render the display in response to associated user inputs,

wherein the original page layout, functionality, and design of the Web page content are preserved at each of the different resolutions.

**7**. The wireless device of claim **1**, wherein execution of the instructions performs further operations comprising returning the display of the Web page to a previous view in response to a corresponding user input.

**8**. The wireless device of claim **1**, wherein execution of the instructions performs further operations comprising enabling a user to pan a view of the Web page in response to a corresponding user input.

**9**. The wireless device of claim **8**, wherein execution of the instructions performs further operations comprising enabling the view of the Web page to be panned in real-time.

**10**. The wireless device of claim **1**, wherein the page layout of the Web page is defined to have an original aspect ratio, and wherein the scalable content is scaled when rendered so as to produce a display of the Web page having a different aspect ratio.

**11**. The wireless device of claim **1**, wherein execution of the instructions performs further operations comprising enabling a user to zoom on a column of the Web page via a corresponding user input, wherein in response thereto, the display is re-rendered such that content corresponding to the selected column is enlarged.

**12**. The wireless device of claim **11**, wherein the content of the column is reformatted to fit characteristics of the display when the display is re-rendered.

**13**. The wireless device of claim **11**, wherein the corresponding user input comprises tapping on the column via the display.

**14**. The wireless device of claim **11**, wherein the display is re-rendered such that content corresponding to the selected column is rendered to fit across the display.

**15**. The wireless device of claim **1**, wherein the Web content includes at least one image, and wherein execution of the instructions performs further operations comprising enabling a user to zoom on an image via a corresponding user input, wherein in response thereto, the display is re-rendered such that the image is enlarged.

**16**. The wireless device of claim **15**, wherein the corresponding user input comprises tapping on the image via the display.

**17**. The wireless device of claim **15**, wherein the display is re-rendered such that the image is rendered to fit across the display.

**18**. The wireless device of claim **1**, wherein execution of the instructions performs further operations comprising enabling a user to zoom on a paragraph of the Web content via a corresponding user input, wherein in response thereto, the display is re-rendered such that content corresponding to the selected paragraph is enlarged.



**19**. The wireless device of claim **18**, wherein the content of the paragraph is reformatted to fit characteristics of the display when the display is re-rendered.

**20**. The wireless device of claim **18**, wherein the corresponding user input comprises tapping on the paragraph via the display.

**21**. The wireless device of claim **18**, wherein the display is re-rendered such that content corresponding to the selected paragraph is rendered to fit across the display.

**22**. The wireless device of claim **1**, wherein the Web page includes text, layout attributes, and images, and wherein execution of the instructions performs further operations comprising:

receiving content corresponding to the text and layout attributes via a first connection; and

receiving content corresponding to at least one image via a second connection.

**23**. The wireless device of claim **1**, wherein execution of the instructions performs further operations comprising:

generating a vector-based display list associated with the scalable content; and

employing the display list to re-render the display at different scale factors to zoom the Web page.

**24**. The wireless device of claim **1**, wherein execution of the instructions performs further operations comprising:

parsing markup language code corresponding to the retrieved Web page to determine the original page layout of the content on the Web page;

logically grouping selected content into objects;

defining a primary datum corresponding to the original page layout; and,

for each object,

defining an object datum corresponding to a layout location datum for the object's associated display content;

generating a vector from the primary datum to the object datum for the object; and

creating a reference that links the object to the vector that is generated.

**25**. The wireless device of claim **24**, wherein execution of the instructions performs further operations comprising:

generating a bounding box for each object, the bounding box representing a portion of a rendered display page occupied by the object's associated group of content.

**26**. The wireless device of claim **25**, wherein execution of the instructions performs further operations comprising:

mapping the object vectors and associated bounding boxes to a virtual display in memory.

**27**. The wireless device of claim **26**, wherein execution of the instructions performs further operations comprising:

enabling a user to view the Web page at a user-selectable zoom level and panned view by,

determining a first scale factor and offset in response to one or more corresponding user inputs defining a user-selectable zoom level and panned view corresponding to a rendered display of the Web page desired by a user; and

determining a virtual display bounding box for the virtual display associated with the first scale factor and offset;

identifying object bounding boxes having at least a portion falling within the virtual display bounding box; and,

for each of such object bounding boxes,

retrieving content associated with that object bounding box;

applying an appropriate scale factor to the content associated with that object bounding box to produce scaled content; and

rendering the portion of scaled content within the virtual display bounding box to render the content on the display.

**28**. The wireless device of claim **1**, wherein the scalable content includes scalable text content, and wherein execution of the instructions performs further operations comprising scaling a scalable font to render the scalable text content.

**29**. The wireless device of claim **1**, wherein at least a portion of the instructions comprise Java-based instructions.

**30**. The wireless device of claim **1**, wherein the device comprises a mobile phone.

**31**. The wireless device of claim **1**, wherein the device comprises one of a Personal Digital Assistant (PDA) or hand-held computer.

**32**. The wireless device of claim **1**, wherein the network comprises a mobile service provider network.

**33**. The wireless device of claim **1**, wherein a portion of the scalable content comprises vector-based content.

**34**. The wireless device of claim **1**, wherein the device comprises one of a desktop computer, notebook computer or laptop computer.

**35**. The wireless device of claim **1**, wherein the device enables a user to browse, zoom, and pan billions of Web pages in a manner that preserves the original layout, functionality, and design of the HTML-based Web page content of each Web page.

**36**. A mobile hand-held device, comprising:

a processor,

a wireless communications device, to facilitate wireless communication with a network that supports access to the Internet;

a display; and

flash memory, operatively coupled to the processor, in which a plurality of instructions are stored that when executed by the processor enable the mobile hand-held device to perform operations including,

rendering a browser interface via which a user is enabled to request access to a Web page comprising HTML-based Web content defining an original page layout, functionality, and design of content on the Web page;

retrieving the Web page via the wireless communications device, and processing HTML-based Web content to produce scalable content; and

employing at least one of the scalable content or data derived therefrom to,

render the Web page on the display; and

re-render the display in response to associated user inputs to enable the Web page to be browsed at various zoom levels and panned views while preserving the original page layout, functionality, and design of the Web page content at each zoom level and panned view.

**37**. The mobile hand-held device of claim **36**, wherein the device comprises a mobile phone.

**38**. The mobile hand-held device of claim **36**, wherein the device comprises one of a Personal Digital Assistant (PDA) or hand-held computer.

**39**. The mobile hand-held device of claim **36**, wherein execution of the instructions performs further operations comprising enabling the user to zoom in on a user-selectable portion of a display of the Web page in response to a user interface input.

**40**. The mobile hand-held device of claim **39**, wherein the user interface input enables the user to define an area of a current view of the Web page on which to zoom in on.

**41**. The mobile hand-held device of claim **36**, wherein the display of the Web page is re-rendered in real-time to effect zooming operations.

**42**. The mobile hand-held device of claim **36**, wherein the Web page includes at least one hyperlink, and wherein execution of the instructions performs further operations comprising:

enabling the user to select the hyperlink via the display; and, in response thereto,

retrieving and processing HMTL-based Web content associated with the hyperlink to produce additional scalable content; and

employing at least one of the additional scalable content or data derived therefrom to render the Web content associated with the hyperlink on the display.

**43**. The mobile hand-held device of claim **36**, wherein at least a portion of the scalable content comprises scalable vector-based content.

**44**. The mobile hand-held device of claim **36**, wherein execution of the instructions performs further operations comprising returning the display of the Web page to a previous view in response to a corresponding user input made via the display.

**45**. The mobile hand-held device of claim **36**, wherein execution of the instructions performs further operations comprising enabling a user to pan a view of the Web page in response to a corresponding user input made via the display.

**46**. The mobile hand-held device of claim **36**, wherein execution of the instructions performs further operations comprising enabling the panned view of the Web page to be panned in real-time.

**47**. The mobile hand-held device of claim **36**, wherein the page layout of the Web page is defined to have an original aspect ratio, and wherein said at least one of scalable content or data derived therefrom is scaled to render a display of the Web page having a different aspect ratio.

**48**. The mobile hand-held device of claim **36**, wherein execution of the instructions performs further operations comprising enabling a user to zoom on a column of the Web content via a corresponding user input, wherein in response thereto, the display is re-rendered such that content corresponding to the selected column is rendered to fit across the display.

**49**. The mobile hand-held device of claim **48**, wherein the content of the column is reformatted to fit characteristics of the display when the display is re-rendered.

**50**. The mobile hand-held device of claim **48**, wherein the corresponding user input comprises tapping on the column via the display.

**51**. The mobile hand-held device of claim **36**, wherein the Web content includes at least one image, and wherein execution of the instructions performs further operations comprising enabling a user to zoom on an image via a corresponding user input, wherein in response thereto, the display is re-rendered such that the image is rendered to fit across the display.

**52**. The mobile hand-held device of claim **51**, wherein the corresponding user input comprises tapping on the image via the display.

**53**. The mobile hand-held device of claim **36**, wherein execution of the instructions performs further operations comprising enabling a user to zoom on a paragraph of the Web page via a corresponding user input, wherein in response

thereto, the display is re-rendered such that content corresponding to the selected paragraph is rendered to fit across a display area of the display.

**54**. The mobile hand-held device of claim **53**, wherein the content of the paragraph is reformatted to fit characteristics of the display area when the display is re-rendered.

**55**. The mobile hand-held device of claim **53**, wherein the corresponding user input comprises tapping on the paragraph via the display.

**56**. The mobile hand-held device of claim **36**, wherein the Web page includes text, layout attributes, and images, and wherein execution of the instructions performs further operations comprising:

receiving content corresponding to the text and layout attributes via a first connection; and

receiving content corresponding to at least one image via a second connection.

**57**. The mobile hand-held device of claim **36**, further comprising dynamic memory having at least a portion employed for rendering purposes, wherein execution of the instructions performs further operations comprising:

building a display list via use of the scalable content and rendering display list content on a virtual display in the dynamic memory; and

scaling the display list content to re-render the display of the Web page.

**58**. The mobile hand-held device of claim **36**, wherein execution of the instructions performs further operations comprising:

parsing HTML-based code corresponding to the retrieved Web page to determine the original page layout of the content on the Web page;

logically grouping selected content into objects;

defining a primary datum corresponding to the original page layout; and,

for each object,

defining an object datum corresponding to a layout location datum for the object's associated display content;

generating a vector from the primary datum to the object datum for the object; and

creating a reference that links the object to the vector that is generated.

**59**. The mobile hand-held device of claim **58**, wherein execution of the instructions performs further operations comprising:

generating a bounding box for each object, the bounding box representing a portion of a rendered display page occupied by the object's associated group of content.

**60**. The mobile hand-held device of claim **59**, further comprising dynamic memory having at least a portion employed for rendering purposes, wherein execution of the instructions performs further operations comprising:

mapping the object vectors and associated bounding boxes to a virtual display in the dynamic memory.

**61**. The mobile hand-held device of claim **60**, wherein execution of the instructions performs further operations comprising:

enabling a user to view the Web page at a user-selectable zoom level and panned view by,

determining a first scale factor and offset in response to one or more corresponding user inputs defining a user-selectable zoom level and panned view corresponding to a rendered display of the Web page desired by a user;

determining a virtual display bounding box for the virtual display associated with the first scale factor and offset;

identifying object bounding boxes having at least a portion falling within the virtual display bounding box; and,

for each of such object bounding boxes,

retrieving content associated with that object bounding box;

applying an appropriate scale factor to the content associated with that object bounding box to produce scaled content; and

rendering the portion of scaled content within the virtual display bounding box to render the content on the display.

**62**. The mobile hand-held device of claim **36**, wherein the scalable content includes scalable text content, and wherein execution of the instructions performs further operations comprising scaling a scalable font to render the scalable text content.

**63**. The mobile hand-held device of claim **36**, wherein the original format of the Web page defines a height and width for the Web page, and wherein execution of the instructions performs further operations comprising:

determining an applicable scale factor to display at least one of the width and height of the Web page to fit across a browser display area of the display; and

employing the scale factor to render the browser display area.

**64**. The mobile hand-held device of claim **36**, wherein at least a portion of the instructions comprise Java-based instructions.

**65**. The mobile hand-held device of claim **36**, wherein a portion of the HTML-based Web content comprises XML code.

**66**. The mobile hand-held device of claim **36**, wherein a portion of the HTML-based Web content comprises cascaded style sheet data defining aspects of the Web page design that are preserved at each zoom level and panned view.

**67**. The mobile hand-held device of claim **36**, wherein the network comprises a Local Area Network or Wide Area Network.

**68**. The mobile hand-held device of claim **36**, wherein the device comprises one of a notebook computer or laptop computer.

**69**. The mobile device of claim **36**, wherein the device enables a user to browse, zoom, and pan billions of Web pages in a manner that preserves the original layout, functionality, and design of the HTML-based Web a e content of each Web page.

**70**. A mobile device, comprising:

processing means;

wireless communications means, to facilitate wireless communication with a network that supports access to the Internet;

a display, to facilitate user input and display rendered content; and

storage means, in which a plurality of instructions are stored,

wherein, upon execution of the instructions by the processing means, the mobile device is enabled to perform operations, including,

rendering a browser interface via which a user is enabled to request access to a Web page comprising HTML-based Web content defining an original page layout, functionality, and design of content on the Web page;

retrieving the Web page via the wireless communications means, and processing at least a portion of the HTML-based Web content to produce scalable content; and

employing at least one of the scalable content or data derived therefrom to,

render the Web page on the display; and

re-render the display in response to associated user inputs made via the display to enable the Web page to be browsed at various zoom levels and panned views while preserving the original page layout, functionality, and design of the Web page content at each zoom level and panned view of the Web page.

**71**. The mobile device of claim **70**, wherein the processing means includes a general-purpose processor.

**72**. The mobile device of claim **70**, wherein the processing means includes a special-purpose processor.

**73**. The mobile device of claim **70**, wherein execution of the instructions performs further operations comprising enabling the user to zoom in on a user-selectable portion of a display of the Web page in response to a user interface input.

**74**. The mobile device of claim **73**, wherein the user interface input enables the user to define an area of a current view of the Web page on which to zoom in on.

**75**. The mobile device of claim **70**, wherein the display of the Web page is re-rendered in real-time to effect zooming operations.

**76**. The mobile device of claim **70**, wherein execution of the instructions performs further operations comprising enabling a user to pan a view of the Web content in response to a corresponding user interface input made via the display.

**77**. The mobile device of claim **70**, wherein execution of the instructions performs further operations comprising enabling the view of the Web content to be panned in real-time.

**78**. The mobile device of claim **70**, wherein the Web content includes at least one image, and wherein execution of the instructions performs further operations comprising enabling a user to zoom on an image via a corresponding user input, wherein in response thereto, the display is re-rendered such that the image is rendered to fit across the display.

**79**. The mobile device of claim **78**, wherein the corresponding user input comprises tapping on the image via the display.

**80**. The mobile device of claim **70**, further comprising dynamic memory having at least a portion employed for rendering purposes, wherein execution of the instructions performs further operations comprising:

building a display list via use of the scalable content and rendering display list objects on a virtual display in the dynamic memory; and

scaling display list objects to re-render the display of the Web page.

**81**. The mobile device of claim **70**, wherein the network comprises a mobile service provider network.

**82**. The mobile device of claim **70**, wherein the device comprises a mobile phone.

**83**. The mobile device of claim **70**, wherein the device comprises one of a Personal Digital Assistant (PDA) or hand-held computer.

**84**. The mobile device of claim **70**, wherein a portion of the scalable content comprises vector-based content.

**85**. The mobile device of claim **70**, wherein the processing means includes logic circuitry programmed with a portion of the instructions.

**86**. The mobile device of claim **70**, wherein the device comprises one of a notebook computer or laptop computer.



**87**. A mobile hand-held device, comprising:

a processor,

a wireless communications interface, to facilitate wireless communication with a network that supports access to the Internet;

a display; and

non-volatile memory, operatively coupled to the processor, in which a plurality of instructions are stored that when executed by the processor enable the mobile hand-held device to perform operations including,

rendering a browser interface on the display via which a user is enabled to request access to a Web page comprising HTML-based Web content defining an original page layout, functionality, and design of content on the Web page;

in response to a user request of the Web page,

retrieving the Web page via the wireless communications interface;

rendering the Web page such that a width of the Web page is rendered to fit across the display; and

re-rendering the display in response to associated user inputs to enable the Web page to be browsed at various zoom levels and panned views while preserving the original page layout, functionality, and design of the Web a e content at each zoom level and panned view.

**88**. The mobile hand-held device of claim **87**, wherein execution of the instructions performs further operations comprising enabling a user to zoom on a column of the Web page via a corresponding user input, wherein in response thereto, the display is re-rendered such that content corresponding to the selected column is enlarged.

**89**. The mobile hand-held device of claim **88**, wherein the content of the column is reformatted to fit characteristics of the display when the display is re-rendered.

**90**. The mobile hand-held device of claim **88**, wherein the corresponding user input comprises tapping on the column via the display.

**91**. The mobile hand-held device of claim **88**, wherein the display is re-rendered such that content corresponding to the selected column is rendered to fit across the display.

**92**. The mobile hand-held device of claim **87**, wherein the Web page includes at least one image, and wherein execution of the instructions performs further operations comprising enabling a user to zoom on an image via a corresponding user input, wherein in response thereto, the display is re-rendered such that the image is enlarged.

**93**. The mobile hand-held device of claim **92**, wherein the corresponding user input comprises tapping on the image via the display.

**94**. The mobile hand-held device of claim **92**, wherein the display is re-rendered such that the image is rendered to fit across the display.

**95**. The mobile hand-held device of claim **87**, wherein execution of the instructions performs further operations comprising enabling a user to zoom on a paragraph of the Web page via a corresponding user input, wherein in response thereto, the display is re-rendered such that content corresponding to the selected paragraph is enlarged.

**96**. The mobile hand-held device of claim **95**, wherein the content of the paragraph is reformatted to fit characteristics of the display when re-rendered.

**97**. The mobile hand-held device of claim **95**, wherein the corresponding user input comprises tapping on the paragraph via the display.

**98**. The mobile hand-held device of claim **95**, wherein the display is re-rendered such that content corresponding to the selected paragraph is rendered to fit across the display.

**99**. The mobile hand-held device of claim **87**, wherein execution of the instructions performs further operations comprising enabling a user to pan a view of the web page while in a zoomed state under which a portion of the web page is displayed.

**100**. The mobile hand-held device of claim **87**, wherein execution of the instructions performs further operations comprising returning the display of the Web page to a previous view in response to a corresponding user input.

**101**. The mobile hand-held device of claim **87**, wherein the display of the Web page is re-rendered in real-time to effect zooming operations.

**102**. The mobile hand-held device of claim **87**, wherein execution of the instructions performs further operations comprising enabling a user to pan a view of the Web page in response to a corresponding user input made via the display.

**103**. The mobile hand-held device of claim **87**, wherein execution of the instructions performs further operations comprising enabling the view of the Web page to be panned in real-time.

**104**. The mobile hand-held device of claim **87**, wherein the Web page includes text, layout attributes, and images, and wherein execution of the instructions performs further operations comprising:

receiving content corresponding to the text and layout attributes via a first connection; and

receiving content corresponding to at least one image via a second connection.

**105**. The mobile hand-held device of claim **87**, wherein a portion of the HTML-based Web content comprises XML code.

**106**. The mobile hand-held device of claim **87**, wherein a portion of the HTML-based Web content comprises cascaded style sheet data defining aspects of the Web page design that are preserved at each zoom level and panned view.

**107**. The mobile hand-held device of claim **87**, wherein the network comprises a mobile service provider network.

**108**. The mobile hand-held device of claim **87**, wherein the device comprises a mobile phone.

**109**. The mobile hand-held device of claim **87**, wherein the device comprises one of a Personal Digital Assistant (PDA) or hand-held computer.

**110**. The mobile device of claim **87**, wherein the network comprises a Local Area Network or a Wide Area Network.

**111**. The mobile hand-held device of claim **87**, wherein the device enables a user to browse, zoom, and pan billions of Web pages in a manner that preserves the original layout, functionality, and design of the HTML-based Web page content of each Web page.

**112**. A wireless device, comprising:

a processor;

a wireless communications interface, to facilitate wireless communication with a network that supports access to the Internet;

a display;

memory; and

a storage device, on which a plurality of instructions are stored that when executed by the processor enable the wireless device to perform operations including,

rendering a browser interface via which a user is enabled to request access to a Web page, the Web page comprising HTML-based Web content having an original format including HTML code defining an original page layout, functionality, and design of corresponding content on the Web page;

retrieving, via the wireless communications interface, and translating at least a portion of the HTML-based Web content into scalable content that supports a scalable resolution-independent representation of the Web page that preserves the original page layout, functionality and design of the content defined by its original format when scaled and rendered;

employing the scalable content to render the Web page on the display using a first scale factor; and

enabling the Web page to be displayed at a different resolution by scaling the scalable content using a second scale factor to re-render the display,

wherein the original page layout, functionality, and design of the Web page content are preserved under both the first and second scale factors.

**113**. The wireless device of claim **112**, wherein the display is re-rendered in real-time.

**114**. The wireless device of claim **112**, wherein the device comprises a hand-held device.

**115**. The wireless device of claim **112**, wherein the device comprises one of a desktop computer, notebook computer or laptop computer.

**116**. The wireless device of claim **112**, wherein execution of the instructions performs further operations comprising enabling a user to pan a view of the Web page in response to a corresponding user input.

**117**. The wireless device of claim **116**, wherein execution of the instructions performs further operations comprising enabling the view of the Web page to be panned in real-time.

**118**. A method, comprising:

rendering a browser interface on a display of a device via which a user is enabled to request access to a Web page, the Web page comprising HTML-based Web content having an original format defining an original width and height of the Web page and an original page layout, functionality, and design of content on the Web page;

in response to a user request to access the Web page,

retrieving the Web page via the device, and translating at least a portion of the HTML-based Web content from its original format into scalable content that supports a scalable resolution-independent representation of the Web page that preserves the original page layout, functionality and design of the content defined by its original format when scaled and rendered; and

scaling the scalable content to render the Web page on the display such that a width of the Web page is rendered to fit across the display.

**119**. The method of claim **118**, further comprising enabling the user to zoom in on a user-selectable portion of a display of the Web page in response to a corresponding user interface input.

**120**. The method of claim **119**, wherein the display of the Web page is re-rendered in real-time to effect zooming operations.

**121**. The method of claim **118**, wherein the Web page includes at least one hyperlink, the method further comprising:

enabling the user to select the hyperlink; and, in response thereto,

retrieving and translating Web content associated with the hyperlink to produce additional scalable content; and

employing the additional scalable content to render the Web content associated with the hyperlink on the display.

**122**. The method of claim **118**, further comprising:

parsing markup language code to determine the original page layout of display content within the Web page, wherein the original page layout defines a layout loca-

tion for a plurality of objects, including at least one of text objects, graphic layout objects, or graphic image objects included in the Web page;

defining a primary datum corresponding to the original page layout; and,

for each object,

defining an object datum corresponding to the layout location for the object;

generating a vector from the primary datum to the object datum for the object; and

creating a reference that links the object to the vector that is generated.

**123**. The method of claim **118**, further comprising enabling the Web page to be displayed at different resolutions by scaling the scalable content to re-render the display in response to associated user inputs,

wherein the original page layout, functionality, and design of the Web page content are preserved at each of the different resolutions.

**124**. The method of claim **118**, further comprising returning the display of the Web page to a previous view in response to a corresponding user input.

**125**. The method of claim **118**, further comprising enabling a user to pan a view of the Web page in response to a corresponding user input.

**126**. The method of claim **125**, further comprising enabling the view of the Web page to be panned in real-time.

**127**. The method of claim **118**, wherein the page layout of the Web page is defined to have an original aspect ratio, and wherein the scalable content is scaled when rendered so as to produce a display of the Web page having a different aspect ratio.

**128**. The method of claim **118**, further comprising enabling a user to zoom on a column of the Web page via a corresponding user input, wherein in response thereto, the display is re-rendered such that content corresponding to the selected column is rendered to fit across the display.

**129**. The method of claim **128**, wherein the corresponding user input comprises tapping on the column via the display.

**130**. The method of claim **128**, wherein the content of the column is reformatted to fit characteristics of the display when the display is re-rendered.

**131**. The method of claim **118**, wherein the Web content includes at least one image, the method further comprising enabling a user to zoom on an image via a corresponding user input, wherein in response thereto, the display is re-rendered such that the image is rendered to fit across the display.

**132**. The method of claim **131**, wherein the corresponding user input comprises tapping on the image via the display.

**133**. The method of claim **118**, further comprising enabling a user to zoom on a paragraph of the Web content via a corresponding user input, wherein in response thereto, the display is re-rendered such that content corresponding to the selected paragraph is rendered to fit across the display.

**134**. The method of claim **133**, wherein the corresponding user input comprises tapping on the paragraph via the display.

**135**. The method of claim **133**, wherein the content of the paragraph is reformatted to fit characteristics of the display when the display is re-rendered.

**136**. The method of claim **118**, wherein the Web page includes text, layout attributes, and images, the method further comprising:

receiving content corresponding to the text and layout attributes via a first connection; and

receiving content corresponding to at least one image via a second connection.



**137**. The method of claim **118**, further comprising:

generating a vector-based display list associated with the scalable content; and

employing the display list to re-render the display at different scale factors to zoom the Web page.

**138**. The method of claim **118**, further comprising:

parsing markup language code corresponding to the retrieved Web page to determine the original page layout of the content on the Web page;

logically grouping selected content into objects;

defining a primary datum corresponding to the original page layout; and,

for each object,

defining an object datum corresponding to a layout location datum for the object's associated display content;

generating a vector from the primary datum to the object datum for the object; and

creating a reference that links the object to the vector that is generated.

**139**. The method of claim **138**, further comprising:

generating a bounding box for each object, the bounding box representing a portion of a rendered display page occupied by the object's associated group of content.

**140**. The method of claim **139**, further comprising:

mapping the object vectors and associated bounding boxes to a virtual display in memory.

**141**. The method of claim **140**, further comprising:

enabling a user to view the Web page at a user-selectable zoom level and panned view by,

determining a first scale factor and offset in response to one or more corresponding user inputs defining a user-selectable zoom level and panned view corresponding to a rendered display of the Web page desired by a user; and

determining a virtual display bounding box for the virtual display associated with the first scale factor and offset;

identifying object bounding boxes having at least a portion falling within the virtual display bounding box; and,

for each of such object bounding boxes,

retrieving content associated with that object bounding box;

applying an appropriate scale factor to the content associated with that object bounding box to produce scaled content; and

rendering the portion of scaled content within the virtual display bounding box to render the content on the display.

**142**. The method of claim **118**, wherein the scalable content includes scalable text content, the method further comprising scaling a scalable font to render the scalable text content.

**143**. The method of claim **118**, wherein the method is facilitated, at least in part, via execution of Java-based instructions.

**144**. The method of claim **118**, wherein the device comprises a mobile phone.

**145**. The method of claim **118**, wherein the device comprises a hand-held device.

**146**. The method of claim **118**, further comprising accessing the Internet via a wireless connection to retrieve the Web page.

**147**. The method of claim **118**, wherein a portion of the scalable content comprises vector-based content.

**148**. The method of claim **118**, wherein the device comprises one of a desktop computer, notebook computer or laptop computer.

**149**. A method, comprising:

rendering a browser interface on a hand-held device via which a user is enabled to request access to a Web page comprising HTML-based Web content defining an original page layout, functionality, and design of content on the Web page;

retrieving the Web page via the hand-held device, and processing HTML-based Web content to produce scalable content; and

employing at least one of the scalable content or data derived therefrom to,

render the Web page on a display of the hand-held device; and

re-render the display in response to associated user inputs to enable the Web page to be browsed at various zoom levels and panned views while preserving the original page layout, functionality, and design of the Web page content at each zoom level and panned view.

**150**. The method of claim **149**, wherein the hand-held device comprises a mobile phone.

**151**. The method of claim **149**, wherein the hand-held device comprises one of a Personal Digital Assistant (PDA) or hand-held computer.

**152**. The method of claim **149**, further comprising enabling the user to zoom in on a user-selectable portion of a display of the Web page in response to a user interface input.

**153**. The method of claim **152**, wherein the user interface input enables the user to define an area of a current view of the Web page on which to zoom in on.

**154**. The method of claim **149**, wherein the display of the Web page is re-rendered in real-time to effect zooming operations.

**155**. The method of claim **149**, wherein the Web page includes at least one hyperlink, the method further comprising:

enabling the user to select the hyperlink via the display; and, in response thereto,

retrieving and processing HMTL-based Web content associated with the hyperlink to produce additional scalable content; and

employing at least one of the additional scalable content or data derived therefrom to render the Web content associated with the hyperlink on the display.

**156**. The method of claim **149**, wherein at least a portion of the scalable content comprises scalable vector-based content.

**157**. The method of claim **149**, further comprising returning the display of the Web page to a previous view in response to a corresponding user input made via the display.

**158**. The method of claim **149**, further comprising enabling a user to pan a view of the Web page in response to a corresponding user input made via the display.

**159**. The method of claim **149**, further comprising enabling the view of the Web page to be panned in real-time.

**160**. The method of claim **149**, wherein the page layout of the Web page is defined to have an original aspect ratio, and wherein said at least one of scalable content or data derived therefrom is scaled to render a display of the Web page having a different aspect ratio.

**161**. The method of claim **149**, further comprising enabling a user to zoom on a column of the Web content via a corresponding user input, wherein in response thereto, the display is re-rendered such that content corresponding to the selected column is enlarged.



**162**. The method of claim **161**, wherein the corresponding user input comprises tapping on the column via the display.

**163**. The method of claim **161**, wherein the content of the column is reformatted to fit characteristics of the display when the display is re-rendered.

**164**. The method of claim **161**, wherein the display is re-rendered such that content corresponding to the selected column is rendered to fit across the display.

**165**. The method of claim **149**, wherein the Web content includes at least one image, the method further comprising enabling a user to zoom on an image via a corresponding user input, wherein in response thereto, the display is re-rendered such that the image is enlarged.

**166**. The method of claim **165**, wherein the corresponding user input comprises tapping on the image via the display.

**167**. The method of claim **165**, wherein the display is re-rendered such that the image is rendered to fit across the display.

**168**. The method of claim **149**, further comprising enabling a user to zoom on a paragraph of the Web page via a corresponding user input, wherein in response thereto, the display is re-rendered such that content corresponding to the selected paragraph is enlarged.

**169**. The method of claim **168**, wherein the content of the paragraph is reformatted to fit characteristics of the display area when the display is re-rendered.

**170**. The method of claim **168**, wherein the display is re-rendered such that content corresponding to the selected paragraph is rendered to fit across the display.

**171**. The method of claim **168**, wherein the corresponding user input comprises tapping on the paragraph via the display.

**172**. The method of claim **149**, wherein the Web page includes text, layout attributes, and images, the method further comprising:

receiving content corresponding to the text and layout attributes via a first connection; and

receiving content corresponding to at least one image via a second connection.

**173**. The method of claim **149**, wherein the hand-held device includes dynamic memory having at least a portion employed for rendering purposes, the method further comprising:

building a display list via use of the scalable content and rendering display list content on a virtual display in dynamic memory; and

scaling the display list content to re-render the display of the Web page.

**174**. The method of claim **149**, further comprising:

parsing HTML-based code corresponding to the retrieved Web page to determine the original page layout of the content on the Web page;

logically grouping selected content into objects;

defining a primary datum corresponding to the original page layout; and,

for each object,

defining an object datum corresponding to a layout location datum for the object's associated display content;

generating a vector from the primary datum to the object datum for the object; and

creating a reference that links the object to the vector that is generated.

**175**. The method of claim **174**, further comprising:

generating a bounding box for each object, the bounding box representing a portion of a rendered display page occupied by the object's associated group of content.

**176**. The method of claim **175**, wherein the hand-held device includes dynamic memory having at least a portion employed for rendering purposes, the method further comprising:

mapping the object vectors and associated bounding boxes to a virtual display in the dynamic memory.

**177**. The method of claim **176**, further comprising:

enabling a user to view the Web page at a user-selectable zoom level and panned view by,

determining a first scale factor and offset in response to one or more corresponding user inputs defining a user-selectable zoom level and panned view corresponding to a rendered display of the Web page desired by a user;

determining a virtual display bounding box for the virtual display associated with the first scale factor and offset;

identifying object bounding boxes having at least a portion falling within the virtual display bounding box; and,

for each of such object bounding boxes,

retrieving content associated with that object bounding box;

applying an appropriate scale factor to the content associated with that object bounding box to produce scaled content; and

rendering the portion of scaled content within the virtual display bounding box to render the content on the display.

**178**. The method of claim **149**, wherein the scalable content includes scalable text content, the method further comprising scaling a scalable font to render the scalable text content.

**179**. The method of claim **149**, wherein the original format of the Web page defines a height and width for the Web page, the method further comprising:

determining an applicable scale factor to display at least one of the width and height of the Web page across a browser display area of the display; and

employing the scale factor to render the browser display area.

**180**. The method of claim **149**, wherein the method is facilitated, at least in part, via execution of Java-based instructions.

**181**. The method of claim **149**, wherein a portion of the HTML-based Web content comprises XML code.

**182**. The method of claim **149**, wherein a portion of the HTML-based Web content comprises cascaded style sheet data defining aspects of the Web page design that are preserved at each zoom level and panned view.

**183**. The method of claim **149**, wherein a portion of the scalable content comprises vector-based content.

**184**. The method of claim **149**, further comprising enabling a user to browse, zoom, and pan billions of Web pages in a manner that preserves the original layout, functionality, and design of the HTML-based Web page content of each Web page.

**185**. A method, comprising:

rendering a browser interface on a display of a device via which a user is enabled to request access to a Web page comprising HTML-based Web content defining an original page layout, functionality, and design of content on the Web page;



in response to a user request of the Web page via the browser interface,

retrieving the Web page via the device;

rendering the Web page via the device such that a full width of the Web page is rendered on the display; and

re-rendering the Web page in response to associated user inputs to the hand-held device to enable the Web page to be browsed at various zoom levels and panned views while preserving the original page layout, functionality, and design of the Web page content at each zoom level and panned view of the Web page,

wherein the method enables a user of the device to browse, zoom, and pan billions of Web pages in a manner that preserves the original layout, functionality, and design of the HTML-based Web page content of each Web page.

**186**. The method of claim **185**, further comprising enabling a user to zoom on a column of the Web page via a corresponding user input, wherein in response thereto, the display is re-rendered such that content corresponding to the selected column is enlarged.

**187**. The method of claim **186**, wherein the corresponding user input comprises tapping on the column via the display.

**188**. The method of claim **186**, wherein the content of the column is reformatted to fit characteristics of the display when the display is re-rendered.

**189**. The method of claim **186**, wherein the display is re-rendered such that content corresponding to the selected column is rendered to fit across the display.

**190**. The method of claim **185**, wherein the Web page includes at least one image, the method further comprising enabling a user to zoom on an image via a corresponding user input, wherein in response thereto, the display is re-rendered such that the image is enlarged.

**191**. The method of claim **190**, wherein the corresponding user input comprises tapping on the image via the display.

**192**. The method of claim **190**, wherein the display is re-rendered such that the image is rendered to fit across the display.

**193**. The method of claim **185**, further comprising enabling a user to zoom on a paragraph of the Web page via a corresponding user input, wherein in response thereto, the display is re-rendered such that content corresponding to the selected paragraph is enlarged.

**194**. The method of claim **193**, wherein the corresponding user input comprises tapping on the paragraph via the display.

**195**. The method of claim **193**, wherein the content of the paragraph is reformatted to fit characteristics of the display when re-rendered.

**196**. The method of claim **193**, wherein the display is re-rendered such that content corresponding to the selected paragraph is rendered to fit across the display.

**197**. The method of claim **185**, further comprising enabling a user to pan a view of the web page while in a zoomed state under which a portion of the web page is displayed in response to a user input made via the display.

**198**. The method of claim **185**, further comprising returning the display of the Web page to a previous view in response to a corresponding user input.

**199**. The method of claim **185**, wherein the display of the Web page is re-rendered in real-time to effect zooming operations.

**200**. The method of claim **185**, further comprising enabling a user to pan a view of the Web page in response to a corresponding user input made via the display.

**201**. The method of claim **185**, further comprising enabling the view of the Web page to be panned in real-time.

**202**. The method of claim **185**, wherein the Web page includes text, layout attributes, and images, the method further comprising:

receiving content corresponding to the text and layout attributes via a first connection; and

receiving content corresponding to at least one image via a second connection.

**203**. The method of claim **185**, wherein a portion of the HTML-based Web content comprises XML code.

**204**. The method of claim **185**, wherein a portion of the HTML-based Web content comprises cascaded style sheet data defining aspects of the Web page design that are preserved at each zoom level and panned view.

**205**. The method of claim **185**, wherein the Web page is retrieved via a wireless connection to one of a mobile service provider network, local area network, or wide area network.

**206**. The method of claim **185**, wherein the device comprises a mobile phone.

**207**. The method of claim **185**, wherein the device comprises a hand-held device.

**208**. The method of claim **185**, wherein the device comprises one of a desktop computer, notebook computer or laptop computer.

**209**. A method, comprising:

rendering a browser interface on a display via which a user of a device is enabled to request access to a Web page, the Web page comprising HTML-based Web content having an original format including HTML code defining an original page layout, functionality, and design of corresponding content on the Web page;

retrieving the Web page, via the device, and translating at least a portion of the HTML-based Web content into scalable content that supports a scalable resolution-independent representation of the Web page that preserves the original page layout, functionality and design of the content defined by its original format when scaled and rendered; and

employing the scalable content to render the Web page on the display using a first scale factor; and

enabling the Web page to be displayed at a different resolution by scaling the scalable content using a second scale factor to re-render the display,

wherein the original page layout, functionality, and design of the Web page content are preserved under both the first and second scale factors.

**210**. The method of claim **209**, wherein the display is re-rendered in real-time.

**211**. The method of claim **209**, wherein the device comprises a hand-held device.

**212**. The method of claim **209**, wherein the device comprises one of a desktop computer, notebook computer or laptop computer.

**213**. The method of claim **209**, further comprising enabling a user to pan a view of the Web page in response to a corresponding user input.

**214**. The method of claim **213**, further comprising enabling the view of the Web page to be panned in real-time.

**215**. The method of claim **209**, further comprising enabling a user to browse, zoom, and pan billions of Web pages in a manner that preserves the original layout, functionality, and design of the HTML-based Web page content of each Web page.

**216**. A machine-readable medium having a plurality of instructions tangibly stored thereon, which when executed enable a device to perform operations comprising:

rendering a browser interface via which a user is enabled to request access to a Web page hosted by an Internet Web site, the Web page comprising HTML-based Web content having an original format defining an original width and height of the Web page and an original page layout, functionality, and design of content on the Web page;



retrieving the Web page via the wireless communication means, and translating at least a portion of the HTML-based Web content from its original format into scalable content that supports a scalable resolution-independent representation of the Web page that preserves the original page layout, functionality and design of the content defined by its original format when scaled and rendered; and

scaling the scalable content to render the Web page on the display such that a width of the Web page is rendered to fit across the display.

**217**. The machine-readable medium of claim **216**, wherein execution of the instructions performs further operations comprising enabling the user to zoom in on a user-selectable portion of a display of the Web page in response to a corresponding user interface input.

**218**. The machine-readable medium of claim **217**, wherein the display of the Web page is re-rendered in real-time to effect zooming operations.

**219**. The machine-readable medium of claim **216**, wherein the Web page includes at least one hyperlink, and wherein execution of the instructions performs further operations comprising:

enabling the user to select the hyperlink; and, in response thereto,

retrieving and translating Web content associated with the hyperlink to produce additional scalable content; and

employing the additional scalable content to render the Web content associated with the hyperlink on the display.

**220**. The machine-readable medium of claim **216**, wherein execution of the instructions performs further operations comprising:

parsing markup language code to determine the original page layout of display content within the Web page, wherein the original page layout defines a layout location for a plurality of objects, including at least one of text objects, graphic layout objects, or graphic image objects included in the Web page;

defining a primary datum corresponding to the original page layout; and,

for each object,

defining an object datum corresponding to the layout location for the object;

generating a vector from the primary datum to the object datum for the object; and

creating a reference that links the object to the vector that is generated.

**221**. The machine-readable medium of claim **216**, wherein execution of the instructions performs further operations comprising enabling the Web page to be displayed at different resolutions by scaling the scalable content to re-render the display in response to associated user inputs,

wherein the original page layout, functionality, and design of the Web page content are preserved at each of the different resolutions.

**222**. The machine-readable medium of claim **216**, wherein execution of the instructions performs further operations comprising returning the display of the Web page to a previous view in response to a corresponding user input.

**223**. The machine-readable medium of claim **216**, wherein execution of the instructions performs further operations

comprising enabling a user to pan a view of the Web page in response to a corresponding user input.

**224**. The machine-readable medium of claim **223**, wherein execution of the instructions performs further operations comprising enabling the view of the Web page to be panned in real-time.

**225**. The machine-readable medium of claim **216**, wherein the page layout of the Web page is defined to have an original aspect ratio, and wherein the scalable content is scaled when rendered so as to produce a display of the Web page having a different aspect ratio.

**226**. The machine-readable medium of claim **216**, wherein execution of the instructions performs further operations comprising enabling a user to zoom on a column of the Web page via a corresponding user input, wherein in response thereto, the display is re-rendered such that content corresponding to the selected column is enlarged.

**227**. The machine-readable medium of claim **226**, wherein the corresponding user input comprises tapping on the column via the display.

**228**. The machine-readable medium of claim **226**, wherein the display is re-rendered such that content corresponding to the selected column is rendered to fit across the display.

**229**. The machine-readable medium of claim **226**, wherein the content of the column is reformatted to fit characteristics of the display when the display is re-rendered.

**230**. The machine-readable medium of claim **216**, wherein the Web content includes at least one image, and wherein execution of the instructions performs further operations comprising enabling a user to zoom on an image via a corresponding user input, wherein in response thereto, the display is re-rendered such that the image is enlarged.

**231**. The machine-readable medium of claim **230**, wherein the corresponding user input comprises tapping on the image via the display.

**232**. The machine-readable medium of claim **230**, wherein the display is re-rendered such that the image is rendered to fit across the display.

**233**. The machine-readable medium of claim **216**, wherein execution of the instructions performs further operations comprising enabling a user to zoom on a paragraph of the Web content via a corresponding user input, wherein in response thereto, the display is re-rendered such that content corresponding to the selected paragraph is enlarged.

**234**. The machine-readable medium of claim **233**, wherein the corresponding user input comprises tapping on the paragraph via the display.

**235**. The machine-readable medium of claim **233**, wherein the content of the paragraph is reformatted to fit characteristics of the display when the display is re-rendered.

**236**. The machine-readable medium of claim **233**, wherein the display is re-rendered such that content corresponding to the selected paragraph is rendered to fit across the display.

**237**. The machine-readable medium of claim **216**, wherein the Web page includes text, layout attributes, and images, and wherein execution of the instructions performs further operations comprising:

- receiving content corresponding to the text and layout attributes via a first connection; and
- receiving content corresponding to at least one image via a second connection.

**238**. The machine-readable medium of claim **216**, wherein execution of the instructions performs further operations comprising:

- generating a vector-based display list associated with the scalable content; and
- employing the display list to re-render the display at different scale factors to zoom the Web page.

**239**. The machine-readable medium of claim **216**, wherein execution of the instructions performs further operations comprising:

- parsing markup language code corresponding to the retrieved Web page to determine the original page layout of the content on the Web page;
- logically grouping selected content into objects;
- defining a primary datum corresponding to the original page layout; and,
- for each object,
  - defining an object datum corresponding to a layout location datum for the object's associated display content;
  - generating a vector from the primary datum to the object datum for the object; and
  - creating a reference that links the object to the vector that is generated.

**240**. The machine-readable medium of claim **239**, wherein execution of the instructions performs further operations comprising:

- generating a bounding box for each object, the bounding box representing a portion of a rendered display page occupied by the object's associated group of content.

**241**. The machine-readable medium of claim **240**, wherein execution of the instructions performs further operations comprising:

- mapping the object vectors and associated bounding boxes to a virtual display in memory.

**242**. The machine-readable medium of claim **241**, wherein execution of the instructions performs further operations comprising:

- enabling a user to view the Web page at a user-selectable zoom level and panned view by,
  - determining a first scale factor and offset in response to one or more corresponding user inputs defining a user-selectable zoom level and panned view corresponding to a rendered display of the Web page desired by a user; and
  - determining a virtual display bounding box for the virtual display associated with the first scale factor and offset;
  - identifying object bounding boxes having at least a portion falling within the virtual display bounding box; and,
  - for each of such object bounding boxes,
    - retrieving content associated with that object bounding box;
    - applying an appropriate scale factor to the content associated with that object bounding box to produce scaled content; and
    - rendering the portion of scaled content within the virtual display bounding box to render the content on the display.

**243**. The machine-readable medium of claim **216**, wherein the scalable content includes scalable text content, and wherein execution of the instructions performs further operations comprising scaling a scalable font to render the scalable text content.

**244**. The machine-readable medium of claim **216**, wherein at least a portion of the instructions comprise Java-based instructions.

**245**. The machine-readable medium of claim **216**, wherein the device comprises a mobile phone.

**246**. The machine-readable medium of claim **216**, wherein the device comprises a hand-held device.

**247**. The machine-readable medium of claim **216**, wherein the Web page is accessed via a mobile service provider network.

**248**. The machine-readable medium of claim **216**, wherein a portion of the scalable content comprises vector-based content.

**249**. The machine-readable medium of claim **216**, wherein the device comprises one of a desktop computer, notebook computer or laptop computer.

**250**. The machine-readable medium of claim **216**, wherein the instructions are embodied as a Web browser.

**251**. The machine-readable medium of claim **216**, wherein execution of the instructions enables a user to browse, zoom, and pan billions of Web pages in a manner that preserves the original layout, functionality, and design of the HTML-based Web page content of each Web page.

**252**. A machine-readable medium having a plurality of instructions comprising a Web browser tangibly stored thereon, which when executed enable a device to perform operations comprising:

rendering a browser interface on a display associated with the device via which a user is enabled to request access to a Web page comprising HTML-based Web content defining an original page layout, functionality, and design of content on the Web page;

retrieving the Web page and processing HTML-based Web content to produce scalable content; and

employing at least one of the scalable content or data derived therefrom to,

render the Web page on the display; and

re-render the display in response to associated user inputs to enable the Web page to be browsed at various zoom levels and panned views while preserving the original page layout, functionality, and design of the Web page content at each zoom level and panned view of the Web page,

wherein the Web browser enables a user of the device to browse, zoom, and pan billions of Web pages in a manner that preserves the original layout, functionality, and design of the HTML-based Web page content of each Web page at each zoom level and panned view.

**253**. The machine-readable medium of claim **252**, wherein the device comprises a mobile phone.

**254**. The machine-readable medium of claim **252**, wherein the device comprises a hand-held device.

**255**. The machine-readable medium of claim **252**, wherein execution of the instructions performs further operations comprising enabling the user to zoom in on a user-selectable portion of a display of the Web page in response to a user interface input.

**256**. The machine-readable medium of claim **255**, wherein the user interface input enables the user to define an area of a current view of the Web page on which to zoom in on.

**257**. The machine-readable medium of claim **252**, wherein the display of the Web page is re-rendered in real-time to effect zooming operations.

**258**. The machine-readable medium of claim **252**, wherein the Web page includes at least one hyperlink, and wherein execution of the instructions performs further operations comprising:

enabling the user to select the hyperlink; and, in response thereto,

retrieving and processing HMTL-based Web content associated with the hyperlink to produce additional scalable content; and



employing at least one of the additional scalable content or data derived therefrom to render the Web content associated with the hyperlink on the display.

**259**. The machine-readable medium of claim **252**, wherein at least a portion of the scalable content comprises scalable vector-based content.

**260**. The machine-readable medium of claim **252**, wherein execution of the instructions performs further operations comprising returning the display of the Web page to a previous view in response to a corresponding user input made via the display.

**261**. The machine-readable medium of claim **252**, wherein execution of the instructions performs further operations comprising enabling a user to pan a view of the Web page in response to a corresponding user input made via the display.

**262**. The machine-readable medium of claim **252**, wherein execution of the instructions performs further operations comprising enabling the view of the Web page to be panned in real-time.

**263**. The machine-readable medium of claim **252**, wherein the page layout of the Web page is defined to have an original aspect ratio, and wherein said at least one of scalable content or data derived therefrom is scaled to render a display of the Web page having a different aspect ratio.

**264**. The machine-readable medium of claim **252**, wherein execution of the instructions performs further operations comprising enabling a user to zoom on a column of the Web content via a corresponding user input, wherein in response thereto, the display is re-rendered such that content corresponding to the selected column is rendered to fit across the display.

**265**. The machine-readable medium of claim **264**, wherein the corresponding user input comprises tapping on the column via the display.

**266**. The machine-readable medium of claim **264**, wherein the content of the column is reformatted to fit characteristics of the display when the display is re-rendered.

**267**. The machine-readable medium of claim **252**, wherein the Web content includes at least one image, and wherein execution of the instructions performs further operations comprising enabling a user to zoom on an image via a corresponding user input, wherein in response thereto, the display is re-rendered such that the image is rendered to fit across the display.

**268**. The machine-readable medium of claim **267**, wherein the corresponding user input comprises tapping on the image via the display.

**269**. The machine-readable medium of claim **252**, wherein execution of the instructions performs further operations comprising enabling a user to zoom on a paragraph of the Web page via a corresponding user input, wherein in response thereto, the display is re-rendered such that content corresponding to the selected paragraph is rendered to fit across a browser display area of the display.

**270**. The machine-readable medium of claim **269**, wherein the corresponding user input comprises tapping on the paragraph via the display.

**271**. The machine-readable medium of claim **269**, wherein the content of the paragraph is reformatted to fit characteristics of the display area when the display is re-rendered.

**272**. The machine-readable medium of claim **252**, wherein the Web page includes text, layout attributes, and images, and wherein execution of the instructions performs further operations comprising:

receiving content corresponding to the text and layout attributes via a first connection; and

receiving content corresponding to at least one image via a second connection.

**273**. The machine-readable medium of claim **252**, wherein the device includes dynamic memory having at least a portion employed for rendering purposes, and wherein execution of the instructions performs further operations comprising:

building a display list via use of the scalable content and rendering display list content on a virtual display in the dynamic memory; and

scaling the display list content to re-render the display of the Web page.

**274**. The machine-readable medium of claim **252**, wherein execution of the instructions performs further operations comprising:

parsing HTML-based code corresponding to the retrieved Web page to determine the original page layout of the content on the Web page;

logically grouping selected content into objects;

defining a primary datum corresponding to the original page layout; and,

for each object,

defining an object datum corresponding to a layout location datum for the object's associated display content;

generating a vector from the primary datum to the object datum for the object; and

creating a reference that links the object to the vector that is generated.

**275**. The machine-readable medium of claim **274**, wherein execution of the instructions performs further operations comprising:

generating a bounding box for each object, the bounding box representing a portion of a rendered display page occupied by the object's associated group of content.

**276**. The machine-readable medium of claim **275**, wherein the device includes dynamic memory having at least a portion employed for rendering purposes, and wherein execution of the instructions performs further operations comprising:

mapping the object vectors and associated bounding boxes to a virtual display in the dynamic memory.

**277**. The machine-readable medium of claim **276**, wherein execution of the instructions performs further operations comprising:

enabling a user to view the Web page at a user-selectable zoom level and panned view by,

determining a first scale factor and offset in response to one or more corresponding user inputs defining a user-selectable zoom level and panned view corresponding to a rendered display of the Web page desired by a user;

determining a virtual display bounding box for the virtual display associated with the first scale factor and offset;

identifying object bounding boxes having at least a portion falling within the virtual display bounding box; and,

for each of such object bounding boxes,

retrieving content associated with that object bounding box;

applying an appropriate scale factor to the content associated with that object bounding box to produce scaled content; and

rendering the portion of scaled content within the virtual display bounding box to render the content on the display.

**278**. The machine-readable medium of claim **252**, wherein the scalable content includes scalable text content, and wherein execution of the instructions performs further operations comprising scaling a scalable font to render the scalable text content.

**279**. The machine-readable medium of claim **252**, wherein the original format of the Web page defines a height and width for the Web page, and wherein execution of the instructions performs further operations comprising:

determining an applicable scale factor to display at least one of the width and height of the Web page across a browser display area of the display; and

employing the scale factor to render the browser display area.

**280**. The machine-readable medium of claim **252**, wherein at least a portion of the instructions comprise Java-based instructions.

**281**. The machine-readable medium of claim **252**, wherein a portion of the HTML-based Web content comprises XML code.

**282**. The machine-readable medium of claim **252**, wherein a portion of the HTML-based Web content comprises cascaded style sheet data defining aspects of the Web page design that are preserved at each zoom level and panned view.

**283**. The machine-readable medium of claim **252**, wherein a portion of the scalable content comprises vector-based content.

**284**. The machine-readable medium of claim **252**, wherein the device comprises one of a desktop computer, notebook computer or laptop computer.

**285**. A machine-readable medium having a plurality of instructions tangibly stored thereon, which when executed enable a wireless device to perform operations comprising:

rendering a browser interface on a display of the wireless device via which a user is enabled to request access to a Web page comprising HTML-based Web content defining an original page layout, functionality, and design of content on the Web page;

in response to a user request of the Web page,

retrieving the Web page via the wireless device;

rendering the Web page such that a width of the Web page is rendered to fit across the display; and

re-rendering the Web page in response to associated user inputs to enable the Web page to be browsed at various zoom levels and panned views while preserving the original page layout, functionality, and design of the Web page content at each zoom level and panned view.

**286**. The machine-readable medium of claim **285**, wherein execution of the instructions performs further operations comprising enabling a user to zoom on a column of the Web page via a corresponding user input, wherein in response thereto, the display is re-rendered such that content corresponding to the selected column is enlarged.

**287**. The machine-readable medium of claim **286**, wherein the corresponding user input comprises tapping on the column via the display.

**288**. The machine-readable medium of claim **286**, wherein the content of the column is reformatted to fit characteristics of the display when the display is re-rendered.

**289**. The machine-readable medium of claim **286**, wherein the display is re-rendered such that content corresponding to the selected column is rendered to fit across the display.

**290**. The machine-readable medium of claim **285**, wherein the Web page includes at least one image, and wherein execution of the instructions performs further operations comprising enabling a user to zoom on an image via a corresponding user input, wherein in response thereto, the display is re-rendered such that the image is enlarged.

**291**. The machine-readable medium of claim **290**, wherein the corresponding user input comprises tapping on the image via the display.

**292**. The machine-readable medium of claim **290**, wherein the display is re-rendered such that the image is rendered to fit across the display.

**293**. The machine-readable medium of claim **285**, wherein execution of the instructions performs further operations comprising enabling a user to zoom on a paragraph of the Web page via a corresponding user input, wherein in response thereto, the display is re-rendered such that content corresponding to the selected paragraph is enlarged.

**294**. The machine-readable medium of claim **293**, wherein the corresponding user input comprises tapping on the paragraph via the display.

**295**. The machine-readable medium of claim **293**, wherein the content of the paragraph is reformatted to fit characteristics of the display when re-rendered.

**296**. The machine-readable medium of claim **293**, wherein the display is re-rendered such that content corresponding to the selected paragraph is rendered to fit across the display.

**297**. The machine-readable medium of claim **285**, wherein execution of the instructions performs further operations comprising enabling a user to pan a display of the web page while in a zoomed state under which a portion of the web page is displayed.

**298**. The machine-readable medium of claim **285**, wherein execution of the instructions performs further operations comprising returning the display of the Web page to a previous view in response to a corresponding user input.

**299**. The machine-readable medium of claim **285**, wherein the display of the Web page is re-rendered in real-time to effect zooming operations.

**300**. The machine-readable medium of claim **285**, wherein execution of the instructions performs further operations comprising enabling a user to pan a view of the Web page in response to a corresponding user input made via the display.

**301**. The machine-readable medium of claim **285**, wherein execution of the instructions performs further operations comprising enabling the view of the Web page to be panned in real-time.

**302**. The machine-readable medium of claim **285**, wherein the Web page includes text, layout attributes, and images, and wherein execution of the instructions performs further operations comprising:

receiving content corresponding to the text and layout attributes via a first connection; and

receiving content corresponding to at least one image via a second connection.

**303**. The machine-readable medium of claim **285**, wherein a portion of the HTML-based Web content comprises XML code.

**304**. The machine-readable medium of claim **285**, wherein a portion of the HTML-based Web content comprises cascaded style sheet data defining aspects of the Web page design that are preserved at each zoom level and panned view.

**305**. The machine-readable medium of claim **285**, wherein the wireless device is configured to connect to a mobile service provider network and retrieve the Web page via the mobile service provider network.

**306**. The machine-readable medium of claim **285**, wherein the wireless device comprises a mobile phone.

**307**. The machine-readable medium of claim **285**, wherein the wireless device comprises a hand-held device.

**308**. The machine-readable medium of claim **285**, wherein the wireless device comprises one of a notebook computer or laptop computer.



**309**. The machine-readable medium of claim **285**, wherein the instructions are embodied as a Web browser.

**310**. The machine-readable medium of claim **285**, wherein execution of the instructions enables a user to browse, zoom, and pan billions of Web pages in a manner that preserves the original layout, functionality, and design of the HTML-based Web page content of each Web page.

**311**. A machine-readable medium having a plurality of instructions comprising a Web browser stored thereon, which when executed enable a device to perform operations comprising:

launching a Web browser including a browser interface via which a user is enabled to request access to a Web page, the Web page comprising HTML-based Web content having an original format including HTML code defining an original page layout, functionality, and design of corresponding content on the Web page;

retrieving, and translating at least a portion of the HTML-based Web content into scalable content that supports a scalable resolution-independent representation of the Web page that preserves the original page layout, functionality and design of the content defined by its original format when scaled and rendered; and

employing the scalable content to render the Web page on the Web browser using a first scale factor; and

enabling the Web page to be displayed at a different resolution by scaling the scalable content using a second scale factor to re-render the Web page on the Web browser,

wherein the original page layout, functionality, and design of the Web page content are preserved under both the first and second scale factors, and

wherein the Web browser enables a user of the device to browse billions of Web pages at multiple scale factors in a manner that preserves the original layout, functionality, and design of the HTML-based Web page content of each Web page at each scale factor.

**312**. The machine-readable medium of claim **311**, wherein the display is re-rendered in real-time.

**313**. The machine-readable medium of claim **311**, wherein the Web browser is configured to be installed on a hand-held device.

**314**. The machine-readable medium of claim **311**, wherein the Web browser is configured to be installed on at least one of a desktop computer, notebook computer or laptop computer.

**315**. The machine-readable medium of claim **311**, wherein execution of the instructions performs further operations comprising enabling a user to pan a view of the Web page in response to a corresponding user input.

**316**. The machine-readable medium of claim **315**, wherein execution of the instructions performs further operations comprising enabling the view of the Web page to be panned in real-time.

**317**. A hand-held wireless device, comprising:

a processor,

a wireless communications interface, to facilitate wireless communication with a network that supports access to the Internet;

a display; and

non-volatile memory, operatively coupled to the processor, in which software comprising a browser is stored, the browser comprising a plurality of instructions that when executed by the processor enable the device to perform operations including,

rendering a browser interface on the display via which a user is enabled to request access to a Web page includ-

ing at least one image, at least one column, at least one hyperlink to an external reference and having a width and height;

retrieving the Web page via the wireless communications interface;

rendering the Web page on the display such that at least one of the width and height of the Web page is fully displayed; and

enabling the user to,

zoom and pan a view of the Web page;

activate a currently displayed hyperlink to an external reference while at a given zoom level and panned view, wherein in response to an activation of a hyperlink to an external reference, Web content associated with the external reference is retrieved and rendered on the display;

zoom in on an image of the Web page by tapping on the image via the display;



zoom in on a column of the Web page by tapping on the column via the display; and

zoom out to a previous view of the Web page.

**318**. The hand-held wireless device of claim **317**, wherein the Web page comprises HTML-based Web page content defining an original page layout, functionality, and design of the Web page content, and wherein the browser renders the Web page such that the original page layout, functionality, and design of the Web page are preserved at any selectable zoom level.

**319**. The hand-held wireless device of claim **318**, wherein the user is enabled to browse, zoom, and pan billions of Web pages in a manner that preserves the original layout, functionality, and design of the HTML-based Web page content of each Web page.

* * * * *

(12) **INTER PARTES REVIEW CERTIFICATE** (110th)
**United States Patent** (10) **Number: US 7,461,353 K1**
**Rohrabaugh et al.** (45) **Certificate Issued: Jan. 12, 2016**

(54) **SCALABLE DISPLAY OF INTERNET CONTENT ON MOBILE DEVICES**

(75) Inventors: **Gary B. Rohrabaugh**; **Scott A. Sherman**

(73) Assignee: **SOFTVIEW L.L.C.**

**Trial Numbers:**

IPR2013-00007 filed Oct. 2, 2012
IPR2013-00256 filed Apr. 29, 2013

**Petitioners:** Kyocera Corporation; Motorola Mobility LLC

**Patent Owner:** Softview LLC

**Inter Partes Review Certificate for:**

Patent No.: **7,461,353**
Issued: **Dec. 2, 2008**
Appl. No.: **11/045,757**
Filed: **Jan. 28, 2005**

The results of joined IPR2013-00007 and IPR2013-00256 are reflected in this inter partes review certificate under 35 U.S.C. 318(b).

# INTER PARTES REVIEW CERTIFICATE
## U.S. Patent 7,461,353 K1
## Trial No. IPR2013-00007
## Certificate Issued Jan. 12, 2016

1

2

AS A RESULT OF THE INTER PARTES REVIEW PROCEEDING, IT HAS BEEN DETERMINED THAT:

Claims **1**, **33**, **36**, **43**, **48**, **51**, **52**, **58**, **59**, **66**, **118**, **138**, **139**, **149**, **183**, **252**, **283** and **317** are cancelled.

* * * * *

US007461353C1

(12) **EX PARTE REEXAMINATION CERTIFICATE** (11231st)

**United States Patent** (10) **Number: US 7,461,353 C1**

**Rohrabaugh et al.** (45) **Certificate Issued: *Dec. 29, 2017**

(54) **SCALABLE DISPLAY OF INTERNET CONTENT ON MOBILE DEVICES**

(75) Inventors: **Gary B. Rohrabaugh**, Bellingham, WA (US); **Scott A. Sherman**, Bellingham, WA (US)

(73) Assignee: **SOFTVIEW L.L.C.**, Bellingham, WA (US)

**Reexamination Request:**
No. 90/009,994, Apr. 13, 2012

**Reexamination Certificate for:**

| | |
|---|---|
| Patent No.: | **7,461,353** |
| Issued: | **Dec. 2, 2008** |
| Appl. No.: | **11/045,757** |
| Filed: | **Jan. 28, 2005** |

Certificate of Correction issued Apr. 21, 2009

( * ) Notice: This patent is subject to a terminal disclaimer.

**Related U.S. Application Data**

(60) Division of application No. 09/878,097, filed on Jun. 8, 2001, now Pat. No. 7,210,099, which is a
(Continued)

(51) **Int. Cl.**
***G06F 17/00*** (2006.01)
***G06F 17/21*** (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC .......... ***G06F 17/211*** (2013.01); ***G06F 3/0488*** (2013.01); ***G06F 9/4443*** (2013.01); ***G06F 17/2235*** (2013.01); ***G06F 17/2247*** (2013.01); ***G06F 17/30896*** (2013.01); ***G06F 17/30905*** (2013.01); ***H04L 67/04*** (2013.01); ***H04L 67/2823*** (2013.01); *G06F 3/0481* (2013.01); *G06F 17/3089* (2013.01); *G06F 17/30861* (2013.01); *G06F 17/30899* (2013.01); *G06F 17/30902* (2013.01); *G06F 2203/04806* (2013.01); *G06F 2212/1048* (2013.01);
(Continued)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 90/009,994, please refer to the USPTO's public Patent Application Information Retrieval (PAIR) system under the Display References tab.

*Primary Examiner* — Adam L Basehoar

(57) **ABSTRACT**

Mobile devices enabled to support resolution-independent scalable display of Internet (Web) content to allow Web pages to be scaled (zoomed) and panned for better viewing on smaller screen sizes. The mobile devices employ software-based processing of original Web content, including HTML-based content, XML, cascade style sheets, etc. to generate scalable content. The scalable content and/or data derived therefrom are then employed to enable the Web content to be rapidly rendered, zoomed, and panned. Moreover, the rendered displays provide substantially the same or identical layout as the original Web page, enabling users to easily navigate to selected content and features on familiar Web pages. Display lists may also be employed to provide further enhancements in rendering speed. Additionally, hardware-based programmed logic may be employed to facilitate various operations.

**At the time of issuance and publication of this certificate, the patent remains subject to pending reexamination control numbers 95/000,634 and 95/002,132 filed May 20, 2011 and Aug. 31, 2012 respectively. The claim content of the patent may be subsequently revised if a reexamination certificate issues from the reexamination proceedings.**



**Related U.S. Application Data**

continuation-in-part of application No. 09/828,511, filed on Apr. 7, 2001, now abandoned.

(60) Provisional application No. 60/211,019, filed on Jun. 12, 2000, provisional application No. 60/217,345, filed on Jul. 11, 2000.

(51) **Int. Cl.**

| | |
|---|---|
| ***H04L 29/08*** | (2006.01) |
| ***G06F 3/0488*** | (2013.01) |
| ***G06F 17/22*** | (2006.01) |
| ***G06F 9/44*** | (2006.01) |
| *G09G 5/24* | (2006.01) |
| *G06F 3/0481* | (2013.01) |
| *G06F 17/30* | (2006.01) |

(52) **U.S. Cl.**

CPC ....... *G09G 5/24* (2013.01); *G09G 2340/0407* (2013.01); *G09G 2340/0492* (2013.01); *H04L 67/02* (2013.01)

# EX PARTE REEXAMINATION CERTIFICATE

THE PATENT IS HEREBY AMENDED AS INDICATED BELOW.

**Matter enclosed in heavy brackets [ ] appeared in the patent, but has been deleted and is no longer a part of the patent; matter printed in italics indicates additions made to the patent.**

AS A RESULT OF REEXAMINATION, IT HAS BEEN DETERMINED THAT:

Claims **1**, **33**, **36**, **43**, **48**, **51**, **52**, **58**, **59**, **66**, **118**, **138**, **139**, **149**, **183**, **252**, **283** and **317** were previously cancelled.

Claims **84** and **220** are cancelled.

Claims **5**, **23-27**, **60**, **61**, **122**, **137**, **140**, **141**, **147**, **156**, **174-177**, **238-242**, **248**, **259** and **274-277** are determined to be patentable as amended.

New claims **320-322** are added and determined to be patentable.

Claims **2-4**, **6-22**, **28-32**, **34**, **35**, **37-42**, **44-47**, **49**, **50**, **53-57**, **62-65**, **67-83**, **85-117**, **119-121**, **123-136**, **142-146**, **148**, **150-155**, **157-173**, **178-182**, **184-219**, **221-237**, **243-247**, **249-251**, **253-258**, **260-273**, **278-282**, **284-316**, **318** and **319** were not reexamined.

**5**. [The wireless device of claim **1**, wherein execution of the instructions performs further operations comprising:] *A wireless device, comprising:*

*processing means;*

*wireless communications means, to facilitate wireless communication with a network that supports access to the Internet;*

*a display;*

*memory; and*

*storage means, in which a plurality of instructions are stored that when executed by the processing means enable the wireless device to perform operations including,*

*rendering a browser interface via which a user is enabled to request access to an original Web page, the Web page comprising HTML-based Web content having an original format defining an original width and height of the Web page and an original page layout, functionality, and design of content on the Web page;*

*in response to a user request to access the Web page, retrieving the Web page via the wireless communication means, and translating the HTML-based Web content from its original format into scalable content that supports a scalable resolution-independent representation of the Web page that preserves the original page layout, functionality and design of the content defined by its original format when scaled and rendered; and*

*scaling the scalable content to render the Web page on the display such that a width of the Web page is rendered to fit across the display; and*

parsing markup language code to determine the original page layout of display content within the Web page, wherein the original page layout defines a layout location for a plurality of *HTML* objects, including [at least one of] *HTML* text objects, *HTML* graphic layout



objects, [or] *and HTML* graphic image objects included in the *HTML-based Web content for the* Web page;

defining a primary datum corresponding to the original page layout; and, for each *HTML* object,

defining an object datum corresponding to the layout location for the *HTML* object;

generating a vector from the primary datum to the object datum for the *HTML* object; and

creating a reference that links the *HTML* object to the vector that is generated.

**23**. The wireless device of claim [**1**] *5*, wherein execution of the instructions performs further operations comprising:

generating a vector-based display list associated with the scalable content; and

employing the display list to re-render the display at different scale factors to zoom the Web page.

**24**. [The wireless device of claim **1**, wherein execution of the instructions performs further operations comprising:] *A wireless device, comprising:*

*processing means;*

*wireless communications means, to facilitate wireless communication with a network that supports access to the Internet;*

*a display;*

*memory; and*

*storage means, in which a plurality of instructions are stored that when executed by the processing means enable the wireless device to perform operations including,*

*rendering a browser interface via which a user is enabled to request access to an original Web page, the Web page comprising HTML-based Web content having an original format defining an original width and height of the Web page and an original page layout, functionality, and design of content on the Web page;*

*in response to a user request to access the Web page, retrieving the Web page via the wireless communication means, and translating the HTML-based Web content from its original format into scalable content that supports a scalable resolution-independent representation of the Web page that preserves the original page layout, functionality and design of the content defined by its original format when scaled and rendered; and*

*scaling the scalable content to render the Web page on the display such that a width of the Web page is rendered to fit across the display; and*

parsing markup language code corresponding to the retrieved Web page to determine the original page layout of the content on the Web page;

logically grouping selected content into *HTML* objects;

defining a primary datum corresponding to the original page layout; and,

for each *HTML* object,

defining an object datum corresponding to a layout location datum for the *HTML* object's associated display content;

generating a vector from the primary datum to the object datum for the *HTML* object; and

creating a reference that links the *HTML* object to the vector that is generated.

**25**. The wireless device of claim **24**, wherein execution of the instructions performs further operations comprising:

generating a bounding box for each *HTML* object, the bounding box representing a portion of a rendered display page occupied by the *HTML* object's associated group of content.

**26**. The wireless device of claim **25**, wherein execution of the instructions performs further operations comprising:

mapping the *HTML* object vectors and associated bounding boxes to a virtual display in memory.

**27**. The wireless device of claim **26**, wherein execution of the instructions performs further operations comprising:

enabling a user to view the Web page at a user-selectable zoom level and panned view by,

determining a first scale factor and offset in response to one or more corresponding user inputs defining a user-selectable zoom level and panned view corresponding to a rendered display of the Web page desired by a user; and

determining a virtual display bounding box for the virtual display associated with the first scale factor and offset;

identifying *HTML* object bounding boxes having at least a portion falling within the virtual display bounding box; and,

for each of such *HTML* object bounding boxes,

retrieving content associated with that *HTML* object bounding box;

applying an appropriate scale factor to the content associated with that *HTML* object bounding box to produce scaled content; and

rendering the portion of scaled content within the virtual display bounding box to render the content on the display.

**60**. [The mobile hand-held device of claim **59**, further comprising] *A mobile hand-held device, comprising:*

*a processor,*

*a wireless communications device, to facilitate wireless communication with a network that supports access to the Internet;*

*a display; and*

*flash memory, operatively coupled to the processor, in which a plurality of instructions are stored that when executed by the processor enable the mobile hand-held device to perform operations including,*

*rendering a browser interface via which a user is enabled to request access to a Web page comprising HTML-based Web content defining an original page layout, functionality, and design of content on the Web page;*

*retrieving the Web page via the wireless communications device, and processing the HTML-based Web content to produce scalable content; and*

*employing at least one of the scalable content or data derived therefrom to,*

*render the Web page on the display; and*

*re-render the display in response to associated user inputs to enable the Web page to be browsed at various zoom levels and panned views while preserving the original page layout, functionality, and design of the Web page content at each zoom level and panned view;*

*wherein execution of the instructions performs further operations comprising:*

*parsing HTML-based code corresponding to the retrieved Web page to determine the original page layout of the content on the Web page;*

*logically grouping selected content into HTML objects;*



*defining a primary datum corresponding to the original page layout and, for each HTML object,*

*defining an object datum corresponding to a layout location datum for the HTML object's associated display content;*

*generating a vector from the primary datum to the object datum for the HTML object; and*

*creating a reference that links the HTML object to the vector that is generated;*

*wherein execution of the instructions performs further operations comprising:*

*generating a bounding box for each HTML object, the bounding box representing a portion of a rendered display page occupied by the HTML object's associated group of content and*

dynamic memory having at least a portion employed for rendering purposes, wherein execution of the instructions performs further operations comprising:

mapping the *HTML* object vectors and associated bounding boxes to a virtual display in the dynamic memory.

**61**. The mobile hand-held device of claim **60**, wherein execution of the instructions performs further operations comprising:

enabling a user to view the Web page at a user-selectable zoom level and panned view by,

determining a first scale factor and offset in response to one or more corresponding user inputs defining a user-selectable zoom level and panned view corresponding to a rendered display of the Web page desired by a user;

determining a virtual display bounding box for the virtual display associated with the first scale factor and offset;

identifying *HTML* object bounding boxes having at least a portion falling within the virtual display bounding box; and,

for each of such *HTML* object bounding boxes,

retrieving content associated with that *HTML* object bounding box;

applying an appropriate scale factor to the content associated with that *HTML* object bounding box to produce scaled content; and

rendering the portion of scaled content within the virtual display bounding box to render the content on the display.

**122**. [The method of claim **118**, further comprising:] *A method, comprising:*

*rendering a browser interface on a display of a device via which a user is enabled to request access to a Web page, the Web page comprising HTML-based Web content having an original format defining an original width and height of the Web page and an original page layout, functionality, and design of content on the Web page;*

*in response to a user request to access the Web page,*

*retrieving the Web page via the device, and translating the HTML-based Web content from its original format into scalable content that supports a scalable resolution-independent representation of the Web page that preserves the original page layout, functionality and design of the content defined by its original format when scaled and rendered; and*

*scaling the scalable content to render the Web page on the display such that a width of the Web page is rendered to fit across the display;*

parsing markup language code to determine the original page layout of display content within the Web page, wherein the original page layout defines a layout loca-

tion for a plurality of *HTML* objects, including [at least one of] *HTML* text objects, *HTML* graphic layout objects, [or] *and HTML* graphic image objects included in *the HTML-based Web content for* the Web page;

*logically grouping selected content into HTML objects;*

defining a primary datum corresponding to the original page layout; and,

for each *HTML* object,

defining an object datum corresponding to the layout location for the *HTML* object;

generating a vector from the primary datum to the object datum for the *HTML* object; and

creating a reference that links the *HTML* object to the vector that is generated.

**137**. The method of claim **[118]** *122*, further comprising:

generating a vector-based display list associated with the scalable content; and

employing the display list to re-render the display at different scale factors to zoom the Web page.

**140**. The method of claim **[139]** *122*, further comprising:

*generating a bounding box for each HTML object, the bounding box representing a portion of a rendered display page occupied by the HTML object's associated group of content and*

mapping the *HTML* object vectors and associated bounding boxes to a virtual display in memory.

**141**. The method of claim **140**, further comprising:

enabling a user to view the Web page at a user-selectable zoom level and panned view by,

determining a first scale factor and offset in response to one or more corresponding user inputs defining a user-selectable zoom level and panned view corresponding to a rendered display of the Web page desired by a user; and

determining a virtual display bounding box for the virtual display associated with the first scale factor and offset;

identifying *HTML* object bounding boxes having at least a portion falling within the virtual display bounding box; and,

for each of such *HTML* object bounding boxes,

retrieving content associated with that *HTML* object bounding box;

applying an appropriate scale factor to the content associated with that *HTML* object bounding box to produce scaled content; and

rendering the portion of scaled content within the virtual display bounding box to render the content on the display.

**147**. The method of claim **[118]** *122*, wherein a portion of the scalable content comprises vector-based content.

**156**. The method of claim **[149]** *174*, wherein at least a portion of the scalable content comprises scalable vector-based content.

**174**. [The method of claim **149**, further comprising:] *A method, comprising:*

*rendering a browser interface on a hand-held device via which a user is enabled to request access to a Web page comprising HTML-based Web content defining an original page layout, functionality, and design of content on the Web page;*

*retrieving the Web page via the hand-held device, and processing the HTML-based Web content to produce scalable content; and*

*employing at least one of the scalable content or data derived therefrom to,*

*render the Web page on a display of the hand-held device; and*



*re-render the display in response to associated user inputs to enable the Web page to be browsed at various zoom levels and panned views while preserving the original page layout, functionality, and design of the Web page content at each zoom level and panned view;*

parsing HTML-based code corresponding to the retrieved Web page to determine the original page layout of the content on the Web page;

logically grouping selected content into *HTML* objects;

defining a primary datum corresponding to the original page layout; and,

for each *HTML* object,

defining an object datum corresponding to a layout location datum for the *HTML* object's associated display content;

generating a vector from the primary datum to the object datum for the *HTML* object; and

creating a reference that links the *HTML* object to the vector that is generated.

**175**. The method of claim **174**, further comprising:

generating a bounding box for each *HTML* object, the bounding box representing a portion of a rendered display page occupied by the *HTML* object's associated group of content.

**176**. The method of claim **175**, wherein the hand-held device includes dynamic memory having at least a portion employed for rendering purposes, the method further comprising:

mapping the *HTML* object vectors and associated bounding boxes to a virtual display in the dynamic memory.

**177**. The method of claim **176**, further comprising:

enabling a user to view the Web page at a user-selectable zoom level and panned view by,

determining a first scale factor and offset in response to one or more corresponding user inputs defining a user-selectable zoom level and panned view corresponding to a rendered display of the Web page desired by a user;

determining a virtual display bounding box for the virtual display associated with the first scale factor and offset;

identifying *HTML* object bounding boxes having at least a portion falling within the virtual display bounding box; and,

for each of such *HTML* object bounding boxes,

retrieving content associated with that *HTML* object bounding box;

applying an appropriate scale factor to the content associated with that *HTML* object bounding box to produce scaled content; and

rendering the portion of scaled content within the virtual display bounding box to render the content on the display.

**238**. The machine-readable medium of claim **[216]** *239*, wherein execution of the instructions performs further operations comprising:

generating a vector-based display list associated with the scalable content; and

employing the display list to re-render the display at different scale factors to zoom the Web page.

**239**. [The machine-readable medium of claim **216**, wherein execution of the instructions performs further operations comprising:] *A machine-readable medium having a plurality of instructions tangibly stored thereon, which when executed enable a device to perform operations comprising:*

*rendering a browser interface via which a user is enabled to request access to a Web page hosted by an Internet Web site, the Web page comprising HTML-based Web content having an original format defining an original width and height of the Web page and an original page layout, functionality, and design of content on the Web page;*

*retrieving the Web page via the wireless communication means, and translating the HTML-based Web content from its original format into scalable content that supports a scalable resolution-independent representation of the Web page that preserves the original page layout, functionality and design of the content defined by its original format when scaled and rendered; and*

*scaling the scalable content to render the Web page on the display such that a width of the Web page is rendered to fit across the display;*

parsing markup language code corresponding to the retrieved Web page to determine the original page layout of the content on the Web page;

logically grouping selected content into *HTML* objects;

defining a primary datum corresponding to the original page layout; and,

for each *HTML* object,

defining an object datum corresponding to a layout location datum for the *HTML* object's associated display content;

generating a vector from the primary datum to the object datum for the *HTML* object; and

creating a reference that links the *HTML* object to the vector that is generated.

**240**. The machine-readable medium of claim **239**, wherein execution of the instructions performs further operations comprising:

generating a bounding box for each *HTML* object, the bounding box representing a portion of a rendered display page occupied by the *HTML* object's associated group of content.

**241**. The machine-readable medium of claim **240**, wherein execution of the instructions performs further operations comprising:

mapping the *HTML* object vectors and associated bounding boxes to a virtual display in memory.

**242**. The machine-readable medium of claim **241**, wherein execution of the instructions performs further operations comprising:

enabling a user to view the Web page at a user-selectable zoom level and panned view by,

determining a first scale factor and offset in response to one or more corresponding user inputs defining a user-selectable zoom level and panned view corresponding to a rendered display of the Web page desired by a user; and

determining a virtual display bounding box for the virtual display associated with the first scale factor and offset;

identifying *HTML* object bounding boxes having at least a portion falling within the virtual display bounding box; and,

for each of such *HTML* object bounding boxes,

retrieving content associated with that *HTML* object bounding box;

applying an appropriate scale factor to the content associated with that *HTML* object bounding box to produce scaled content; and

rendering the portion of scaled content within the virtual display bounding box to render the content on the display.



**248**. The machine-readable medium of claim **[216]** *239*, wherein a portion of the scalable content comprises vector-based content.

**259**. The machine-readable medium of claim **[252]** *274*, wherein at least a portion of the scalable content comprises scalable vector-based content.

**274**. **[**The machine-readable medium of claim **252**, wherein execution of the instructions performs further operations comprising:**]** *A machine-readable medium having a plurality of instructions comprising a Web browser tangibly stored thereon, which when executed enable a device to perform operations comprising:*

*rendering a browser interface on a display associated with the device via which a user is enabled to request access to a Web page comprising HTML-based Web content defining an original page layout, functionality, and design of content on the Web page;*

*retrieving the Web page and processing the HTML-based Web content to produce scalable content; and*

*employing at least one of the scalable content or data derived therefrom to,*

*render the Web page on the display; and*

*re-render the display in response to associated user inputs to enable the Web page to be browsed at various zoom levels and panned views while preserving the original page layout, functionality, and design of the Web page content at each zoom level and panned view of the Web page,*

*wherein the Web browser enables a user of the device to browse, zoom, and pan billions of Web pages in a manner that preserves the original layout, functionality, and design of the HTML-based Web page content of each Web page at each zoom level and panned view; and*

parsing HTML-based code corresponding to the retrieved Web page to determine the original page layout of the content on the Web page;

logically grouping selected content into *HTML* objects;

defining a primary datum corresponding to the original page layout; and,

for each *HTML* object,

defining an object datum corresponding to a layout location datum for the *HTML* object's associated display content;

generating a vector from the primary datum to the *HTML* object datum for the object; and

creating a reference that links the *HTML* object to the vector that is generated.

**275**. The machine-readable medium of claim **274**, wherein execution of the instructions performs further operations comprising:

generating a bounding box for each *HTML* object, the bounding box representing a portion of a rendered display page occupied by the *HTML* object's associated group of content.

**276**. The machine-readable medium of claim **275**, wherein the device includes dynamic memory having at least a portion employed for rendering purposes, and wherein execution of the instructions performs further operations comprising:

mapping the *HTML* object vectors and associated bounding boxes to a virtual display in the dynamic memory.

**277**. The machine-readable medium of claim **276**, wherein execution of the instructions performs further operations comprising:

enabling a user to view the Web page at a user-selectable zoom level and panned view by,

determining a first scale factor and offset in response to one or more corresponding user inputs defining a user-selectable zoom level and panned view corresponding to a rendered display of the Web page desired by a user;

determining a virtual display bounding box for the virtual display associated with the first scale factor and offset;

identifying *HTML* object bounding boxes having at least a portion falling within the virtual display bounding box; and,

for each of such *HTML* object bounding boxes,

retrieving content associated with that *HTML* object bounding box;

applying an appropriate scale factor to the content associated with that *HTML* object bounding box to produce scaled content; and

rendering the portion of scaled content within the virtual display bounding box to render the content on the display.

*320. The wireless device of claim 5, wherein the HTML text objects include HTML paragraph objects.*

*321. The wireless device of claim 5, wherein the plurality of HTML objects include an HTML table object, a plurality of HTML table row objects, and a plurality of HTML table data objects.*

*322. The wireless device of claim 321, wherein the HTML-based Web content includes Cascaded Style Sheet (CSS) content defining formatting used to layout content associated with the HTML table object.*

* * * * *

FORM 19. Certificate of Compliance with Type-Volume Limitations

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2023-1005 and 2023-1007

**Short Case Caption:** SoftView LLC v. Apple Inc.

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

- [x] the filing has been prepared using a proportionally-spaced typeface and includes 14,000 words.

- [ ] the filing has been prepared using a monospaced typeface and includes __________ lines of text.

- [ ] the filing contains __________ pages / __________ words / __________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. __________).

Date: 06/01/2023

Signature: /s/ R. Alan Burnett

Name: R. Alan Burnett